**BLOCK & LEVITON LLP**
Whitney E. Street
610 16th Street, Suites 214-216
Oakland, CA  94612
Tel: 415-968-8999
Fax: 617-507-6020
whitney@blockesq.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ELI INZLICHT, derivatively on behalf of MCKESSON CORPORATION, | : | No. |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES |
| | : | |
| ANDY D. BRYANT, WAYNE A. BUDD, JOHN H. HAMMERGREN, M. CHRISTINE JACOBS, MARIE L. KNOWLES and EDWARD A. MUELLER, | : | |
| | : | DEMAND FOR JURY TRIAL |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| MCKESSON CORPORATION, | : | |
| | : | |
| Nominal Defendant. | : | |

1    Plaintiff Eli Inzlicht ("Plaintiff"), by and through his undersigned attorneys, hereby submits

2   this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties (the "Complaint")

3   for the benefit of nominal defendant McKesson Corporation ("McKesson" or the "Company")

4   against certain current members of its Board of Directors (the "Board") and executive officers,

5   seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

6                                    **NATURE OF THE ACTION**

7    1.    This derivative action arises from the McKesson Board's actions in failing to

8   monitor and knowingly causing and permitting the Company to engage in nearly a decade of

9   improper and illegal distribution of controlled substances by selling highly addictive

10   pharmaceuticals to certain of its customers throughout the United States.  On January 17, 2017, the

11   U.S. Department of Justice ("DOJ"), on behalf of the Drug Enforcement Agency ("DEA"),

12   announced that it had reached a $150 million settlement with McKesson arising from the

13   Company's failure to report suspicious orders of addictive painkillers in violation of the Controlled

14   Substances Act ("CSA") (the "2017 DEA Settlement").  As part of the DEA Settlement, McKesson

15   also must suspend sales of controlled substances from its distribution centers in Colorado, Ohio,

16   Michigan and Florida for several years.  These suspensions were amongst the most severe ever

17   agreed to by a DEA registered pharmaceutical distributor.  The Company will also be subject to

18   new and enhanced compliance obligations and must maintain internal controls to assess compliance

19   with the new obligations.  In connection with the 2017 DEA Settlement, the DEA revealed that

20   since 2008 McKesson supplied various pharmacies with increasing amounts of oxycodone and

21   hydrocodone pills, both opioid drugs that are frequently misused, and failed to report those

22   suspicious orders in violation of federal law.

23    2.    McKesson's 2017 DEA Settlement follows numerous prior regulatory enforcement

24   actions and warnings well known to the Board.  This was second major penalty imposed by the

25   DEA for the Company's failure to monitor and report suspicious orders.  In 2008, McKesson

26   entered into a settlement agreement with the DOJ and a Memorandum of Agreement with the DEA

27

28
                                              1

1   in connection with McKesson's failure to report suspicious orders of controlled substances to the
2   DEA when discovered, which cost McKesson $13.25 million (the "2008 Agreements").   In
3   connection with the 2008 Agreements, McKesson developed a Controlled Substance Monitoring
4   Program ("CSMP") to assure future compliance with the CSA, in which McKesson recognized that
5   it had a duty to monitor its sales of all controlled substances and report suspicious orders to the
6   DEA.   But the Company's CSMP was an utter failure and did not prevent the Company's
7   misconduct or compliance with the obligations under the 2008 Agreements, a fact which was
8   confirmed by the DEA in the 2017 DEA Settlement.

9          3.     In light of numerous regulatory warnings and communications (detailed below), and
10   the prior fine in connection with the 2008 Agreements for failure to monitor and report suspicious
11   orders to the DEA, McKesson's Board and senior executives knew that continued illegal and
12   improper conduct could subject the Company and its stockholders to grave consequences –
13   including large fines and penalties and suspension of sales in lucrative markets.  Despite these risks
14   and red flags, the Board and senior management threw the dice to see if the rewards from the
15   improper conduct outweighed the negative consequences of being caught ignoring the mandate of
16   the CSMP and the CSA.  But the odds were not in the Company's favor.  The Board's conduct
17   represents direct breaches of fiduciary duties that caused significant harm to the Company.

18         4.     In order to push sales and increase revenues, the recidivist Board, knowingly
19   disregarded signs demonstrating the Company's wrongdoing and allowed the Company and its
20   distribution centers to sell controlled substances to retailers without ensuring compliance with
21   federal laws and regulations and its own internal controls.  The Defendants – a majority of the
22   current Board – are subject to the obligations agreed to by McKesson in the 2017 DEA Settlement
23   and were also directors at the time of, and subject to the obligations of, the 2008 Agreements.
24   Defendants operated McKesson with blatant disregard for the laws governing its business and its
25   own internal controls and policies – Defendants did this despite prior government penalties and
26   agreements to implement internal controls to ensure that McKesson complied with the CSA.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.     This litigation on behalf of McKesson seeks to rectify the conduct of the individuals bearing ultimate responsibility for the Company's blatant misconduct – the Board and senior management – and to impose appropriate responsibility upon those individuals.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states, and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7.     Venue is proper in this District because McKesson conducts business and maintains its principal executive offices this District.   Upon information and belief, one or more of the Defendants resides in this District.  Further, McKesson engages in numerous activities and conducts business here, which had an effect in this District.

## THE PARTIES

8.     Plaintiff is a current shareholder of McKesson, and has continuously held McKesson stock since 2011.  Plaintiff is a citizen of New York.

9.     Nominal corporate defendant McKesson is a Delaware corporation with its principal executive offices located at One Post Street, San Francisco, California 94104.   McKesson is a healthcare services and information technology company. McKesson partners with payers, hospitals, physician offices, pharmacies and pharmaceutical companies to provide prescription drugs and other medical devices and services to patients.   At all relevant times, McKesson distributed or directed the distribution of pharmaceuticals to retail pharmacies and institutional providers in all 50 states in the United States and Puerto Rico.   McKesson is the largest pharmaceutical distributor in North America, delivering one-third of all pharmaceuticals in North America.  McKesson's common stock is traded on the New York Stock Exchange under the ticker symbol "MCK."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10.     Defendant Andy D. Bryant ("Bryant") has served as a director of the Company since January 2008.  Bryant is a citizen of Oregon.

11.     Defendant Wayne A. Budd ("Budd") has served as a director of the Company since October 2003, and is a member of the Board's Audit Committee (the "Audit Committee").  Budd is a citizen of Massachusetts.

12.     Defendant John H. Hammergren ("Hammergren") has served as the Company's President and Chief Executive Officer ("CEO") since 2001 and as Chairman of the Board since 2002.  Hammergren is a citizen of California.

13.     Defendant M. Christine Jacobs ("Jacobs") has served as a director of the Company since January 1999.  Jacobs is a citizen of Georgia.

14.     Defendant Marie L. Knowles ("Knowles") has served as a director of the Company since March 2002, and is the Chair of the Audit Committee.  Knowles is a citizen of California.

15.     Defendant Edward A. Mueller ("Mueller") has served as a director of the Company since April 2008 and as Lead Independent Director since July 2013.   Mueller is a citizen of Colorado.

16.     Defendants Bryant, Budd, Hammergren, Jacobs, Knowles and Mueller collectively referred to as "Defendants."

17.     Defendants Budd and Knowles are collectively referred to as the "Audit Committee Defendants."

**DEFENDANTS' DUTIES**

18.     By reason of their positions as officers, directors, and fiduciaries of McKesson and because of their ability to control the business and corporate affairs of McKesson and its subsidiaries, Defendants owed McKesson and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage McKesson in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of McKesson and its shareholders so as to benefit all stockholders

equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to McKesson and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

19.     McKesson's corporate documents (such as the Company's Corporate Governance Guidelines and the Charter of the Governance Committee of the Board) also expressly detail the Board's duties, including that the Board ensure that the Company operates in a legal and ethically responsible matter.

20.     McKesson maintains, and the directors are obligated to follow, formal Corporate Governance Guidelines, which are specifically adopted by the Board "to assist the Board in the exercise of its responsibilities."  The Corporate Governance Guidelines are meant to ensure that the Company operates in a legal and ethically responsible manner.  As stated in the Corporate Governance Guidelines:

> The business and affairs of the Company shall be conducted under the direction and oversight of the Board.  The members of the Board are elected by the stockholders to oversee management for the benefit of the long-term interests of the stockholders of the Company.  Directors are expected to spend the time and effort necessary to properly discharge their responsibilities.

21.     Under the Corporate Governance Guidelines, the Board is also charged with:

> monitor[ing] both the performance of the Company (in relation to its financial objectives, major goals, strategies and competitors) and the performance of the Company's Chief Executive Officer ("CEO"), and offer him or her constructive advice and feedback.  The Board is also responsible for assuring that the Company's management and employees operate in a legal and ethically responsible manner.

22.     Under the Company's By-Laws and Corporate Governance Guidelines, the Board has responsibility for overseeing the business and affairs of the Company, including risk management, which includes periodic reviews of the Company's enterprise risk management processes for identifying, ranking and assessing risks across the organization.

23.     Additionally, the Company's Code of Conduct (the "Code of Conduct"), which expressly applies to all Defendants, states the following, in part:

Cooperate with Investigations

We are committed to prompt investigation of any concerns brought to our attention. It is important to provide all information requested in any investigation conducted by our company. Always provide accurate information, and do not make untrue or misleading statements or encourage anyone else to do so. Government agencies also may request information from or about our company. If you are contacted by an outside investigator, please contact the Law Department or your Compliance Officer immediately. If you are notified by the Law Department, your Compliance Officer or your manager that documents in your possession are subject to a legal hold or are needed for an investigation, be sure to follow directions and preserve those documents. Under no circumstances should you destroy, conceal, or alter those records in any way.

24.     The Board has several committees to monitor specific aspects of McKesson's business.   These committees have their own charters setting forth additional duties for their respective members.   For example, the charter of the Audit Committee provides that its members have a special obligation to monitor the Company's compliance with the law.   The charter states that the Audit Committee must monitor, among other things, "compliance by the Company with legal and regulatory requirements."   The Audit Committee's duties also include that it:

Discuss annually with the individual(s) with operational responsibility for the compliance and ethics program the implementation and effectiveness of the Company's compliance and ethics program in detecting and preventing violations of law and the Company's Code of Business Conduct and Ethics. [Emphasis added].

25.     According to the McKesson's 2013 Annual Proxy Statement filed with the SEC on June 21, 2013 (the year that the DEA began its investigation of the wrongdoing that led to the 2017 DEA Settlement), the Board as a whole receives periodic reports from the Company's management on various risks, including risks facing the Company's businesses.   The Board has ultimate responsibility for risk management, and has delegated to the Audit Committee certain responsibilities.   The Audit Committee engages in periodic discussions with management concerning the process by which risk assessment and management are undertaken.   To that end, the Audit Committee regularly reviews with the head of Internal Audit the audits or assessments of significant risks conducted by Internal Audit personnel based on their audit plan; and the committee regularly meets in executive sessions with the head of Internal Audit.

26.     Defendants, because of their positions of control and authority as directors and/or officers of McKesson, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with McKesson, each of the Defendants had knowledge of the misconduct described herein.

27.     To discharge their duties, the officers and directors of McKesson were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of McKesson were required to, among other things:

    a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

**A.    Background of the Company, its Long-Standing Failure to Monitor and Report Suspicious Orders, and Agency Reprimands and Warnings**

29.     According to its public filings, McKesson is a healthcare services and information technology company that operates in two segments: distribution solutions and technology solutions. McKesson distributes pharmaceuticals, including controlled and non-controlled prescription medications, to all 50 states in the United States and Puerto Rico through a network of 29

7

distribution centers.  McKesson is North America's largest drug distributor, and reported net revenues of $176 billion in 2015.

30.     McKesson's distribution solutions segment is highly competitive in both price and service.  Price, quality of service, innovation and, in some cases, convenience to the customer are generally the principal competitive elements in this segment.

31.     McKesson's distribution centers are registered with the DEA, which means those distribution centers are required to operate in accordance with the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, *et seq.*, (which includes the CSA) and the regulations promulgated thereunder, 21 C.F.R. Part 1300, *et seq*.

32.     For nearly a decade, Defendants caused and permitted McKesson to openly violate and evade federal laws and regulations pertaining to its products and permitted excessive sales of controlled substances without reporting the suspicious nature of the sales to the DEA.

33.     Defendants' bad acts were eventually noticed by the DEA, who warned McKesson as early as 2005 at an in-person meeting that as a DEA-registered entity, McKesson was required to report to the DEA any suspicious orders of controlled substances.  When McKesson did not heed the warnings of the DEA, the DEA eventually commenced an action against McKesson relating to the Company's distribution of, and failure to report suspicious orders of, controlled substances, particularly oxycodone and hydrocodone, both highly addictive prescription pain killers.

34.     On or about September 27, 2006, February 7, 2007 and December 27, 2007, the DEA's Deputy Assistant Administrator, Office of Diversion Control, sent McKesson letters providing guidance for the identification and reporting of suspicious orders to DEA, as required by 21 C.F.R. §1301.74(b) (the "DEA Letters").

35.     On May 2, 2008, in connection with the 2008 Agreements, Defendants caused McKesson to pay $13.25 million to settle claims that the Company (under Defendants' direction and supervision) failed to report suspicious sales of medications.   The 2008 Agreements settled claims between the Company, the DEA and six U.S. Attorney's Offices for alleged violations of the

Company's obligations under the CSA between 2005 and 2007.  The 2008 Agreements settled claims that McKesson failed to report to the DEA suspicious sales of certain controlled substances to pharmacies that filled orders from illegal "Internet pharmacies" that sell drugs online to customers who do not have a legal prescription.  McKesson also failed to report suspicious orders of controlled substances that it received from other pharmacies and clinics even though the orders were unusually large.

36.     The press release from the DOJ relating to the 2008 Agreements issued on May 2, 2008 detailed McKesson's egregious behavior:

> Three McKesson distribution centers received and filled hundreds of suspicious orders placed by pharmacies participating in illicit Internet schemes, but failed to report the orders to DEA. They did so even after a Sept.1, 2005, meeting at which DEA officials met with and warned McKesson officials about excessive sales of their products to pharmacies filling illegal online prescriptions. The pharmacies filled purported online "prescriptions" for hydrocodone (contained in drugs such as Vicodin), but the prescriptions were issued outside the normal course of professional practice and not for a legitimate medical purpose. The United States Attorneys allege that the orders that McKesson received from these pharmacies were unusually large, unusually frequent, and/or deviated substantially from the normal pattern. As a result, millions of dosage units of controlled substances were diverted from legitimate channels of distribution. (Emphasis added).

37.     As part of the 2008 Agreements, Defendants were required to develop the CSMP under which the Company (under Defendants' direction) recognized it had a duty to monitor its sales of all controlled substances and report suspicious orders to the DEA.

38.     Each of the Defendants was a member of the McKesson Board at the time of the 2008 Agreements, and Hammergren was the Company's President, CEO and Chairman of the Board at that time.

39.     In connection with the first DEA investigation and eventual settlement, the Company first disclosed in its quarterly report on Form 10-Q for the period ending December 31, 2007, filed with the SEC on February 1, 2008, that it was seeking to resolve claims with the DEA and certain U.S. Attorneys General that between 2005 and 2007 certain of McKesson's distribution centers fulfilled orders of controlled substances that were not adequately reported to the DEA.   The

Company further stated that it was implementing controls and reporting procedures to address the concerns of the DEA:

> We have been implementing improvements to our comprehensive controls and reporting procedures to avoid future claims of this type. Based on our understanding of these claims and the settlement discussions with the DEA and USAOs, we believe that the procedures and processes we are implementing will satisfy concerns of the relevant agencies, and that we have established an adequate reserve for such claims. (Emphasis added).

40.    In its annual report filed on Form 10-K filed with the SEC on May 7, 2008, McKesson disclosed the 2008 Settlement, but failed to mention the Company's improvements to controls and reporting procedures:

> On May 2, 2008, we entered into two agreements which resolved previously disclosed claims by the Drug Enforcement Administration ("DEA") and six USAOs that between 2005 and 2007, certain of our pharmaceutical distribution centers fulfilled customer orders for select controlled substances, which orders were not adequately reported to the DEA. The settlements were achieved consistent with the previously disclosed $13 million reserve established for these matters. These settlements resolve all administrative and civil claims arising out of the investigations.

41.    McKesson did not disclose any other details about the 2008 Agreements, nor did it ever detail or report on the procedures and processes that it had implemented in connection with the 2008 Agreements.  McKesson's CSMP was a failure and Defendants to no steps to ensure that the Company was complying with its obligations under the 2008 Agreements, the CSMP or federal law to maintain effective controls against diversion of particular controlled substances and report suspicious orders of controlled substances.

42.    Five years later, the DOJ's second investigation of the Company's distribution and reporting practices would eventually reveal the utter failure of the CSMP:  McKesson's distribution and reporting violations never ceased, and in fact continued in 2008 through at least 2013.

**B.      The DEA Investigation and 2017 DEA Settlement Resulted in a Record Civil Penalty and a Severe Suspension of Sales**

43.      On March 12, 2013, the DEA executed an Administrative Inspection Warrant at McKesson's Aurora, Colorado distribution facility.  And between March 2013 and 2017 the DEA executed one additional warrant and served numerous subpoenas investing and inspecting several of McKesson's distribution facilities (approximately one-third of its facilities), including the following locations: (i) Washington Court House, Ohio; (ii) Livonia, Michigan; (iii) Lakeland, Florida; (iv) Methuen, Massachusetts; (v) Aurora, Illinois; (vi) Delran, New Jersey; (vii) LaCrosse, Wisconsin; (viii) La Vista, Nebraska; (ix) Ruther Glen, Virginia; (x) West Sacramento, California.

44.      On or about August 13, 2014, McKesson received a letter from the U.S. Attorney for the District of Colorado setting forth allegations that McKesson failed to maintain effective controls against diversion of particular controlled substances and failed to design and operate a system to report suspicious orders of controlled substances in violation of the CSA.

45.      On or about November 14, 2014, McKesson received a letter from the DEA stating that the DEA was separately pursuing administrative action detailed by the Colorado U.S. Attorney and for failures at ten additional McKesson distribution facilities.

46.      On April 30, 2015, Defendants caused McKesson to file with the SEC a Form 8-K announcing that it reached an agreement in principle with the DEA, DOJ and various U.S. Attorneys' offices to settle all potential administrative and civil claims relating to investigations about the Company's suspicious order reporting practices for controlled substances.

47.      Then, on January 17, 2017, Defendants caused the Company to issue a press release announcing the $150 million settlement with the DEA and DOJ.  The Company disclosed that its improper reporting practices dated back to 2009, and were challenged by the DEA in 2013. McKesson further stated in the press release that it has implemented significant changes to its monitoring and reporting processes since 2013.

48.      That same day, the DOJ also issued a press release concerning the 2017 DEA Settlement that called McKesson's $150 million civil penalty a "record" for violations of the CSA.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Acknowledging McKesson's 2008 $13.25 million civil penalty and administrative agreement for "similar violations," the DEA "alleged again that McKesson failed to design and implement an effective system to detect and report "suspicious orders" for controlled substances distributed to its independent and small chain pharmacy customers – i.e., orders that are unusual in their frequency, size, or other patterns." McKesson's wrongdoing spanned from 2008 until 2013.

49.     In addition to the $13.25 million fine, the 2017 DEA Settlement required McKesson to suspend sales of controlled substances from distribution centers in Colorado, Ohio, Michigan and Florida for multiple years.  According to the DEA, these suspensions are among the most severe sanctions ever imposed.

50.     The DEA and McKesson also agreed to enhanced compliance terms for the next five years.  Among other things, McKesson must implement specific, rigorous staffing and organizational improvements; periodic auditing; and stipulated financial penalties for failing to adhere to the compliance terms. McKesson is also required to engage an independent monitor to assess compliance – the first independent monitor of its kind in a CSA civil penalty settlement.

51.     In the 2017 DEA Settlement, McKesson entered into a Settlement Agreement and Release ("Settlement Agreement"), and an Administrative Memorandum of Agreement ("Administrative Memorandum"), which includes a Compliance Addendum.  The Administrative Agreement details the compliance program agreed to by McKesson in the settlement.

**C.     The 2017 DEA Settlement Documents Confirm the Board's Breaches of Fiduciary Duty and Illegal Activity**

52.     The Settlement Agreement details McKesson's failure to comply with the 2008 Agreements and the CSMP, including:

- McKesson failed to follow the procedures and policies set forth in the McKesson CSMP to detect and disclose suspicious orders of controlled substances.  Among other things, McKesson failed to conduct adequate due diligence of its customers, failed to keep complete and accurate records in the CSMP files maintained for many of its customers, and bypassed suspicious order reporting procedures set forth in the McKesson CSMP.

- In addition, McKesson failed to inform the DEA Field Division Offices and/or DEA Headquarters of certain suspicious orders of controlled substances made by its customers during [January 1, 2009 through January 17, 2017], including order of unusual size, orders deviating substantially from normal patterns, and orders of unusual frequency, as required by and in violation of 21 C.F.R. § 1301.74(b), 21 U.S.C. § 842(a)(5), and the 2008 Agreements.

- McKesson failed to report suspicious orders for certain controlled substances in accordance with the standards identified and outlined by the DEA in three letters from the DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, including McKesson, on September 27, 2006, February 7, 2007, and December 27, 2007.

- Certain McKesson Distribution Centers distributed controlled substances to pharmacies even though those Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R. § 1306.04(a).

Settlement Agreement at 3-4 (available at https://www.justice.gov/opa/press-release/file/928471/download, last visited Mar. 22, 2017).

53.     According to the DOJ press release concerning the 2017 DEA Settlement, McKesson did not fully implement or adhere to its own compliance program after the 2008 Agreements.  In Colorado, for example, McKesson processed more than 1.6 million orders for controlled substances from June 2008 through May 2013, but reported just 16 orders as suspicious, all connected to one instance related to a recently terminated customer.

54.     Under Defendants' direction and control, the Company was never in compliance with the CSMP's terms, as required by the 2008 Agreements.  Defendants failed to establish and maintain effective controls against diversion of particular substances into other than legitimate medical, scientific, and industrial channels by sales to certain of its customers, in violation of federal law, at certain McKesson distribution centers which included (but were not necessarily limited to) the following: (i) Aurora, Colorado; (ii) Aurora, Illinois; (iii) Delran, New Jersey; (iv) LaCrosse, Wisconsin; (v) Lakeland, Florida; (vi) Landover, Maryland; (vii) La Vista, Nebraska; (viii) Livonia, Michigan; (ix) Methuen, Massachusetts; (x) Santa Fe Springs, California; (xi)

1  Washington Courthouse, Ohio; and (xii) West Sacramento, California (the "McKesson Distribution

2  Centers").

3        55.     Defendants allowed the McKesson Distribution Centers to distribute controlled

4  substances to pharmacies even though Defendants knew or should have known that the pharmacists

5  practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure

6  that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical

7  purposes by practitioners acting in the usual course of their professional practice.  This was a

8  pattern that was repeated on Defendants' watch and should have been prevented by the Company's

9  internal controls put in place in connection with the 2008 Agreements.

10        56.     Thus, as a result of Defendants' actions, the Company has suffered damages.  These

11  damages include (but are not limited to) the $150 million fine, lost revenues that will occur as a

12  result of the suspension of sales, reputational harm, and costs incurred as a result of the DOJ and

13  DEA (and related) investigations.

14  **DEMAND ON THE BOARD WOULD BE FUTILE**

15        57.     Plaintiff brings this action derivatively in the right and for the benefit of McKesson

16  to redress the breaches of fiduciary duty and other violations of law by Defendants.

17        58.     Plaintiff will adequately and fairly represent the interests of McKesson and its

18  shareholders in enforcing and prosecuting this type of action.

19        59.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as

20  though they were fully set forth herein.

21        60.     The Board currently consists of the following nine (9) directors: Defendants and

22  non-defendants N. Anthony Coles, Donald R. Knauss and Susan R. Salka.  Defendants, a majority

23  of the current Board (six out of nine members), were members of the McKesson Board at the time

24  of the 2008 Agreements and prior DEA penalty.  Plaintiff has not made any demand on the present

25  Board to institute this action because such a demand would be a futile, wasteful and useless act

26  because Defendants would have been "interested" in (and therefore conflicted from and unable to

27

28

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

fairly consider) a demand because they face a substantial likelihood of liability for their role in McKesson's improper misconduct.

61.    Defendants (a majority of the Board) served as directors of the Company during some or all of the wrongdoing alleged herein, and each of the Defendants knew of the wrongdoing but failed to act in the face of a known duty to act.  For these reasons, each Defendant faces a substantial likelihood of liability for their participation in the illicit acts.  The sustained failure of the Board to ensure effective corporate governance and ensure compliance with the law and the CSMP can only have been a result of the Defendants' knowing breach or reckless disregard for their fiduciary duties.  Despite being aware of the Company's prior misconduct concerning improperly reporting suspicious orders of controlled substances to the DEA, the Defendants took no steps in an effort to prevent or remedy the situation, and that failure to take any action resulted in substantial corporate losses.  For these reasons, the Defendants' decision to not act was not made in good faith and was contrary to the best interests of the Company.

62.    Defendants' conduct resulted in the Company suffering the $150 million fine and losing hefty future profits that will not be realized because the Company is now suspended from selling to its distribution centers in Colorado, Ohio, Michigan and Florida for multiple years.  This was in violation of, among other things, these Defendants' fiduciary duties of good faith and loyalty, as well as McKesson's own Code of Conduct, Corporate Governance Guidelines and the CMSA.  Thus, Defendants (a majority of the Board) each face a substantial likelihood of personal liability for their acts in connection with these actions, rendering a demand upon them futile.

63.    Hammergren is the President and CEO of McKesson, and in that capacity, he receives substantial monetary compensation and other benefits.  McKesson admits in its annual proxy statement filed with the SEC on June 17, 2016 and other public filings that Hammergren is not independent.  Hammergren thus lacks independence, rendering him incapable of impartially considering a stockholder demand to commence and vigorously prosecute this action.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

64.     Budd and Knowles are further conflicted from considering demand because they each face a substantial likelihood of liability as a result of their conduct on the Audit Committee. Budd and Knowles have both served as directors on the Board since at least 2008 and have also served as members of the Audit Committee since 2008.  As set forth above, the Audit Committee's charter imposes specific duties on members of this committee to ensure compliance with laws, regulations and internal policies.  The Audit Committee Defendants violated their fiduciary duties to act in good faith to address the violations of law complained of herein.

65.     A majority of the Board face a substantial likelihood of personal liability because they deliberately disregarded red flags of improper distribution and reporting practices eventually resulting in the 2017 DEA Settlement.  Each of the Directors deliberately or recklessly disregarded the Company's misconduct since at least 2008, when McKesson entered into the 2008 Agreements and purported to implement the CSMP to prevent the violations of the CSA described herein.

66.     As alleged herein and based on the duties imposed pursuant to the Company's Corporate Governance Guidelines, Delaware law, and the obligations set forth in McKesson's CSMP, the Defendants were aware of indicators and warnings that necessarily informed them of the CSA violations taking place within the Company.

67.     Given these duties placed on the directors of the Board, to the extent any of the Defendants did not have actual knowledge of the repeated violations of the drug distribution and reporting laws taking place within McKesson, such lack of knowledge could only be the product of willful disregard or recklessness that constitutes bad faith of their duties.

## COUNT I

**DERIVATIVE CLAIM AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR CAUSING OR PERMITTING THE COMPANY TO ENGAGE IN UNLAWFUL CONDUCT AND/OR CONCIOUSLY DISREGARDING VIOLATIONS OF LAW**

68.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

69.    Defendants all owed and owe fiduciary duties to McKesson and its shareholders.  By reason of their fiduciary relationships, Defendants specifically owed and owe McKesson the highest obligation of good faith and loyalty in the administration of the affairs of McKesson, including assuring that McKesson complied with federal laws governing, among other things, the distribution or diversion of particular controlled substances and reporting of suspicious orders of controlled substances.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequent harm to McKesson alleged herein.

70.    Defendants also had a duty to develop and implement a CSMP, which McKesson agreed to put in place in connection with the 2008 Agreements with the DEA to ensure that the Company complied with federal law in reporting suspicious orders of controlled substances.

71.    Defendants willfully ignored their obligations under federal law, McKesson's internal controls and numerous warnings and government investigations and inquiries specifically relating to failure to report suspicious orders.  Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

72.    Defendants consciously violated their corporate responsibilities by affirmatively and repeatedly declining to stop and prevent McKesson from failing to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels after receiving numerous warnings and indicators, including a prior DEA investigation and fine in connection with the Company's failure to comply with the CSA.

73.    Defendants consciously violated their corporate responsibilities by ignoring red flags and failing to ensure that McKesson complied with its affirmative duty to implement and comply with the CSMP, as required by the 2008 Agreements.

74. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of McKesson in a manner consistent with the duties imposed upon them by law.

75. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and loyalty in the management and administration of McKesson's affairs and in the use and preservation of McKesson's assets.

76. As a direct and proximate result of the Defendants' conscious failure to perform their fiduciary obligations, McKesson has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, the substantial penalties, fines, sales suspension and expenses described herein.

77. As a result of the misconduct alleged herein, Defendants are liable to the Company.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law and demand on the McKesson Board is excused;

B. Awarding against all Defendants and in favor of the Company the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

C. Awarding to McKesson restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D. Directing McKesson to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its stockholders from a recurrence of the damaging events described herein;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: April 3, 2017

**BLOCK & LEVITON LLP**

By: */s/* Whitney E. Street
Whitney E. Street (State Bar No. 223870)
610 16th Street, Suites 214-216
Oakland, CA  94612
Tel: 415-968-8999
Fax: 617-507-6020
whitney@blockesq.com

**GARDY & NOTIS, LLP**
Jennifer Sarnelli (State Bar No. 242510)
James S. Notis
Meagan A. Farmer
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508
jsarnelli@gardylaw.com

*Counsel for Plaintiff*

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Eli Inzlicht, hereby declare and verify that I am a stockholder of McKesson Corporation.  I have authorized the filing of the attached Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty ("Complaint").  I have reviewed the Complaint, and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  3/31/2017

_____
ELI INZLICHT