**HAGENS BERMAN SOBOL SHAPRIO LLP**
Reed R. Kathrein (State Bar No. 139304)
Peter E. Borkon (State Bar No. 212596)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Tel: 510-725-3000
Fax: 510-725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

**GARDY & NOTIS, LLP**
James S. Notis (admitted *pro hac vice*)
Jennifer Sarnelli (State Bar No. 242510)
Meagan Farmer (admitted *pro hac vice*)
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
Tel:  212-905-0509
Fax:  212-905-0508
jnotis@gardylaw.com
jsarnelli@gardylaw.com
mfarmer@gardylaw.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE MCKESSON CORPORATION DERIVATIVE LITIGATION | Case No. 4:17-cv-1850-CW |
| | **VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED AMENDED COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................1

II.    JURISDICTION AND VENUE ..........................................................................4

III.   THE PARTIES ....................................................................................................5

IV.    STATEMENT OF FACTS .................................................................................10

    A.   McKesson's DEA Settlements Documents Reveal Knowledge of and
        Reckless Disregard for Unlawful Opioid Distribution ...........................10

        1.   In 2008, McKesson Settled Claims by the DOJ Relating to Failures
              to Report Suspicious Distributions of Controlled Substances.....................12

        2.   Following the 2008 Agreements, McKesson Breached its 2008
              Settlement Terms with the DEA and Contributed to the National
              Opioid Epidemic .........................................................................................17

    B.   The 2017 Settlement Reveals that Defendants Permitted McKesson to
        Engage in the Same Misconduct that Resulted in the 2008 Settlement ...................20

    C.   The Biggest of the "Big Three": McKesson is the Largest Pharmaceutical
        Distributors in the Country ....................................................................24

    D.   The Opioid Public Health Emergency.........................................................27

    E.   McKesson's Directors and Officers are Charged with Protecting
        McKesson and Ensuring that McKesson Complies with Federal Drug
        Laws and Regulations..................................................................................33

        1.   The Directors and Officers Have a Duty to Run McKesson in a
              Legal and Ethical Manner Under McKesson's Corporate Code of
              Conduct and Corporate Governance Policies.................................................36

        2.   The Board's Audit Committee is Responsible for Monitoring
              McKesson's CSA Compliance ....................................................................37

        3.   The Board's Governance Committee Duties.................................................40

        4.   The Board's Compensation Committee Duties.............................................41

    F.   The Directors and Officer Defendants Breached their Fiduciary Duties .................43

        1.   The Audit Committee Minutes Demonstrate a Conscious Failure to
              Carry Out Oversight ...................................................................................44

Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

2.     The Board Minutes Demonstrate a Conscious Failure to Carry Out Oversight ........................................................................54

3.     The Compensation Committee Minutes Demonstrate a Conscious Failure to Carry Out Oversight ........................................................63

G.     The Directors' and Officers' Malfeasance has Harmed McKesson ........................71

H.     The International Teamster's Attempted To Force The Board To Act ....................74

I.     Rather than Limit Unlawful Drug Sales, McKesson Hired Lobbyists to Pass a Law Insulating Them from Liability for Dumping Opioids on the Public ........................................................................................................79

V.     DEMAND ON THE BOARD WOULD BE FUTILE ........................................81

COUNT I ........................................................................................................85

COUNT II .......................................................................................................87

COUNT III ......................................................................................................87

COUNT IV ......................................................................................................88

Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

Plaintiffs ELI INZLICHT and VLADIMIR GUSINSKY, as Trustee for the Vladimir Gusinsky Living Trust ("Plaintiffs"), by and through the undersigned attorneys, hereby submit this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties, Waste of Corporate Assets, and Insider Trading (the "Complaint") for the benefit of nominal defendant McKesson Corporation ("McKesson" or the "Company") against certain current members of its Board of Directors (the "Board") and senior officers,[1] seeking to remedy Defendants' conduct alleged herein. Plaintiffs make the allegations within this Complaint based upon their investigation, which included a review of documents produced by McKesson in response to a demand for books and records under 8 *Del. C.* § 220; the Company's filings with the SEC, conference calls, announcements, press releases, corporate governance documents available on the Company's web site, governmental and regulatory investigations and other publicly available information.

## I.      INTRODUCTION

1.      This case arises from the sustained and systemic failure McKesson's Board of Directors and senior executives and officers to comply with their fiduciary obligations to maintain oversight and effective controls in the distribution of controlled substances.  The Board's actions and/or inactions caused the Company, for nearly a decade, to illegally distribute highly addictive painkillers, including the opioids oxycodone and hydrocodone.  This suit seeks to remedy Defendants' intentional or reckless breaches of their fiduciary duty, unjust enrichment, waste of corporate assets and insider trading that caused substantial harm to the Company beginning in 2009.

2.      **Short-Term Profits over Safety**.  The United States is in the grips of the deadliest drug epidemic in its history and McKesson is one of the largest suppliers of the opioid drugs at the center of the epidemic.  It is estimated that the prescription opioid epidemic costs the United States more than $78.5 billion annually, according to a study published in the October 2017 issue of *Medical Care*.

---

[1] The Board and the officer defendants are sometimes referred to as Director and Officer Defendants.

010688-11 994281 V2

1

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

3.    McKesson is the largest pharmaceutical distributor in the country.  McKesson and its two biggest competitors, Cardinal Health and AmerisourceBergen, distribute more than 85% of all prescription drugs in the United States and play a key role in flooding the markets with prescription opioids.

4.    In a settlement first announced in 2015 and executed January 17, 2017 (the "2017 Settlement"), the Company agreed to pay a $150 million civil penalty, and to suspend sales of controlled substances from several distribution centers, for multiple years, in order to resolve repeated and ongoing violations of applicable statutes and regulations governing controlled substances.  The U.S. Department of Justice ("DOJ") described the $150 million payment as a "record," and it said the suspensions "are among the most severe sanctions ever agreed to by a [DEA] registered distributor."  As the former head of the DEA's Office of Diversion Control noted "This is an industry out of control.  If they don't follow the law in drug supply, and diversion occurs, people die.  That's just it, people die.  And what they're [distributors] saying is, 'the heck with your compliance.  We'll just get the law changed.'"

5.    The $150 million penalty was not the first time that McKesson paid millions for violating applicable laws and regulations concerning the reporting and distribution of these highly addictive drugs.  McKesson was a repeat-offender, and most of the same McKesson directors and officers who approved the 2017 Settlement were also at the helm of the Company in 2008 when the Board of Directors agreed to settle a case brought by the Drug Enforcement Administration ("DEA") for McKesson's failure to report suspicious orders of controlled substances for nearly a decade (the "2008 Settlement").  In the 2008 Settlement, McKesson paid $13.25 million to settle claims by the DEA and six other states' Attorneys' General that McKesson's failure to report suspicious orders from online pharmacies "fueled the explosive prescription drug problem."  A majority of the Board members who agreed to the 2008 Settlement terms were the same Board members who agreed to the 2017 Settlement.  In other words, this Board majority were repeat offenders.  Despite being aware of the Company's opioid distribution and reporting violations, the Board permitted McKesson to

2
Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

continue with its illegal behavior, in violation of the terms of the 2008 Settlement and applicable laws.  In connection with the 2008 Settlement, McKesson was required to create a "Controlled Substances Monitoring Program" ("CSMP").  When McKesson disclosed the 2008 Settlement to investors, it also revealed claims against the Company from six United States Attorneys' Offices ("USAOs") related to inadequately reported "suspicious orders" at several of McKesson's Distribution Centers.  In response to the 2008 Settlement, CEO John Hammergren ("Hammergen") assured investors on a conference call that "nothing is more important to our industry than the safety of our drug supply chain."

6.     But, as demonstrated by internal McKesson documents produced to Plaintiffs in response to demands under 8 *Del. C.* § 220, the Board continued to fail in its oversight duties.  The problems that led to the 2017 Settlement were known to but recklessly disregarded by Defendants. McKesson's document production demonstrates that while the Board claimed – and, indeed, was required by the 2008 Settlement – to oversee the CSMP, the Board was inattentive and ignored the pervasive opioid addiction crisis that it was helping to create – consciously turning a blind eye as McKesson unlawfully flooded the market with opioids.  Through these failures, the Board members breached their fiduciary duty to McKesson and its shareholders.

7.     Notwithstanding these tragic repeated compliance failures, mounting lawsuits, regulatory proceedings, and congressional investigations over McKesson's supply of prescription opioids into American communities, the Board of Directors made McKesson CEO Hammergren one of the country's highest paid CEOs at the direct expense of McKesson and its shareholders. Hammergren and other insiders also earned hundreds of millions of dollars through timely insider sales made before the market learned of the oversight failures that would lead to the record-setting fine.

8.     Decades of repeated failure to control opioid related distribution resulting in repeated record setting fines by enforcement agencies are symptomatic of corporate governance and accountability failures by the Board and senior officers of McKesson.  These repeated failures and

violations occurred with a majority of the same Board at the helm at the time of both the 2008 Settlement and the 2017 Settlement.  At the time this lawsuit commenced, six of the nine Board members were also on the Board when the Company entered the 2008 Settlement.  Their failures have exposed McKesson to hundreds of millions of dollars in losses and expenses, including (i) significant legal fees relating to civil litigation, congressional investigations, as well as dealing with regulatory investigation; (ii) increased compliance costs related to establishing an independent monitor to police McKesson's failure to establish proper compliance methods; (iii) compensation paid or that will be paid to States, cities, counties and independent native American nations, for the harm inflicted upon them by Defendants' misconduct; (iv) substantial regulatory fines including a $150 million civil penalty; (v) significant lobbying costs aimed at reducing the influence of regulatory entities investigating defendants' misconduct; (vi) waste of McKesson's assets in the form of overcompensating Officers; (vii) likely loss of future profits that will not be realized because the Company was suspended from selling from its distribution centers in Colorado, Ohio, Michigan and Florida for multiple years as a result of the 2017 Settlement; and (viii) reputational harm.

9.      For these reasons and as set forth in greater detail herein, Plaintiffs seek needed corporate governance, management policy and procedural changes, which are necessary to ensure that the Company makes compliance with distribution laws and the terms of related settlement agreements a priority.  Plaintiffs, on behalf of McKesson, also seek monetary damages from the non-corporate defendants (the "Director and Officer Defendants") who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by McKesson and its shareholders.  Finally, Plaintiffs seek to enjoin the Director and Officer Defendants from continuing to manage the Company in the same manner going forward.

## II.      JURISDICTION AND VENUE

10.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332 because Plaintiffs and Defendants are citizens of different states, and the matter in controversy

exceeds $75,000.00, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     Venue is proper in this District because McKesson conducts business and maintains its principal executive offices this District.  Upon information and belief, one or more of the Defendants resides in this District.  Further, McKesson engages in numerous activities and conducts business here, which had an effect in this District.

### III.     THE PARTIES

12.     Plaintiff Eli Inzlicht is a current shareholder of McKesson, and has continuously held McKesson stock since 2011.  Inzlicht is a citizen of New York.  Inzlicht filed his original complaint on April 3, 2017.

13.     Plaintiff Vladimir Gusinsky is a current shareholder of McKesson, and has continuously held McKesson stock since 2005.  Gusinsky is a citizen of Illinois.

14.     Nominal defendant McKesson is a Delaware corporation with its principal executive offices located at One Post Street, San Francisco, California 94104.  According to its most recent form 10-K, filed with the SEC on May 22, 2017, McKesson is the largest pharmaceutical distributor in the United States, with over 210 million shares outstanding.  McKesson operates through two segments: McKesson Distribution Solutions and McKesson Technology Solutions.  The Distribution Solutions segment, which in the most recent fiscal year accounted for 99% of the Company's revenue, distributes branded and generic pharmaceutical drugs and other healthcare-related products internationally and provides practice management, technology, clinical support and business solutions to community-based oncology and other specialty practices.  The Technology Solutions segment provides clinical, financial and supply chain management solutions to healthcare organizations.  McKesson's stock is publicly traded on the New York Stock Exchange under the ticker symbol "MCK."

15.     Defendant Andy D. Bryant ("Bryant") has served as a director of the Company since January 2008.  Bryant is a citizen of Oregon.  Bryant is the current Chairperson of the Compensation

Committee and a member of the Finance Committee.  Bryant has reaped $2,632,855 in compensation for his service on the Board.

16.     Defendant Wayne A. Budd ("Budd") served as a director of the Company from October 2003 until his retirement on July 26, 2017 and was a member of the Board's Audit Committee (the "Audit Committee") and Chairperson of the Governance Committee.  Budd is a citizen of Massachusetts.  Budd earned $3.8 million in total compensation for his service on the Board.  From 2008 until 2017, Budd sold over $1.2 million in McKesson securities.  An itemized listing of his lucrative stock sales that were made while in possession of material, adverse, non-public information is attached at Appendix A.  A summary of his trading includes:

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|------|------|------|------|------|------|------|------|------|------|-------|
| $0 | $562,500.00 | $0.00 | $0.00 | $0.00 | $0 | $196,223.40 | $0 | $520,312.00 | $0.00 | $1,279,035 |

17.     Defendant Hammergren has served as the Company's President and Chief Executive Officer ("CEO") since 2001 and as Chairman of the Board since 2002.  Hammergren is consistently one of the highest paid CEO's in the world and since 2008 his total compensation and payments from McKesson amount to $360,830,966.  Hammergren is a citizen of California.  From 2008 until 2017, Hammergren has sold over $791.3 million in McKesson securities.  An itemized listing of his lucrative stock sales that were made while in possession of material, adverse, non-public information is attached at Appendix A.  A summary of his trading includes:

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|------|------|------|------|------|------|------|------|------|------|-------|
| $23,011,639 | $7,561,090.00 | $147,735,430.00 | $93,323,930.00 | $24,206,600.00 | $48,420,700 | $86,104,347.00 | $125,676,184 | $78,232,170.00 | $157,080,327.39 | $791,352,417 |

18.     Defendant M. Christine Jacobs ("Jacobs") has served as a director of the Company since January 1999.  Jacobs is a citizen of Georgia.  Jacobs serves on the Compensation Committee and the Governance Committee.  Jacobs has been paid $2.6 million in total compensation since 2008.  From 2009 until 2017, Jacobs has sold nearly $4.4 million in McKesson securities.  An itemized listing of her lucrative stock sales that were made while in possession of material, adverse, non-public information is attached at Appendix A.  A summary of her trading includes:

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|------|------|------|------|------|------|------|------|------|------|-------|
| $0 | $453,540.00 | $990,624.00 | $781,200.00 | $1,297,598.00 | $0 | $497,302.00 | $0 | $177,312.00 | $157,500.47 | $4,355,076 |

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

19. Defendant Marie L. Knowles ("Knowles") has served as a director of the Company since March 2002, and is the Chair of the Audit Committee and a member of the Finance Committee. Knowles is a citizen of California. Since 2008, Knowles has earned over $3 million in total compensation for her service on the Board. From 2008 until 2017, Knowles has sold $2.1 million in McKesson securities. An itemized listing of her lucrative stock sales that were made while in possession of material, adverse, non-public information is attached at Appendix A. A summary of her trading includes:

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|------|------|------|------|------|------|------|------|------|------|-------|
| $659,303 | $167,535.00 | $139,589.60 | $0.00 | $313,637.00 | $151,089 | $150,798.00 | $177,991 | $176,348.00 | $176,041.65 | $2,112,332 |

20. Defendant Edward A. Mueller ("Mueller") has served as a director of the Company since April 2008 and as Lead Independent Director since July 2013. Mueller serves on the Compensation Committee and the Corporate Governance Committee. Mueller is a citizen of Colorado. From 2008 until 2017, Mueller has been paid $2,639, 476 for his service on the Board.

21. Defendant Donald R. Knauss ("Knauss") has served as a director of the Company since October 2014. Knauss is a member of the Audit Committee and is the Chairperson of the Corporate Governance Committee. Since joining the Board, Knauss has been paid $586,999 for his service on the Board. Knauss is a citizen of California.

22. Defendant Susan R. Salka has served as a director of the Company since October 2014. Salka is a member of the Audit Committee and the Corporate Governance Committee. Since joining the Board, Salka been paid $620,028 for her service on the Board. Salka is a citizen of California.

23. Defendant N. Anthony Coles, M.D. ("Coles") has served as a director of the Company since April 2014. Coles is a member of the Compensation Committee and the Finance Committee. Since joining the Board, Coles has been paid $866,129 for his service on the Board. Coles is a citizen of Massachusetts.

24. Defendant Alton F. Irby III ("Irby") served as a director of the Company from January 1999 until his retirement at the July 27, 2016 shareholders' annual meeting. Irby is a citizen

of California.  Irby served on the Audit Committee from 2013 until 2016 and was Chairperson of the Finance Committee and the Compensation Committee.  For his service on the Board, Irby was paid $3,775,501.  Irby sold $2.1 million in McKesson securities.  An itemized listing of his lucrative stock sales that were made while in possession of material, adverse, non-public information is attached at Appendix A.  A summary of his trading includes:

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| $0 | $400,672.20 | $976,945.00 | $212,660.00 | $417,455.00 | $0 | $949,297.00 | $1,103,790 | $0.00 | $0.00 | $4,060,819 |

25.    Defendant David M. Lawrence ("Lawrence") served as a director of the Company from January 2004 until his retirement at the shareholders' annual meeting on July 27, 2016.  Lawrence served on the Compensation Committee and the Finance Committee.  Since 2008, Lawrence earned $2,195,894 for his service on the Board.  Lawrence is a citizen of California.

26.    Defendant Jane E. Shaw, PhD ("Shaw") served as a director of the Company from April 1992 until her retirement on July 30, 2014.  Shaw is a citizen of California.  Shaw served as the Chairperson of the Compensation Committee, a member of the Audit Committee, and a member of the Governance Committee.  Shaw was paid $2,977, 826 for her service on the Board.  From 2008 until 2017, Shaw sold over $3.3 million in McKesson securities.  An itemized listing of her lucrative stock sales that were made while in possession of material, adverse, non-public information is attached at Appendix A.  A summary of her trading includes:

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| $0 | $381,947.40 | $2,347,626.00 | $0.00 | $662,783.00 | $0 | $0.00 | $0 | $0.00 | $0.00 | $3,392,356 |

27.    Bryant, Budd, Hammergren, Jacobs, Knowles, Mueller, Knauss, Salka, Coles, Irby, Lawrence and Shaw are collectively referred to as "Director and Officer Defendants."  Defendants Bryant, Budd, Shaw, Irby, Knauss, Salka and Knowles are collectively referred to as the "Audit Committee Defendants."

28.    As Board members, the Director and Officer Defendants are lavishly compensated.  According to the Company's most recent proxy statement, each Board member receives approximately $300,000 in stock awards and cash in total compensation for each year they serve on

8

the Board.  As such, they are effectively employees of the Company.  Employees of the Company are beholden to Hammergren, the current CEO and Chairperson of the Board under whom they received their compensation packages.

29.     The following chart shows the Director and Officer Defendants' membership on Board committees during their respective tenures (as identified in the annual proxy filed for the fiscal years below):

| Defendant | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|-----------|------|------|------|------|------|------|------|------|
| Bryant | A, F | A, F | A, F | A, F | A, F | A, F | C, F | C, F |
| Budd | A, CG | A, CG | A, CG | A, CG | A, CG | A, CG | A, CG | A, CG |
| Hammergren | | | | | | | | |
| Jacobs | C, CG | C, CG | C, CG | C, CG | C, CG | C, CG | C, CG | C, CG |
| Knowles | A, F | A, F | A, F | A, F | A, F | A, F | A, F | A, F |
| Mueller | C, CG | C, CG | C, CG | C, CG | C, CG | C, CG | C, CG | C, CG |
| Shaw | A, CG | A, CG | A, CG | A, CG | A, CG | C, CG | | |
| Lawrence | CG, C | C, F | C, F | C, F | C, F | C, F | C, F | C, F |
| Irby | C, F | C, F | C, F | C, F, A | A, F | A, F | A, F | A, F |
| Coles | | | | | | C, F | C, F | C, F |
| Knauss | | | | | | A, CG | A, CG | A, CG |
| Salka | | | | | | A, CG | A, CG | A, CG |

A: Audit; C: Compensation; CG: Corporate Governance;[2] F: Finance

---

[2] Renamed "Governance" in 2014.

## IV.   STATEMENT OF FACTS

### A.   McKesson's DEA Settlements Documents Reveal Knowledge of and Reckless Disregard for Unlawful Opioid Distribution

30.     McKesson distributes branded and generic prescription drugs to retail pharmacies throughout the United States through its distribution centers.  McKesson holds Certificates of Registration issued by the DEA authorizing it to distribute controlled substances from its distribution centers.

31.     As a pharmaceutical distributor, McKesson is required to comply with certain state and federal regulations.  At all relevant times, McKesson and its distribution centers were required to operate in accordance with the statutory provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801 *et seq.* (the "CSA", and the regulations promulgated thereunder, 21 C.F.R. Part 1300 *et seq*.

32.     The DEA is the DOJ component agency primarily responsible for administering the CSA and the regulations promulgated thereunder, and is vested with the responsibility of investigating CSA violations.

33.     The regulations promulgated under the CSA include a requirement to design and operate a system to detect and report "suspicious orders" for controlled substances, that deviate from the normal course and are suspected of being diverted into illicit markets. *See* 21 C.F.R. § 1301.74(b).

34.     The CSA seeks to prevent the diversion of controlled substances by establishing a closed system of distribution.  As a distributor in that closed system, McKesson is required by the CSA to register with DEA to engage in the commercial distribution of certain controlled substances for therapeutic use. 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100.

35.     McKesson's directors and executives knew, or should have known, that McKesson was required to comply with the CSA.  But in 2008, it became clear the McKesson's directors and officers failed to ensure compliance with the law, when they agreed to the 2008 Settlement.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

36.     McKesson agreed to pay a $13.25 million fine as the result of the 2008 Settlement. The Director and Officer Defendants would ultimately breach the terms of that 2008 Settlement and wholly fail to oversee the Company's compliance with the terms of that settlement, and permit McKesson continued to ship millions upon millions of doses of opioids.  The Defendants' failure to comply with the laws and the terms, practices and procedures agreed to in the 2008 Settlement are well documented in the 2017 Settlement documents.

37.     McKesson and the DOJ entered into the 2017 Settlement documents, executed January 17, 2017, in which the Company agreed to pay a $150 million civil penalty, and to suspend sales of controlled substances from several distribution centers, for multiple years, in order to resolve continued violations of applicable statutes and regulations governing controlled substances.  The DOJ described the $150 million payment as a "record," and it said the suspensions "are among the most severe sanctions ever agreed to by a [DEA] registered distributor."

38.     In the Administrative Memorandum Agreement, part of the 2017 Settlement Documents, McKesson admitted, among other things, that  (i) between January 1, 2009 and January 17, 2017 (the Effective Date of the 2017 Settlement), it failed to identify and report to the DEA certain suspicious orders based on guidance set forth in the DEA letters (discussed below); (ii) it failed to identify and report to the DEA certain suspicious orders as required by the 2008 Settlement and failed to follow the procedures required by McKesson's CSMP; and (iii) McKesson distributed opioids to certain pharmacies even though McKesson should have known that the pharmacists at those pharmacies failed to dispense pharmaceuticals in accordance with the law.  *See* Administrative Memorandum Agreement, Sections I.2, I.3(f).

39.     The story of the two settlements is a story of dereliction of duty committed by the Director and Officer Defendants as the nation's opioid problem became the deadliest drug epidemic in U.S. history.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1

2

  **1.**  **In 2008, McKesson Settled Claims by the DOJ Relating to Failures to Report Suspicious Distributions of Controlled Substances**

3

4

  40.  In the mid-2000s, McKesson engaged in a pattern and practice of violating the laws and regulations governing the distribution, and reporting of, controlled substances, which resulted in the 2008 Settlement with the DOJ.

5

6

7

  41.  According to the DOJ, McKesson was advised no later than September 1, 2005 of serious problems concerning the Company's compliance with controlled substances laws and regulations.  That day, officials from the DEA "warned McKesson officials about excessive sales of their products to pharmacies filling illegal online prescriptions," according to a DOJ statement.

8

9

10

11

  42.  McKesson also received guidance from the DEA in three letters in 2006 and 2007 (the "DEA Letters") concerning the requirements set forth in 21 U.S.C. § 842(a)(5) (a section of the Comprehensive Drug Abuse Prevention and Control Act of 1970; the ("CSA" or the "Act")), and corresponding regulations.  The DEA Letters were sent to McKesson on or about September 27, 2006, February 7, 2007 and December 27, 2007.  The DEA Letters contained, among other things, guidance for the identification and reporting of suspicious orders to DEA, as required by 21 C.F.R. § 1301.74(b).

12

13

14

15

16

17

  43.  McKesson was further placed on notice that it had problems in connection with its handling of controlled substances when, on August 4, 2006, the DEA sent McKesson's Lakeland, Florida, Distribution Center an Order to Show Cause.  That order alleged that McKesson "failed to maintain effective controls at [Lakeland] against diversion of particular controlled substances …"

18

19

20

21

  44.  The Order to Show Cause at Lakeland was the beginning of the problems for McKesson.  Federal authorities initiated a multi-year investigation that led to specific allegations relating to more than 20% of McKesson's Distribution Centers.

22

23

24

  45.  Among those allegations:

25

26

27

28

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

a.   The Landover Distribution Center sold millions of doses of hydrocodone and phentermine to just two pharmacies from January 2005 to October 2006, and failed to report them as suspicious when discovered.

b.   The Lakeland Distribution Center sold more than 2 million doses of hydrocodone to seven Tampa-area pharmacies in October 2005 and failed to report these sales as suspicious orders to DEA when discovered.

c.   In 2007, the Conroe Distribution Center sold about 2.6 million doses of hydrocodone to just two pharmacies, and failed to report these sales as suspicious orders to DEA when discovered.

d.   From 2005 to November 2007, the Aurora Distribution Center sold large quantities of hydrocodone to three pharmacies in Colorado, failing to report these sales as suspicious orders to DEA when discovered.

e.   From January 2005 to October 2007, the Salt Lake City Distribution Center sold more than 800,000 doses of Methadone, Fentanyl, hydrocodone and Oxycodone to a single clinic at the Blackfeet Indian Reservation in Montana, and failed to report these sales as suspicious orders to DEA when discovered.

f.   Finally, prior to June 2007, the West Sacramento Distribution Center suffered theft or loss of controlled substances on 28 separate occasions, and failed to timely notify the DEA.

46.   McKesson's abject failure to monitor and limit its distribution of controlled substances led to the 2008 Settlement with the DOJ.  On April 30, 2008, McKesson entered into a settlement agreement with the DOJ, through six different United States Attorney's offices (the "2008 Settlement Agreement").  Hammergren signed the 2008 Settlement Agreement on behalf of McKesson.  According to a public statement by the DOJ dated May 2, 2008, the 2008 Settlement with McKesson resolved claims that McKesson:

> failed to report to DEA suspicious sales of controlled substance pharmaceuticals it made to pharmacies that filled orders from illegal "Internet pharmacies" that sell drugs

online to customers who do not have a legal prescription.  McKesson also failed to report suspicious orders of controlled substance pharmaceuticals that it received from other pharmacies and clinics even though the orders were suspiciously large.

47.     DEA Acting Administrator, Michele Leonhart described McKesson's vital role in creating the nation's opioid crisis, "[b]y failing to report suspicious orders for controlled substances that it received from rogue Internet pharmacies, the McKesson Corporation fueled the explosive prescription drug abuse problem we have in this country."

48.     As a result of McKesson's insufficient controls and lack of oversight of distribution of highly addictive drugs, the DOJ said that "millions of dosage units of controlled substances were diverted from legitimate channels of distribution."

49.     To resolve this misconduct, McKesson's board of directors at the time authorized the Company to enter into the 2008 memorandum of agreement, as well as a settlement agreement with the DOJ (collectively, the "2008 Agreements").  McKesson agreed to pay $13.25 million in civil penalties under the 2008 Agreements.  Pursuant to the 2008 Agreements, McKesson also agreed to develop a "Controlled Substance Monitoring Program," (referred to as the "CSMP"), in which it recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to the DEA.

50.     The 2008 Agreements required payment of a $13.25 million fine and other remedial action.  The Company was required to pay the USAOs for the Middle District of Florida $7,456,000, the District of Maryland $2,000,000, the District of Colorado $1,000,000, the Southern District of Texas $2,000,000, the District of Utah $544,000, and the Eastern District of California $250,000. McKesson's license to distribute Schedule III controlled substances was temporarily suspended at the Lakeland DC and Conroe DC Distribution Centers.

51.     McKesson's entry into the 2008 Settlement was a board-level decision, such that the members of McKesson's board of directors at the time in 2008 (a majority of whom constitute the board at the time of the 2017 Settlement) knew that McKesson had serious problems concerning the

Company's compliance with controlled substances laws and regulations for many years and spread across many of the Company's facilities.

52.     For instance, during the May 21, 2008 Board meeting Executive Vice President, General Counsel and Secretary Laureen E. Seeger ("Seeger") provided Defendants Hammergren, Bryant, Budd, Irby, Jacobs, Knowles, Shaw, Mueller and Lawrence, a litigation update on the "completion of the settlement with the Drug Enforcement Agency (DEA) and certain United States Attorneys' Offices."

53.     The known problems leading to the 2008 Agreements prompted a change in McKesson's public statements in early 2008, as the Company sent signals to investors that it would strengthen its controls and reporting procedures to the satisfaction of the relevant governmental agencies.  On an earnings conference call January 31, 2008, Hammergren said, "Nothing is more important to our industry than the safety and integrity of the drug supply chain.  McKesson has had strong productive relationships with regulatory authorities, focused on achieving this goal." Hammergren said the Company was working to resolve claims with the DEA and DOJ and assured investors "[w]e have been implementing improvements to our comprehensive controls and reporting procedures to avoid future claims of this type."

54.     On January 22, 2008, the Board's Audit Committee considered a "legal reserve" pertaining to the upcoming 2008 Agreements.  The Board's Audit Committee at that time included current Board-member Knowles and prior Board members Shaw and Irby.

55.     McKesson then reported, on its Form 10-Q for the period ending December 31, 2007, filed with the SEC on February 1, 2008, that it was seeking to resolve claims with the DEA and certain U.S. Attorneys General that between 2005 and 2007 certain of McKesson's distribution centers fulfilled orders of controlled substances that were not adequately reported to the DEA.

56.     At that time, McKesson reported that "We have been implementing improvements to our comprehensive controls and reporting procedures to avoid future claims of this type…we believe

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

that the procedures and processes we are implementing will satisfy concerns of the relevant agencies[.]"

57.     At an Audit Committee meeting on May 2, 2008 – the day the DOJ publicly announced the 2008 Agreements – committee members were working on McKesson's upcoming Form 10-K.  They heard legal advice concerning the "disclosure regarding discussions between the [DEA] and certain United States Attorneys' Offices."  There was no discussion concerning the Company's compliance obligations relating to the 2008 Settlement, or the implementation of those procedures.  That meeting was attended by Knowles, Bud, Shaw, Hammergren, Bryant, Lawrence, Seeger, Nigel Rees ("Rees"), Vice President and Controller, and Jill Robinson ("Robinson"), Vice President of Internal.

58.     In its own press release on May 2, 2008, McKesson sought to downplay its liability in the uncontrolled distribution of dangerous controlled substances.  McKesson said it had reached settlements "regarding the company's distribution of so-called 'lifestyle drugs.'  These drugs, especially hydrocodone and alprazolam, have come under increased DEA scrutiny in recent months because of their potential for abuse."

59.     McKesson described the 2008 Agreements in a Form 10-K, filed just five days later on May 7, 2008, and signed by Defendants Hammergren, Bryant, Budd, Irby, Jacobs, Knowles, Lawrence, Mueller and Shaw.  McKesson reported that "On May 2, 2008, we entered into two agreements which resolved previously disclosed claims by the Drug Enforcement Administration ('DEA') and six USAOs that between 2005 and 2007, certain of our pharmaceutical distribution centers fulfilled customer orders for select controlled substances, which orders were not adequately reported to the DEA."

60.     A meeting of the full Board on May 21, 2008, Hammergren, Bryant, Knowles, Budd, Lawrence, Mueller, Irby, Jacobs, Shaw, Julian, and Seeger were advised "of the completion of the settlement with the [DEA] and certain United States Attorneys' Offices."

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

61.     In short, the Board members were fully apprised of the 2008 Agreements, the Company's failure to comply with controlled substances laws and regulations that resulted in the 2008 Agreements, and the Company's obligations under the CSMP requiring stringent monitoring, controls, and oversight of McKesson's opioid distribution to prevent future violations.

### 2.     Following the 2008 Agreements, McKesson Breached its 2008 Settlement Terms with the DEA and Contributed to the National Opioid Epidemic

62.     The CSMP, as conceived in 2008, was a three-tier system.  Each of McKesson's pharmacy customers were assigned monthly threshold levels for their controlled substance orders. Orders at the threshold would block the order and trigger a review process.  If the reason for reaching the threshold level was compelling, McKesson would supply the drugs and in some cases raise the threshold; if not, the matter would be passed to a regional compliance officer.  If that officer deemed it suspicious, the order would be kicked up to McKesson's corporate compliance team.  If they also judged it suspicious, the company would then report the order to the DEA.

63.     The Director and Officer Defendants failed to ensure that McKesson complied with the CSMP, despite the Company's prior distribution and reporting violations.  In or around 2011, a DEA agent named Lindsey Malocu noticed that she could not find any suspicious-order reports from McKesson's Landover, Maryland, Distribution Center.  In July 2011, she requested customer files for 20 or so suspect pharmacies.  Prompted by the DEA request, McKesson acknowledged there was a problem; in a short period of time, the Landover Distribution Center filed 318 suspicious orders with the DEA that covered the previous months and weeks.

64.     The compliance files Malocu obtained were revealing, and showed known failures in the CSMP the Defendants were obligated to implement and monitor.  The documents showed that when pharmacies hit thresholds, they typically breezed through the review process. Customers offered vague, flimsy reasons for needing more oxycodone supply such as "increase in foot traffic"; "more business" and they would get the drugs without triggering further review

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1    normally required if the CSMP were being effectively run (just three years after the 2008

2    Agreements).  And, McKesson knew from the 2008 Agreement that the Landover facility had a

3    history of failing to comply with controlled substances laws and regulations in failing to report

4    suspicious sales in 2005 and 2006.

5         65.    Moreover, investigations of McKesson were multiplying.  By the summer of

6    2014, prosecutors in 12 districts around the country were again investigating possible violations

7    of the Controlled Substances Act at McKesson distribution centers.

8         66.    One of the most serious areas of investigation was in Colorado.  On March 12,

9    2013, dozens of DEA agents descended upon McKesson's Aurora distribution center as they

10   executed an Administrative Inspection Warrant.

11        67.    The Aurora site was an obvious target for DEA investigators because for several

12   years, from June 2008 to May 2013, the facility had reported no suspicious orders, and the

13   Aurora facility was named in the 2008 Agreements as previously failing to report suspicious

14   sales from 2005 to November 2007.  Even after the 2008 Agreements, and at the time with the

15   CSMP was supposed to be fully running and monitored by the board, the Aurora distribution center

16   flagged for the DEA just 16 of the more than 1.6 million controlled substances orders it

17   processed.  All 16 of those orders were reported in March 2012 – they dated back to January

18   2012 and related to a single independent pharmacy in Fort Lupton, Colo. with which McKesson

19   was no longer doing business.

20        68.    According to published reports, documents collected by the DEA at Aurora

21   revealed that McKesson had not fully implemented or adhered to the CSMP program.  The

22   government alleged that the distribution center preemptively raised thresholds for customers'

23   controlled substances orders or set them at inappropriately high levels so that they would never

24   trigger a CSMP review (or possibility of a suspicious order report); in other cases, it alleged the

25   distribution center had ignored thresholds and supplied pharmacies volumes of controlled

26   substances that exceeded their assigned amount without a proper review.

27

28

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

69.     Investigators believed the Company's reviews over whether to supply customers more controlled substances were not meaningful and were used as a sales tool; customers were granted threshold increases for specious reasons, such as the Fourth of July, or the closure of an area pharmacy years earlier.

70.     McKesson then disclosed in its January 30, 2014 10-Q that the U.S. Attorney for the Northern District of West Virginia was investigating "potential claims under the Comprehensive Drug Abuse Prevention and Control Act" in connection with the Company's Landover distribution center.

71.     The government's investigation ramped up, as Defendants' oversight failures caught up to McKesson.  For example, on or about August 13, 2014, McKesson received a letter from the U.S. Attorney for the District of Colorado alleging that McKesson failed to "maintain[] ... effective controls against diversion of particular controlled substances," 21 U.S.C. § 823(b)(l), and failed to "design and operate a system to disclose to the registrant suspicious orders of controlled substances," 21 C.F.R. § 1301.74(b).

72.     Then, on or about November 14, 2014, McKesson received a letter (dated November 4, 2014) from the DEA's Office of Chief Counsel, Diversion Regulatory and Litigation Section, stating that the DEA was separately pursuing administrative action against McKesson for the conduct outlined in the August 13, 2014 Letter.  The DEA also stated that the allegations regarding McKesson's failure to "maintain[] . . . effective controls against diversion of particular controlled substances," 21 U.S.C. § 823(b)(l), and failure to "design and operate a system to disclose to the registrant suspicious orders of controlled substances," 21 C.F.R. § I 301.74(b) was national in scope. The November 2014 letter also stated that McKesson's failures were not limited to Aurora; they were "national in scope" and the "DEA was also pursuing administrative investigations of such alleged failures at" ten additional McKesson facilities.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1

2

**B.      The 2017 Settlement Reveals that Defendants Permitted McKesson to Engage in the Same Misconduct that Resulted in the 2008 Settlement**

3

4       73.      On March 19, 2015, the McKesson Board "authorized a global settlement with the

5   DEA and DOJ," according to minutes of its meeting.  In its Form 10-K filed May 12, 2015,

6   McKesson disclosed "[i]n March 2015, we reached an agreement in principle with the DEA and

7   Department of Justice pursuant to which we agreed to pay the sum of $150 million to settle all

8   potential administrative and civil claims relating to investigations about the Company's suspicious

9   order reporting practices for controlled substances."

10      74.      Nearly two years passed before the settlement would become finalized and more

11  details would be made public.

12      75.      On January 17, 2017, the DOJ announced that McKesson had agreed to pay a $150

13  million to settle charges that McKesson failed to report suspicious orders of pharmaceuticals.

14      76.      The 2017 Settlement constituted an admission that McKesson had wholly abdicated

15  its responsibilities under the 2008 Agreements.  The 2017 Settlement proved that McKesson had

16  simply failed to abide by the policies it agreed to follow and monitor in 2008.

17      77.      Under the 2017 Settlement, the Company agreed to pay a $150 million civil penalty,

18  and to suspend sales of controlled substances from several distribution centers, for multiple years, in

19  order to resolve continued violations of applicable statutes and regulations governing controlled

20  substances.  The DOJ described the $150 million payment as a "record," and it said the suspensions

21  "are among the most severe sanctions ever agreed to by a [DEA] registered distributor."

22      78.      In settling with DEA and the DOJ in 2017, McKesson admitted that it breached the

23  terms of its 2008 Settlement by failing to "identify or report to DEA certain orders placed by certain

24  pharmacies which should have been detected by McKesson as suspicious...."

25      79.      McKesson also admitted that it should have identified these orders as "suspicious"

26  based on guidance it received from the DEA in 2006 and 2007 in the DEA Letters concerning the

27  requirements set forth in 21 U.S.C. § 842(a)(5) (a section of the Controlled Substances Act), and

28  corresponding regulations.

80.     The 2017 Settlement proved that McKesson failed to abide by the 2008 Agreements and failed to correct the Director and Officer Defendants' behavior.

81.     One element of the 2017 Settlement was an Administrative Memorandum of Agreement executed by McKesson's President of U.S. Pharmaceutical Mark Walchirk ("Walchirk") and the DEA ("2017 MOA").  The 2017 MOA revealed that, from *January 1, 2009 to January 17, 2017* (the "Covered Time Period"):

g.     "McKesson failed to maintain effective controls against diversion of particular controlled substances" at 12 different distribution centers – including (not surprisingly) Aurora and Landover.

h.     "McKesson failed to properly monitor its sales of controlled substances and/or report suspicious orders to the DEA, in accordance with McKesson's obligations under the 2008 Agreements, the CSA and 21 C.F.R. § 1301.74(b);

i.     "McKesson failed to follow the procedures and policies set forth in the McKesson CSMP to detect and disclose suspicious orders of controlled substances.  Among other things, McKesson failed to conduct adequate due diligence of its customers, failed to keep complete and accurate records in the CSMP files maintained for many of its customers, and bypassed suspicious order reporting procedures set forth in the McKesson CSMP."

j.     "McKesson failed to inform the DEA Field Division Offices and/or DEA Headquarters of suspicious orders of controlled substances made by its customers during the Covered Time Period, including orders of unusual size, orders deviating substantially from normal patterns, and orders of unusual frequency, as required by and in violation of 21 C.F.R. §130l.74(b), 21 U.S.C. § 842(a)(5), and the 2008 Agreements";

k.     "failed to report suspicious orders for controlled substances in accordance with the standards identified and outlined in the DEA Letters"; and

l.     "McKesson Distribution Centers distributed controlled substances to pharmacies even though those Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R § 1306.04(a)."

82.     According to the DOJ's announcement of the 2017 Settlement, despite entering into the 2008 Agreements, and creating the CSMP, "McKesson supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills, frequently misused products that are part of the current opioid epidemic."

83.     One example provided by the DOJ: "McKesson did not fully implement or adhere to its own program.  In Colorado, for example, McKesson processed more than 1.6 million orders for controlled substances from June 2008 through May 2013, but reported just 16 orders as suspicious."

84.     The DOJ described the $150 million penalty as a "record."  As part of the settlement, McKesson also agreed to suspend controlled substance shipments from its Aurora, Colorado, Distribution Center for three years, its Livonia, Michigan, Distribution Center for two years, and from its Washington Court House, Ohio, Distribution Center for two years.  McKesson also agreed that its Lakeland, Florida, Distribution Center (another repeat offender from the 2008 Agreements, where McKesson's license to distribute Schedule III controlled substances was temporarily suspended) would suspend delivery of Schedule II hydromorphone products for two years.  These were among "the most severe sanctions ever agreed to by a [DEA] registered distributor," according to the DOJ.

85.     McKesson also agreed to make various reports of its controlled substance shipments to the DEA.  McKesson also agreed to specific, rigorous staffing and organizational improvements; periodic auditing; and stipulated financial penalties for failing to adhere to the compliance terms.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

Critically, the 2017 Settlement required McKesson to engage an independent monitor to assess compliance – the first independent monitor of its kind in a CSA civil penalty settlement.

86.     It is also important to note that McKesson admitted to its misbehavior.  In a section of the 2017 MOA entitled "Acceptance of Responsibility," McKesson "acknowledge[d] that, at various times during the period from January 1, 2009 up through and including the Effective Date of this Agreement (the "Covered Time Period") it did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters[.]"

87.     McKesson also admitted its failure to comply with the requirements of the 2008 Agreements: "McKesson acknowledge[d] that, at various times during the Covered Time Period, it did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 [Memorandum of Agreement]."

88.     The 2017 Settlement thus constitutes an admission that the Defendants had simply failed to resolve a serious problem that they had been aware of since at least the beginning of 2008 and to which the Company was contractually obligated under the 2008 Agreements.

89.     Moreover, the 2017 Settlement places burdens on McKesson going forward.  In addition to the substantial monetary payment, several of McKesson's Distribution Centers were barred from distributing all controlled substances for years at a time.

90.     McKesson also agreed to follow the terms of a 36-page "Compliance Addendum" attached to the 2017 MOA.

91.     Of particular note: the Compliance Addendum acknowledges the board's failure to implement and monitor an effective CSMP process by now requiring an outside monitor – termed an "Independent Review Organization"  or "IRO" – to perform (i) Threshold Change Request Reviews; (ii) Onboarding New Customer; (iii) Event Triggered Due Diligence Review; and (iv) Incentive Compensation Review.  McKesson agreed that "the compensation for Regulatory Affairs

Department and Regulatory Affairs Third-Party Personnel shall not be based on revenue or profitability targets or expectations for sales of controlled substances[.]"

92.     The IRO is also empowered to interview members of the McKesson Regulatory Affairs Department to the extent that it "identif[ies] questions or concerns about particular decisions." The IRO can also review emails and documents.  The IRO is to prepare annual reports, as well as a series of audit reports.

93.     McKesson is also required to make annual compliance reports to the government and to implement a series of committees, among other steps.

94.     In short, the misconduct of the Director and Officer Defendants resulted in settlement requirements that are burdensome and costly for McKesson and its shareholders, and is a direct result of the Director and Officer Defendants being forced to outsource their obligations because of these defendants' personal and collective failures to run the Company in compliance with controlled substances laws and regulations.

**C.     The Biggest of the "Big Three": McKesson is the Largest Pharmaceutical Distributors in the Country**

95.     In the United States, pharmaceutical manufacturers do not sell drugs directly to patients or pharmacies.  Instead, manufacturers sell their products to pharmaceutical wholesalers, which, in turn, sell drugs to pharmacies, which, in turn, provide the drugs to patients.  The diagram below is taken from a June 2017 publication by the University of Southern California's Leonard D. Schaeffer Center for Health Policy & Economics3 and shows the overall structure of the market for non-specialty drugs covered under private insurance and purchased in a retail setting:

---

[3] Sood, et al., *The Flow of Money Through The Pharmaceutical Distribution System* (June 2017), http://healthpolicy.usc.edu/documents/USC%20Schaeffer_Flow%20of%20Money_2017.pdf



96.    The table below, taken from the same study, identifies the key players and their market share as of 2015:

| MANUFACTURERS | | | |
|---|---|---|---|
| | **US MARKET SHARE** | | |
| **Company** | **All[4]** | **Brands[5]** | **Generics[13]** |
| Gilead Sciences (Brand) | 6.9% | 10.9% | -- |
| J&J (Brand) | 5.9% | 9.4% | -- |
| Roche (Brand) | 5.7% | 9.0% | -- |
| Merck & Co (Brand) | 5.7% | 9.0% | -- |
| Amgen (Brand) | 5.3% | 8.5% | -- |
| Pfizer (Brand) | 4.7% | 7.4% | -- |
| Fresenius Kabi (Generic) | 4.6% | -- | 3.1% |
| AbbVie (Brand) | 4.4% | 6.9% | -- |
| Sanofi (Brand) | 4.3% | 6.8% | -- |
| Novartis (Brand) | 3.3% | 5.3% | -- |
| Astrazeneca (Brand) | 3.1% | 4.8% | -- |
| Allergan (Brand) | 3.0% | 4.7% | -- |
| GlaxoSmith Kline (Brand) | 2.6% | 4.2% | -- |
| Pfizer-Hospira (Generic) | 2.3% | -- | 3.6% |
| Teva (Brand) | 2.1% | 3.3% | -- |
| Mylan (Generic) | 1.6% | -- | 8.8% |
| Teva (Generic) | 1.5% | -- | 12.2% |
| Novartis-Sandoz (Generic) | 1.1% | -- | 11.5% |
| Allergan-Actavis (Generic) | 1.1% | | 8.9% |
| Aspen (Generic) | 0.4% | -- | 4.1% |
| Lupin (Generic) | 0.3% | -- | 2.7% |
| **TOTAL** | **70%** | **90%** | **55%** |

| PHARMACY BENEFIT MANAGERS | |
|---|---|
| **Company** | **Share[11]** |
| Express Scripts | 29% |
| CVS Health | 24% |
| Optum Rx | 13% |
| **TOTAL** | **66%** |

| WHOLESALERS | |
|---|---|
| **Company** | **Share[10]** |
| McKesson | 32.7% |
| AmerisourceBergen | 31.6% |
| Cardinal Health | 20.7% |
| **TOTAL** | **85%** |

| PHARMACIES | |
|---|---|
| **Company** | **Share[13]** |
| Walgreens | 14.9% |
| CVS Retail | 13.8% |
| Express Scripts Mail Order Pharmacy | 11.0% |
| CVS Mail Order | 9.0% |
| Walmart | 5.5% |
| **TOTAL** | **54%** |

| INSURERS[a] | |
|---|---|
| **Company** | **Share[b]** |
| UnitedHealth Group | 11.4% |
| Anthem | 9.2% |
| Aetna | 4.1% |
| Cigna | 4.5% |
| Humana | 8.7% |
| Centene | 3.4% |
| HealthNet | 2.6% |
| WellCare | 2.1% |
| Molina | 2.0% |
| Magellan | 0.5% |
| **TOTAL** | **49%** |

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

97.     At all relevant times, and as demonstrated above, the wholesale pharmaceutical segment of the market has been dominated by a group of three companies known as the "Big Three": Cardinal Health, Inc. ("Cardinal Health"), AmerisourceBergen Corporation ("AmerisourceBergen"), and McKesson.  Between 2008 and the present, the Big Three accounted for between 85% and 90% of all wholesale revenues from pharmaceuticals distributed in the United States.[4]  The pharmacy segment is also highly concentrated with Walgreens, CVS, Express Scripts and Walmart accounting for more than half of the total U.S. market.

98.     McKesson is the largest of the Big Three and controls nearly a third of the total U.S. market.  According to McKesson's most recent Form 10-K, its North America pharmaceutical distribution and services business is "the largest pharmaceutical distributor in the United States with more than 40,000 customers."  McKesson's annual revenues from its North America distribution business have grown every year since the 2008 Settlement, with revenues growing from $98.7 billion in 2008 to $167.8 billion in 2017.

99.     Although McKesson does not provide this level of detail in its financial statements, it seems clear that a material portion of those revenues were attributable to sales of opioids.  According to IMS Healthcare, pharmaceutical manufacturers' total U.S. revenues for sales of prescription opioids were approximately $9.6 billion, nearly one third of that amount was realized by McKesson, according to Fortune magazine's estimates, which used data from QuintilesIMS

100.    At all relevant times, the Directors and Officers Defendants were aware that the Company operated in a highly regulated environment.  The Company's Form 10-K for fiscal year 2008[5] warned: "The healthcare industry is highly regulated.  We are subject to various local, state, federal, foreign and transnational laws and regulations, which include the operating and security standards of the DEA, the FDA, various state boards of pharmacy, state health departments, the

---

[4] Although it has a handful of other operations, McKesson's core operational focus is the distribution of pharmaceuticals.  In every year from 2008 to the present, the percentage of McKesson's revenue attributable to its Distribution Solutions segment accounted for 97% or more of the Company's total revenues.

[5] McKesson's Form 10-K for fiscal year 2008 was signed by Defendants Hammergren, Bryant, Budd, Irby, Jacobs, Knowles, Lawrence, Mueller and Shaw.

HHS, CMS, and other comparable agencies. … Any noncompliance by us with applicable laws and regulations or the failure to maintain, renew or obtain necessary permits and licenses could have an adverse impact on our results of operations."  Similar language appears in each Form 10-K that McKesson has filed since and each of them is signed by the Board.

**D.      The Opioid Public Health Emergency**

101.    Opioids are a diverse category of painkillers including oxycodone, hydrocodone and fentanyl.  The potency and easy availability of opioids have made them popular as a prescribed and recreational drug.  Controlling distribution of these highly addictive pain medications is a known component to combating this crisis effectively.

102.    For most of the 20th century, doctors reserved opioids for severe, short-term pain; such as surgery; or for pain related to deadly diseases like cancer.  But in the 1990s that changed when prescriptions for pain related to arthritis or back pain became more common.  By 2016, more than 289 million annual prescriptions were written for opioids.

103.    McKesson is one of the few distributors of opioids in this country, and Defendants had to have been aware of the opioid epidemic, which has been repeatedly reported in the news for several years, and has been recognized as a public health emergency be numerous politicians, including the U.S. Congress.  Defendants should have been on heightened alert for red flags following the 2017 Settlement and McKesson's implementation of the CSMP because the opioid epidemic had become a major public health crisis, a fact repeatedly reported in the media.  The opioid epidemic or opioid crisis is the rapid increase in the use of opioid drugs in the United States since 1999.

104.    In May 2010, the Obama administration released its inaugural National Drug Control Strategy, which stated that "[p]rescription drug abuse is the fastest-growing drug problem in the United States," and recognized that "[o]piate overdoses, once almost always due to heroin use, are now increasingly due to abuse of prescription painkillers."

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

105.     In July 2016, Congress passed and President Obama signed the Comprehensive

Addiction and Recovery Act of 2016, which authorized $181 million in additional annual funding for

a variety of initiatives aimed at addressing the opioid epidemic.

106.     On October 26, 2017, the United States President declared the American opioid crisis

a public health emergency.  It is the deadliest drug epidemic in U.S. history, claiming more than

200,000 lives by April 2016 and killing about 90 Americans every day.

107.     Since 1999, over 200,000 Americans have died as a result of prescription drug

overdoses.  Thousands more have died from overdoses on heroin, fentanyl, or other non-prescription

opioids after first developing an opioid addiction through abuse of prescription pain medication.

Between 2000 and 2015, the rate of opioid overdose deaths in the United States more than tripled:



108.     As noted in a January 2017 article by the *New York Times*, "[p]ublic health officials

have called the current opioid epidemic the worst drug crisis in American history, killing more than

010688-11 994281 V2

33,000 people in 2015.  Overdose deaths were nearly equal to the number of deaths from car crashes.  In 2015, for the first time, deaths from heroin alone surpassed gun homicides."

109.    Some of these deaths took place on McKesson's doorstep.  In 2015, the Journal of Urban Health published a study of opioid overdose deaths in San Francisco between 2010 and 2012 documenting a remarkable shift: "[o]pioid overdose death[s] in San Francisco from 2010 to 2012 [were] almost exclusively due to prescription opioids, a major transition from the prior decade when heroin was the driver of such deaths."  Visconti, *et al.*, *Opioid Overdose Deaths in the City and County of San Francisco: Prevalence, Distribution, and Disparities*, J. URBAN HEALTH 92:4 758-772 (Aug. 2015).  Coincidentally, the most significant cluster of those prescription opioid overdoses appeared in a triangle formed by Geary Street, Van Ness Avenue and Market Street, less than a mile from McKesson's headquarters at the intersection of Geary and Market (indicated below with a blue star):



110.    By early 2012, it was widely apparent that federal and state regulators were focused on pharmaceutical manufacturers (*i.e.*, McKesson's suppliers), wholesalers (*i.e.*, McKesson's direct competitors) and retailers (*i.e.*, McKesson's customers) as a key part of the problem, an issue of which McKesson must have been keenly aware.  On February 21, 2012, the Wall Street Journal reported that "[t]he federal government alleges Cardinal Health Inc. and CVS Caremark Corp. [a

large retail pharmacy, and McKesson's largest customer] were aware of high-volume orders of prescription painkiller oxycodone shipped to two pharmacies in Florida, in a ***closely watched case probing how much responsibility companies bear for a growing drug-abuse problem***."  The story went on to explain that "[t]he DEA moved earlier this month to revoke controlled-medication licenses at one Cardinal distribution facility and four pharmacies – including two Sanford, Fla., stores owned by drugstore chain CVS.  Two other, independent pharmacies in Sanford that came under scrutiny in the same case voluntarily surrendered their controlled-substance licenses."  They then explained that "[t]he case involving Cardinal and CVS is the latest example of the ***DEA's strategy of targeting large corporations*** in its efforts to tame the nation's prescription drug-abuse problem."

111.    On June 26, 2012, the State of West Virginia filed suit against fourteen drug distributors, including Cardinal Health and AmerisourceBergen accusing them of being part of a "pill mill" ecosystem contributing to rampant abuse of prescription painkillers.  (AmerisourceBergen and Cardinal Health ultimately settled with West Virginia in late 2016 for $16 million and $20 million, respectively).

112.    During 2012 and 2013, both AmerisourceBergen and Mallinckrodt revealed that they had received subpoenas from the DEA seeking records regarding diversion of controlled substances and suspicious order monitoring programs.  (Mallinckrodt ultimately reached a $35 million settlement in July 2017).

113.    In June 2013, Walgreens – a large retail pharmacy – announced that it had reached an $80 million settlement with the DOJ and DEA.  In its press release announcing the settlement, DOJ explained "[t]he settlement, the largest in DEA history, resolves allegations that the Registrants committed an unprecedented number of record-keeping and dispensing violations under the Act. According to documents filed in the underlying administrative actions, the Registrants negligently allowed controlled substances listed in Schedules II – V of the Act, such as oxycodone and other prescription pain killers, to be diverted for abuse and illegal black market sales."  In its June 11, 2013

story reporting on the deal, the Wall Street Journal observed that this was part of "the U.S. Drug Enforcement Administration's strategy of cracking down on rampant prescription drug abuse by targeting large corporations like Walgreen," and noted that other large distributors and retailers were also targets:

> Other national pharmacy companies, like CVS Caremark Corp. and Cardinal Health Inc., have recently been targeted over pain pills by the DEA. Cardinal, one of the nation's largest drug wholesalers, reached a settlement last year with the DEA to halt controlled-substance shipments from a Lakeland, Fla., facility.  In August, two subpoenas were issued by federal prosecutors and agents against a major wholesaler, AmerisourceBergen Corp.

114.    In October 2013, a presentation to McKesson's Board noted that the "CDC has declared abuse of controlled substances as a nationwide epidemic."  In that same October 2013 presentation, Board members were warned that "Prescription drugs cause more deaths than heroin and cocaine combined," that "[prescription drug abuse is a nationwide problem, to which all members of the industry must respond," and that DEA "enforcement will continue and likely increase."

115.    By then it was too late.  As detailed below, as a result of the Board's oversight failures, the wheels were already set in motion for a massive federal investigation of McKesson that would ultimately lead to the 2017 Settlement.

116.    As that investigation moved forward, the opioid crisis became an increasingly significant focus of public and regulatory attention.  So much so that in March 2014, Deval Patrick, then-Governor of Massachusetts, declared a public health emergency to combat opioid abuse, stating "[w]e have an epidemic of opiate abuse in Massachusetts, so we will treat it like the public health crisis it is[.]"  Days later, the U.S. Attorney General, Eric Holder, issued a statement describing the rise in opioid overdose deaths as an "urgent public health crisis," stating "right now, few substances are more lethal than prescription opiates and heroin."

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

117.   Since 2014, several state and federal legislators have taken or proposed regulatory efforts to address the opioid epidemic.

118.   On April 30, 2015, McKesson announced the broad outlines of what would become the 2017 Settlement:

On April 30, 2015, McKesson Corporation (the "Company") announced that it reached an agreement in principle with the Drug Enforcement Administration ("DEA"), Department of Justice ("DOJ") and various U.S. Attorney's offices to settle all potential administrative and civil claims relating to investigations about the Company's suspicious order reporting practices for controlled substances.  The investigations and potential for settlement were previously disclosed in the Company's Quarterly Report on Form 10-Q that was filed with the Securities and Exchange Commission on February 5, 2015.  The global settlement with the DEA and DOJ is subject to the execution of final settlement agreements.
Under the terms of the agreement in principle, the Company has agreed to pay the sum of $150 million, implement certain remedial measures and have the following distribution centers' DEA registrations suspended for the specified products and time periods:

- Aurora, Colorado: all controlled substances for three years;
- Livonia, Michigan: all controlled substances for two years;
- Washington Courthouse, Ohio: all controlled substances for the two-year period following completion of the Livonia suspension; and
- Lakeland, Florida: hydromorphone products for one year.

119.   Since the April 20, 2015 announcement, the Company's share price has declined over 40% and has recently traded as low as $135 per share.

120.   These are just some examples of the thousands of publicly reported incidents that had to have put Defendants on notice of the crisis their acts and practices were contributing to, and Defendants should have been aware of their contribution to the opioid crises resulting from their failure to oversee McKesson's distribution, sales and reporting obligations relating to these highly addictive drugs.  Instead, they ignored the red flags about the increasing opioid epidemic, despite the fact that McKesson was one of the largest distributors of these drugs in the country, and remained focused on increasing McKesson's profits.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### E.     McKesson's Directors and Officers are Charged with Protecting McKesson and Ensuring that McKesson Complies with Federal Drug Laws and Regulations

121.    Delaware law imposes the traditional fiduciary duties of care, loyalty, good faith and disclosure upon all directors and officers to a corporation and the corporation's shareholders.  Except where exempted under the General Corporation Law of the State of Delaware, it is the duty and responsibility of the Board of Directors to manage the business of a Delaware Corporation.  As such, McKesson's Directors and Officers are entrusted with management responsibility and must protect the interests of the corporation and its shareholders.

122.    To facilitate execution of their duties and responsibilities, McKesson codified Directors' and Officers' roles in committee charters, among other places.  A board charter is a policy document that defines the respective roles, responsibilities, and authorities of the board of directors and management.  At McKesson, a charter that charges the committee and management with certain duties and responsibilities governs each Board committee.

123.    By reason of their positions as officers, directors, and fiduciaries of McKesson and because of their ability to control the business and corporate affairs of McKesson and its subsidiaries, Defendants owed McKesson and its shareholders fiduciary obligations of care, good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage McKesson in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of McKesson and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to McKesson and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

124.    To fulfill their responsibilities and duties, the Directors and Officers of McKesson must supervise and manage McKesson's policies, controls, and compliance with applicable controlling statutes.  McKesson's Directors are each made aware of their duties and responsibilities

010688-11 994281 V2

1  when, as new Board members they are required to undergo training and education on fiduciary

2  obligations.

3        125.    In addition to these fiduciary duties, the Directors' and Officers' oversight and

4  management obligations require them to know of and oversee compliance with various laws and

5  regulations that apply to McKesson's business.  As a drug distributor, McKesson is subject to

6  extensive regulation and regulatory oversight from both the federal government and each of the

7  States that it operates within.  McKesson distributes pharmaceuticals through a network of

8  distribution centers located throughout the United States ("Distribution Centers").

9        126.    McKesson's pharmaceutical distribution business is heavily regulated.  The Board has

10  acknowledged its awareness of this in all of its annual statements where they reiterate that

11  McKesson's business is "highly regulated" and that "[a]ny noncompliance by us with applicable

12  laws and regulations or the failure to maintain, renew or obtain necessary permits and licenses could

13  lead to litigation and have a material adverse impact on our results of operations."  In particular,

14  McKesson Distribution Centers are required to operate in accordance with the statutory requirements

15  of the Comprehensive Drug Abuse Prevention and Control Act of 1970 ("CSA"), 21 U.S.C. §§ 801

16  *et seq.*, and the regulations promulgated pursuant to the CSA, 21 C.F.R. Part 1300, *et seq*.  Congress

17  enacted the CSA in 1970 with two goals.  First, to promote public health by making medications

18  available to patients and second, to protect public safety by abating illegal diversion of these

19  controlled substances.

20        127.    The CSA created a "closed" chain of distribution designed and intended to prevent the

21  diversion of legally produced controlled substances into the illicit market.  The regulations applied to

22  this closed system require McKesson to design and operate a system to monitor, identify, halt and

23  report "suspicious orders" for controlled substances, as that term is defined in the regulation.  *See* 21

24  C.F.R. § 1301.74(b).  McKesson holds a Certificate of Registration issued by the DEA authorizing

25  the Company to distribute controlled substances from its Distribution Centers.

26

27

28

128.     The DEA sent McKesson the DEA Letters, which were guidance for identifying and reporting suspicious orders to the DEA, as required by 21 C.F.R. § 1301.74(b).  Each letter made clear that federal regulations impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant.  Suspicious order include orders of unusual size, orders deviating substantially from a normal pattern, and order of unusual frequency."  21 C.F.R. §1302.74(b).  Companies that fail to report suspicious orders can face fines and revocation of their DEA Certificates of Registration.  21 U.S.C. § 824(a)(4).

129.     To discharge their duties, the officers and directors of McKesson were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of McKesson were required to, among other things:

m.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

n.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

o.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

130.     Defendants were aware that McKesson was at heightened risk for violations of the CSA because the Company was already accused of violating the CSA and it had entered into the 2008 Settlements.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

131.     As detailed in this Complaint, the Board and management consciously disregarded their duties and responsibilities to McKesson and its shareholders.  Defendants failed to monitor or oversee the operations of McKesson, thereby disabling them from being informed of the ongoing violations of the CSA, the terms of the 2008 Settlements and their fiduciary responsibilities. Defendants failed to act in conscious disregard where they has a known obligation to act.

1.     **The Directors and Officers Have a Duty to Run McKesson in a Legal and Ethical Manner Under McKesson's Corporate Code of Conduct and Corporate Governance Policies**

132.     The Board knows that when they agree to serve as a McKesson Director, they are responsible for overseeing, monitoring, and reporting on the Company's compliance risks.

133.      On November 9, 2012, McKesson's "Code of Ethics Application to the Chief Executive Officer, Controller and Financial Managers" was consolidated with and into the "Code of Conduct" and it expressly applies to all employees regardless of position or tenure, including the Directors and Officers.  Every Director, Officer and employee has "a duty to read and understand our Code and the local policies applicable to our jobs."

134.     In the preamble to McKesson's current Code of Conduct, CEO Hammergren states that "McKesson's mission is to bring better business health to our customers and better health to the patients they serve.  …Our long-term success depends on ensuring that we demonstrate the highest ethical standards in everything we do, everywhere we operate."  The Code of Conduct insists that in order to protect their reputation that all McKesson's Directors, Officers and employees "comply with quality and safety-related standards.  These include applicable laws and regulations and internal procedures that promote the safe handling, distribution and manufacture of high-quality goods."

135.     McKesson further espouses the importance of ethical behavior in its Corporate Governance Guidelines which state "[t]he Board is committed to, ensuring that the Company operated in a legal and ethically responsible manner and in conformance with the Code."  These same Guidelines charge the Board with monitoring "both the performance of the Company (in

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

relation to its financial objectives, major goals, strategies and competitors) and the performance of the Company's Chief Executive Officers" and emphasize that the Board is "responsible for assuring that the Company's management and employees operate in a legal and ethically responsible manner."

136.    Had the Director and Officer Defendants adhered to their fiduciary duties and the terms of the Corporate Code of Conduct and Corporate Governance Guidelines, McKesson would not be in violation of the 2008 Settlement terms and would not have suffered the financial and reputational harm culminating in the 2017 Settlement.

**2.    The Board's Audit Committee is Responsible for Monitoring McKesson's CSA Compliance**

137.    The primary purpose of a corporate audit committee is to provide oversight of the financial reporting process, the audit process, the system of internal controls and compliance with laws and regulations.  Effective audit committees will consider internal controls and review their efficacy.  Reports on, and management responses to, observations and significant findings should be obtained and reviewed by the audit committee.  Controls over financial reporting, information technology security and operational matters fall under the purview of the well-designed audit committee.

138.    The April 30, 2014 Charter of the Audit Committee of the Board of Directors defines the Board appointed Audit Committee's general purpose, authority, composition, responsibility and reporting requirements.  McKesson's Board defines the Audit Committee's purpose to include assisting the Board in monitoring integrity of financial statements, auditor independence and performance, internal audit functions, and "[t]he *compliance by the Company with legal and regulatory requirements*."  The Audit Committee's Charter also places responsibility on the Audit Committee for preparing the report on this compliance for inclusion in the Company's annual proxy statement as required by the rules of the SEC.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

139.    The Audit Committee charter requires that the committee consist of at least three independent members of the Board.  The current committee consists of Defendants Knowles, Knauss and Salka.  Membership on McKesson's Audit Committee is determined by the Board on the recommendation of the Committee on Directors and Corporate Governance.

140.    Members of the Audit Committee are required to meet at least quarterly and to "meet periodically with management, the internal auditor and the independent auditors in separate executive sessions, and also in executive session with only the Committee members."  They are responsible for monitoring the Company's information and reporting systems to track the Company's compliance with the statutes and regulations that govern sales of controlled substances and the suspicious order reporting mandated by the DEA.

141.    The Audit Committee must make regular reports to the Board and is required to review and assess the Audit Committee charter at least annually and to make recommendations for proposed changes to that charter to the full Board.  The Audit Committee must also conduct an annual self-assessment and report the results to the Board.

142.    McKesson explicitly charges members of the Audit Committee with engaging in periodic discussions with management about, monitoring and reporting to the Board regarding "guidelines and policies to govern the process by which risk assessment and management is undertaken …."  The Audit Committee is also charged with reviewing disclosures made to the Audit Committee by the "Company's CEO and CFO during the certification process for the Form 10-K and 10-Q about any significant deficiencies in the design or operation of internal controls…."

143.    The Audit Committee is also charged with oversight of McKesson's relationship with the independent auditors.  To fulfill this oversight, the charter requires that the Audit Committee obtain and review a report from the independent auditors at least annually and that report must contain an account about the independent auditors' independent quality control procedures.  The Audit Committee report and the Audit Committee's conclusions resulting from the report and

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

analysis of the independent auditors' qualifications, performance and independence must be presented to McKesson's Board.

144.    The Audit Committee's obligations include ***compliance oversight*** responsibilities.  In furtherance of its compliance oversight obligations, the Audit Committee is required to obtain at least annual reports prepared by management and attested to by the independent auditor that assess the effectiveness of the McKesson's internal control structure and procedures for financial reporting and stating management's responsibility to establish and maintain such structure and procedures, prior to its inclusion in the Company's annual report.  The Audit Committee must also have quarterly discussions with the Company's General Counsel regarding legal matters that may have a material impact on the Company's financial statements.

145.    The Audit Committee's compliance oversight obligations also require them to:

> Discuss annually with the individual(s) with operational responsibility for the compliance and ethics program the implementation and effectiveness of the Company's compliance and ethics program in detecting and preventing violations of law and the Company's Code of Business Conduct and Ethics.

146.    In 2013, the year that the DEA raided McKesson's Aurora distribution facility ultimately resulting in the 2017 settlement, the Company confirmed in its proxy statement (the "2013 Proxy Statement") disclosures that the Board had ultimate responsibility for risk management, but, as reflected in the charter, had delegated various oversight functions to the Audit Committee.  The 2013 Proxy Statement states that the Audit Committee "engages in ongoing discussions regarding major financial risk exposures and the process and system employed to monitor and control such exposures.  In addition, consistent with its charter, the Audit Committee engages in periodic discussions with management concerning the process by which risk assessment and management are undertaken."

147.    The 2013 Proxy Statement further states, "[i]n carrying out these responsibilities, the Audit Committee, among other things, regularly reviews with the head of Internal Audit the audits or

assessments of significant risks conducted by Internal Audit personnel based on their audit plan; and the committee regularly meets in executive sessions with the head of Internal Audit … As part of the reviews involving Internal Audit …, the Audit Committee reviews steps taken by management to monitor, control and mitigate risks.  The Audit Committee also regularly reviews with General Counsel and Chief Compliance Officer significant, legal, regulatory, and compliance matters that could have a material affect the Company's financial statements or business.  Finally, from time to time executives who are responsible for managing a particular risk report to the Audit Committee on how the risk is being controlled and mitigated."

148.    After signing the 2008 Settlement, the following Directors have served on the Audit Committee: Marie L. Knowles, Chairperson; Donald Knauss; Susan Salka; Wayne Budd; Alton Irby; Jane Shaw, and Andy Bryant.

149.    The Audit Committee members, as set forth in the committee's charter and reiterated in the Company's proxy statement disclosures, had direct responsibility for oversight of McKesson's compliance functions including compliance with the 2008 Settlement, the CSMP, and the controls over the sale of controlled substances and suspicious order reporting.

### 3.    The Board's Governance Committee Duties

150.    The May 28, 2014 Charter of the Board's Governance Committee charged the Governance Committee with several duties including (i) advising the Board with respect to the Board composition, compensation, procedures and committees; (ii) to develop and recommend to the Board a set of corporate governance guidelines application to the Company; and (iii) to oversee the evaluation of the Board.

151.    The Governance Committee Charter obligates members of the Committee to meet and report on the meeting to the Board, including a summary description of actions taken by the Committee at the meetings.  The Governance Committee is also required to meet annually to evaluate and report to the Board, the Company's governance related performance, including

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

comparing the Company's performance against it goals and objectives for the prior year, and setting forth goals and objectives of the impending year.  The Governance Committee is required to evaluate factors such as "the adequacy, appropriateness and quality of the information and recommendations presented by the Committee to the Board, the manner in which they were discussed or debated, and whether the number and length of meetings of the committee were adequate for it to complete its work in a thorough and thoughtful manner."

152.    After signing the 2008 Settlement Agreement, the following Directors have served on the Governance Committee: Donald Knauss, Chairperson; N. Christine Jacobs; Edward Mueller; Susan Salka; Wayne Budd, former Chairperson; David M. Lawrence, and; Jane Shaw, former Chairperson.

### 4.    The Board's Compensation Committee Duties

153.    The primary purposes of a corporate compensation committee include setting the Company's philosophy on compensation and overseeing compliance with legal rules affecting compensation.  The U.S. Securities and Exchange Commission (the "SEC") and the New York Stock Exchange (the "NYSE") require a publicly held company to have a compensation committee that assumes a number of compensation-related responsibilities.  These requirements establish the floor for responsibilities of a NYSE listed, SEC reporting corporation.

154.    The April 30, 2014 Charter of the Board's Compensation Committee makes clear that the Board retains significant control over McKesson's Compensation Committee while vesting the Compensation Committee with significant compensation related authority.  The Compensation Committee charter states that the Compensation Committee is appointed by the Board to "discharge the Board's responsibilities with respect to all forms of compensation for the company's executive officers and to administer the Company's equity incentive plans for employees."

155.    The charter outlines that the Compensation Committee must have three or more members but the exact number of members can be determined and altered by the Board.  The Board

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

selects the members of the Compensation Committee by majority vote and the Board will select the chairperson of the Compensation Committee.  The Board retains the power to remove members of the Compensation Committee at any time during the committee member's term of service.  The Compensation Committee itself is only allowed to select its own chairperson in the event the full Board fails to fulfill this task.

156.     The Compensation Committee is only required to meet at least twice each year, but may be called upon to meet more frequently at the Board's request and the committee is required to maintain minutes of its meetings that will be retained as part of the books and records of the Company.

157.     The oversight responsibilities assigned to the Compensation Committee by its charter charge this Committee with numerous duties including setting the Company's overall compensation philosophy and aligning that philosophy with the Company's business strategy.

158.     The Compensation Committee has ***sole authority to determine the form and amount of compensation to be paid or awarded to the CEO and all other executive officers***.

159.     When setting the CEO's compensation, they are required to annually review and report on the CEO's 1) salary; 2) grants of case-based bonuses and equity compensation; 3) changes to the CEO's employment contract; 4) severance or change in control arrangements; 5) material prerequisites provided to the CEO; 6) any other compensation matter that may arise as *directed by the Board*.  Among the consideration the Compensation Committee must undertake when establishing the CEO's compensation are ***the Company's performance and relative shareholder return,*** a comparison to other CEO's at comparable companies and the incentive awards previously granted to the CEO by the Company.

160.     For all other executives, the Compensation Committee is assigned the same list of relevant factors to review and approve annually, but for these executives, the Compensation Committee conducts the review conducts its evaluation in consultation with the CEO.

161.    The Compensation Committee is vested with authority to review the incentive-compensation, equity-based compensation, deferred compensation, or other plans in the Company's executive benefits program.

162.    Any "say on pay" vote or other shareholder votes with respect to compensation are reviewed and considered by the Compensation Committee and the Committee is charged with recommending any changes because of these votes.

163.    The Compensation Committee is responsible for generating reports that comply with SEC rules and regulations for inclusion in SEC filings, including quarterly, annual and proxy statements.

164.    Finally, the Compensation Committee is required to review its charter every year and recommend any updates or changes that it believes are appropriate.  It must also conduct annual review of its own performance and report that review to the Board.

165.    After signing the 2008 Settlement Agreement, the following Directors have served on the Compensation Committee: Andy Bryant, Chairperson; N. Anthony Coles; Christine Jacobs; Edward Mueller; David M. Lawrence; Jane Shaw, former Chairperson; Alton Irby, former Chairperson.

**F.    The Directors and Officer Defendants Breached their Fiduciary Duties**

166.    During the time period leading up to the 2017 Settlement, the Company maintained an information and reporting system that was reportedly designed to detect and report on the sales of controlled substances, and to monitor the Company's compliance with all applicable laws and regulations.  Those enhanced systems were a direct response to the 2008 Settlement in the form of the CSMP.  The Company's Internal Audit department has the ability to audit the CSMP and generate reports concerning the CSMP.  Those reports fell within the oversight and management responsibilities of the Board.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**1.      The Audit Committee Minutes Demonstrate a Conscious Failure to Carry Out Oversight**

167.     In response to a demand for books and records, McKesson produced redacted minutes of 17 Audit Committee meetings that took place between 2008 and 2016.  The Audit Committee Charter required the Audit Committee to meet a minimum of 36 times between 2008 and 2016, so we can infer that there were nineteen meetings with no discussion of the CSMP whatsoever.  Even in the 17 Audit Committee meetings for which McKesson did produce minutes, it appears that issues related to controlled substances were given scant attention.

168.     Importantly, on January 27, 2015, at the height of the DEA's investigation into McKesson's opioid dumping practices and two months before inking the 2017 Settlement Agreement, the Audit Committee received a report from the Company's internal auditors stating that the internal audit "***finds no issues were identified related to the reporting of suspicious orders.***"

169.     This conclusion was presented to the Audit Committee just two months after McKesson received letters from the DEA alleging McKesson failed to maintain effective controls against diversion of controlled substances nationally.  It was presented just nine days before the Company would file a Form 10-Q (on February 5, 2015) stating that "the Company was informed in the third quarter of 2014 of an investigation by the U.S. Department of Justice ('DOJ') through the United States Attorney's Office for the Northern District of West Virginia of potential claims under the Comprehensive Drug Abuse Prevention and Control Act relating to the Company's pharmaceutical distribution of certain controlled substances by its Landover, Maryland Distribution Center, which closed in 2012.

170.     The Company revealed in its Form 10-Q filed with the SEC that in the second quarter of 2015 it received a letter from the USAO for the District of Colorado "advising of an investigation and similar potential claims relating to the Company's distribution of certain controlled substances by its Aurora, Colorado distribution center.  The DOJ and other United States Attorney's offices are also involved in investigations of other distribution centers.  The Company has been engaged in discussions with the DOJ, United States Attorney's offices and the DEA with the purpose of

resolving all potential claims under the Comprehensive Drug Abuse Prevention and Control Act.  It is possible that the ultimate cost to resolve these matters may be significant and require changes to the Company's procedures for distributing certain controlled substances."

171.    Yet, notwithstanding contemporaneous settlement talks with DOJ and the DEA that could lead to a "significant" cost, the Audit Committee did not question the conclusion that "no issues were identified relating to the reporting of suspicious orders."

172.    This egregious lapse was symptomatic of the Audit Committee's performance throughout the relevant period.  The January 22, 2008 minutes of the Audit Committee reflect that at that meeting, held mere months before signing the 2008 Settlement Agreement with the DEA and DOJ, the full Audit Committee attended, including Chairperson Knowles, Budd, and Shaw and they heard presentations from Nigel Rees, Vice President and Controller, regarding a "significant and other items of accounting interest in the third quarter, including, among other things, a legal reserve relating to a pending settlement with the U.S. Drug Enforcement Administration ("DEA") and certain U.S. Attorney Offices ("USAOs").  Although heavily redacted, the presentation from Mr. Rees included a report that "pertained to …. certain tax credits offset by a non-tax deductible increase in a legal reserve pertaining to the pending settlement with the DEA and USAOs…."  The minutes do not reflect any discussion about the Company's compliance deficiencies or underlying causes that resulted in the 2008 Settlement.

173.    The May 2, 2008 minutes of the Audit Committee demonstrate that all members of the Audit Committee were present, Knowles, Chairperson, Budd and Shaw.  Also, present at this meeting of the Audit Committee were Board members Bryant, Lawrence, Napier, as well as Officers including CEO Hammergren, CFO Jeffrey C. Campbell ("Campbell"), General Counsel and Secretary Laureen E. Seeger, Vice President and Controller, Nigel Rees, Vice President, Internal Audit and the outside auditors.  This meeting took place the same day that the DEA and DOJ issued press releases disclosing the 2008 Settlement.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1

174.    The minutes of the May 2, 2008 Audit Committee are extensively redacted, but show

2    that the Board and senior executives heavily attended the meeting.  The meeting began at 8:00 am

3    and concluded at 8:35 am.  The minutes of this meeting are five pages long and other than the cover

4    page, there are nine unreadacted lines, three of which recount "with respect to the disclosure

5    regarding discussions between the Drug Enforcement Administration (or DEA) and certain United

6    State Attorneys Officers, Ms. Seeger advised the Committee…"

7    175.    The Audit Committee minutes reflect Defendants' understanding that the opioid crisis

8    was becoming a national emergency.  The Audit Committee was informed that the CSMP was not

9    functioning properly, but the Audit Committee again did nothing to fix it.  Specifically, at the

10    October 22, 2008 Audit Committee meeting attended by Chairperson Knowles, Budd, Bryant, Shaw,

11    Seeger, and Rees, Jill Robinson, Vice President of Internal Audit "provide[d] background to and

12    summaries of selected audits, including… U.S. Pharmaceuticals – Controlled Substance Monitoring

13    Program[.]" Robinson's presentation to the Audit Committee categorized states that for the second

14    quarter of Fiscal Year 2009, McKesson completed its Internal Audit of the CSMP as categorized the

15    CSMP as "Needs Improvement."

16    176.    The Audit Committee minutes further reflect that at the same October 22, 2008

17    meeting the internal audit of the CSMP was conducted "[a]t the request of the Law Department" "to

18    detect and prevent diversion of controlled substances."  The results of this audit provided evidence to

19    the Audit Committee and Seeger that the CSMP was not implemented to ensure that McKesson

20    would comply with the CSA and the 2008 Settlement.  This presentation to the Audit Committee

21    identified with particularity "key issues" related to deficiencies in the CSMP.  For example, the

22    Audit Committee and Seeger were informed that "[s]ome Med-Surg and Pharma customers have not

23    yet been assigned thresholds in the system to flag large shipments of controlled substances for

24    review", and that "documentation evidencing new customer due diligence was incomplete."  The

25    Audit Committee and Seeger were further informed that "documentation supporting the company's

26    decision to change thresholds for existing customers was also incomplete."  The audit further

27

28

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1    informed the Audit Committee and Seeger that they had "identified opportunities to enhance the

2    Standard Operating Procedures (SOPs)" for the CSMP.  Even though this presentation mentioned

3    that management had taken steps to address the serious deficiencies identified in this audit, the Audit

4    Committee, Seeger, and the full Board did nothing to ensure that the CSMP was implemented and

5    properly functioning to prevent future CSA violations and related fines.  In fact, for the next two

6    years, the Board did nothing as McKesson continued to fail to comply with the CSA and the 2008

7    Settlement.  Moreover, the Board knew that due to the 2008 Settlement, McKesson was under

8    increased scrutiny from the DEA and DOJ, so it had an increased duty to ensure that McKesson's

9    compliance with the CSA.

10          177.    Within McKesson' books and records request production, there is only one set of

11   redacted Audit Committee minutes in 2009.  The single set of minutes from January 20, 2009 shows

12   that the Audit Committee that day was attended by the full Audit Committee (Chairperson Knowles,

13   Bryant, Budd and Shaw) as well as the CFO Campbell, General Counsel and Secretary Laureen

14   Seeger, Nigel Reeds, Jill Robinson and a few other executives and the outside auditors.  The minutes

15   of the Audit Committee meeting show that there was a presentation at the request of Chairperson

16   Knowles on the Internal Audit Report.  That presentation included an overview of the audits and

17   other projects completed.  At this meeting, members of the Audit Committee and executives in

18   attendance discussed in the Internal Audit Report for the Third Quarter of Fiscal Year 2009 which

19   included a statement that the U.S. Pharma Business Unit completed the audit of its Controlled

20   Substance Monitoring Program.

21          178.    For 2010, McKesson only produced the Audit Committee's July 27, 2010 meeting

22   minutes.  All members of the Audit Committee were present: Knowles, Bryant, Budd and Shaw.

23   Also present were executives Campbell, Seeger, Rees, and Mark Fuller ("Fuller"), Vice President,

24   Internal Audit, among others.  At the request of the Chairperson Knowles, Fuller presented an

25   Internal Audit Report for McKesson's first quarter of fiscal year 2011.  Fuller provided a

26   "background to and summaries of selected audits and projects, including those involving U.S.

27

28

Pharmaceutical distribution center operations." The minutes reflect that Audit Committee members asked questions relating to Fuller's presentation. McKesson also produced a redacted version of Fuller's presentation to the Audit Committee, dated July 27, 2010, entitled "Internal Audit Report, First Quarter FY2011." This presentation included selected audit summaries of the "US Pharma Distribution Center operations and STARS (Standard Team Audit Review System) program that is used to monitor risks associated with inventory, security, operations and regulatory areas." The audits "evaluated the effectiveness of key controls surrounding the Controlled Substance Monitoring and Pedigree requirements." The auditors found that "*the Distribution Centers selected for testing consistently lacked documented evidence to demonstrate controls are operating effectively,*" and that "*adequate controls [were] not in place* to ensure the required Pedigree is included when invoicing wholesale licensed customers." Fuller claimed that the issues were communicated to the "appropriate level of management" and "action plans [were] created to address the areas across the DC network." Despite being informed of these audit findings, the Audit Committee did little to address this glaring red flag, as there appears to have been no follow up on these findings at the next few Audit Committee meetings. And, as we know from the 2017 Settlement Agreement, McKesson's conduct and inadequate controls continued from this date forward.

179. ***Nearly one year*** passed before the next Audit Committee meeting minutes that contain any reference to McKesson's CSMP, the CSA, the DEA or the DOJ. Those minutes memorialize a meeting on May 24, 2011. In attendance for the May 24, 2011 Audit Committee meeting were all members of the Audit Committee including Chairperson Knowles, Bryant, Budd and Shaw, as well as executives Campbell, Seeger, Rees, Fuller, CFO of US Pharmaceutical, Alain Vachon, Vice President of Global Compliance and Ethics and Assistant General Counsel, Matthew Tuchow and the outside auditors. Mr. Tuchow was introduced by General Counsel Seeger as the person who bore "day-to-day responsibility for McKesson's compliance and ethics function." Mr. Tuchow reviewed McKesson's Global Compliance and Ethics ("GCE") program for the Audit Committee including discussion of the GCE's mission and components. He referenced the

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

implementation of a structured GCE framework in FY 2011 and he mentioned that not every McKesson business unit had embedded compliance officers until FY 2011.  The minutes also state that Mr. Tuchow gave a presentation on a legal and regulatory risk assessment that the GCE conducted.  One page of Tuchow's multipage presentation was produced in response to Plaintiffs' demand for books and records.  That single page shows that as part of the legal and regulatory risk assessment, the GCE contemplated "Controlled Substances" as a legal and regulatory risk and characterizes the capacity of the assessment in veiled language as "GCE identified opportunities for improvement in the GCE program."

180.    *Another full year passed*.  On May 22, 2012, the Audit Committee met and in attendance were Directors Knowles, the Audit Committee Chairperson, Bryant, Budd and Shaw.  Also attending were executives CFO Campbell, General Counsel Seeger, Vice President and Controller Rees, Vice President, Internal Audit Mark Fuller, Matthew Tuchow and the outside auditors.  This meeting began at 2:10 pm.  Mr. Fuller provided those present with an update and overview of the FY13 Internal Audit plan and references materials provided to the Audit Committee prior to the meeting.  Fuller provided a detailed discussion of the Internal Audit plans including a breakdown by business units of the planned number of audits for groups within Distribution Solutions.  Fuller identified FY13 audit plan focus areas and included regulatory and compliance matters among those plans.  The materials provided to the Audit Committee appear to be an Internal Audit Report entitled "Internal Audit Update and FY13 Internal Audit Plan."  The one page produced of that at least 16-page document is an Appendix showing that the Distribution Solutions group includes McKesson's CSMP.  In other words, the Internal Audit plan presented to the Audit Committee included an audit of the CSMP.

181.    The Audit Committee minutes reflect that on two occasions during 2013, the Audit Committee discussed issues related to the CSA, CSMP, DEA or DOJ.  On January 29, 2013, Audit Committee members Knowles, Chairperson, Bryant, Budd and Shaw met and also in attendance were the CFO Campbell, General Counsel and Chief Compliance Officer Seeger, Rees, Fuller,

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

Senior Vice President and CFO, U.S. Pharmaceutical Alain Vachon and the outside auditors.  At the meeting, Fuller again gave an overview presentation of audits and other projects completed during the quarter.  The Audit Committee also received a presentation entitled Internal Audit Report, 3rd Quarter FY13.  At page 14 of the presentation under the heading "6. US Pharma – Controlled Substance Monitoring," the Audit Committee saw that "US Pharma enhanced its Controlled Substance Monitoring Program (CSMP) in connection with U.S. Drug Enforcement Administration (DEA) agreement entered into on May 2, 2008."  The presentation documented that the May 2, 2008 Agreement with the DEA "required McKesson to establish a compliance program designed to detect and prevent the diversion of controlled substances as stipulated under the Controlled Substances Ace and applicable DEA regulations."

182.    The same report noted that although "controls to on-board new customers, assign and monitor thresholds, and report suspicious orders to the DEA are effective …" "the application of policies and procedures across business units and customer segments could be improved."

183.    At the second 2013 meeting of the Audit Committee held on October 22, 2013, for which McKesson produced minutes, Chairperson Knowles was absent, but Bryant, Budd and Irby all attended.  Also present were executives including: CFO Beer; General Counsel and Chief Compliance Officer Seeger; Chief Technology Officer and Chief Information Officer, Randall Spratt; Executive Vice President and Group President Paul Julian; President, U.S. Pharmaceutical Mark Walchirk; Rees, Fuller, and the outside auditors.  At this meeting, the Audit Committee heard a presentation by Walchirk entitled "U.S. Pharmaceutical Controlled Substances Review."  Seeger offered introductory remarks and turned leadership of the presentation over to Walchirk.  The minutes of Audit Committee reveal that Walchirk started by reiterating what everyone already knew, or what they were recklessly disregarding if they did not know, that there was a "prescription drug abuse epidemic in the United States."

184.    Walchirk "then described the nature of that abuse, and identified certain drugs involved in that abuse."  He also "reported the number of controlled substances distributed by U.S.

Pharmaceuticals" according to the meeting minutes.  Walchirk's power point presentation further repeated to the Audit Committee that "Prescription Drug Abuse is an Epidemic in the U.S.", detailing how "[p]rescription drugs cause more deaths than heroin and cocaine combined," and that the "US consumes 83% of the world's oxyocodone and 99% of the world's hydrocodone, two highly prescribed opioid drugs for pain."

185.    Walchirk's presentation revealed that McKesson had failed to take the required actions to ensure compliance with the CSA and the 2008 Settlement until after the DEA had commenced its "investigative action in Colorado (March 2013)."  This Audit Committee presentation showed how the CSMP was never effectively implemented and how it was riddled with deficiencies – all issues that the Audit Committee and the Board should have questioned McKesson executives about prior to the DEA tip off that McKesson was in trouble.

186.    For example, the presentation stated that the CSMP "requires more formal governance structure," and indicated that McKesson needed to "enhance governance to include cross-functional governance board that aims at staying contemporary with diversion trends."  It further stated that the CSMP "requires specialists and more senior level decisions makers", which prompted McKesson to "[e]xpand the regulatory affairs team."  The presentation also revealed deficiencies in McKesson's "own distribution data (ARCOS)" which is the "DEA's primary investigative tool" requiring McKesson to revise how it calculates the "statistical norms for customer evaluations and thresholds."

187.    Walchirk's presentation further revealed that the Audit Committee and Board's oversight failures had caused the "US Pharma [to] recently hire[] former DEA employees to review its [CSMP]" and noted that "[s]everal enhancements [were] in progress" to the CSMP.  In other words, McKesson's CSMP was not properly implemented five years ago as required by the 2008 Settlement, and now it needed to be completely overhauled and actually implemented because McKesson had continued to violate the CSA, and now it was also in trouble for violating the terms of the 2008 Settlement with the DEA.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

188.     The presentation materials that were distributed to the Audit Committee for the October 22, 2013 meeting bear Walchirk's name and note that U.S. Pharmaceutical was still in the process of enhancing McKesson's CSMP.  They also note the severity of prescription drug abuse in the U.S. and the massive variety of controlled substances that McKesson distributed.  The presentation materials include a statement that Suspicious Order Monitoring is a key component of the CSMP.  Among the key takeaways and warnings from this presentation were an acknowledgment that "prescription drug abuse is a nationwide problem, to which all members of the industry must respond' and that "DEA's focus and enforcement will continue and likely increase."

189.     The Audit Committee started 2014 with a meeting on January 28, 2014.  At that meeting were Chairperson, Knowles, Bryant, Budd and Irby.  Among the executives who also attended this meeting were CEO Hammergren, CFO Beer, General Counsel and Chief Compliance Officer, Seeger, Rees, Fuller, additional employees from the General Counsel's office and the outside auditors.  According to the minutes, the meeting included a litigation update and no discussion of the CSMP, the DEA's investigation or compliance with the 2008 Settlement.

190.     On April 29, 2014, the Audit Committee met again and focused on litigation exposure.  The full Audit Committee was present including Chairperson Knowles, Bryant, Budd and Irby.  CFO Beer and General Counsel and Chief Compliance Officer Seeger were also present as were Rees, Fuller a few other executives and the outside auditors.  The Audit Committee heard Seeger's review of loss contingencies.  Fuller also presented the Internal Audit Report for the Fourth Quarter of FY14.  The Audit Committee heard a presentation on the US Pharma – Distribution Center Operations and noted a lack of complete adherence to application Standard Operating Procedures with respect to hazardous material storage.  The presentation also noted that McKesson's Internal Audit group conducted an annual audit of the U.S. Pharmaceutical Distribution Centers to assess compliance.  The presentation mentioned that in Fiscal Year 2013, U.S. Pharmaceutical distributed over 28 million order lines of controlled substances generating $10.9 billion in revenues.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

191.     By mid-2014, there were at least twelve U.S. Attorney Offices investigating McKesson's alleged violations of the CSA at its Distribution Centers.  In the midst of those investigations, the full Audit Committee (Chairperson Knowles, Bryant, Budd and Irby) attended another meeting on July 29, 2014 and heard a presentation on litigation proceedings in the Form 10-Q from General Counsel and Chief Compliance Officer Seeger.  There was no follow up on CSMP deficiencies noted at the October 22, 2013 meeting and no discussion regarding the CSA.  The Audit Committee met again on October 21, 2014.  In attendance were Chairperson Knowles, Budd, Irby and two new members Knauss and Salka.  Seeger elaborated on issues in the 10-Q and the Audit Committee asked questions related to the 10-Q.  No mention of the CSA, CSMP, DEA or the fact that McKesson received a letters from the U.S. Attorney for the District of Colorado on August 13, 2014 informing, McKesson that it was under investigation for failing to comply with the CSA and itemizing the civil penalties that the Company might face.  In other words, a demonstration of the Audit Committee's complete disregard for their duties to McKesson

192.     The full Audit Committee met on January 27, 2015 including Chairperson Knowles, Budd, Irby, Knauss and Salka.  At the meeting, the Audit Committee heard a presentation from Ana Schrank, the new Senior Vice President, Internal Audit; a role formerly occupied by Fuller.  At a time when McKesson was under investigation, by an increasing number of US Attorneys and the DEA and DOJ, the Audit Committee heard – and apparently did not challenge – Schrank's assessment that the Internal Audit revealed that there were no issues related to suspicious order reporting under the CSMP and that the Internal Audit of U.S. Pharmaceutical's Distribution Center Operations was completed and satisfactory.  The new General Counsel and Chief Compliance Officer, Schecter, also made a presentation on the DEA and DOJ investigation of McKesson's controlled substance distribution operations and commented that a full presentation would be made to the full Board the next day.

193.     Despite the Audit Committee assurance in January 2015 that the Internal Audit found no issues with suspicious order reporting, at the very next meeting of the Audit Committee on April

28, 2015, the full Audit Committee comprised of Chairperson Knowles, Budd, Irby, Knauss and Salka, heard testimony from the Senior Vice President, U.S. Pharmaceutical Regulatory Affairs and Compliance executive Krista Peck that key program enhancements and related benefits in related to the CSMP organization were necessary.  Peck specifically raised needed enhancements to the suspicious order reporting initiative and the use of a third-party to assist in developing those enhancements.

194.    The May 26, 2015 Audit Committee meeting minutes also show that the Audit Committee and McKesson's executives continued to work on issues related its proposed settlement with the DEA.  The meeting was attended by Chairperson Knowles, Budd, Irby, and Salka.  Knauss was absent.  At this Audit Committee meeting, Schrank presented the Internal Audit Update that noted the Proposed FY16 Audit Plan included audits of the CSMP.  Schrank again noted the need for enhancements to the Internal Audit methodology and metrics.  Schrank's presentation included a section bearing the title "Insight" referencing the Audit Plan to use "year over year equivalent in audit work."  Seemingly, the Audit Committee and officers intended to use the same failed metrics and oversight that resulted in violations of the CSA on an ongoing basis.

195.    The Audit Committee's January 26, 2016 meeting minutes reflect that the Audit Committee was informed about WVAG's lawsuit against the Company related to its role in the opioid crisis and that they received a presentation from Schrank titled "Internal Audit Report 3rd Quarter FY 16."  Notably, this Internal Audit Report – made months after the Company had agreed to a record-setting $150 million fine – marked the Company's CSMP as an "Emerging Trend."

**2.    The Board Minutes Demonstrate a Conscious Failure to Carry Out Oversight**

196.    It is evident that the Director and Officer Defendants enabled and created an environment in which McKesson continued to place profit over public safety.  Despite all of McKesson's misrepresentations and misstatements that it has changed its compliance and monitoring or addressed the opioid crisis, it is evident that McKesson has not improved its controls and has not

shifted its focus to placing safety of consumers and the people of the United States above its own short-term profit.  Instead, the Board allowed McKesson to repeat violations of the CSA, breach McKesson's 2008 Settlement Agreement with the DOA and ignore its own internal policies for reporting and distributing dangerous pharmaceuticals.  As such, Plaintiffs were left with no choice but to bring this derivative action, on behalf of McKesson to remedy the Directors' and Officers' misconduct and to place the Company's long-term success ahead of short-term and myopic profiteering.  Unless this Court acts to change the culture of McKesson, more senseless deaths will continue to cause substantial financial and reputational harm to McKesson.

197.     Upon learning of McKesson's egregious failure to abide by the 2008 Agreements, Plaintiff Gusinsky made a demand upon McKesson, pursuant to Section 220 of the General Corporation Law of the State of Delaware, for various categories of books and records.

198.     As part of the parties' negotiations, the parties agreed that "all documents produced in response to the Demand [would] be deemed incorporated by reference in any pleading [Plaintiff] file[d] in any Litigation and that those documents [could] be relied upon in connection with any motion to dismiss."   In other words, McKesson and its Board had every incentive in the world to provide exculpatory documents – knowing that they would be able to rely on those documents in support of a motion to dismiss.  Yet, the production includes minutes of only 14 Board meetings between 2008 and 2016, so we can infer that there were numerous meetings with no discussion of the CSMP whatsoever.

199.     From January 22-23, 2008, the full Board met with Board members Budd, Hammergren, Irby, Knowles, Lawrence, Jacobs, Napier, Shaw, Bryant and Walchirk (then-Senior Vice President and Chief Operating Officer of McKesson Pharmaceutical) present.  The minutes contain a reference to the CFO Campbell requesting discussion with Executive Vice President, General Counsel and Secretary Laureen Seeger and Executive Vice President, Group President Paul Julian. The minutes offer no indication that the Board considered anything related to a CSMP, the CSA or any topic related to the Company's role in the opioid crisis even though the Company was under investigation by and actively negotiating settlements with the DEA, DOJ and USAOs.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

200.    After the January Board meeting and the Company entered into the 2008 Settlement Agreement in May, McKesson continued its business as usual moving forward with deficient CSA compliance procedures.  For their part, the Board and McKesson's senior management team made zero effort to ensure the Company adhered to the terms of the 2008 Settlement and implemented an effective CSMP, as agreed to with the DOJ.  The Board repeatedly ignored the red flags raised concerning McKesson's compliance with controlled substances regulation.

201.    The Board's first two meetings after entering the 2008 Settlement took place on May 21, 2008 and July 23, 2008.  Given the record-setting nature of the 2008 Settlement and potential to harm the Company if the Board failed to follow the terms of the 2008 Settlement, the McKesson directors and officers should have been vigilant in their oversight of the CSMP's implementation at these meetings.  However, that was not the case.  Hammergren, Bryant, Knowles, Budd, Lawrence, Mueller, Irby, Jacobs, Shaw, Julian, and Seeger attended both meetings, and none of the people present raised a single question or inquiry concerning the CSMP or the 2008 Settlement.

202.    At the May 21, 2008 meeting, the minutes reflect only a reference to Seeger providing a generic "litigation update" and informing the Board "of the completion of the [2008] [S]ettlement with the Drug Enforcement Agency (DEA) and certain United States Attorneys' Offices."  These minutes offer no evidence of Board discussions or actions associated with ensuring that McKesson would avoid recidivist conduct and violate the law again thereby facing another fine along with disciplinary actions from U.S. governmental agencies.

203.    At the July 23, 2008 meeting, the Board again failed to raise the aforementioned issues even after Ann Berkey ("Berkey"), Vice President of Corporate Public Affairs at McKesson, presented a "Public Policy Update" of issues affecting the Company, which listed "DEA Susp. Orders" as one of the most "urgent" political action items facing the Company out of a list of approximately 35 public policy issues – another red flag for the Board about the need to address those issues.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

204.    In fact, for the next two years, the Board did nothing as McKesson continued to disregard and fail to comply with the CSA and the 2008 Settlement. Moreover, the Board knew that due to the 2008 Settlement, McKesson was under increased scrutiny from the DEA and DOJ, so it had an increased duty to ensure that McKesson was in compliance with the CSA.

205.    After entering the 2008 Settlement, McKesson's Board minutes fail to mention a single discussion, presentation or agenda item about the CSA or CSMP until May 28, 2014.  Instead, the minutes reflect concerns about profits while ignoring red flags about the increasing opioid epidemic and the Company's role in that epidemic.  The minutes deemed relevant by defendants and produced by the Company consist of minutes of five Board meetings: one in each of the years 2009, 2010, two in 2011 and one in 2013.

206.    For 2009, McKesson produced the minutes to one Board meeting, on April 22, 2009. Bryant, Budd, Knowles, Hammergren, Mueller, Irby, Jacobs, Shaw, Seeger, and Julian attended that meeting.  These minutes reflect that the Board and McKesson's executives remained focused on increasing McKesson's profits while ignoring red flags about the increasing opioid epidemic and McKesson's contributing role to that crisis due to the Board's oversight failures.  For example, the April 22, 2009 meeting minutes state that at "the request of the Chairman [i.e., Hammergren], Mr. Julian, referring to materials provided to the Directors in advance of the meeting, commenced a review relating to the FY' 10 Operating Plan for the Distribution Solutions segment."  This discussion regarding Operating Plans appears to have nothing to do with that unit's compliance with the CSA or the effective implementation of the CSMP.  It is, however, a reflection of the Directors' and Officers' focus on making more profits at the expense of complying with the 2008 Settlement.

207.    Further demonstrating the Board's focus on profits over complying with the CSA or implementing the CSMP.  At this meeting, Julian also provided "an overview of the business environment for U.S. Pharmaceutical, focusing on industry, competitive landscape and public policy."  Julian's presentation to the Board entitled "Distribution Solutions" contained a page with a chart that had a column called "Public Policy."  In the Public Policy column, under "Federal", this

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

presentation stated "DEA Controlled Substances."  It is reasonable to infer that Julian told the Board that the DEA was increasing its scrutiny on distributors, like McKesson, who distributed these controlled substances as the opioid crisis continued to grow in the U.S.  The minutes show that the Board ignored that red flag and that the Board completely ignored its oversight duties by asking no questions about the CSA or the CSMP during all of 2009.  McKesson's profits, however, increased as McKesson rose on the Fortune 500 ranking.

208.    The next Board minutes produced are the only minutes for 2010.  They are the minutes of the Board's April 21, 2010 meeting attended by Bryant, Budd, Knowles, Lawrence, Irby, Mueller, Jacobs, Hammergren, Shaw, Julian, and Seeger.  The April 21, 2010 minutes document McKesson's focus remained on profits irrespective of any compliance issues or safety concerns.  These minutes reflect that at "the Request of the Chairman [i.e., Hammergren], Mr. Julian, referring to materials provided to the Directors in advance of the meeting, began a review relating to the FY' 11 Operating Plan for the Distribution Solutions segment."

209.    At this Board meeting, Julian presented an "overview of the business environment for U.S. Pharmaceutical, focusing on industry, competitive landscape and public policy."  Julian's presentation to the Board entitled "Distribution Solutions" contained a page with a chart that had a column called "Public Policy."  In the Public Policy column, under "Federal," this presentation stated "DEA Controlled Substances."  It is reasonable to infer that Julian told the Board that the DEA was increasing its scrutiny on distributors, like McKesson, who distributed these controlled substances as the opioid crisis continued to grow in the U.S.  The minutes show that the Board ignored that red flag and that the Board completely ignored its oversight duties by asking no questions about the CSA or the CSMP during all of 2010.  McKesson's profits, however, increased as McKesson rose on the Fortune 500 ranking.

210.    The April 26-27, 2011 Board meeting minutes show the Board continued to ignore its oversight duties, focusing on McKesson's profits without any regard to McKesson's compliance with the CSA and the 2008 Settlement.  Defendants Hammergren, Bryant, Budd, Irby, Jacobs,

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1    Knowles, Lawrence, Mueller, Shaw, Julian, and Seeger were present at this Board meeting.  "At the

2    request of the Chairman [i.e., Hammergren], Mr. Julian, referring to materials provided to the

3    Directors before the meeting, reviewed the FY'12 Operating Plan for the Distribution Solutions

4    segment.  "Mr. Julian then provided an overview of the business environment for U.S.

5    Pharmaceutical, focusing on the industry, competitive landscape and public policy."

6         211.   McKesson also produced Julian's presentation to the Board entitled "Review of

7    McKesson Distribution Solutions – FY 12 Operating Plan."  Similar to 2009 and 2010, this

8    presentation included the chart with a Public Policy column that states "DEA Controlled

9    Substances."  It is reasonable to infer that Julian told the Board that the DEA was increasing its

10   scrutiny on distributors, like McKesson, who distributed these controlled substances as the opioid

11   crisis continued to grow in the U.S.  The minutes show that the Board ignored that red flag that that

12   the Board completely ignored its oversight duties by asking no questions about the CSA or the

13   CSMP during all of 2011.

14        212.   By July 2011, the Board was on notice that the DEA was pursuing new investigations,

15   but the Board continued to ignore the threat of regulatory involvement for its failure to oversee CSA

16   compliance or to effectively implement CSMP.  At the July 27, 2011 meeting, the Board again failed

17   to raise the and issue regarding the CSA or CSMP even after Ann Berkey, now a Senior Vice

18   President of Corporate Public Affairs at McKesson, presented a "Public Policy Update."  In fact,

19   contrary to all evidence, this presentation now downgraded "DEA Susp. Orders" from one of the

20   most "urgent" political action items facing the Company with the potential for the greatest impact on

21   the Company to one on a list of approximately 35 public policy issues that had a *low* potential to

22   impact the company.  One can infer that the Board knowingly or with reckless disregard ignored this

23   red flag.  There was no discussion by the Board about the CSMP, the CSA or compliance under the

24   2008 Settlement.  The Board appears to have done nothing related to oversight or compliance with

25   the relevant controlled substance laws, regulations or 2008 Settlement.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

213.    McKesson determined that for almost two years – from July 2011 until April 23, 2013, there were absolutely no minutes that, in anyway, way, reflect meetings of the Board at which the Board considered any issue relevant to the opioid crisis or the Board's oversight over the distribution of controlled substances.  It can be inferred from this failure that the Board considered no related topics in that time; a failure that would amount to conscious disregard of the Board's duties and responsibilities.  Given the Board and management's utter disregard for the effective implementation of the CSMP it is hardly a surprise that on March 12, 2013, the DEA executed an Administrative Inspection Warrant at McKesson's Aurora DC.

214.    In April 24, 2013, the Board met and recorded minutes demonstrating that defendants Bryant, Budd, Hammergren, Irby, Jacobs, Knowles, Lawrence, Mueller and Shaw were present.  The April 24, 2013 Board meeting minutes show the Board continued to ignore its oversight duties, focusing on McKesson's profits without any regard to McKesson's compliance with the CSA and the 2008 Settlement.  At this Board meeting. "At the request of the Chairman [i.e., Hammergren], Mr. Julian, referring to materials provided to the Directors before the meeting, reviewed the FY'14 Operating Plan for the Distribution Solutions segment.  "Mr. Julian then provided an overview of the business environment for U.S. Pharmaceutical, focusing on the industry, competitive landscape and public policy."

215.    McKesson also produced Julian's presentation to the Board entitled "Review of McKesson Distribution Solutions – FY 14 Operating Plan."  Similar to 2009, 2010 and 2001, this presentation included the chart with a Public Policy column that states "DEA Controlled Substances."  It is reasonable to infer that Julian told the Board that the DEA was increasing its scrutiny on distributors, like McKesson, who distributed these controlled substances as the opioid crisis continued to grow in the U.S.  The minutes show that the Board ignored that red flag that that the Board completely ignored its oversight duties by asking no questions about the CSA or the CSMP during all of 2013.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

216.     The Board's 2014 minutes and presentation materials further demonstrate its utter disregard and failure to oversee the CSMP, which was never implemented properly and needed a complete overhaul.  Nearly six years after entering the 2008 Settlement, on May 28, 2014, the full Board finally discussed how its oversight failures related to McKesson's compliance with the CSA and the 2008 Settlement had resulted in the DEA's investigation into those issues.  The Board was now forced to acknowledge that McKesson was in even worse trouble, especially since it had executed the 2008 Settlement.  Bryant, Budd, Coles, Hammergren, Irby, Jacobs, Knowles, Lawrence, Mueller, Shaw, Julian, Seeger, and Mark Walchirk attended this Board meeting.

217.     The meeting minutes reflect that Walchirk made a presentation to the Board similar to the one that he had presented to the Audit Committee in October 2013.  "Walchirk started with a summary, which included mention of the following: the nationwide problem of the abuse of controlled substances; [and] the regulatory responsibility of participants in the pharmaceutical supply chain to manage against the diversion of such substances."  None of this information should have been novel or unknown to the Board members.  Walchirk then informed the Board about the CSMP's failure to be properly implemented since 2008, and as such, in light of the DEA's recent actions against McKesson related to that failure and other non-compliance issues with the CSA and the 2008 Settlement that explicitly called for "enhancement of U.S. Pharmaceutical's controlled substances compliance program" (i.e., the CSMP).  Walchirk further detailed that these failures resulted in the DEA increasing "scrutiny on U.S. Pharmaceutical's distribution of controlled substances and referred to a potential Government lawsuit with regard to the now closed Landover, Maryland distribution center."  Walchirk presented written materials to the Board entitled, "U.S. Pharma Controlled Substances Review" which highlighted how the CSMP never worked.  It can be inferred from the minutes that Walchirk pointed out to the Board that because McKesson got caught by the DEA in for repeated violations of the CSA and the 2008 Settlement, McKesson's executives reacted by making certain changes to fix the CSMP's vast deficiencies.  For example, the

presentation noted the "[m]ost recent updates were informed by former DEA high-level employees" and they added "more advanced analytics & internal drug diversion expertise."

218.    On August 13, 2014, McKesson received a letter from the USAO for the District of Colorado, which detailed the Company's failure to comply with the CSA and the specific civil penalties that McKesson may be subject to as a result, the Board refused to raise the issue at its October 21-22, 2014 meetings.  Defendants Bryant, Budd, Coles, Hammergren, Irby, Jacobs, Knauss, Knowles, Lawrence, Mueller and Salka attended the Board meeting on October 21-22, 2014. The Board minutes from that meeting reflect that the new General Counsel and Chief Compliance Officer, Schecter, gave a general presentation on litigation, but fail to offer any indication that the Board considered anything related to the CSMP, CSA or the 2008 Settlement.

219.    The Board convened again on January 27 and 28, 2015 with Defendants Bryant, Coles, Hammergren, Irby Jacobs, Knauss, Knowles, Lawrence, Mueller, and Salka present on both days.  Defendant Budd attended on January 27 only.  At this meeting, there was a presentation by Schecter and another by Defendant Knowles who reported to the Board on the Audit Committee's activities.  Knowles presentation was focused on the Form 10-Q and auditing of Celesio; not the CSA, CSMP or related issues.

220.    Then, on March 19, 2015, the Board met and – for one of the only times since the 2008 Settlement – the meeting minutes reflect that the Board addressed issues related to the CSMP, CSA and compliance with 2008 Settlement.  Specifically, the minutes state, "[a]fter discussion, on motion duly made and seconded, the Board authorized a global settlement with the DEA and DOJ as described by Ms. Schechter." At this meeting, "Ms. Schechter commented on state matters relating to the distribution of controlled substances," providing evidence that the federal settlement was just the tip of the iceberg when it came to damages related to the Board's oversight failures related to the CSA and the 2008 Settlement.

221.    On April 30, 2015, more than a month later, McKesson filed a Form 8-K with the SEC announcing that it reached an agreement in principle with the DEA, DOJ, and various U.S.

Attorney's offices to settle administrative and civil claims "relating to investigations about the Company's suspicious order reporting practices for controlled substances."  Neither the Directors nor the Officers took responsibility for any wrongdoing reported in the announcement.

222.    According to the Board's meeting minutes, on April 29, 2015, Defendants Bryant, Budd, Coles, Hammergren, Irby, Jacobs, Knauss, Knowles, Lawrence, Mueller, and Salka attended a Board meeting where, "[a]t the Chairman's request, Ms. Knowles reported on the meeting of the Audit Committee that occurred the previous day," including an "update on U.S. Pharmaceutical's [CSMP] in the aftermath of the DEA settlement (key terms of which she generally described); [and] received the General Counsel's report concerning compliance activities."

223.    The Board's meeting minutes and related materials from its October 27, 28 & 30, 2015 meetings show that in light of the DEA settlement, DEA activity was now one of "McKesson's Top Compliance Risks."  Attending the October 27, 28 & 30, 2015 Board meeting were Defendants Bryant, Budd, Coles, Irby, Jacobs, Knauss, Knowles, Lawrence, Mueller and Salka.

### 3.    The Compensation Committee Minutes Demonstrate a Conscious Failure to Carry Out Oversight

224.    Faced with mounting costs related to failed oversight of its opioid distribution, closing of multiple Distribution Centers, and falling stock prices relates to Congressional investigations into McKesson's improper conduct, the Compensation Committee continued to unjustifiably overcompensate Hammergren for his tenure as CEO.  Since 2008, Hammergren has sold over $700 million in McKesson common stock.

225.    The Compensation Committee (comprised of Bryant (Chair), Coles, Jacobs, and Mueller) has failed to consider the financial and reputational damage Hammergren's, Julian's, Seeger's and Walchirk's conduct have caused the Company.

226.    The Compensation Committee has refused to use McKesson's Compensation Recoupment Policy (the "Clawback Policy"), approved by the Compensation Committee on January 20, 2010, and amended on January 21, 2014.  The Clawback Policy allows the Company to recover

010688-11 994281 V2

annual or long-term incentive compensation provided to certain employees "in the event that these individuals engage in conduct that is detrimental to the Company."

227.   The Clawback Policy defines "detrimental conduct" to include "dishonesty to the detriment of the Company's financial results as filed with the SEC." Specifically, each Officer Defendant is covered by the Clawback Policy.  Thus, if they engage in detrimental conduct then, to the fullest extent of the law, McKesson may require such Officer to: "(i) reimburse the Company for all, or a portion of, any Incentive Compensation deferred or received by such Covered Officer within 12 months preceding the Measurement Date; and (ii) remit to the Company any profits realized by such Covered Officer from the sale of the Company's common stock within 12 months preceding the Measurement Date."

228.   Moreover, under the Company's executive incentive plans, the Compensation Committee may also seek recoupment of economic gain from "any employee who engages in conduct that is not in good faith and which disrupts damages, impairs or interferes with the business, reputation or employees of the Company."

229.   McKesson's Compensation Committee primarily grants Hammergren compensation through a mix of purported incentive compensation in the form of stock awards, stock options, and non-equity incentive compensation.  Below is a chart detailing Hammergren's incentive compensation received between 2008 and 2017:

| (Dollars in Thousands) | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Stock Awards ($) | 11,956 | 11,988 | 11,049 | 12,186 | 8,602 | 8,201 | 7,732 | 7,317 | 7,317 | 5,896 | 92,244 |
| Stock Options ($) | 2,278 | 3,833 | 7,648 | 7,371 | 6,133 | 5,820 | 4,402 | 5,057 | 5,057 | 5,896 | 53,495 |
| Non-Equity Incentive Plan Compensation ($) | 11,962 | 12,035 | 12,828 | 9,860 | 12,828 | 11,464 | 10,843 | 10,422 | 9,234 | 6,036 | 107,512 |
| Total ($) | 26,196 | 27,856 | 31,525 | 29,417 | 27,563 | 25,485 | 22,977 | 22,796 | 21,608 | 17,828 | 253,251 |

230.   Other senior executives have received similar largess while disregarding their responsibilities to implement a viable CSMP and ignoring their obligations to keep McKesson in compliance with the CSA.  For example, Paul Julian received more than $133 million in incentive

compensation between 2008-2017 and Laureen Seeger received more than $33 million in incentive compensation from 2008-2014.

231.    Data from Equilar, the leader in executive compensation benchmarking and governance research, reveals that Hammergren realized a total of $692 million in compensation from McKesson since the 2008 Settlement.  This figure includes annual salaries and bonuses, the value of McKesson shares vested during those years and the gains realized when Hammergren exercised options he received and other compensation perquisites, such as life insurance and retirement benefits and the value of his use of the corporate jet for personal travel.

232.    Moreover, as Mueller acknowledged, "Managing the regulatory risks in our business is also one of the CEO's major responsibilities."  Yet, despite failing to implement an effective CSMP, which resulted in a $150 million fine, pending litigation, and a host of other risks that hang over the Company in the future, the Compensation Committee has not attempted to clawback any of Hammergren's compensation.

233.    Indeed, one of many examples of "dishonesty to the detriment of the Company's financial results" can be found in Hammergren telling regulators (and shareholders) that "[n]othing is more important to our industry than the safety and integrity of the drug supply chain" and that "[w]e have been implementing improvements to our comprehensive controls and reporting procedures to avoid future claims" like the 2008 Settlement.  Accordingly, the Compensation Committee knew that Hammergren's conduct was "detrimental" to the Company, and thus, the Committee had the authority to clawback his compensation.

234.    The Compensation Committee should have been on alert concerning its right to and shareholders' desire to clawback each of the Officer Defendants' compensation following such wrongdoing.  For example, at the Company's 2013 annual meeting, a shareholder proposal was made to strengthen McKesson's Clawback Policy.  Notably, the shareholders sought to amend the Clawback Policy to empower the Compensation Committee to clawback compensation for unintentional misconduct that results in a "non-material detriment" to the Company.

235.    The Board, however, recommended that shareholders vote "AGAINST" the proposal believing that it strengthened accountability at McKesson's executive level was "not in the best interests of McKesson or its shareholders."  Shareholders were not persuaded.  The proposal was approved by the shareholders at the meeting over the Board's objections with over 140 million shares voted "against" the Company in its "say-on-pay" vote, with just approximately 40 million shares in favor.

236.    In addition to failing to use the Clawback Policy, the Board affirmatively rewarded Hammergren and the other Officers for their work while the Company suffered from mismanagement and to protect their compensation from those very same misdeeds.  In this regard, at the Company's 2015 Annual Meeting of Shareholders, the Board sought shareholder approval of performance metrics available for performance-based awards under the Company's management incentive plan.  The Board sought specific approval of a proposed addition to the list of previously-approved metrics that the Compensation Committee (then comprised of Bryant, Jacobs, Mueller, Coles, Irby, Lawrence, and Shaw) recommended and approved on April 28, 2015, "litigation and regulatory resolution."  In recommending that shareholders vote "FOR" the performance metric, the Board stated in the proxy that "[t]he Compensation Committee [] recognized that settlements and other payments relating to litigation or regulatory matters may have an effect on McKesson's financials, and so decided to include the possibility of developing appropriate goals in those areas."  In other words, the Board and the Compensation Committee sought fit to specifically reward Hammergren, Julian, and Walchirk for "resolving" the massive issues plaguing the Company caused by those executives failure to achieve compliance with the CSA and the 2008 Settlement.

237.    Since approving the new "performance" metrics, the Compensation Committee has doled out approximately $30 million to Hammergren and other executive officers under the Company's Management Incentive Plan. Similarly, the Compensation Committee approved a $1.1 million increase to Hammergren's annual bonus pay in 2017, despite the entering into "the most severe sanctions ever" levied upon a DEA registered distributor.  This increase was the result of a

1    150% "individual performance modifier."  Sadly, this "individual performance modifier" has only

2    served to benefit Hammergren by increasing his annual bonus pay amidst the opioid epidemic, while

3    he served as a Board member and an executive, the Company paid out at least $150 million in

4    penalties.  Similarly, in 2015 and 2016, the Compensation Committee awarded Hammergren 210%

5    and 168% of his target award, respectively.  The Compensation Committee in those years was

6    awarding 140% to 210% and 134% to 168% of the target award, respectively, to participants.  Thus,

7    Hammergren received the maximum percentage of his target award allowable as bonus pay for both

8    years.

9           238.    Other executives have also enjoyed an above-threshold percentage of their target

10   amount as annual bonus pay.  For example, for Fiscal 2017, the Compensation Committee granted

11   Julian 135% of his target amount of $1,435,417, resulting in a bonus pay of $1,937,813 in the same

12   year that the Company faced "the most severe sanctions" and litigation over the business segment in

13   which he was in charge.  For Fiscal Years 2015 and 2016, Julian received 210% of his target reward

14   and 168% of his target award, respectively.  In fact, for Fiscal Years 2015 through 2017, the

15   Compensation Committee rewarded Julian the maximum amount allowed under the Plan each year,

16   despite the Company's violations of the terms of the 2008 Settlement, the CSA, and DEA

17   regulations.

18          239.    According to the Company's 2017 proxy statement, the "individual performance

19   modifier" includes an assessment against the Company's ICARE Principles of integrity, customer

20   first, accountability, respect and excellence.  It is striking that the Compensation Committee, at its

21   own discretion, was willing to increase Hammergren's bonus pay by $1.1 million, using the

22   "individual performance modifier," just months after the Company settled with the DEA for $150

23   million and in a year where the Company has faced congressional scrutiny, negative press, and

24   increasing amounts of litigation with respect to its diversion of opioids and its lack of oversight.

25   Accordingly, paying out a $1.1 million boost to Hammergren's already lucrative annual bonus pay is

26

27

28
                                                    67

1    not only a matter of poor optics, but unjustifiable by any measure on the Compensation Committee's

2    part.

3          240.    Additionally, the Compensation Committee has designed the Officer Defendants'

4    compensation structure in such a way that any regulatory repercussions and fines suffered by the

5    Company are not borne by them personally. The majority of the Officer Defendants' annual

6    compensation is dependent upon the Company's financial performance. However, the Compensation

7    Committee uses an "adjusted earnings per share" ("Adjusted EPS") metric that excludes McKesson's

8    legal and regulatory liabilities.  Thus, the Officer Defendants' 2017 compensation was not impacted

9    in any way by the $150 million fine the Company paid to the DEA in connection with the 2017

10   Settlement.

11         241.    Lastly, after McKesson's shareholders crushingly voted against the Compensation

12   Committee's compensation practices for the Officer Defendants at the Company's 2013 "say-on-

13   pay" vote, the Company introduced "total shareholder return units" ("TSRU") as an element of long-

14   term incentive awards based on the company's three-year performance in relation to the S&P 500

15   Health Care Index. This component replaced the earnings per share based performance restricted

16   stock unit program.

17         242.    The executives, however, failed to meet the incentive thresholds, and the grants

18   vested at a zero payout at the end of the programs first award cycle, FY 2015-2017.  This marked the

19   first time in more than a decade that any award, short- or long-term, had failed to pay out at least at

20   its target, and the second time within the decade that an award was not paid out above its target.

21         243.    Instead of taking proactive steps to shore up the Company and improve its

22   performance to ensure that the Company meets its target goals, the Compensation Committee

23   decided to reintroduce the Adjusted EPS measure to "incentivize" its executives, thereby decreasing

24   the TSRU component for 2018-2020 award to just 25% of the award. In other words, after the

25   shareholders demanded accountability by the Compensation Committee and the officers the directors

26   in 2013, the Committee made superficial changes to the compensation structure.  Once those

27

28

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1    superficial changes, however, proved to be too difficult to meet due to the Company's

2    underperformance under the executives' leadership, the Committee showed where its loyalties laid,

3    and immediately returned to the very same practices that its shareholders strongly rejected.

4        244.    Given the series of events that have transpired and come to light over the past year, at

5    the Company's 2017 Annual Meeting of Shareholders, which was held on July 26, 2017, its

6    shareholders loudly voiced their disapproval of the Director and Officer Defendants.  Before that

7    meeting, the International Brotherhood of Teamsters (the "Teamsters") submitted a shareholder

8    proposal urging the Board to appoint an independent Chairman. In other words, the Teamster's

9    wanted Hammergren removed as Chairman.  The Teamsters cited Hammergren's dual role as CEO

10   and Chairman at times when McKesson has suffered "reputational, legal and regulatory risks… over

11   its role in the nation's opioid epidemic, including its history of compliance challenges concerning the

12   distribution of controlled substances."  The Supporting Statement found at Item 5 of McKesson's

13   July 2017 Proxy Statement went on to specifically cite the 2008 Settlement, the 2017 Settlement, and

14   the WVAG suit.

15       245.    The Teamsters also urged shareholders to vote against McKesson's compensation

16   practices for, inter alia, the Officer Defendants, in the Company's upcoming "say-on-pay" advisory

17   vote.  In its letters to shareholders, the Teamsters iterated that the fact that Board's "[r]ecent pay

18   decisions ... send completely the wrong message to shareholders, regulators, lawmakers and the

19   public about executive accountability," and highlighted, among other things, the Company's use of

20   individual performance modifiers.

21       246.    Institutional Shareholder Services Inc. and Glass Lewis & Co., the two leading

22   providers of proxy research to institutional investors, agreed with the Teamsters and recommended

23   that shareholders vote in favor of its independent chairperson proposal and against the Company in

24   its "say-on-pay" vote.

25       247.    The State Treasurers for West Virginia, Illinois, and Pennsylvania agreed.  The three

26   State Treasurers issued a public letter addressed to Mueller, dated July 24, 2017, requesting that the

27

28

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

Board adopt the Teamsters' proposal to appoint an independent chairperson. The State Treasures further requested that the Board "include[e] a metric for senior executive compensation related to progress towards the fight against the opioid epidemic." Finally, the State Treasures requested that the Board "instruct the Compensation Committee to secure recovery in accordance with McKesson's clawback policy regarding 'conduct that is not in good faith and which disrupts, damages, impairs or interferes with the business, reputation or employees of the Company' by recouping compensation from senior executives charged with risk oversight for their failure to identify and remedy McKesson's role in the opioid epidemic." The letter concluded: "Although little more can be done for the tens of thousands of lives already lost or ruined as a consequence of opioid addiction, there is still time for McKesson to become an industry leader in addressing the still enormous challenges facing millions of prescription drug users. We urge you to act immediately upon the requests in this letter."

248. The Company and the Board did not adhere to its shareholders' demand; and instead, they engaged in a proxy contest to defeat and reject all the shareholders' proposals and requests. For example, the Board issued a statement opposing the Teamsters' proposal and recommended shareholders vote "against" it. The Board's statement against the proposal reveals its utter lack of understanding of the wrongdoing that has transpired at all levels of the Company for over a decade. The Board argued "Mr. Hammergren's combined role as Chairman and CEO provides the Company and the Board with strong leadership and continuity of expertise in the Company's business and corporate governance matters… In addition, maintaining a combined Chairman and CEO structure enables Mr. Hammergren to act as a bridge between management and the Board, which assists the Company's senior management in understanding and executing on the Board-endorsed vision and strategy." Yet, after a decade of mismanagement, "continuity" is not something that should be sought after.

249. Unsurprisingly, McKesson's shareholders overwhelmingly voted "against" the compensation of the Company's named executive officers by a margin of nearly 3 to 1. The

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1   Teamsters' proposal for an independent chairperson was narrowly defeated, with approximately 67

2   million votes in favor and approximately 99 million votes against.

3

4   **G.     The Directors' and Officers' Malfeasance has Harmed McKesson**

5         250.     The opioid crisis and the Director and Officer defendants' misconduct in overseeing

6   McKesson's role in the opioid crisis has cost and will continue to cost McKesson and its

7   shareholders hundreds of millions of dollars in liability, legal, expert, public relations, investigation

8   expenses, fines, penalties, lost revenue, overtime, lobbying, consulting fees and other related

9   expenses.  The misconduct of the Director and Officer defendants already forced McKesson to pay

10  two record setting penalties for violations associated with the opioid crisis.  After entering into the

11  2008 Settlement Agreement with obligations to pay penalties and implements controls and processes

12  to limit McKesson's opioid dumping practices, the misconduct continued unabated.

13        251.     In April 2015, McKesson announced the broad outlines of a settlement with the DEA,

14  the DOJ and several U.S. Attorney's Offices to resolve possible administrative and civil claims

15  related to investigations of McKesson's failure to report suspicious orders for controlled substances.

16        252.     On December 22, 2016, the *Washington Post* published a quote from McKesson that

17  the Company "put significant resources towards building a best-in-class controlled substances

18  monitoring program to help identify suspicious orders and prevent prescription drug diversion in the

19  supply chain."  The source is further quoted as saying, "Our team is deeply passionate about curbing

20  the opioid epidemic in our country."  The Company made this statement about its "best-in-class"

21  monitoring program shortly before it publicly announced the whopping record civil penalty it paid in

22  the 2017 Settlement (as a result of, in large part, the Company's wholly ineffective monitoring

23  program).

24        253.     The finalized settlement requiring McKesson to pay a $150 million civil penalty was

25  publicly announced ***nearly two years later*** in January 2017.  In addition to the record setting

26  monetary settlement, McKesson agreed to enhance compliance terms for a period of five years,

27

28

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1    including specific, stringent organizational improvements and staffing requirements; periodic

2    compliance auditing; stipulated financial penalties for failure to comply with the terms of the

3    settlement agreement; and appointment of an independent monitor to assess compliance with the

4    terms of the agreement.  The settlement is historic in terms of the size of the monetary penalty and

5    breadth of the oversight changes; this is reportedly the first time an independent monitor was

6    imposed as part of a civil penalty settlement related to controlled substances regulations.  The

7    heightened oversight resulting from this settlement will create increased compliance costs for

8    McKesson.

9         254.    McKesson and its shareholders have sustained and will continue to sustain damages

10   and injuries for which they have no adequate remedy at law.  Since the 2008 Settlement, McKesson

11   has incurred substantial expenses relating to the investigation of misconduct and wrongdoing related

12   to the Opioid Crisis including legal fees and expenses, the potential for compensation to individual

13   victims, States, Cities, Counties, independent native American nations, possible suspensions of

14   distribution facilities, and regulatory fines and penalties.  The potential shut down of additional

15   distribution centers could inflict catastrophic losses on the Company as ninety-nine percent of its

16   revenues are attributed to its Distribution Solutions Segment.  McKesson has paid hundreds of

17   millions of dollars in civil penalties and has lost significant goodwill while suffering reputational

18   harm.

19        255.    Among the numerous pending lawsuits related to McKesson's participation in the

20   Opioid crisis, in West Virginia alone, are the West Virginia Attorney General's lawsuit now pending

21   in the Southern District of West Virginia for violations West Virginia Controlled Substances Act and

22   the West Virginia Consumer and Protection Act, McDowell County, The City of Huntington, Cabell

23   County, Kanawha County, Fayette County, Wayne County, Boone County, Wyoming County,

24   Logan County, the City of Welch, Lincoln County, the Towns of Gilbert and Kermit, the City of

25   Williamson, Mercer County and the Town of Chapmanville.

26

27

28

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

256. McKesson faces similar litigation filed by the Cherokee Nation of Oklahoma, City of Birmingham, Alabama, California's San Joaquin County, the City of Stockton and the Montezuma Frist Protection District. Related cases in Ohio have been filed by the City of Dayton, City of Lorain, City of Cincinnati, City of Portsmouth, the Ohio Counties of Belmont, Ross, Vinton, Scioto, Jackson, Brown, and Clermont. In New York, Nassau County is suing McKesson for its role in fueling the opioid crisis. Oregon's Multnomah County is also suing. These lawsuits cite the "foreseeable widespread diversion of prescription opioids into the illicit market creating serious health and safety crises," and seek recoupment of costs related to the opioid epidemic, injunctive relief, and punitive and exemplary damages for McKesson's failure to detect, investigate, refuse and/or report suspicious orders of opioids.

257. Opioid crisis cases are currently pending against McKesson in state and federal courts in Alabama, California, Delaware, Illinois, Kentucky, New Hampshire, New Mexico, Michigan, New Mexico, Ohio, Oregon and Texas.

258. McKesson also faces significant liability from numerous other lawsuits and investigations by various Attorneys General, Congressional investigations, and regulatory compliance. As reported by the *Washington Post* in October 2017, "41 states attorneys general have banned together to investigate the [pharmaceutical distribution] industry. Hundreds of counties, cities and towns also are suing."

259. Various opioid crisis related Congressional investigations are also pending. In May 2017, The House Energy and Commerce Committee announced it is investigating "pill dumping in West Virginia." And on July 26, 2017, Ranking Member Senator Claire McCaskill of the Senate Committee on Homeland Securities and Governmental Affairs sent a letter to Hammergren requesting information and documentation related to McKesson's role in the opioid epidemic. McCaskill called out allegations by the West Virginia Attorney General against McKesson that it, "paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied" to West Virginia.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

260.    There is also a class action now on file in the United States District Court for the Northern District of Ohio against McKesson and others which contends that McKesson failed in its oversight duties and allowed opioids to flood the market.  That class action seeks damages for negligence and unjust enrichment, including exemplary and punitive damages.

## H.    The International Teamster's Attempted To Force The Board To Act

261.    The Board continued to handsomely reward senior officers despite breaches of their fiduciary duties.

262.    McKesson's annual proxies detail payments to Hammergren of over $363 million between 2008 and today:

|  | Compensation Disclosed In Annual Proxy |
|---|---|
| **FY 2017** | $20,096,599 |
| **FY 2016** | $23,649,638 |
| **FY 2015** | $24,844,555 |
| **FY 2014** | $25,919,882 |
| **FY 2013** | $51,744,999 |
| **FY 2012** | $39,680,322 |
| **FY 2011** | $46,149,360 |
| **FY 2010** | $54,584,021 |
| **FY 2009** | $37,157,668 |
| **FY 2008** | $39,942,625 |
| **TOTAL** | **$363,769,669** |

263.    The compensation figures disclosed in the annual proxies are based on accounting assumptions about the fair value of equity grants at the time of the award and do not account for future increases in share prices.  According to the executive compensation data firm, Equilar, Hammergren's total compensation over the past ten years was worth approximately $692 million, after accounting for increases in the share price.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

264.     The Board went to significant trouble to ensure Hammergren's compensation would not be affected by the fallout from the settlement with the DEA.  In May 2014 – approximately a year before the Company would be forced to record a $150 million litigation reserve for the settlement – the Board's Compensation Committee approved a Management Incentive Plan with two key financial metrics: Adjusted Earnings Per Share ("Adjusted EPS") and Adjusted Operating Cash Flow ("Adjusted OCF").  The "Adjusted" adjective in both metrics reflected an adjustment to *exclude (among other things) the impact of litigation reserves*.

265.     In 2015 and again in 2016, the Compensation Committee continued to use Adjusted EPS and Adjusted OCF as the key financial metrics used in the Management Incentive Plan.  As a result, Hammergren (and other McKesson executives) were shielded from the financial impact of the massive legal expenses resulting from their oversight failures.  Even more surprisingly, on July 14, 2017 – just six months after the final settlement details were announced – McKesson disclosed that Hammergren had received an additional compensation increase of $1.1 million based on an "individual performance modifier."

266.     Unsurprisingly, Equilar ranks McKesson in the *bottom 3%* of all companies in the Russell 3000 index with respect to its pay-for-performance policies.

267.     Before shareholders resorted to derivative litigation, one large shareholder attempted to utilize non-judicial means to get the Board to take necessary actions to protect not only the Company, but also the public.

268.     On November 15, 2016, the International Brotherhood of Teamsters sent a letter to "All McKesson Board Members," "Re: Board-Level Response to McKesson's Role in Fueling Opioid Epidemic."

269.     The Teamsters' letter, signed by Ken Hall, the general secretary-treasurer, alleged that "[d]espite repeated assurances from CEO John Hammergren, dating as far back as 2008 – the time of the first of two settlements with the Drug Enforcement Administration (DEA) – that preventing the diversion of controlled substances was a top priority, the available evidence suggests that

1  management either did know or should have known that many of the opioids the company

2  distributed were going to the black market."

3        270.    The Teamsters observed that "over the past five years, CEO Hammergren received

4  more than $368 million in realizable compensation demonstrating a startling lack of accountability at

5  the top." The Teamsters then proposed five concrete steps for the Board to take, including

6                a.    Establishing an independent committee, with the assistance of outside public

7                      health experts, to investigate the claims made by the state of West Virginia;

8                b.    Amend executive incentive plans to provide that awards include "a compliance-

9                      based metric that can reduce the entire payout to zero in the event of future

10                      failures…"

11                c.    Utilize the "executive clawback policy to recover all or a significant portion of

12                      CEO Hammergren's incentive pay"

13                d.    "Investigate whether the incentive pay for other top executives should be clawed

14                      back under the 'reputational injury' standard in McKesson's clawback policy;"

15                      and

16                e.    Suspend the use of incentive pay related to the sale of controlled substances at

17                      all levels in the company pending the board's independent investigation into

18                      company practices."

19        271.    The letter added that "the repeated compliance failures, spanning nearly a decade, also

20  shines a harsh spotlight on the performance of the audit committee; and the entire board … At this

21  point, it is critical that the board wake up to the seriousness of the issue (indeed it is a matter of life

22  and death)…"

23        272.    In response to the Teamsters' letter, the Board did nothing until March 10, 2017 (well

24  after McKesson entered into the 2017 Settlement).  That day, the Board appointed "Special Review

25  Committee" consisting of three Board members, (but not including outside public health efforts).

26

27

28

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

The Special Review Committee was charged with "review[ing] the allegations and claims asserted in the [Teamsters'] letter."

273.    There is no indication, however, that McKesson has taken any meaningful steps as a result of the Special Review Committee's appointment, notwithstanding the passage of a year since the Teamsters sent their letter.

274.    In an apparent effort to force the Company to improve its handling of the opioid crisis ravaging both the United States and McKesson, the Teamsters also sounded the alarm on the disconnect between the massive legal and regulatory failures at McKesson, and its massive executive compensation packages.

275.    The Teamsters circulated a letter to their fellow shareholders in July 2017 urging them to vote "no" on their advisory vote to Approve Executive Compensation (a/k/a the "Say-on-Pay" vote).

276.    Particular concerns raised by the Teamsters had to do with the "use of a generous 'individual performance modifier' in the company's annual incentive plan."  The "individual performance modifier" allowed McKesson to boost Hammergren's preliminary annual incentive payout by 150%, based on earnings per share and operating cash flow.  By focusing on those two metrics, the Teamsters noted, "Hammergren received a $1.1 million boost to his bonus just months after the company announced it had reached a record $150 million settlement …"

277.    The Teamsters also pointed out to their fellow shareholders that Hammergren's pay package was seemingly "innoculat[ed]" against regulatory and legal fines.  "[T]he recent DEA settlement is excluded from a key profit metric used across the company's short- and long-term executive incentive plans."  According to the Teamsters, "in 2015 McKesson set aside a litigation reserve of $150 million for the DEA case, and this figure is excluded from the 'adjusted EPS' metric that the company uses to compute a significant portion of annual and long-term incentive pay."  The Teamsters said McKesson had a "long-standing practice of insulating executive pay from the legal and regulatory liabilities built up by the company's business practices."

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

278.   Moreover, the Teamsters informed their fellow shareholders that the Company had been "unwinding … recent pay reforms after new awards fail to payout."  The Teamsters pointed out that, in its long-term incentive awards program, the company had previously replaced an EPS-based performance restricted stock unit program with a "total shareholder return units" ("TSRU").  But – perhaps due to the poor performance of McKesson shares – the TSRU awards did not pay out. Accordingly, McKesson's compensation plan for 2018-2020 reduced "total shareholder return" to just 25% of the award.

279.   The Teamsters' primary concern – that McKesson management should not enjoy such princely compensation while the Company contributes to a national opioid epidemic – plainly struck a nerve with investors.

280.   Although the Company urged shareholders to vote in favor of the pay package, at the Company's annual meeting on July 26, 2017, shareholders agreed with the Teamsters and roundly rejected the proposed pay compensation package by a vote of 121.9 million votes against, to 44.1 million votes for the package.

281.   Prior to the annual meeting, the Teamsters also submitted a "Shareholder Proposal on Independent Board Chairman" for a vote at the annual meeting.

282.   The Teamsters' proposal was to make the Company's Chairman of the Board "an independent director who has not previously served as an executive officer of the Company."  The Teamsters' proposal would have precluded Hammergren from serving as both Chairman and CEO.

283.   The Teamsters said they sought to improve oversight and management accountability, in light of the "potential reputational, legal and regulatory risks McKesson faces over its role in the nation's opioid epidemic, including its history of compliance challenges concerning the distribution of controlled substances."

284.   McKesson, nevertheless, cynically recommended that shareholders vote against the proposal – maintaining the ineffective status quo at the root of the Company's problems with respect to controlled substance distribution.

010688-11 994281 V2

285.     The Teamsters' proposal nearly passed, garnering almost 67 million votes.  After the shareholder vote, McKesson said that it would "split the role of chairman and CEO in the future, commencing with the company's next CEO."

286.     The promise is an illusory one given that the current Chairperson and CEO, Hammergren, has served in both of those roles since 2001 and he has revealed no plans to step down. McKesson has not disclosed any plans to replace him.  After the shareholder vote, the Company said that its "Board believes that Mr. Hammergren currently remains the right person to serve as chairman …"

287.     Notwithstanding the Company's dismal track record with respect to controlled substances, Hammergren will therefore likely remain as both chairperson and CEO for the foreseeable future.

I.     **Rather than Limit Unlawful Drug Sales, McKesson Hired Lobbyists to Pass a Law Insulating Them from Liability for Dumping Opioids on the Public**

288.     Rather than abide by their non-delegable duties to comply with the CSA or redoubling their efforts to more effectively control the distribution of opioids, the Board elected to lobby Congress to pass legislation that would defang the DEA of its ability to effectively regulate the Company.  The Company, individually and collectively through trade/industry groups, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of the power to immediately suspend distributor registrations.

289.     Congress passed the "Ensuring Patient Access and Effective Drug Enforcement Act," or EPAEDEA in 2016.  Key provisions are that it permits registrants (such as McKesson) to submit a "corrective action plan" which the DEA must consider in situations where the agency serves an order to show cause why its registration should not be denied, revoked or suspended.  *See* 21 U.S.C. § 824(c).

290.     The DEA's chief administrative law judge, John J. Mulrooney II, wrote that this "is akin to a state legislature mandating that law enforcement authorities allow shoplifting suspects

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

caught in the act to outline how they intend to replace purloined items on store shelves; allow

intoxicated drivers to pull to the side of the road and park their previously swerving vehicles; or

perhaps allow bank robbers to round up and return inkstained money and agree not to rob any more

banks – all before any of those wrongdoers actually admit fault and without any consequence that

might deter such behavior in the future."

291.    The EAPEDEA also reduced the Attorney General's discretion to "suspend any

registration simultaneously" with the initiation of revocation hearings, where there is an "imminent

danger to the public health or safety."  Now, the phrase "imminent danger to the public health or

safety" is statutorily defined to mean there is "a substantial likelihood of an immediate threat that

death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an

immediate suspension of the registration." 21 U.S.C.A. § 824(d).

292.    According to Judge Mulrooney, "it is all but logically impossible, due to the obvious

attenuation between the distributor or manufacturer registrant and the potential victims, to make the

requisite showing up the production chain, in the case of a distributor or manufacturer…. If it had

been the intent of Congress to completely eliminate the DEA's ability to ever impose an immediate

suspension on distributors or manufacturers, it would be difficult to conceive of a more effective

vehicle for achieving that goal."

293.    According to the *Washington Post*, McKesson spent $2.9 million between 2014 and

2016 lobbying Congress to pass EPAEDEA.

294.    The Healthcare Distribution Alliance ("HDA") spent an additional $3.5 million

lobbying to pass EPAEDEA. McKesson has influence over the HDA's lobbying expenditures

because the President of McKesson's U.S. pharmaceuticals business, Walchirk, sits on the Board of

Directors of the HDA.

295.    According to the *Post*, "Besides the sponsors and co-sponsors of the bill, few

lawmakers knew the true impact the law would have.  It sailed through Congress and was passed by

unanimous consent, a parliamentary procedure reserved for bills considered to be noncontroversial.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

The White House was equally unaware of the bill's import when President Barack Obama signed it into law, according to interviews with former senior administration officials."

296.    After the *Post* and *60 Minutes* cast light on the passage of EPAEDEA, there was a further public backlash against the people instrumental in passing EPAEDEA.

297.    One of the EPAEDEA's sponsors, Rep. Tom Marino, had, ironically, been President Trump's nominee to lead the Office of National Drug Control Policy.  Following public disclosure of his role in passing EPAEDEA, President Trump announced that Marino had withdrawn his name from consideration for the post.

## V.    DEMAND ON THE BOARD WOULD BE FUTILE

298.    Plaintiffs bring this action derivatively in the right and for the benefit of McKesson to redress the breaches of fiduciary duty and other violations of law by Defendants.

299.    Plaintiffs will adequately and fairly represent the interests of McKesson and its shareholders in enforcing and prosecuting this type of action.

300.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

301.    The Board, at the time this litigation commenced (and therefore the Board subject to any demand analysis), consisted of the following nine (9) directors: Hammergren, Bryant, Budd, Coles, Jacobs, Knauss, Knowles, Mueller and Salka.  Thus, a majority of the Board at that time (six out of nine members), were members of the McKesson Board at the time of the 2008 Settlement Agreement and prior DEA penalty: Hammergren, Budd, Bryant, Jacobs, Knowles and Mueller. Plaintiffs did not make a demand on the Board prior to initiating this action because such a demand would have been a futile, wasteful and useless act because a majority of the Director Defendants would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in McKesson's improper misconduct.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

302.     The Director Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of criminal activity, including knowingly and consciously presiding over the Company's systematic violations of the drug marketing laws and regulations, as well as actively covering up this misconduct.  The Board implemented and oversaw a business strategy that resulted in widespread and repeated violations of the law.  Breaking the law, and breaching agreements with the DEA, is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

303.     A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment – conduct for which the Board may face potential personal liability.

304.     McKesson's history of non-compliance with the drug distribution and reporting laws, knowledge of the opioid epidemic and DEA fines render this derivative action distinct from most other corporate boards.  A typical corporate board might plausibly claim ignorance when it comes to compliance failures, in general.  In this case, the Board was made uniquely accountable and responsible for monitoring and reporting under the CSMP.  The Board's failure to carry out the obligations and responsibilities under the CSMP, and permitting McKesson to repeatedly violate the drug distribution and reporting laws as an intentional business strategy, cannot be regarded as a valid exercise of business judgment.  For these reasons, demand on the Board is futile and excused.

305.     The Board is also excused because the Board are not disinterested or independent and cannot, therefore, properly consider any demand.  Defendants (a majority of the Board) served as directors of the Company during some or all of the wrongdoing alleged herein, and each of the Defendants knew of the wrongdoing but failed to act in the face of a known duty to act.  For example, all of the Defendants were aware of the 2008 Agreement, yet they ignored their obligations to cause McKesson to abide by those obligations.  In addition to the 2008 Settlement compliance obligations, the Board had to have been aware of the prescription drug epidemic in the United States, considering McKesson was the largest supplier of those drugs, yet the Board still failed to act.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

306.     For these reasons, each Defendant faces a substantial likelihood of liability for their participation in the illicit acts.  The sustained failure of the Board to ensure effective corporate governance and ensure compliance with the law and the CSMP can only have been a result of the Defendants' knowing breach or reckless disregard for their fiduciary duties.  Despite being aware of the Company's prior misconduct concerning improperly reporting suspicious orders of controlled substances to the DEA, the Defendants took no steps in an effort to prevent or remedy the situation, and that failure to take any action resulted in substantial corporate losses.  For these reasons, the Defendants' decision to not act was not made in good faith and was contrary to the best interests of the Company.

307.     All of the Defendants were responsible for a sustained or systemic failure of the Board to exercise oversight.  Moreover, the 220 Production shows that they devoted patently inadequate time or consciously disregarded compliance with the controlled substance laws in general, and the 2008 Settlement Agreement in particular.

308.     Defendants' conduct resulted in the Company suffering the $150 million fine and losing hefty future profits that will not be realized because the Company was suspended from selling from its distribution centers in Colorado, Ohio, Michigan and Florida for multiple years.  This was in violation of, among other things, these Defendants' fiduciary duties of good faith and loyalty, as well as McKesson's own Code of Conduct, Corporate Governance Guidelines and the CSMP.  Thus, Defendants (a majority of the Board) each face a substantial likelihood of personal liability for their acts in connection with these actions, rendering a demand upon them futile.

309.     Hammergren is the President and CEO of McKesson, and in that capacity, he receives substantial monetary compensation and other benefits.  McKesson admits in its annual proxy statement filed with the SEC on June 17, 2016 and other public filings that Hammergren is not independent.  Hammergren thus lacks independence, rendering him incapable of impartially considering a shareholder demand to commence and vigorously prosecute this action.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

1    310.    Bryant, Budd, Knowles, Shaw, Knauss and Salka are further conflicted from

2    considering demand because they each face a substantial likelihood of liability as a result of their

3    conduct on the Audit Committee.  Bryant, Budd, Shaw and Knowles served on the Board and the

4    Audit Committee at all relevant times including during negotiation and implementation of the 2008

5    Settlement and during the time the Audit Committee failed in its oversight obligations resulting in

6    the 2017 Settlement.  As set forth above, the Audit Committee's charter imposes specific duties on

7    members of this committee to ensure compliance with laws, regulations and internal policies.  The

8    Audit Committee Defendants violated their fiduciary duties to act in good faith to address the

9    violations of law complained of herein.

10    311.    Defendants Mueller, Knauss and Salka were also conflicted from considering demand

11    because they each face substantial likelihood of liability as a result of their participation in and

12    obligations arising from being members on the Corporate Governance Committee.  As detailed

13    above, the Corporate Governance Committee charter required the members of the committee to

14    recommend, monitor and oversee corporate governance, which included recommending to the Board

15    guidelines, trends, and procedures for the Company.

16    312.    At the time this litigation was commenced, six of the nine members of the Board –

17    Hammergren, Bryant, Budd, Jacobs, Knowles and Mueller – face a substantial likelihood of personal

18    liability because they each served on the Board during the time of the 2008 Settlement and

19    deliberately disregarded red flags of improper distribution and reporting practices eventually

20    resulting in the 2017 Settlement.  Each of the Directors deliberately or recklessly disregarded the

21    Company's misconduct since at least 2008, when McKesson entered into the 2008 Settlement

22    Agreement and purported to implement the CSMP to prevent the violations of the CSA described

23    herein.

24    313.    As alleged herein and based on the duties imposed pursuant to the Company's

25    Corporate Governance Guidelines, Delaware law, and the obligations set forth in McKesson's

26

27

28

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

CSMP, the Defendants were aware of indicators and warnings that necessarily informed them of the CSA violations taking place within the Company.

314.    The 220 Production, for example, demonstrated that, the Defendants were warned in July 2008 of the "urgency" of the suspicious orders issue, and in October 2008 the Audit Committee learned of the "Needs Improvement" label attached to the CSMP.  Notwithstanding these warnings, the Defendants wholly failed to provide oversight for years.

315.    Given the duties placed on the Board, to the extent any of the Defendants did not have actual knowledge of the repeated violations of the drug distribution and reporting laws taking place within McKesson, and the nationwide opioid epidemic and state and federal lawmakers' focus on regulation, such lack of knowledge could only be the product of willful disregard or recklessness that constitutes bad faith breaches of their duties.

316.    Indeed, the Board has implicitly conceded that these Defendants are not independent. On March 10, 2017, the Board adopted a resolution appointing a "Special Review Committee" to investigate a letter received from a large institutional shareholder regarding the 2017 Settlement and the West Virginia litigation. The three committee members are the newest board members, N. Anthony Coles, Donald Knauss, and Susan Salka.

**COUNT I**

**FOR BREACH OF FIDUCIARY DUTY
AGAINST ALL DEFENDANTS**

317.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

318.    Defendants all owed and owe fiduciary duties to McKesson.  By reason of their fiduciary relationships, Defendants specifically owed and owe McKesson the highest obligation of good faith and loyalty in the administration of the affairs of McKesson, including assuring that McKesson complied with federal laws governing, among other things, the distribution or diversion of particular controlled substances and reporting of suspicious orders of controlled substances.  The

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to McKesson alleged herein.

319.   Defendants also had a duty to develop and implement a CSMP, which McKesson agreed to put in place in connection with the 2008 Agreements to ensure that the Company complied with federal law in reporting suspicious orders of controlled substances.

320.   Defendants willfully ignored their obligations under federal law, McKesson's internal controls and numerous warnings and government investigations and inquiries specifically relating to failure to report suspicious orders.  Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

321.   Defendants consciously violated their corporate responsibilities by affirmatively and repeatedly declining to stop and prevent McKesson from failing to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels after receiving numerous warnings and indicators, including a prior DEA investigation and fine in connection with the Company's failure to comply with the CSA.

322.   Defendants consciously violated their corporate responsibilities by ignoring red flags and failing to ensure that McKesson complied with its affirmative duty to implement and comply with the CSMP, as required by the 2008 Agreements.

323.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of McKesson in a manner consistent with the duties imposed upon them by law.

324.   By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and loyalty in the management and administration of McKesson's affairs and in the use and preservation of McKesson's assets.

325.   As a direct and proximate result of the Defendants' conscious failure to perform their fiduciary obligations, McKesson has sustained significant damages, not only monetarily, but also to

its corporate image and goodwill.  Such damage includes, among other things, the substantial penalties, fines, sales suspension and expenses described herein.

326.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT II

### WASTE OF CORPORATE ASSETS
### AGAINST ALL DEFENDANTS

327.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

328.    By their actions alleged above, and by failing to properly consider the interests of McKesson and its public shareholders by failing to conduct proper supervision, Defendants have caused the Company to waste valuable corporate assets by paying improper compensation and bonuses to liability or legal costs to defend Defendants' unlawful actions.

329.    As a result of the waste of corporate assets, McKesson has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

330.    The acts of Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiffs on behalf of McKesson are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial

## COUNT III

### INSIDER TRADING IN VIOLATION OF
### CALIFORNIA CORPORATIONS CODE §§25402 and 25502.5
### AGAINST DEFENDANTS BUDD, HAMMERGREN,
### JACOBS, KNOWLES, IRBY AND SHAW

331.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

332.    At the time that Defendants Budd, Hammergren, Jacobs, Knowles, Irby and Shaw (the "Selling Defendants") sold their McKesson common stock on or after the Company entered into the

2008 Settlement Agreement, as set forth herein, by reason of their high executive and/or directorial positions with McKesson, the Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of McKesson's failure to adhere to the terms of the 2008 Settlement Agreement and contribution to the opioid crisis in violation of the CSA.

333.    At the time of such sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of McKesson shares at that time. In April 2015, when the market began to learn that McKesson was not complying with the terms of the 2008 Settlement Agreement and the CSA, McKesson's stock price began a long period of price decline that has continued until the time this complaint was filed.

334.    The Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their McKesson common stock in California in violation of California Corporations Code § 25402.

335.    Pursuant to California Corporations Code § 25502.5, the Selling Defendants, and each of them, are liable to McKesson for damages in an amount up to three times the difference between the price at which McKesson common stock was sold by these defendants, and each of them, and the market value which McKesson common stock would have had at the time of the sale if the information known to these defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## COUNT IV

### INSIDER TRADING IN VIOLATION OF DELAWARE LAW
### AGAINST THE SELLING DEFENDANTS

336.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

Verified Shareholder Derivative Consolidated Amended Complaint
Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

337.    At the time that the Selling Defendants sold their McKesson common stock on or after the Company entered into the 2008 Settlement Agreement, as set forth herein, by reason of their high executive and/or directorial positions with McKesson, the Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of McKesson's failure to adhere to the terms of the 2008 Settlement Agreement and contribution to the opioid crisis in violation of the CSA.

338.    At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of McKesson shares at that time.  In April 2015, when the market began to learn that McKesson was not complying with the terms of the 2008 Settlement Agreement and the CSA, McKesson's stock price began a long period of price decline that has continued until the time this complaint was filed.

339.    The Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their McKesson common stock in reliance on that information and thereby breached their fiduciary duties to the Company under Delaware law and must disgorge all profits from such insider selling. *See Brophy v. Cities Serv. Co.*, 31 Del. Ch. 241 (1949).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law and demand on the McKesson Board is excused;

B.    Awarding against all Defendants and in favor of the Company the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties and statutory violations;

C.    Awarding to McKesson restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

1    D.    Directing McKesson to take all necessary actions to reform and improve its corporate

2  governance and internal procedures to comply with the Company's existing governance obligations

3  and all applicable laws and to protect the Company and its shareholders from a recurrence of the

4  damaging events described herein;

5    E.    Awarding to Plaintiffs the cost and disbursements of the action, including reasonable

6  attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7    F.    Granting such other and further relief as the Court deems just and proper.

8                                **JURY DEMAND**

9    Plaintiffs demand a trial by jury.

10  Dated: December 1, 2017                    **HAGENS BERMAN SOBOL SHAPIRO LLP**

11

12                                            By: */s/ Reed R. Kathrein*
                                              Reed R. Kathrein (State Bar No. 139304)
13                                            Peter E. Borkon (State Bar No. 212596)
                                              715 Hearst Avenue, Suite 202
14                                            Berkeley, CA  94710
                                              Tel: 510-725-3000
15                                            Fax: 510-725-3001
                                              reed@hbsslaw.com
16                                            peterb@hbsslaw.com

17

18                                            **GARDY & NOTIS, LLP**
                                              James S. Notis (admitted *pro hac vice*)
19                                            Jennifer Sarnelli (State Bar No. 242510)
                                              Meagan Farmer (admitted *pro hac vice*)
20                                            Tower 56
21                                            126 East 56th Street, 8th Floor
                                              New York, NY  10022
22                                            Tel: 212-905-0509
                                              Fax: 212-905-0508
23                                            jnotis@gardylaw.com
24                                            jsarnelli@gardylaw.com
                                              mfarmer@gardylaw.com
25

26                                            *Provisional Co-Lead Counsel for Plaintiffs*

27

28
                                              90
   Verified Shareholder Derivative Consolidated Amended Complaint
   Case No.: 4:17-cv-1850-CW

   010688-11 994281 V2

1

Dated: December 1, 2017

**BLOCK & LEVITON LLP**

2

By: _/s/ Whitney E. Street_

Whitney E. Street (State Bar No. 223870)

3

610 16th Street, Suites 214-216

Oakland, CA  94612

4

Tel: 415-968-8999

Fax: 617-507-6020

5

whitney@blockesq.com

6

**BLOCK & LEVITON LLP**

7

Jeffrey C. Block (*pro hac vice* forthcoming)

Thomas Kirchofer (*pro hac vice* forthcoming)

8

Joel Fleming (State Bar No. 281264)

155 Federal Street, Suite 400

9

Boston, MA  02110

10

Tel: 617-398-5600

Fax: 617-507-6020

11

jeff@blockesq.com

tom@blockesq.com

12

joel@blockesq.com

13

*Counsel for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

91

Verified Shareholder Derivative Consolidated Amended Complaint

Case No.: 4:17-cv-1850-CW

010688-11 994281 V2

**Appendix A: Stock Sales By The Selling Defendants (2008 – Present)**

| Trade Date | Defendant | Trade Type | Sale Price | Shares Sold | Total | Shares Held After Sale |
|---|---|---|---|---|---|---|
| | | *Wayne Budd* | | | | |
| October 9, 2009 | Wayne Budd | Sale + Options Exercise | $60.00 | 9,375 | $562,500.00 | 100 |
| October 31, 2014 | Wayne Budd | Sale | $204.96 | 785 | $160,894.00 | 1,423 |
| November 21, 2014 | Wayne Budd | Sale | $207.82 | 170 | $35,329.00 | 1,323 |
| September 12, 2016 | Wayne Budd | Sale | $179.70 | 2,309 | $414,920.00 | 723 |
| December 5, 2016 | Wayne Budd | Sale | $145.77 | 723 | $105,392.00 | 0 |
| | | *John Hammergren* | | | | |
| January 8, 2008 | John Hammergren | Sale + Options Exercise | $66.55 | 125,000 | $8,318,310.00 | 225,775 |
| February 12, 2008 | John Hammergren | Sale + Options Exercise | $58.02 | 25,000 | $1,450,545.00 | 225,780 |
| March 11, 2008 | John Hammergren | Sale + Options Exercise | $55.47 | 25,000 | $1,386,718.00 | 225,786 |
| August 12, 2008 | John Hammergren | Sale + Options Exercise | $56.21 | 75,820 | $4,262,089.00 | 266,475 |
| September 9, 2008 | John Hammergren | Sale + Options Exercise | $58.24 | 75,000 | $4,368,340.00 | 266,474 |
| June 11, 2010 | John Hammergren | Sale + Options Exercise | $69.73 | 500,000 | $34,866,788.00 | 542,777 |
| June 21, 2010 | John Hammergren | Sale + Options Exercise | $69.38 | 500,000 | $34,689,075.00 | 542,777 |
| July 7, 2010 | John Hammergren | Sale + Options Exercise | $67.59 | 500,000 | $33,794,486.00 | 542,789 |
| August 6, 2010 | John Hammergren | Sale + Options Exercise | $62.13 | 500,000 | $31,067,103.00 | 542,792 |

| Trade Date | Defendant | Trade Type | Sale Price | Shares Sold | Total | Shares Held After Sale |
|---|---|---|---|---|---|---|
| August 17, 2010 | John Hammergren | Sale + Options Exercise | $61.77 | 168,666 | $10,417,865.00 | 542,793 |
| January 5, 2011 | John Hammergren | Sale + Options Exercise | $72.01 | 300,000 | $21,604,350.00 | 542,809 |
| January 18, 2011 | John Hammergren | Sale + Options Exercise | $75.01 | 488,800 | $36,665,183.00 | 542,807 |
| February 3, 2011 | John Hammergren | Sale + Options Exercise | $75.69 | 111,200 | $8,416,595.00 | 542,808 |
| February 17, 2011 | John Hammergren | Sale + Options Exercise | $80.02 | 285,000 | $22,804,731.00 | 542,806 |
| May 22, 2012 | John Hammergren | Sale + Options Exercise | $87.09 | 149,066 | $12,981,591.00 | 594,318 |
| February 13, 2013 | John Hammergren | Sale + Options Exercise | $105.03 | 150,000 | $15,754,170.00 | 594,340 |
| March 6, 2013 | John Hammergren | Sale + Options Exercise | $109.00 | 75,000 | $8,175,000.00 | 594,340 |
| May 10, 2013 | John Hammergren | Sale + Options Exercise | $115.30 | 75,000 | $8,647,605.00 | 594,343 |
| May 28, 2013 | John Hammergren | Sale + Options Exercise | $115.21 | 230,484 | $26,554,638.00 | 594,344 |
| May 27, 2014 | John Hammergren | Sale + Options Exercise | $183.31 | 125,596 | $23,023,223.00 | 594,354 |
| October 6, 2014 | John Hammergren | Sale + Options Exercise | $197.28 | 100,000 | $19,728,085.00 | 594,361 |
| November 24, 2014 | John Hammergren | Sale + Options Exercise | $209.25 | 100,000 | $20,925,452.00 | 594,360 |
| December 8, 2014 | John Hammergren | Sale + Options Exercise | $214.01 | 12,200 | $2,610,913.00 | 594,359 |
| December 19, 2014 | John Hammergren | Sale + Options Exercise | $214.00 | 10,700 | $2,289,832.00 | 594,359 |
| January 7, 2015 | John Hammergren | Sale + Options Exercise | $214.00 | 77,100 | $16,499,400.00 | 594,364 |
| January 22, 2015 | John Hammergren | Sale + Options Exercise | $219.07 | 35,479 | $7,772,322.00 | 594,363 |

| Trade Date | Defendant | Trade Type | Sale Price | Shares Sold | Total | Shares Held After Sale |
|---|---|---|---|---|---|---|
| January 27, 2015 | John Hammergren | Sale + Options Exercise | $219.52 | 64,521 | $14,163,471.00 | 594,363 |
| May 26, 2015 | John Hammergren | Sale + Options Exercise | $238.97 | 30,062 | $7,183,979.00 | 654,365 |
| May 27, 2015 | John Hammergren | Sale | $238.53 | 60,000 | $14,311,866.00 | 594,365 |
| October 12, 2015 | John Hammergren | Sale + Options Exercise | $190.51 | 101,835 | $19,400,718.00 | 594,383 |
| November 20, 2015 | John Hammergren | Sale + Options Exercise | $190.01 | 56,533 | $10,741,598.00 | 594,383 |
| December 1, 2015 | John Hammergren | Sale + Options Exercise | $190.06 | 101,833 | $19,354,869.00 | 594,383 |
| January 4, 2016 | John Hammergren | Sale + Options Exercise | $194.11 | 101,833 | $19,766,478.00 | 590,362,888 |
| April 4, 2016 | John Hammergren | Sale + Options Exercise | $159.00 | 45,300 | $7,202,899.00 | 594,401 |
| April 25, 2016 | John Hammergren | Sale + Options Exercise | $176.81 | 101,833 | $18,005,592.00 | 594,397 |
| May 10, 2016 | John Hammergren | Sale + Options Exercise | $170.72 | 101,833 | $17,384,380.00 | 594,398 |
| May 23, 2016 | John Hammergren | Sale + Options Exercise | $179.33 | 18,718 | $3,356,768.00 | 631,819 |
| May 24, 2016 | John Hammergren | Sale + Options Exercise | $182.87 | 37,420 | $6,842,877.00 | 594,405 |
| September 6, 2016 | John Hammergren | Sale + Options Exercise | $184.22 | 100,500 | $18,513,939.00 | 594,403 |
| September 12, 2016 | John Hammergren | Sale + Options Exercise | $180.77 | 100,500 | $18,166,963.00 | 594,403 |
| March 1, 2017 | John Hammergren | Sale + Options Exercise | $150.49 | 100,500 | $15,124,522.00 | 594,427 |
| March 28, 2017 | John Hammergren | Sale + Options Exercise | $150.44 | 100,500 | $15,119,325.00 | 594,427 |
| May 30, 2017 | John Hammergren | Sale + Options Exercise | $162.31 | 19,316 | $3,135,099.00 | 633,052 |

| Trade Date | Defendant | Trade Type | Sale Price | Shares Sold | Total | Shares Held After Sale |
|---|---|---|---|---|---|---|
| May 31, 2017 | John Hammergren | Sale | $163.76 | 38,619 | $6,324,254.00 | 594,432 |
| September 20, 2017 | John Hammergren | Sale + Options Exercise | $151.67 | 225,000 | $34,125,100.00 | 469,441 |
| September 25, 2017 | John Hammergren | Sale + Options Exercise | $154.75 | 300,000 | $46,426,300.00 | 469,441 |
| September 28, 2017 | John Hammergren | Sale + Options Exercise | $153.70 | 199,000 | $30,585,761.00 | 469,441 |
| | | *Alton Irby* | | | | |
| July 15, 2009 | Alton Irby | Sale + Options Exercise | $44.47 | 4,049 | $180,056.00 | 10,967 |
| July 31, 2009 | Alton Irby | Sale + Options Exercise | $50.60 | 4,360 | $220,616.00 | 16,628 |
| July 12, 2010 | Alton Irby | Sale + Options Exercise | $67.15 | 5,394 | $362,204.00 | 22,358 |
| July 14, 2010 | Alton Irby | Sale + Options Exercise | $68.52 | 5,957 | $408,157.00 | 27,525 |
| December 21, 2010 | Alton Irby | Sale | $70.00 | 3,038 | $212,660.00 | 28,498 |
| December 21, 2010 | Alton Irby | Sale + Options Exercise | $68.00 | 3,038 | $206,584.00 | 30,048 |
| December 19, 2012 | Alton Irby | Sale + Options Exercise | $99.56 | 4,193 | $417,455.00 | 40,348 |
| January 22, 2014 | Alton Irby | Sale + Options Exercise | $167.98 | 1,300 | $218,379.00 | 27,149 |
| May 28, 2014 | Alton Irby | Sale | $182.73 | 4,000 | $730,918.00 | 13,278 |
| February 10, 2015 | Alton Irby | Sale | $220.76 | 5,000 | $1,103,792.00 | 8,278 |
| | | *Christine Jacobs* | | | | |
| June 10, 2009 | Christine Jacobs | Sale + Options Exercise | $42.00 | 6,100 | $256,200.00 | 4,900 |
| July 31, 2009 | Christine Jacobs | Sale | $50.60 | 3,900 | $197,340.00 | 1,000 |
| June 14, 2010 | Christine Jacobs | Sale + Options Exercise | $69.72 | 14,209 | $990,624.00 | 1,000 |
| October 29, 2010 | Christine Jacobs | Sale + Options Exercise | $65.00 | 13,600 | $884,000.00 | 1,000 |

| Trade Date | Defendant | Trade Type | Sale Price | Shares Sold | Total | Shares Held After Sale |
|---|---|---|---|---|---|---|
| May 6, 2011 | Christine Jacobs | Sale + Options Exercise | $83.00 | 7,000 | $581,000.00 | 1,000 |
| February 3, 2012 | Christine Jacobs | Sale + Options Exercise | $82.42 | 7,493 | $617,573.00 | 1,000 |
| April 12, 2012 | Christine Jacobs | Sale + Options Exercise | $90.67 | 7,500 | $680,025.00 | 1,000 |
| August 8, 2014 | Christine Jacobs | Sale | $189.88 | 2,619 | $497,302.00 | 0 |
| August 22, 2016 | Christine Jacobs | Sale | $193.78 | 915 | $177,312.00 | 0 |
| August 21, 2017 | Christine Jacobs | Sale | $145.43 | 1,083 | $157,500.00 | 0 |
| | | *Marie Knowles* | | | | |
| February 15, 2008 | Marie Knowles | Sale + Options Exercise | $58.12 | 8,904 | $517,464.00 | 0 |
| July 28, 2008 | Marie Knowles | Sale | $55.64 | 2,549 | $141,838.00 | 0 |
| July 31, 2009 | Marie Knowles | Sale | $51.00 | 3,285 | $167,535.00 | 0 |
| August 31, 2010 | Marie Knowles | Sale | $58.77 | 854 | $50,190.00 | 1,490 |
| September 3, 2010 | Marie Knowles | Sale | $60.00 | 1,490 | $89,400.00 | 0 |
| February 7, 2012 | Marie Knowles | Sale | $81.83 | 1,863 | $152,449.00 | 0 |
| December 19, 2012 | Marie Knowles | Sale | $99.56 | 1,619 | $161,188.00 | 0 |
| August 6, 2013 | Marie Knowles | Sale | $123.54 | 1,223 | $151,089.00 | 0 |
| August 5, 2014 | Marie Knowles | Sale | $192.10 | 785 | $150,799.00 | 0 |
| August 4, 2015 | Marie Knowles | Sale | $224.17 | 794 | $177,991.00 | 0 |
| August 1, 2016 | Marie Knowles | Sale | $192.73 | 915 | $176,348.00 | 0 |
| July 31, 2017 | Marie Knowles | Sale | $162.55 | 1,083 | $176,042.00 | 0 |
| | | *Jane Shaw* | | | | |
| July 31, 2009 | Jane Shaw | Sale + Options Exercise | $50.60 | 1,427 | $72,206.00 | 12,310 |

| Trade Date | Defendant | Trade Type | Sale Price | Shares Sold | Total | Shares Held After Sale |
|---|---|---|---|---|---|---|
| August 14, 2009 | Jane Shaw | Sale + Options Exercise | $55.44 | 1,380 | $76,507.00 | 12,930 |
| September 4, 2009 | Jane Shaw | Sale + Options Exercise | $55.63 | 1,380 | $76,769.00 | 13,550 |
| September 11, 2009 | Jane Shaw | Sale + Options Exercise | $57.07 | 1,368 | $78,072.00 | 14,182 |
| September 25, 2009 | Jane Shaw | Sale + Options Exercise | $57.94 | 1,353 | $78,393.00 | 14,829 |
| January 13, 2010 | Jane Shaw | Sale + Options Exercise | $62.25 | 3,800 | $236,550.00 | 17,760 |
| June 21, 2010 | Jane Shaw | Sale + Options Exercise | $70.90 | 3,533 | $250,490.00 | 19,248 |
| July 7, 2010 | Jane Shaw | Sale + Options Exercise | $67.59 | 3,579 | $241,905.00 | 20,699 |
| August 4, 2010 | Jane Shaw | Sale + Options Exercise | $62.49 | 3,943 | $246,398.00 | 21,756 |
| September 1, 2010 | Jane Shaw | Sale + Options Exercise | $58.78 | 4,063 | $238,823.00 | 22,693 |
| October 6, 2010 | Jane Shaw | Sale + Options Exercise | $60.91 | 3,536 | $215,378.00 | 24,160 |
| November 3, 2010 | Jane Shaw | Sale + Options Exercise | $66.81 | 3,435 | $229,492.00 | 25,725 |
| December 1, 2010 | Jane Shaw | Sale | $64.62 | 3,500 | $226,170.00 | 15,790 |
| December 1, 2010 | Jane Shaw | Sale | $64.62 | 3,500 | $226,170.00 | 15,790 |
| December 1, 2010 | Jane Shaw | Sale + Options Exercise | $67.50 | 3,500 | $236,250.00 | 27,225 |
| December 3, 2012 | Jane Shaw | Sale | $94.55 | 7,010 | $662,783.00 | 20,215 |

## VERIFICATION

I, Eli Inzlicht, hereby declare and verify that I am a stockholder of McKesson Corporation.  I have authorized the filing of the attached amended complaint.  I have reviewed the amended complaint, and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   Nov 30, 2017

ELI INZLICHT

**VERIFICATION**

I, Vladimir Gusinsky, hereby declare and verify that I am Trustee for the Vladimir Gusinsky Living Trust which is a stockholder of McKesson Corporation. I have authorized the filing of the attached Verified Shareholder Derivative Consolidated Amended Complaint (the "Complaint"). I have reviewed the Complaint and, based upon discussions with and in reliance upon my counsel, and as to those upon which I have personal knowledge, verify that the facts alleged therein are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  12/1/17

Vladimir Gusinsky