| | |
|---|---|
| IN RE MCKESSON CORPORATION DERIVATIVE LITIGATION. | Case No. 17-cv-01850-CW |
| | ORDER DENYING MOTION TO STAY AND DENYING IN PART AND GRANTING IN PART MOTIONS TO DISMISS |

_____/

Plaintiffs Eli Inzlicht and Vladimir Gusinsky are shareholders of McKesson Corporation (McKesson), a pharmaceutical distributor. They allege that certain members of McKesson's Board of Directors and senior officers have maximized short-term profits over safety with respect to sales and distribution of prescription opioids and failed properly to implement a Controlled Substance Monitoring Program (CSMP), as required by a settlement with the United States Department of Justice (DOJ) and Drug Enforcement Administration (DEA) in 2008. That settlement also included a $13.25 million fine. Their actions resulted in a second settlement in 2017 including a $150 million fine payment.

Plaintiffs bring a shareholder derivative action against those directors and officers for breach of fiduciary duty, waste of corporate assets, and insider trading. Now before the Court are three motions by Defendants. First, nominal Defendant McKesson moves to stay the case pending the outcome of substantially similar proceedings in the Delaware Court of Chancery. Because McKesson fails to show exceptional circumstances warranting a stay of this case, the Court denies the motion to stay.

Defendants also bring two motions to dismiss on behalf of McKesson and the individual Defendants respectively. McKesson moves to dismiss for Plaintiffs' failure to allege demand futility. Because Plaintiffs have sufficiently alleged a substantial likelihood of director oversight liability based on conscious failure to oversee the CSMP, the Court denies McKesson's motion to dismiss. The individual Defendants move to dismiss all claims against them for failure to state a claim. For the reasons stated below, the Court denies that motion in part and grants it in part, with leave to amend.

BACKGROUND

I.   Factual Background

McKesson is the largest pharmaceutical distributor in the United States. Compl. ¶ 3. It is a Delaware corporation with its principle executive offices located in San Francisco, California, in this district. Id. ¶ 14. Its stock is publicly traded on the New York Stock Exchange under the ticker symbol "MCK." Id. Plaintiffs Inzlicht and Gusinsky are current shareholders of McKesson who have continuously held McKesson stock since 2011 and 2005, respectively. Id. ¶¶ 12-13.

Defendants Andy D. Bryant, Wayne A. Budd, John Hammergren, M. Christine Jacobs, Marie L. Knowles, Edward A. Mueller, Donald R. Knauss, Susan R. Salka, N. Anthony Coles, Alton F. Irby III, David M. Lawrence, and Jane E. Shaw are current or former members of McKesson's Board of Directors. See Compl. ¶¶ 15-26. While Defendants Bryant, Budd, Hammergren, Jacobs, Knowles, Mueller, Irby, Lawrence, and Shaw have served on the Board since at least 2008, Defendants Knauss, Salka, and Coles did not join until 2014.

Id.  Hammergren has served as McKesson's President and CEO since 2001, and as Chairman of the Board since 2002.  Id. ¶ 17.

The present litigation focuses on the period between 2008 and 2017.  The specific allegations are detailed below and will only be briefly recounted here.  On April 30, 2008, McKesson entered into a settlement agreement with the DOJ through six United States Attorney Offices (the 2008 Settlement Agreement).  Compl. ¶ 46.  According to a public statement made by the DOJ, the 2008 Settlement Agreement resolved claims that McKesson

> failed to report to DEA suspicious sales of controlled substance pharmaceuticals it made to pharmacies that filled orders from illegal "Internet pharmacies" that sell drugs online to customers who do not have a legal prescription.  McKesson also failed to report suspicious orders of controlled substance pharmaceuticals that it received from other pharmacies and clinics even though the orders were suspiciously large.

Id.  As part of the 2008 Settlement Agreement, McKesson agreed to pay $13.25 million in civil penalties as well as to develop and implement the CSMP, recognizing its duty to monitor sales of controlled substances and report suspicious orders to the DEA.  Id. ¶ 49.

After the 2008 settlement, however, McKesson continued to have problems relating to its sales and distribution of controlled substances.  In 2011, a DEA agent noticed that McKesson's Landover, Maryland distribution center had not filed any suspicious order reports, and she requested customer files for approximately twenty suspect pharmacies.  Compl. ¶ 63.  That request prompted the Landover distribution center to file 318 suspicious orders with the DEA, covering the previous months.  Id.

On March 12, 2013, dozens of DEA agents raided McKesson's Aurora, Colorado distribution center while executing an Administrative Inspection Warrant. Compl. ¶ 66. From June 2008 to May 2013, the Aurora facility had reported no suspicious orders, despite being named in the 2008 agreements as failing to report suspicious sales from 2005 to 2007. Id. ¶ 67. Documents collected by the DEA at Aurora revealed that McKesson had not fully implemented or adhered to the CSMP. Id. ¶ 68. By mid-year 2014, prosecutors in twelve districts around the United States were investigating McKesson distribution centers for possible violations of the Controlled Substances Act. Id. ¶ 65.

These events culminated in McKesson's Board of Directors authorizing a second global settlement with the DEA and DOJ on March 19, 2015. Compl. ¶ 73. The settlement was finalized and made public on January 17, 2017 (the 2017 Settlement Agreement), resulting in McKesson paying a $150 million fine and admitting that it "had wholly abdicated its responsibilities under the 2008 Agreements." Id. ¶¶ 75-76. The settlement also suspended sales of controlled substances from several of McKesson's distribution centers for multiple years. Id. ¶ 77. The DOJ described the $150 million payment as a "record," and noted that the suspensions were "among the most severe sanctions ever agreed to by a [DEA] registered distributor." Id. (alteration in original).

From 2008 to 2017, while these events were occurring, directors Budd, Hammergren, Jacobs, Knowles, Irby, and Shaw (the Selling Defendants) routinely sold McKesson securities worth millions of dollars. Compl. ¶¶ 16-19, 24, 26. Budd sold over $1.2 million, Hammergren over $791.3 million, Jacobs nearly $4.4

million, Knowles over $2.1 million, Irby $2.1 million, and Shaw over $3.3 million.  Id.

Meanwhile, during the same time period, certain of McKesson's executive officers, namely CEO Hammergren, Executive Vice President and Group President Paul Julian, and General Counsel and Chief Compliance Officer Lauren Seeger, were very well compensated.  Hammergren has realized a total of $692 million in compensation from McKesson since the 2008 settlement.  Compl. ¶ 263.  Hammergren, Julian, and Seeger each received generous incentive compensation, including more than $253 million to Hammergren between 2008 and 2017, $133 million to Julian between 2008 and 2017, and $33 million to Seeger from 2008 to 2014.  Id. ¶¶ 229–30.  In 2015 and 2016, during the time that the Board authorized the 2017 settlement payment of $150 million, Hammergren and Julian received the maximum percentage of their target bonus awards, 210 percent in 2015 and 168 percent in 2016.  Id. ¶¶ 237–38.  Equilar, the leader in executive compensation benchmarking and governance research, ranks McKesson in the bottom three percent of all companies in the Russell 3000 index with respect to "pay-for-performance" policies.  Id. ¶¶ 231, 266.

II.  Procedural History

On April 3, 2017, Inzlicht filed this diversity action, asserting a derivative claim for breach of fiduciary duty on behalf of McKesson.  See Dkt. No. 1.  On May 12, 2017, non-party Charles Ojeda moved to intervene in and stay this action.  See Dkt. No. 14.  Inzlicht opposed on the grounds that Ojeda's participation would end diversity jurisdiction.  See Dkt. No. 22.

The Court denied Ojeda's motion without prejudice on July 10, 2017. See Dkt. No. 38.

On July 26 2017, Gusinky filed his case, identifying it as related to the Inzlicht action. See Gusinky v. Bryant, No. 4:17-cv-04248-LHK). Inzlicht and Gusinky jointly submitted a stipulation to the Court on September 19, 2017 seeking consolidation and appointment of lead counsel. See Dkt. No. 39. Ojeda objected to the stipulation. See Dkt. No. 41. The Court consolidated the Inzlicht and Gusinky actions on October 9, 2017, with provisional appointment of co-lead counsel. See Dkt. No. 45.

At the initial case management conference in this case on October 17, 2017, Defendants' counsel noted that a substantially similar action had been filed in the Delaware Court of Chancery, Steinberg v. Bryant, No. 2017-0736. The parties nonetheless agreed to a briefing schedule and hearing date on Defendants' anticipated motion to dismiss. The Court directed Ojeda to provide Inzlicht and Gusinky his proposed complaint to see if the parties could agree on a consolidated complaint and on leadership. Plaintiffs were directed to file an amended consolidated complaint by December 1, 2017, and Defendants to file a motion to dismiss by January 5, 2018 with a hearing date of April 10, 2018. See Dkt. No. 47. Ojeda ultimately opted not to file in this Court and instead filed suit in Delaware state court.

Meanwhile, a related action was filed in the Delaware Court of Chancery on November 8, 2017, Police & Fire Retirement System of the City of Detroit v. Bryant, No. 2017-0803. Ojeda's action, Amalgamated Bank v. Hammergren, No. 2017-0881, followed on December 8, 2017. These two actions along with Steinberg are all

pending before the same Vice Chancellor, the Honorable Sam Glasscock III.  Defendants moved to consolidate those cases, and also filed a motion to dismiss in the Steinberg action, which was heard on March 6, 2018.  To date, this motion has not been decided.  The Delaware actions have not been consolidated nor has lead counsel been appointed.

LEGAL STANDARD

I.    Motion to Stay

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them."  Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).  Only in "rare" or "exceptional" circumstances will "the presence of a concurrent state proceeding" permit the district court to stay or dismiss a concurrent federal action "for reasons of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."  R.R. Street & Co. Inc. v. Transport Ins. Co., 656 F.3d 966, 977–78 (9th Cir. 2011) (citing Colorado River, 424 U.S. at 817–18).

Courts apply an eight factor balancing test in deciding whether to stay or dismiss a case:  "(1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings

will resolve all issues before the federal court." <u>R.R. Street</u>,
656 F.3d at 978-79.  The balance is "heavily weighted in favor of
the exercise of jurisdiction." <u>Moses H. Cone Memorial Hosp. v.
Mercury Constr. Corp.</u>, 460 U.S. 1, 15 (1983).

II.  Motion to Dismiss (Demand Futility)

     Pursuant to Federal Rule of Procedure 23.1, a shareholder
seeking to bring a derivative suit must first "state with
particularity" any effort "to obtain the desired action from the
directors" or, in the alternative, why such a demand would have
been futile.  Fed. R. Civ. P. 23.1; <u>see also</u> <u>Rosenbloom v. Pyott</u>,
765 F.3d 1137, 1148 (9th Cir. 2014).  "Although Rule 23.1 supplies
the pleading standard for assessing allegations of demand
futility, [t]he substantive law which determines whether demand
is, in fact, futile is provided by the state of incorporation of
the entity on whose behalf the plaintiff is seeking relief."
<u>Rosenbloom</u>, 765 F.3d at 1148 (internal quotation marks omitted).
Under the substantive law of Delaware, "the right of a stockholder
to prosecute a derivative suit is limited to situations where the
stockholder has demanded that the directors pursue the corporate
claim and they have wrongfully refused to do so or where demand is
excused because the directors are incapable of making an impartial
decision regarding such litigation." <u>Rales v. Blasband</u>, 634 A.2d
927, 932 (Del. 1993).  Delaware law provides a two-part test for
demand futility, known as the <u>Aronson</u> test:

          The first prong of the futility rubric is whether, under
     the particularized facts alleged, a reasonable doubt is
     created that . . . the directors are disinterested and
     independent.  The second prong is whether the pleading
     creates a reasonable doubt that the challenged
     transaction was otherwise the product of a valid

United States District Court
For the Northern District of California

exercise of business judgment. These prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused.

Brehm v. Eisner, 746 A.2d 244, 256 (Del. 2000) (citing Aronson v. Lewis, 473 A.2d 805, 814, 816 (Del. 1984)).

"Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." Brehm, 746 A.2d at 255. "[I]t is important that the trial court consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs." Del. Cty. Emps. Ret. Fund v. Sanchez, 124 A.3d 1017, 1019 (Del. 2015).

III. Motion to Dismiss (Failure to State a Claim)

Under Federal Rule of Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." Id. While courts do not require "heightened fact pleading of specifics," a plaintiff must

allege facts sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. See Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses a complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." See Moore v. Kayport Package Express, 885 F.2d 531, 538 (9th Cir. 1989).

DISCUSSION

I. Motion to Stay

McKesson moves to stay this case pending the outcome of the litigation proceeding in the Delaware Court of Chancery, primarily for efficiency and convenience reasons. McKesson bears the burden of showing exceptional circumstances and that the balance of the eight factors weighs strongly in favor of staying this case.

McKesson most vigorously argues that the desire to avoid piecemeal litigation weighs strongly in favor of granting the stay. "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." R.R Street, 656 F.3d at 979 (citing Am. Int'l Underwriters, (Philippines), Inc. v. Cont'l Ins. Co., 843 F.2d 1253, 1258 (9th Cir. 1988)). "The mere possibility of piecemeal litigation does not constitute an exceptional circumstance. Instead, the case must raise a special concern about piecemeal litigation." Id. (internal quotation marks and citation omitted).

McKesson argues that shareholder derivative actions present special concerns about piecemeal litigation, citing Krieger v. Atheros Communications, Inc., 776 F. Supp. 2d 1053 (N.D. Cal. 2011), and In re CytRx Corp. Stockholder Derivative Litigation, No. 14-6414-GHK, 2015 WL 12745084 (C.D. Cal. Jan. 8, 2015), in support of its argument. Krieger, a case involving a decision by a company's board to proceed with a merger, is easily distinguishable. In that case, the court concluded that special concerns were present "due to the complexity of the litigation, the presence of class-action claims, and the need to proceed expeditiously to address the proposed merger." 776 F. Supp. 2d at 1062. Here, none of those concerns are present.

Cases more similar to this one, involving shareholder derivative actions without class action claims or pending mergers, have reached conflicting results. While the court in In re CytRx concluded that derivative lawsuits generally "present the kind of exceptional circumstances which would result in special concern

**United States District Court**
For the Northern District of California

about piecemeal litigation" because they "waste the resources of the real party in interest and create a serious risk of conflicting results that could impact thousands of shareholders," 2015 WL 12745084, at *5, the decision in Sabbag v. Cinnamon, No. 5:10-cv-02735-JF, 2010 WL 8470477 (N.D. Cal. Dec. 10, 2010), came to the opposite conclusion. The Sabbag court concluded that "the mere potential of inconsistent judgments is not 'exceptional.'" Id. at *5.

This Court agrees with Sabbag that concurrent litigation and the mere potential for inconsistent judgments does not rise to the level of exceptional circumstances or present any special concern with respect to piecemeal litigation. As is the case with any concurrent litigation, there may be some duplication of effort in the cases. The parties indicated at the hearing on this matter, however, that should both cases proceed, they will work together to avoid some of the logistical pitfalls of simultaneous litigation, including, for example, coordination of schedules and joint discovery.

With respect to the order in which each forum obtained jurisdiction, the present case was filed more than six months prior to those in the Delaware Chancery Court. The Supreme Court has counseled, however, that "[t]his factor, as with the other Colorado River factors, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand. Thus, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." Moses H. Cone, 460 U.S. at 21. While it is true that the Delaware Chancery Court heard its pending

motion to dismiss approximately one month sooner than this Court heard the motion here, it has yet to issue a decision as of the time of writing.  It has also yet to rule on the motion for consolidation or appoint lead counsel, which has already happened in this case.  Given the slightly advanced progress in the present case, and the fact it was earlier filed, this factor weighs slightly in favor of denying the stay.

With respect to whether federal or state law provides the rule of decision, this case requires the Court to apply Delaware state law in addition to California state law.  While courts have recognized that "the Delaware Court of Chancery unquestionably has a well-recognized expertise in the field of state corporation law and is a particularly suitable forum to adjudicate those disputes," Krieger, 776 F. Supp. 2d at 1062 (internal quotation marks omitted), the Ninth Circuit has stated that "routine issues of state law--misrepresentation, breach of fiduciary duty, and breach of contract--which the district court is fully capable of deciding," do not present the "rare circumstances" necessary to weigh in favor of a stay.  Travelers Indem. Co. v. Madonna, 914 F.2d 1364, 1370 (9th Cir. 1990).  On balance, this factor weighs only slightly in favor of granting the stay.

Due to the California insider trading claim that is present in this case only, the factors of protection of federal litigants' rights and resolution of all issues both weigh in favor of denying the stay.  The remaining factors involving forum shopping, inconvenience, and jurisdiction over property are not relevant or are neutral.

Based on all of the factors, Defendants have not met their burden to demonstrate the exceptional circumstances necessary to justify granting a stay. The only factor clearly weighing in favor of staying this case is the rule of decision, but this Court is capable of applying Delaware state law. The presence of the California state law claim in this case, however, weighs strongly in favor of exercising jurisdiction. Nor does this case present any special concern regarding piecemeal litigation. For these reasons, the Court denies Defendants' motion to stay this case.

II.  Motion to Dismiss (Demand Futility)

McKesson moves to dismiss Plaintiffs' lawsuit on the grounds that Plaintiffs did not first bring a pre-suit demand to the Board of Directors, and they cannot show that such a demand would have been futile. Plaintiffs argue that such a demand would have been futile pursuant to Aronson's first prong, that is, that there is "reasonable doubt" that "the directors are disinterested and independent." Brehm, 746 A.2d at 256.

Plaintiffs may show a reasonable doubt as to a director's disinterest "by demonstrating a potential personal benefit or detriment to the director as a result of the decision." In re Goldman Sachs Grp., Inc. S'holder Litig., Civ. A. 5215, 2011 WL 4826104, at *7 (Del. Ch. Oct. 12, 2011) (internal quotation marks omitted). For that reason, "[d]irectors who are sued have a disabling interest for pre-suit demand purposes when the potential for liability . . . may rise to a substantial likelihood." Ryan v. Gifford, 918 A.2d 341, 355 (Del. Ch. 2007) (internal quotation marks omitted); accord Rattner v. Bidzos, Civ. A. 19700, 2003 WL 22284323, at *9 (Del. Ch. Sept. 30, 2003) ("[A] 'substantial

likelihood' of personal liability prevents a director from

impartially considering a demand.") (internal quotation marks

omitted).  To meet that standard when presented with a motion to

dismiss under Rule 23.1, Plaintiffs must make "a threshold

showing, through the allegation of particularized facts, that

their claims have some merit."   Rales, 634 A.2d 927, 934 (Del.

1993).

        Plaintiffs here argue that they have sufficiently alleged a

substantial likelihood of liability for their breach of fiduciary

duty claim.  Pursuant to an exculpation provision and consistent

with Delaware law, McKesson's directors are exculpated from

liability for a breach of the duty of care.  See Stone v. Ritter,

911 A.2d 362, 367 (Del. 2006).  Thus, Plaintiffs must establish

bad faith or a breach of the duty of loyalty, requiring them to

plead "conduct that is qualitatively different from, and more

culpable than, the conduct giving rise to a violation of the

fiduciary duty of care (i.e., gross negligence)."  Id. at 369.

Plaintiffs may establish bad faith, for example, "where the

fiduciary intentionally acts with a purpose other than that of

advancing the best interests of the corporation, where the

fiduciary acts with the intent to violate applicable positive law,

or where the fiduciary intentionally fails to act in the face of a

known duty to act, demonstrating a conscious disregard for his

duties."  Id. (citing In re Walt Disney Co. Derivative Litig., 906

A.2d 27, 67 (Del. 2006)).

        Plaintiffs here proceed on a director oversight theory, that

although the directors implemented a reporting or information

system, they "consciously failed to monitor or oversee its

15

operations thus disabling themselves from being informed of risks or problems requiring their attention." Stone, 911 A.2d at 367 (citing In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996)). Plaintiffs may show conscious disregard by pointing to "red flags" and a subsequent failure to act in the face of such information. See South v. Baker, 62 A.3d 1, 15 (Del. Ch. 2012) ("A board that fails to act in the face of such information makes a conscious decision, and the decision not to act is just as much of a decision as a decision to act.").

A. Plaintiffs Have Alleged Sufficient "Red Flags" to Establish a Plausible Caremark Claim

Here, Plaintiffs allege a long timeline of facts that they argue show that McKesson's directors and officers should have responded to various red flags but failed to do so. Plaintiffs and Defendants present dramatically different interpretations of the events and their legal implications. For purposes of this motion, the Court accepts as true the allegations in the complaint and draws all reasonable inferences from the totality of the facts in favor of Plaintiffs. Del. Cty. Emps. Ret. Fund, 124 A.3d at 1019.

McKesson was first advised by the DOJ no later than September 1, 2005 of "serious problems concerning the Company's compliance with controlled substances laws and regulations," and its Lakeland, Florida Distribution Center received an Order to Show Cause relating to controlled substances from the DEA on August 4, 2006. Compl. ¶¶ 41, 43. The DEA also sent McKesson three letters on September 27, 2006, February 7, 2007, and December 27, 2007 concerning certain requirements under the Comprehensive Drug Abuse

Prevention and Control Act, 21 U.S.C. § 842(a)(5)k, and corresponding regulations. Id. ¶ 42.

McKesson's alleged failure to monitor and limit its distribution of controlled substances led to the 2008 Settlement Agreement with the DOJ, signed by Hammergren on April 30, 2008. Compl. ¶ 46. The 2008 Settlement Agreement required McKesson to pay a $13.25 million civil penalty and to develop the CSMP, and resulted in temporary suspension of McKesson's license to distribute controlled substances at certain distribution centers. Id. ¶¶ 49–50. The entry into the settlement was a "board-level decision, such that the members of McKesson's board of directors at the time in 2008 (a majority of whom constitute the board at the time of the 2017 Settlement) knew that McKesson had serious problems concerning the Company's compliance with controlled substances laws and regulations for many years and spread across many of the Company's facilities." Id. ¶ 51.

Plaintiffs argue, and the Court agrees, that the 2008 Settlement Agreement represents the first occurrence that put Defendants on notice that there were serious issues with respect to their compliance with controlled substances laws. The affirmative agreement not only to pay fines but also to implement the CSMP are sufficient events to establish Defendants' knowledge that McKesson had a problem and obligating them to ensure that the problem was properly addressed and rectified.

Following the 2008 settlement, however, minutes from meetings of the Board of Directors and the Audit Committee show that these

17

issues were seldom addressed.[1]  Immediately following the settlement, on May 2, 2008, the Audit Committee held a meeting during which there appears to have been no discussion of the settlement or the CSMP.  See Compl. ¶¶ 57; 174.  From this time until the DEA raid in March 2013, nearly a five year period, these issues were only discussed in meetings three times, on October 22, 2008, July 27, 2010, and January 29, 2013.

These matters were first discussed at an Audit Committee meeting on October 22, 2008, attended by at least four individual Defendants.[2]  See Compl. ¶ 175.  At this meeting, a presentation showed that the internal audit of the CSMP was categorized as "Needs Improvement."  Id.; see also Weiner Decl. Ex. 4 (Dkt. No. 71-4).[3]  The presentation identified key issues, including

---

[1] Plaintiffs allege and Defendants do not deny that Plaintiffs made a demand pursuant to Delaware General Corporation Law Section 220 for relevant documents, providing "the opportunity to provide exculpatory documents," but the production included minutes of only fourteen Board meetings between 2008 and 2016. See Opp'n at 18; Compl. ¶ 198.

[2] Those individual Defendants were Knowles, Bryant, Budd, and Shaw.

[3] Defendants request judicial notice of several documents, including certain of McKesson's SEC filings, the 2008 Settlement Agreement, the 2017 Settlement Agreement, internal audit reports, and meeting minutes and presentations from various Board and Audit Committee meetings.  See Dkt. No. 72.  The Court agrees with Defendants that several of these documents, namely the settlement agreements and meeting minutes and presentations, have been incorporated by reference in the complaint, because Plaintiffs quote from them and describe them in their allegations, and thus are properly subject to judicial notice.  See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).  The Court only takes judicial notice of these documents, however, insofar as they evidence that certain topics of discussion were addressed at these meetings, and not for the truth of the facts discussed.  See id. ("Courts may only take judicial notice of adjudicative facts that

assignment of customer thresholds to flag large shipments of controlled substances, incomplete new customer due diligence, incomplete documentation supporting changed thresholds for existing customers, and enhancement of Standard Operating Procedures. Compl. ¶ 176; Weiner Decl. Ex. 4. It also stated, however, that "[a]ll of the items noted have already been addressed by management." Compl. ¶ 176; Weiner Decl. Ex. 4.

Meeting minutes reflect that these issues were not addressed again until July 27, 2010. This gap alone suggests some level of disregard. Not only were Defendants aware of the 2008 Settlement Agreement and the gravity of the situation, but they also knew that, as of October 2008, there were serious issues with the CSMP that warranted follow up.

At the July 27, 2010 meeting, attended by the same four individual Defendants, a presentation described an audit summary of the CSMP and found that "the Distribution Centers selected for testing consistently lacked documented evidence to demonstrate controls are operating effectively," and that "adequate controls [were] not in place to ensure the required Pedigree is included when invoicing wholesale licensed customers." Compl. ¶ 178 (emphasis omitted). The presentation noted that the issues were

are 'not subject to reasonable dispute.'" (citing Fed. R. Evid. 201(b))). The remaining documents are not necessary to resolve these motions, and the Court declines to take judicial notice of them at this time. See Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1410 n.2 (9th Cir. 1990) (declining to take judicial notice of another action "not relevant" to the case); Neylon v. Cty. of Inyo, No. 1:16-cv-0712, 2016 WL 6834097, at *4 (E.D. Cal. Nov. 21, 2016) ("[I]f an exhibit is irrelevant or unnecessary to deciding the matters at issue, a request for judicial notice may be denied.").

communicated to the "appropriate level of management" and "action plans" were created. Id.

Defendants argue that both this and the October 2008 presentation indicated to directors that, while there were some issues identified, they were all being addressed and under control, and thus did not raise any red flags. Plaintiffs' plausibly allege, however, that the presentations made clear that there were ongoing and consistent problems with the CSMP that certainly warranted follow up, because they implicated a major legal obligation and a national problem with respect to opioids. Unfortunately, no follow up took place.

In July of 2011, a DEA agent noticed that McKesson's Landover, Maryland distribution center had no suspicious-order reports, and requested customer files for twenty suspect pharmacies. See Compl. ¶ 63. This forced McKesson to acknowledge the problem, and the Landover distribution center filed 318 suspicious orders with the DEA covering previous months. Id. Defendants were already on notice of problems involving the CSMP, and this incident was certainly a red flag indicating that it was failing and required oversight. Yet meeting minutes do not reflect that this was ever discussed. Defendants' failure to inquire at all into the program following this incident supports Plaintiffs' theory of conscious disregard for the CSMP's functioning.

These issues were not discussed until a year and a half later, on January 29, 2013, at another Audit Committee meeting. See Compl. ¶ 181. The presentation at the meeting stated, with respect to the CSMP, that its controls were "effective," but "the

application of policies and procedures across business units and customer segments could be improved." Id. ¶ 182; Weiner Decl. Ex. 3 (Dkt. No. 71-3). Not two months later, on March 12, 2013, the DEA raided McKesson's Aurora, Colorado distribution center. Compl. ¶ 66. According to published reports, documents seized by the DEA at the facility revealed that McKesson had not fully implemented or adhered to the CSMP. Id. ¶ 68. It can be inferred that Defendants must have willfully blinded themselves to these serious violations in order to remain ignorant of them.

At an Audit Committee meeting[4] on October 22, 2013, a presentation titled "U.S. Pharmaceutical Controlled Substances Review" discussed the prescription drug abuse epidemic in the United States generally, as well as McKesson's own failure to comply with the 2008 Settlement Agreement and the March 2013 investigation. Compl. ¶¶ 183-85. It identified specific areas needing improvement, including governance structure, specialists, and more senior-level decision makers. Id. ¶ 186. Again, however, Defendants failed to follow up and see that these serious problems were addressed.

On May 28, 2014, a presentation given during a meeting to the full board stated that McKesson had "[c]ontinually enhanced & audited" the CSMP, including "[m]ore advanced analytics & internal drug diversion expertise." Weiner Decl. Ex. 10 (Dkt. No. 71-10). But by mid-year of 2014, at least twelve U.S. Attorney Offices were investigating McKesson distribution centers. Compl. ¶ 191.

---

[4] Defendants Bryant, Budd, and Irby were present. See Compl. ¶ 183.

United States District Court
For the Northern District of California

That these issues were not discussed at Audit Committee meetings on July 29, 2014 or October 21, 2014 provide further support for Plaintiffs' oversight theory.

On January 27, 2015, the Audit Committee[5] was told during a presentation "that there were no issues related to suspicious order reporting under the CSMP and that the internal audit of U.S. Pharmaceutical's Distribution Center Operations was completed and satisfactory." Compl. ¶ 192. Given the number of issues with the CSMP known to the board, as well as the multiple ongoing federal investigations and the litigation risk, no Defendant should have taken this presentation at face value without inquiring further. Indeed, at an Audit Committee meeting on April 28, 2015, a presentation stated that enhancements to the CSMP were necessary. Id. ¶ 193.

On March 19, 2015, the Board initially authorized a second global settlement with the DEA and DOJ of $150 million. Compl. ¶ 73. The 2017 Settlement Agreement was finalized on January 17, 2017, and included an admission that McKesson had "wholly abdicated" its responsibilities under the 2008 Settlement Agreement. Id. ¶ 76. The DOJ described the $150 million civil penalty as a "record," and imposing "among the most severe sanctions ever," including suspension of sales of controlled substances from several distribution centers for multiple years. Id. ¶ 77.

---

[5] Defendants Knowles, Budd, Irby, Knauss, and Salka were present. See Compl. ¶ 192.

Defendants claim that they were simply ignorant of what was happening with the company because they were constantly reassured that if any problems existed, they were being addressed.  At this stage, however, Plaintiffs have plausibly alleged sufficient factual allegations constituting multiple "red flags" that Defendants ignored.  Defendants indisputably had knowledge of the first red flag--the 2008 Settlement Agreement--and it was upon them from that point on to ensure that McKesson improved its practices and complied with its legal obligations.  The infrequency with which they discussed this serious issue, despite the regular signals that the CSMP was failing and required more attention, evidences conscious disregard and abdication of responsibility.

B.    The Relevant Case Law Supports Liability Here

The case law supports the plausibility of liability in this instance, and several cases are illustrative here.  In In re Abbott Laboratories Derivative Shareholders Litigation, for example, the Seventh Circuit considered a case in which the plaintiffs alleged that the defendant directors had ignored red flags raised by the FDA, which had inspected the company thirteen times over a six-year period, and sent four formal certified warning letters to the defendants.  325 F.3d 795, 799 (7th Cir. 2003).  The Seventh Circuit reversed the district court's dismissal and concluded that the facts "support[ed] a reasonable assumption that there was a sustained and systemic failure of the board to exercise oversight . . . ."  Id. at 809.

In another case, In re Pfizer Inc. Shareholder Derivative Litigation, Pfizer had entered into at least three settlements

23

United States District Court

For the Northern District of California

with the FDA and paid fines relating to illegal sales. 722 F.
Supp. 2d 453, 455–57 (S.D.N.Y. 2010). The court found that Pfizer
"was acutely aware of the need to prevent such illegal practices
on the part of itself and its subsidiaries because of prior
settlements with the Government attributing just such misconduct
to various Pfizer subsidiaries shortly prior to their acquisition
by Pfizer." Id. at 455. It concluded that the plaintiffs'
allegations showed the defendants knew of a high probability of
illegal practices but "deliberately decided to let it continue by
blinding themselves to that knowledge," and that "a majority of
the directors face[d] a substantial threat of personal liability
arising from their alleged breach of their non-exculpated
fiduciary duties." Id. at 460.

Similarly to both Abbott and Pfizer, in this case, Defendants
were repeatedly made aware of ongoing problems with the CSMP that
required oversight, which Defendants allegedly failed to exercise.
While Defendants seek to differentiate Abbott on the grounds that
the FDA sent its letters directly to the chairman of the board,
Plaintiffs here have alleged that the entire board approved the
2008 Settlement Agreement and therefore were on notice of the need
for McKesson properly to implement the CSMP, as well as that
several individual Defendants were present at each of the Audit
Committee meetings. Nor does the fact that the settlement in
Pfizer contained an obligation that misconduct be reported
directly to the board differentiate it from the present case.
Here, Plaintiffs have plausibly alleged several incidents
representing red flags that required action on behalf of the
board, but that it repeatedly failed to intervene.

24

Defendants liken this case to Horman v. Abney, in which the Delaware Court of Chancery rejected a claim that an Assurance of Discontinuous Agreement (AOD) resulting from a prior government investigation served as a red flag in that case because the plaintiffs acknowledged that the company complied with the AOD for more than five years following it. No. 12290-VCS, 2017 WL 242571, at *11 (Del. Ch. Jan. 19, 2017). The court recognized, however, that "[t]here might well be a reasonably conceivable scenario where the AOD itself could have taken the form of a red flag. For instance, if UPS had entered the AOD in 2005 and then continued a pattern of non-compliant shipments immediately thereafter and through 2014, one might reasonably infer that the Board had consciously disregarded UPS's commitments under the AOD and its own oversight responsibilities." Id. The present case alleges precisely that "reasonably conceivable scenario" where the underlying agreement--namely, the 2008 Settlement Agreement--takes the form of a red flag, and Plaintiffs here do indeed allege that Defendants continued a pattern of noncompliance immediately thereafter and through the relevant period.

Defendants also contend that In re General Motors Co. Derivative Litigation should control the result here. No. 9627-VCG, 2015 WL 3958724 (Del. Ch. June 26, 2015). In that case, shareholders brought suit against GM after it issued over forty-five recalls starting in February 2013, resulting in approximately thirteen million vehicles recalled, approximately $1.5 billion charges against earnings in 2014, two Congressional investigations, and a criminal investigation by the DOJ. Id. The plaintiffs sought to hold the board of directors liable because

1  the board did not know about the defect and lacked a better

2  mechanism to receive information about safety risks, even though

3  certain engineers and other employees in the company knew of the

4  defect for a number of years.  Id. at *2.  The court concluded

5  that the plaintiffs failed to show an utter failure to implement a

6  proper reporting system because they did not allege that the board

7  had knowledge that the system was inadequate, or consciously

8  remained uninformed, nor were there sufficient red flags to impute

9  knowledge to them.  Id. at *14.

10      That case is easily distinguishable from the present case,

11 where Plaintiffs have alleged not one but two major incidents

12 involving federal regulators, the first of which put Defendants on

13 notice, as well as sufficient red flags in between the two

14 incidents.  The plaintiffs in General Motors alleged that the

15 board should have known about certain safety risks, but here,

16 Plaintiffs allege that Defendants did in fact know of McKesson's

17 major legal risks.

18      Plaintiffs here have provided sufficient factual allegations

19 to support that Defendants were repeatedly faced with red flags

20 but consciously decided not to act, resulting in a knowing failure

21 to exercise oversight of the CSMP as was their duty.  These

22 allegations are sufficient to plead a substantial likelihood of

23 liability for Defendants' breach of their fiduciary duty, such

24 that Plaintiffs have established that bringing a demand to the

25 Board would have been futile.  For these reasons, the Court denies

26 nominal Defendant McKesson's motion to dismiss the complaint.

27

28

III. Motion to Dismiss (Failure to State a Claim)

Defendants move to dismiss each count for failure to state a claim. With respect to Defendants' argument that Plaintiffs fail to plead a Caremark claim against the nine directors[6] who served on McKesson's Board at the time that the 2008 Settlement Agreement was executed, the Court denies dismissal for the reasons discussed above. Each of these directors was aware of and approved the 2008 Settlement Agreement, and therefore knew of McKesson's misconduct and legal obligations to implement and oversee the CSMP.

Defendants also move to dismiss the Caremark claim against Defendants Coles, Knauss, and Salka, and the claims for waste and insider trading under both Delaware and California law. Finally, they move to strike Plaintiffs' demand for a jury trial.

A.   Plaintiffs Fail to Allege Sufficient Facts Supporting a Caremark Claim Against Defendants Coles, Knauss, and Salka

Defendants separately move to dismiss the Caremark claim alleged against Defendants Coles, Knauss, and Salka on the grounds that they did not join the Board until 2014, and therefore the bulk of Plaintiffs' allegations are irrelevant to them.[7] Plaintiffs argue that these Defendants are not shielded from liability because at the time that they joined the Board, they were made aware of McKesson's "heightened risk for violations" and the 2008 Settlement Agreement, and failed to ensure McKesson's compliance up until the 2017 settlement. Opp'n at 10-11; Compl. ¶

---

[6] Namely, directors Bryant, Budd, Hammergren, Jacobs, Knowles, Mueller, Irby, Lawrence, and Shaw.

[7] Coles joined the Board in April 2014, and Knauss and Salka joined in October 2014. See Compl. ¶¶ 21-23.

27

130.  The 2017 settlement, however, was approved by the Board as early as March 19, 2015, less than one year after Coles joined the Board, and only five months after Knauss and Salka joined. Plaintiffs do not allege any red flag events during this short period.

The Court concludes that there were too few intervening events between these directors joining the board and the authorization of the settlement in March 2015 to establish conscious disregard and a failure to act.  See In re Intel Corp. Derivative Litig., 61 F. Supp. 2d 165, 175 (D. Del. 2009) (since an arbitration award "was made roughly 16 years ago and before nine of the twelve current Directors joined the Board, it is difficult to see how this is a 'red flag' that the Directors[] allegedly disregarded at their peril").  Because Plaintiffs fail to allege that these three Defendants exhibited an utter failure to oversee the CSMP in the short time between their joining the Board and the March 2015 authorization of the 2017 settlement, the Court dismisses, with leave to amend, the breach of fiduciary duty claims alleged against Coles, Knauss, and Salka.

B.    Plaintiffs Sufficiently Allege their Claim for Waste of
      Corporate Assets

Defendants also move to dismiss the claim for waste of corporate assets alleged against all Defendants.  "To recover on a claim of corporate waste, the plaintiffs must shoulder the burden of proving that the exchange was so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."  Disney, 906 A.2d at 74 (internal quotation marks omitted).  "A claim of waste

28

United States District Court
For the Northern District of California

will arise only in the rare, unconscionable case where directors
irrationally squander or give away corporate assets.  This onerous
standard for waste is a corollary of the proposition that where
business judgment presumptions are applicable, the board's
decision will be upheld unless it cannot be attributed to any
rational business purpose." Id. (internal quotation marks and
citations omitted).

"[T]he discretion of directors in setting executive
compensation is not unlimited," however, and "there is an outer
limit to the board's discretion to set executive compensation, at
which point a decision of the directors on executive compensation
is so disproportionately large as to be unconscionable and
constitute waste." In re Citigroup Inc. S'holder Derivative
Litig., 962 A.2d 106, 138 (Del. Ch. 2009) (citing Brehm, 746 A.2d
at 262 n.56)).  In Citigroup, for example, the court denied the
defendants' motion to dismiss where the plaintiffs alleged that a
departing director would receive $68 million in compensation,
along with an office, an administrative assistant, and a car and
driver for five years or until commencement of full time
employment in exchange for non-compete, non-disparagement, and
non-solicitation agreements, and a release of claims. Id.  The
court agreed that the plaintiffs' allegations constituted waste
and met the "so one sided" standard because the CEO was "allegedly
responsible, in part, for billions of dollars of losses at
Citigroup." Id.

Here, Plaintiffs allege that the Compensation Committee[8] unjustifiably compensated Hammergren, Julian, and Seeger, despite McKesson's mounting costs and civil penalties and resounding shareholder disapproval.  See Compl. ¶¶ 244-49.  With respect to Hammergren, Plaintiffs allege that he was compensated a total of $692 million since the 2008 settlement, id. ¶ 231, and under the company's new incentive plan in 2015, has received additional compensation including a $1.1 million increase to his annual bonus in 2017, despite McKesson receiving "the most severe sanctions ever" levied on a DEA registered distributor, id. ¶ 237.  In 2015 and 2016, the Compensation Committee awarded Hammergren 210 percent and 168 percent of his target awards, respectively, the maximum percentage of his target award allowable as bonus pay in both years.  Id. ¶ 237.  Finally, he was permitted to sell over $700 million in stock since 2008.  Id. ¶ 224.

The Compensation Committee also granted Julian more than $133 million in incentive compensation between 2008 and 2014.  Compl. ¶ 230.  Like Hammergren, Julian received 210 percent and 168 percent of his target awards in 2015 and 2016, respectively.  Id. ¶ 238.  In 2017, the Committee awarded him 135 percent of his target award, resulting in a $1,937,813 bonus.  Id.  Julian was awarded the maximum amount allowed each year, despite McKesson's continuing violations of the 2008 Settlement Agreement and the events leading to the 2017 Settlement Agreement.  Seeger, General Counsel and Chief compliance Officer, received more than $33

---

[8] Defendants Bryant, Jacobs, Mueller, Shaw, Lawrence, Irby, and Coles served on the Compensation Committee for varied tenures between 2009 and 2016.  See Compl. ¶ 29.

United States District Court
For the Northern District of California

million in incentive compensation between 2008 and 2014, despite McKesson's continuing failure to comply with its legal obligations and litigation risk. Id. ¶ 230. Such lavish compensation did not go unnoticed by the market: McKesson was rated in the bottom three percent of all companies in the Russell 3000 index with respect to its "pay-for-performance" policies. Id. ¶ 266.

Even after the misconduct over the same period came to light, and the Board approved the 2017 settlement in March of 2015, the Compensation Committee refused to exercise McKesson's Compensation Recoupment Policy. Compl. ¶ 226. That policy allows the company to recover annual or long-term incentive compensation provided to certain employees in the event that they engage in conduct detrimental to the company. Id. Despite the record fines imposed by the 2017 settlement, the Compensation Committee never exercised its power to recoup any of these awards.

Viewed against the background of the 2008 and 2017 settlements, Plaintiffs' allegations are sufficient to state a claim for waste of corporate assets. The awards granted to Hammergren, Julian, and Seeger, in the same years as McKesson's continuing and major legal violations, are so disproportionately large that they may plausibly reach the level of unconscionability, particularly when viewed in hindsight in conjunction with the Compensation Recoupment Policy and in comparison to other companies in the Russell 3000 index. For these reasons, the Court denies Defendants' motion to dismiss the claim for waste.

C.   Plaintiffs Fail to Allege with Particularity Sufficient
     Facts to Establish a Claim for Insider Trading Under
     Both Delaware and California Law

Defendants first move to dismiss Plaintiffs' insider trading claims under California law on the grounds that, because McKesson is a Delaware corporation, it is not subject to the California Corporations Code.  Even if it is, however, Defendants also move to dismiss for failure to state a claim under both California and Delaware law.

1.   Plaintiffs May Bring Their Insider Trading Claim
     Under California Law

Defendants argue that under the internal affairs doctrine, McKesson is not subject to the California Corporations Code, but may only be subject to claims brought under Delaware law because it is a Delaware corporation.

> The internal affairs doctrine is a conflict of laws
> principle which recognizes that only one State should
> have the authority to regulate a corporation's internal
> affairs--matters peculiar to the relationships among or
> between the corporation and its current officers,
> directors, and shareholders--because otherwise a
> corporation could be faced with conflicting demands.
> States normally look to the State of a business'
> incorporation for the law that provides the relevant
> corporate governance general standard of care.

Friese v. Super. Ct., 134 Cal. App. 4th 693, 706 (2005) (internal quotation marks and citation omitted).  This doctrine is codified in California Corporations Code Section 2116, which states that "[t]he directors of a foreign corporation transacting intrastate business are liable to the corporation . . . according to any applicable laws of the state or place of incorporation or organization, whether committed or done in this state or elsewhere."  Cal. Corp. Code § 2116.

Plaintiffs cite Friese for the proposition that Section 2116 bars neither their Section 25402 nor their Section 25502.5 claim. In that decision, a California appellate court reviewed the history and purpose of California's insider trading prohibitions as well as existing precedent, and reasoned that the prohibitions exhibited the California legislature's "historic and well-established intent to regulate both intrastate conduct and . . . subject securities transactions which take place in this state to California's securities laws even if those securities are issued by foreign corporations." Friese, 134 Cal. App. 4th at 709. It thus concluded that because these laws served both "the public and regulatory interests," they were not subject to the internal affairs doctrine. Id. at 710.

Defendants for their part cite the decision in In re Wells Fargo & Co. Shareholder Derivative Litigation, 282 F. Supp. 3d 1074 (N.D. Cal. 2017). In that decision, another judge in this district analyzed the same issue and considered Friese, noting that it was "a close issue." Id. at 1111. The court nonetheless rejected Friese and stated that "California law codifying the internal affairs doctrine is relatively clear." Id. It thus concluded that, pursuant to the internal affairs doctrine, the defendants were not subject to suit under California law and dismissed an insider trading claim brought under Section 25402. Id. at 1112.

While this Court agrees that it is "a close issue," In re Wells Fargo, 282 F. Supp. 3d at 1111, the decisions of California's state courts are more persuasive authority on California law. Nor does any part of the decision in Friese

33

suggest that it is inapplicable to derivative actions, as
Defendants suggest.  See also In re Maxim Integrated Prods, Inc.,
Derivative Litig., 574 F. Supp. 2d 1046, 1070 (N.D. Cal. 2008)
(stating in a derivative action that "plaintiff may bring a
California insider trading claim against individuals who traded on
insider information in California even if the corporation is
incorporated in Delaware"); In re Verisign, Inc., Derivative
Litig., 531 F. Supp. 2d 1173, 1221 (N.D. Cal. 2007) (concluding,
in a derivative action, pursuant to Friese "that the claims
brought under §§ 25402 and 25403 are not barred by application of
California's internal affairs doctrine").  This Court follows the
decision in Friese and denies Defendants' motion to dismiss the
insider trading claims under California law pursuant to the
internal affairs doctrine.

> ### 2.  Plaintiffs Fail to State a Claim for Insider Trading

In order to state a claim for insider trading under Delaware
law, Plaintiffs must show that "1) the corporate fiduciary
possessed material, nonpublic company information; and 2) the
corporate fiduciary used that information improperly by making
trades because she was motivated, in whole or in part, by the
substance of that information."  In re Oracle Corp., 867 A.2d 904,
934 (Del. Ch. 2004).  Delaware requires that "the selling
defendants acted with scienter."  Guttman v. Huang, 823 A.2d 492,
505 (Del. Ch. 2003).

California Corporations Code Section 25402 makes it unlawful
for an officer or director of a company with direct or indirect
access to material information not generally available to the

public to purchase or sell any security of the company in
California when he or she knows the material information would
significantly affect the market price of that security.  <u>See</u> Cal.
Corp. Code § 25402.[9]

Because insider trading is a fraudulent practice, Plaintiffs
must satisfy Rule 9(b), which requires that they allege with
particularity the facts giving rise to their claims.  Fed. R. Civ.
P. 9(b).  Both Delaware and California law require that the trader
have material, nonpublic information.  In Delaware, the trader
must be motivated by the substance of that information, <u>Oracle</u>,
867 A.2d at 934, whereas in California the trader must simply make
a purchase or sale with the knowledge that the information would
significantly affect the market price of the security, Cal. Corp.
Code § 25402.

Plaintiffs' complaint includes tables of each Selling
Defendant's trading summaries in the years 2008 to 2017.  <u>See</u>
Compl. ¶¶ 16–19, 24, 26; <u>see also</u> Compl. App'x A.  While
Plaintiffs provide detailed allegations regarding Defendants'
sales transactions, they fail to link with sufficient
particularity each transaction to material, nonpublic information
either motivating each sale or with the potential to affect the
market price significantly.  Instead, Plaintiffs allege generally
that "the Selling Defendants had access to highly material

_____

[9] California Corporations Code Section 25502.5 provides, "Any
person other than the issuer who violates Section 25402 shall be
liable to the issuer of the security purchased or sold in
violation of Section 25402" for treble damages.  Cal. Corp. Code §
25502.5.  Thus, Plaintiffs' Section 25502.5 claim rises and falls
with their Section 25402 claim.

information regarding the Company, including the information set forth herein regarding the true adverse facts of McKesson's failure to adhere to the terms of the 2008 Settlement Agreement and contribution to the opioid crisis."  Compl. ¶ 332.

These allegations are lacking because much of the adverse information that Plaintiffs discuss was made public, but Plaintiffs appear to include all sales from the years 2008 to 2017 without regard to when the alleged material adverse information became public.  For example, in 2008, McKesson's February 1, 2008 Form 10-Q reported that McKesson "was seeking to resolve claims with the DEA and certain U.S. Attorneys General that between 2005 and 2007 certain of McKesson's distribution centers fulfilled orders of controlled substances that were not adequately reported to the DEA," and noted that the company was implementing comprehensive procedures and processes to satisfy these concerns.  Compl. ¶ 56.  On May 2, 2008, the DEA publicly announced the 2008 Settlement Agreement and McKesson issued a press release as well.  Id. ¶¶ 57-58.

Even assuming that the February 1 filing did not make public the full scope of the violations or the settlement terms, the May 2 announcement certainly did.  Thus, it is not clear why sales made after May 2, 2008, before any new red flags were raised, would be subject to an insider trading claim.  Only two of the six directors made any sales prior to May 2, 2008.

The next major event occurred in July 2011, when a DEA agent noticed anomalies with McKesson's Landover, Maryland distribution center.  Plaintiffs do not allege any theory, however, with respect to the many sales made in between May 2, 2008 and July

36

United States District Court
For the Northern District of California

2011, which include eleven of Hammergren's sales, six of Irby's, five of Jacobs', four of Knowles', and all but one of Shaw's.  <u>See</u> Compl. App'x A.  And assuming that the Selling Defendants had knowledge of the July 2011 incident, Plaintiffs fail to allege how this single event motivated any Defendant's sales.

With respect to the March 12, 2013 raid and ensuing investigations, McKesson "disclosed in its January 30, 2014 10-Q that the U.S. Attorney for the Northern District of West Virginia was investigating potential claims under the Comprehensive Drug Abuse Prevention and Control Act in connection with the Company's Landover distribution center."  Compl. ¶ 70 (internal quotation marks omitted).  McKesson also publicly announced on April 30, 2015 that it had reached an agreement in principle with the DEA, the DOJ, and various U.S. Attorney offices, and that the investigations and potential for settlement were previously disclosed in a February 5, 2015 Form 10-Q.  <u>Id.</u> ¶ 118.  The April 30 announcement caused McKesson's share price to decline over forty percent.  <u>Id.</u> ¶ 119.

Giving Plaintiffs the benefit of the doubt at this stage, and assuming that the April 30, 2015 disclosure made public information that was not disclosed by the public filings, Plaintiffs may bring claims with respect to sales between March 12, 2013 and April 30, 2015.  Out of the myriad sales Plaintiffs list, this includes only two sales by Budd, ten sales by Hammergren, three sales by Irby, one sale by Jacobs, two sales by Knowles, and no sales by Shaw.  Plaintiffs nonetheless fail to allege, however, that this event motivated these sales.  Nor do

**United States District Court**
For the Northern District of California

Plaintiffs allege any theory as to why the many sales made after April 30, 2015 should be subject to insider trading claims.

Plaintiffs argue that they are not required to identify "defendant-by-defendant, transaction-by-transaction, the specific material non-public information allegedly possessed by that particular defendant at the time of any particular transaction." In re RasterOps Corp. Sec. Litig., No. C 92-20115 RMW EAI, 1993 WL 476651, at *5 (N.D. Cal. Sept. 10, 1993). More recent cases under both California and Delaware law, however, have held plaintiffs to a higher pleading standard. See, e.g., In re Verisign, 531 F. Supp. 2d at 1221 (dismissing California insider trading claims where "plaintiffs d[id] not explain which 'true adverse facts' each of the selling defendants knew, when each knew those facts, how they acquired the knowledge, or which sales were made when defendants were in possession of which inside information"); Guttman, 823 A.2d at 505 (concluding that plaintiffs failed to allege particularized facts supporting "that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information").

Given that the majority of the transactions at issue fall into time periods during which there does not appear to be any non-public material adverse information, Plaintiffs' generalized allegations fail to state with particularity a plausible theory supporting their insider trading claim. Even those transactions that do fall within the relevant time periods addressed above must be pled with more particularity with respect to the Selling Defendants' knowledge and motivation. For these reasons, the Court grants the Selling Defendants' motion to dismiss the insider

trading claims under both California and Delaware law, with leave to amend.

### D. Defendants' Motion to Strike Plaintiffs' Jury Demand Is Denied Without Prejudice

Plaintiffs request a trial by jury, to which Defendants argue they are not entitled because their claims are brought in equity. The Seventh Amendment guarantees a party's right to a jury trial "[i]n Suits at common law," U.S. Const., amend VII, but this right does not extend to actions involving only equitable claims. "[T]he right to jury trial attaches to those issues in derivative actions as to which the corporation, if it had been suing in its own right, would have been entitled to a jury." Ross v. Bernhard, 396 U.S. 531, 532–33 (1970). This question requires the Court to "examine both the nature of the action and of the remedy sought." Tull v. United States, 481 U.S. 412, 417 (1987).

Plaintiffs concede that their breach of fiduciary duty claim is traditionally equitable in nature, but contend that their waste and insider trading claims are based in law rather than equity and therefore subject to a jury trial. See Opp'n at 20. Both parties cite cases that they claim support their arguments as to the nature of the waste and insider trading claims.

The parties' cases concerning the waste claim fail to provide any clarity on the issue. While Defendants cite In re Shaw & Elting LLC for the proposition that "[a] claim for breach of fiduciary duty, like a claim for waste, sounds in equity," Nos. 9661-CB, 9686-CB, 9700-CB, 10449-CB, 2015 WL 4874733, at *36 (Del. Ch. Aug. 13, 2015), Plaintiffs point to Navellier v. Sletten, in which a case involving only breach of fiduciary duty and waste

claims went to a jury (although it appears that the jury trial question was not explicitly raised), 262 F.3d 923, 931 (9th Cir. 2001).

With respect to the insider trading claims, Defendants argue that such claims rely on "principles of restitution and equity." Kahn v. Kolberg Kravis Roberts & Co., L.P., 23 A.3d 831, 837 (Del. 2011). Plaintiffs respond that that case did not actually address the question of whether insider trading claims are subject to jury trials, and instead point to Morales v. Executive Telecard, Ltd., No. 95 CIV 10202, 1998 WL 1031493, at *3 (S.D.N.Y. Oct. 30, 1998), which held that a claim for damages based on a short-swing trading violation of Section 16(b) of the Securities Exchange Act was subject to a jury trial. That case, however, is inapposite, as it did not consider the type of insider trading claims alleged here. Neither side cites nor addresses Securities and Exchange Commission v. Lipson, in which the Seventh Circuit stated, "Trading on insider knowledge by a major shareholder who is also the corporation's chief executive officer is a breach of fiduciary obligation, and so the disgorgement of the insider's ill-gotten gain (or averted loss, which is the economic equivalent or profit) is indeed equitable in character," 278 F.3d 656, 663 (7th Cir. 2002).

Plaintiffs also argue that the remedies they seek are legal, such as "money damages, including restitution and disgorgement," as well as "a request for treble damages for violations of California Corporations Code § 25502.5." Opp'n at 20. Defendants argue that restitution and disgorgement are equitable, not legal, remedies, and that Plaintiffs cannot "salvage" their jury demand

by citing Section 25502.5 because that cause of action is barred by the internal affairs doctrine. Rep. at 13. As discussed above, however, the Court declines to bar Plaintiffs' insider trading claims on that ground.

Defendants do not appear to contest that Plaintiffs' Section 25502.5 claim sounds in law rather than equity. Thus, should Plaintiffs amend their California insider trading claims so as to survive dismissal, those claims at least may be tried to a jury. Moreover, given the lack of clarity surrounding the other insider trading and waste claims, as well as the early stage of the current proceedings, the Court denies Defendants' motion to strike the jury demand at this time without prejudice.

CONCLUSION

For the reasons stated above, the Court denies nominal Defendant McKesson's motions to stay and dismiss this action. The Court denies in part Defendants' motion to dismiss for failure to state a claim and grants it in part, with leave to amend. Plaintiffs may file an amended complaint within twenty-eight days of the date of this Order.

IT IS SO ORDERED.

Dated: May 14, 2018

CLAUDIA WILKEN
United States District Judge