**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (139304)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (admitted *Pro Hac Vice*)
Ronnie S. Spiegel (admitted *Pro Hac Vice*)
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
ronnie@hbsslaw.com

**GARDY & NOTIS, LLP**
James S. Notis (admitted *Pro Hac Vice*)
Meagan Farmer (admitted *Pro Hac Vice*)
Tower 56
126 East 56th Street, 8th Floor
New York, NY  10022
Telephone: (212) 905-0509
Facsimile:  (212) 905-0508
jnotis@gardylaw.com
mfarmer@gardylaw.com

[Additional counsel on signature block]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE MCKESSON CORPORATION DERIVATIVE LITIGATION | Case No. 4:17-cv-01850-CW<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: Tuesday, February 4, 2020<br>Hearing Time: 2:30 pm<br>Coutroom: TBD<br>Judge: Hon. Claudia Wilken |

MOTION FOR PRELIMINARY APPROVAL
Case No.: 4:17-cv-01850-CW

1

2

3

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on February 7, 2020, at 2:30 p.m., or as soon thereafter as this motion may be heard Plaintiffs Eli Inzlicht ("Inzlicht"), Vladimir Gusinsky, as Trustee for the Vladimir Gusinsky Living Trust ("Gusinsky"), Chaile Steinberg ("Steinberg"), Michael Berent, Trustee of the Police & Fire Retirement System City of Detroit ("Detroit") and Amalgamated Bank, as Trustee for Longview Largecap 500 Index Fund and Longview Largecap 500 Index VEBA Fund ("Amalgamated" and, collectively, with the other plaintiffs, "Plaintiffs") will and hereby do move for an order before the Honorable Claudia Wilken, United States District Judge of the United States District Court for the Northern District of California, 1301 Clay Street, Oakland, California, seeking an order: (1) preliminarily approving the proposed settlement of this derivative action (the "Settlement"), (2) approving the form and manner of notice of the proposed settlement (the "Notice"), and (3) scheduling a final approval hearing to determine whether to approve the proposed settlement and to hear Plaintiffs' forthcoming motion for an award of attorneys' fees and expenses.

The Motion should be granted. The proposed Settlement is fair, reasonable, and adequate and the proposed Notice is reasonably calculated to give notice to stockholders. The Motion is supported by the accompanying memorandum and points of authorities, the Stipulation and Agreement of Compromise, Settlement and Release, dated December 11, 2019 submitted herewith (the "Stipulation"), and Exhibits thereto, the accompanying Joint Declaration of Reed R. Kathrein and Meagan Farmer ("Lead Counsel Decl.") and the Declaration of Prof. Robert Bartlett of the UC Berkeley School of Law ("Bartlett Decl."), the previous papers filed in this action and such other matters as the Court may consider.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ........................................................................1

II.    BACKGROUND AND PROCEDURAL HISTORY .........................................2

     A.    Factual Background ...............................................................................2

         1.    The Opioid Epidemic ................................................................2

         2.    McKesson's Role......................................................................3

     B.    Procedural Background ..........................................................................5

     C.    Settlement Discussions ..........................................................................8

III.   SETTLEMENT TERMS ....................................................................................9

     A.    Monetary Consideration ........................................................................9

     B.    Governance Consideration ....................................................................9

     C.    Attorneys' Fees and Expenses...............................................................9

     D.    The Release .........................................................................................10

IV.   LEGAL STANDARD .....................................................................................10

V.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ..............11

     A.    The Settlement Is A Great Result When Weighed Against The Risks of Continued Ligitation ...............................................................................................11

     B.    The Stage Of The Litigation Supports Preliminary Approval: Plaintiffs Obtained Extensive Discovery, Allowing Them To Evaluate The Strengths And Weaknesses Of Their Claims ..........................................................................................18

     C.    Plaintiffs' Counsel Are Highy Experienced And The Court Should Give Weight To Their Views, Which Supports Preliminary Approval ................................20

     D.    The Settlement Is the Product of Hard-Fought, Arm's-Length Negotiations Conducted Under the Auspices of Experienced Mediators ........................................20

     E.    The Proposed Fee and Expense Award Is Reasonable............................21

VI.   THE NOTICE PLAN IS REASONABLY CALCULATED TO APPRISE STOCKHOLDERS OF THE ACTION AND AFFORD THEM AN OPPORTUNITY TO OBJECT ........................................................................................................24

VII.  PROPOSED SCHEDULE................................................................................25

VIII. CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Activision Blizzard, Inc. Stockholder Litig.*,
    124 A.3d 1025 (Del. Ch. 2015) ............................................................23

*Alaska Elec. Pension Fund v. Brown*,
    988 A.2d 412 (Del. 2010)....................................................................9

*Americas Mining Corp. v. Theriault*,
    51 A.3d 1213 (Del. 2012)..............................................................23, 24

*In re Atmel Corp. Deriv. Litig.*,
    2010 WL 9525643 (N.D. Cal. Mar. 31, 2010) ......................................25

*Barbosa v. Cargill Meat Sols. Corp.*,
    297 F.R.D. 431 (E.D. Cal. 2013) ........................................................19

*Breault v. Folino*,
    2002 WL 31974381 (C.D. Cal. Mar. 15, 2002) ....................................18

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996) .....................................................*passim*

*In re Cendant Corp., Derivative Action Litig.*,
    232 F. Supp. 2d 327 (D.N.J. 2002)......................................................20

*City of Birmingham Ret. & Relief Sys. v. Good*,
    177 A.3d 47 (Del. 2017) ....................................................................13

*Churchill Vill., L.L.C. v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004)...............................................................25

*David B. Shaev Profit Sharing Account v. Armstrong*,
    2006 WL 391931 (Del. Ch. Feb. 13, 2006), *aff'd*, 911 A.2d 802 (Del. 2006) ......................13

*In re Facebook, Inc. Section 220 Litig.*,
    2019 WL 2320842 (Del. Ch. May 30, 2019) ........................................14

*Feuer v. Thompson*,
    2013 WL 2950667 (N.D. Cal. June 14, 2013)........................................22

*In re Fuqua Indus., Inc. S'holder Litig.*,
    752 A.2d 126 (Del. Ch. 1999) ............................................................18

*Garner v. State Farm Mut. Auto. Ins. Co.*,
    2010 WL 1687832 (N.D. Cal. Apr. 22, 2010)........................................11

*In re Gen. Motors Company Derivative Litig.*,
    2015 WL 3958724 (Del. Ch. June 26, 2015), *aff'd sub nom. In re Gen. Motors Co.
    Derivative Litig.*, 133 A.3d 971 (Del. 2016) .................................................................. 13, 14

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
    2011 WL 4826104 (Del. Ch. Oct. 12, 2011) .......................................................................... 13

*Goodrich v. E.F. Hutton Grp., Inc.*,
    681 A.2d 1039 (Del. 1996) ..................................................................................................... 23

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ............................................................................................... 11

*Harbor Fin. Partners v. Huizenga*,
    751 A.2d 879 (Del. Ch. 1999) ................................................................................................ 16

*HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*,
    2010 WL 4027632 (S.D. Cal. Oct. 14, 2010) ....................................................................... 21

*Hefler v. Wells Fargo & Co.*,
    2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ........................................................................ 21

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
    716 F. App'x 603 (9th Cir. 2017) .................................................................................... 11, 25

*Horman v. Abney*,
    2017 WL 242571 (Del. Ch. Jan. 19, 2017) ..................................................................... 15, 16

*Kandell on behalf of FXCM, Inc. v. Niv*,
    2017 WL 4334149 (Del. Ch. Sept. 29, 2017) ................................................................. 14, 15

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998) ............................................................................................... 20

*Lloyd v. Gupta*,
    2016 WL 3951652 (N.D. Cal. July 22, 2016) ...................................................................... 10

*Marchand v. Barnhill*,
    212 A.3d 805 (Del. 2019) ...................................................................................................... 12

*Marie Raymond Revocable Tr. v. MAT Five LLC*,
    980 A.2d 388 (Del. Ch. 2008) *aff'd sub nom. Whitson v. Marie Raymond
    Revocable Tr.*, 976 A.2d 172 (Del. 2009) ............................................................................ 22

*In re Massey Energy Co. Derivative & Class Action Litig.*,
    160 A.3d 484 (Del. Ch. 2017) ............................................................................................... 14

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ................................................................................................. 20

*In re NVIDIA Corp. Derivative Litig.*,
   2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ............................................... 10

*In re Oracle Corp. Derivative Litig.*,
   824 A.2d 917 (Del. Ch. 2003) ....................................................................... 17

*In re Pac. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ..................................................................... 10, 11

*Paul, Johnson, Alston & Hunt v. Graulty*,
   886 F.2d 268 (9th Cir. 1989) ........................................................................ 22

*Pokorny v. Quixtar Inc.*,
   2011 WL 2912864 (N.D. Cal. July 20, 2011) ............................................... 22

*In re Rambus Inc. Derivative Litig.*,
   2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ................................................. 25

*Roberti v. OSI Sys., Inc.*,
   2015 WL 8329916 (C.D. Cal. Dec. 8, 2015) ................................................ 21

*Rodriguez v. W. Publ'g. Corp.*,
   563 F.3d 948 (9th Cir. 2009) ........................................................................ 19

*Satchell v. Fed. Express Corp.*,
   2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) .............................................. 20

*In re Sauer-Danfoss Inc. Shareholders Litig.*,
   65 A.3d 1116 (Del. Ch. 2011) ................................................................. 23, 24

*Sciabacucchi v. Salzberg*,
   2019 WL 2913272 (Del. Ch. July 8, 2019) .............................................. 23, 24

*Seinfeld v. Coker*,
   847 A.2d 330 (Del. Ch. 2000) ................................................................. 23, 24

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) ..................................................................... 1, 14, 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ................................................ 22

*Thorpe v. CERBCO, Inc.*,
   1997 WL 67833 (Del. Ch. Feb. 6, 1997) ...................................................... 23

*Tornetta v. Musk*,
   2019 WL 4566943 (Del. Ch. Sept. 20, 2019) ............................................... 16

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*,
 736 F. App'x 639 (9th Cir. 2018) ........................................................................ 24

*Vizcaino v. Microsoft Corp.*,
 290 F.3d 1043 (9th Cir. 2002) .............................................................. 22, 23, 24

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
 229 F. Supp. 3d 1052 (N.D. Cal. 2017) .................................................. 19, 20, 21

*In re Wells Fargo S'holder Derivative Litig.*,
 282 F. Supp. 3d 1074 (N.D. Cal. 2017) ............................................................ 12

*In re Yahoo! Inc. S'holder Derivative Litig.*,
 153 F. Supp. 3d 1107 (N.D. Cal. 2015) ............................................................ 11

*Zapata Corp. v. Maldonado*,
 430 A.2d 779 (Del. 1981) .................................................................................. 17

**Federal Statutes**

28 U.S.C. § 1711(2) .................................................................................................. 25

Delaware General Corporation Law Section 220 .................................................. 5, 15

Fed. R. Civ. P. 23.1 ................................................................................................. 10

**Other Authorities**

Charles W. Murdock, *Corporate Governance: The Role of Special Litigation Committees*, 68 WASH. L. REV. 79, 84 (1993) .................................................. 17

C.N.V. Krishnan, Steven Davidoff Solomon, Randall S. Thomas, *How do Legal Standards Matter? An Empirical Study of Special Litigation Committees* (Feb. 15, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3053449 ................... 18

Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2013) .............. 19

Jessie Hellman, *Four states announce $48 billion settlement framework in opioid lawsuits*, THE HILL (Oct. 21, 2019) ................................................................... 16

Minor Myers, *The Decisions of the Corporate Special Litigation Committees: An Empirical Investigation*, 84 IND. L.J. 1309, 1311 (2009) ...................................... 17

Robert M. Cover, *Violence and the Word*, 95 YALE L.J. 1601 (1986) ........................... 3

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Is the Settlement within the range of possible approval as fair, adequate, and reasonable?

2.      Is the Notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      PRELIMINARY STATEMENT**

> A claim that directors are subject to personal liability for employee failures is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.

-   *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006) (cleaned up).

This is a stockholder derivative action brought by shareholders of McKesson Corporation,[1] the largest pharmaceutical distributor in the United States.  For more than two-and-a-half years, Plaintiffs have engaged in hard-fought litigation, seeking to prove that the individual Defendants[2] (certain current and former members of McKesson's Board of Directors) breached their fiduciary duties through oversight failures related to McKesson's distribution of prescription opioid medications.  After months of arm's-length negotiations—and multiple failed mediations—the parties have, finally, reached a proposed Settlement.

The result is extraordinary.  Defendants have agreed to cause their insurers to pay $175 million to the Company—the second-largest settlement of a so-called *Caremark* claim[3] in history.  The parties have also agreed to significant governance reforms that will address and prevent the recurrence of the compliance failures that gave rise to the litigation.  Those reforms include: the separation of the CEO and Chairman roles, term limits for directors, the addition of two new

---

[1] "McKesson" or the "Company."
[2] The Individual Defendants are Andy Bryant, Wayne Budd, John Hammergren, M. Christine Jacobs, Marie L. Knowles, Edward Mueller, Donald Knauss, Susan Salka, N. Anthony Coles, Alton Irby, III, David Lawrence, and Jane Shaw.
[3] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

MOTION FOR PRELIMINARY APPROVAL                                             1
Case No.: 4:17-cv-01850-CW

independent directors, reforms to the composition, mandate, and training of McKesson's compliance committee as well as improvements in reporting to the compliance committee (which was formed after this Court denied the motion to dismiss) and reporting by the compliance committee, revisions to the Company's compensation clawback policy, and enhancements to the Company's disclosures relating to lobbying concerning controlled substances and adjustments to executive compensation based on legal or compliance costs.

The Settlement is fair, reasonable, and adequate. While Plaintiffs believed in the merits of their claims, there is zero doubt that they faced extreme risks if the action were prosecuted through trial. Delaware law is extraordinarily deferential to the business judgment of independent directors and no *Caremark* claim has ever been successfully prosecuted to judgment.  We are aware of the serious consequences that McKesson faces from their failure to comply with the Controlled Substance Act, including both government actions and litigation including *In re National Prescription Opiate Litig.*, Case No. 1:17-md-2804 (N.D. Ohio) (the "MDL").  As such, it was important factor that McKesson quickly enact substantial corporate governance reforms to substantially enhance Board oversight of distributions of controlled substances and compliance with the CSA, to avoid future violations.  The proposed Settlement appropriately balances those risks and factors and represents a remarkable result for the Company and its shareholders.  The Court should grant preliminary approval.

## II.     BACKGROUND AND PROCEDURAL HISTORY

### A.     Factual Background

#### 1.     The Opioid Epidemic

For lawyers who specialize in shareholder litigation, it is easy, sometimes, to forget that "[l]egal interpretation takes place in a field of pain and death."  Robert M. Cover, *Violence and the Word*, 95 Yale L.J. 1601 (1986).

MOTION FOR PRELIMINARY APPROVAL                                                    2
Case No.: 4:17-cv-01850-CW

Not in this case.  This action arises from one of the greatest human tragedies in recent American history.  Since 1999, over 200,000 Americans have died as a result of prescription drug overdoses.  ECF No. 124 (Second Am. Compl.) ¶ 110.[4]  Thousands more have died from overdoses on heroin, fentanyl, or other non-prescription opioids after first developing an opioid addiction through abuse of prescription pain medication.  *Id.*  Between 2000 and 2015, the rate of opioid overdose deaths in the United States more than tripled.  *Id.*[5]

### 2.     McKesson's Role

The causes of the opioid crisis are not limited to deep-rooted social factors.  Drug manufacturers and drug distributors played a particularly significant role and their failures to avoid over prescription and diversion of opioids were among the most important causes of the crisis.

McKesson is—and, at all relevant times, was—the largest wholesale pharmaceutical distributor in the United States, controlling nearly a third of the total U.S. market.  ¶¶ 98, 195.  Throughout the relevant period, McKesson sold billions of dollars' worth of opioids.  According to outside analysts, pharmaceutical manufacturers' total annual U.S. revenues for sales of prescription opioids were approximately $9.6 billion, nearly one-third of which was realized by McKesson.  ¶ 102.

In 2008 McKesson's Board of Directors agreed to settle a case brought by the Drug Enforcement Administration ("DEA") relating to McKesson's alleged failure to report suspicious orders of controlled substances (the "2008 Settlement").  ¶ 5.  In the 2008 Settlement, McKesson paid $13.25 million to settle claims by the DEA and six other states' Attorneys General that McKesson's alleged failure to report suspicious orders from online pharmacies "fueled the explosive prescription drug problem."  *Id.*  In connection with the 2008 Settlement, McKesson was required to

---

[4] Hereafter, ¶ _ citations are to the Second Amended Complaint.
[5] Nor are the consequences limited to overdose deaths.  One need to only look to this Court's criminal docket to see the human toll of addiction.

create a "Controlled Substances Monitoring Program" ("CSMP").  *Id.*

The Complaint alleges that Defendants failed to exercise their oversight responsibilities in the years following the 2008 Settlement.  The Complaint alleges that McKesson's board minutes show only five meetings between 2008 and 2013 at which issues related to opioids or the CSMP were discussed: "one in each of the years 2009, 2010, two in 2011 and one in 2013."  ¶ 208.  "[F]or almost two years—from July 2011 until April 23, 2013—there were . . . no minutes [reflecting] . . . meetings of the Board at which the Board considered any issue relevant to the opioid crisis or the Board's oversight over the distribution of controlled substances."  ¶ 216.

Moreover, the Complaint alleges that the Board ignored a number of red flags during that same period, including presentations flagging the DEA's increased scrutiny on controlled substance distribution (¶¶ 210-212) and a warning that the CSMP program "Needs Improvement."  ¶ 317.

In a settlement first announced in 2015 and executed January 17, 2017 (the "2017 Settlement"), the Company agreed to pay a $150 million civil penalty, and to suspend sales of controlled substances from several distribution centers, for multiple years, in order to resolve investigations and claims related to alleged violations of applicable statutes and regulations governing controlled substances.  ¶ 4.  The U.S. Department of Justice ("DOJ") described the $150 million payment as a "record," and it said the suspensions "are among the most severe sanctions ever agreed to by a [DEA] registered distributor."  *Id.*

Worse still, hundreds of local governments and other private plaintiffs brought suit against McKesson in the MDL and the Company has also been targeted by state attorneys general.  In October 2019, McKesson paid $82 million to resolve claims brought by Cuyahoga and Summit counties, which were the first bellwether plaintiffs in the MDL.[6]  Media reports have suggested that McKesson and other distributors could end up paying billions of dollars in a global settlement.

---

[6] *See* Form 10-Q filed by McKesson on October 30, 2019 at 31.

MOTION FOR PRELIMINARY APPROVAL                                                   4
Case No.: 4:17-cv-01850-CW

**B.      Procedural Background**

A number of McKesson stockholders filed similar suits alleging breaches of fiduciary duty by the Defendants.  On January 31, 2017, the first action, *Silverman v. Bryant, et al.*, No.  4:17-cv-00494-CW (N.D. Cal. Jan. 31, 2017), was filed in this Court.  On April 3, 2017, Plaintiff Inzlicht filed suit in this Court.  ECF No. 1.  On April 25, 2017, the Court entered an Order relating the *Inzlicht* action with the *Silverman* action.  On May 9, 2017, Inzlicht filed a motion to consolidate cases and to appoint lead counsel (*Silverman* Action, ECF Nos. 29-30).  A day later, Charles Ojeda,[7] filed a motion to intervene, consolidate the related actions, and stay proceedings (*Silverman* action, ECF No. 31-30).  Shortly thereafter, the *Silverman* action was voluntarily dismissed (*Silverman* action, ECF Nos. 32, 36).  On May 12, 2017, Ojeda filed a motion to intervene and stay proceedings in the *Inzlicht* action (ECF No. 14), which was ultimately denied by the Court on July 10, 2017 (ECF No. 38).

On July 26, 2017, Plaintiff Gusinsky—who had obtained books and records from McKesson through a pre-litigation demand made pursuant to Section 220 of the Delaware General Corporation Law (a "220 Demand")—filed suit.  *Gusinsky v. Bryant, et al.*, No.5:17-cv-4248-LHK (N.D. Cal.). Gusinsky and Inzlicht agreed to work together and filed a stipulation and proposed order consolidating the cases and appointing co-lead counsel.  ECF No. 39.  Ojeda objected.  ECF No. 41. The Court granted the stipulation over his objection, but ordered that Ojeda be allowed to participate in the drafting of a consolidated amended complaint.  ECF No. 45.

On October 17, 2017, Intervening Plaintiff Chaile Steinberg—who had also obtained books and records through a 220 Demand—filed suit in the Delaware Court of Chancery.  *Steinberg v. Bryant, et al.*, Case No. 2017-0736 (Del. Ch.).  On November 7, 2017, McKesson and the individual defendants moved to dismiss the *Steinberg* action.  On November 8, 2017, Intervening Plaintiff

---

[7] Plaintiff in the related, Delaware action discussed below.

Detroit filed suit in the Delaware Court of Chancery.  *Police & Fire Ret. Sys. of the City of Detroit v. Bryant, et al.*, Case No. 2017-0803 (Del. Ch.).

On November 17, 2017, co-lead counsel, in the federal action, sent a letter to the Court seeking relief from the requirement that Ojeda be permitted to participate in the drafting of a consolidated amended complaint.  ECF No. 52.  As counsel explained in the letter, they had learned that Ojeda was a citizen of California and, as such, his inclusion in any complaint likely would have destroyed the Court's subject-matter jurisdiction.  *Id.*  On December 1, 2017, Ojeda wrote to inform the Court that he did not intend to file an action in this Court after all.  ECF No. 56.  Also on December 1, 2017, Inzlicht and Gusinsky moved for leave to file the consolidated amended complaint under seal.  ECF No. 57.  The consolidated complaint, which was eventually unsealed, alleged breach of fiduciary duty claims against the Defendants.

On December 8, 2017, Ojeda and Intervening Plaintiff Amalgamated filed suit in Delaware. *Amalgamated Bank v. Hammergren, et al.*, Case No. 2017-0881 (Del. Ch.).[8]  The Delaware actions were subsequently consolidated as *In re McKesson Corp. Stockholder Derivative Litigation*, Consol. C.A. No. 2017-0736-SG.

On December 22, 2017, Defendants and McKesson moved to stay this action in favor of the Delaware action. ECF No. 64. Shortly thereafter, McKesson and the Defendants moved to dismiss in this action. ECF No. 69, 70. Defendants' motions to dismiss the Delaware actions were also fully briefed and argued on March 7, 2018.  On May 14, 2018, after briefing and oral argument in this Action, this Court denied the motion to stay and denied, in substantial part, the motions to dismiss (the "MTD Order").  ECF No. 85.

On May 25, 2018, the Delaware court stayed the Delaware action in deference to this Action.

---

[8] At the time, Amalgamated and Ojeda were both represented by the Levi & Korsinsky firm. Amalgamated has since substituted its counsel and is now represented by the Bernstein Litowitz and Grant & Eisenhofer firms.  ECF No. 199.

MOTION FOR PRELIMINARY APPROVAL                                                          6
Case No.: 4:17-cv-01850-CW

ECF No. 90-2, Ex. H.  On June 7, 2018, Defendants moved for partial reconsideration of the MTD Order.  ECF No. 89.  The Court denied that request.  ECF No. 97.

On July 25, 2018, McKesson's Board of Directors formed a one-member Special Litigation Committee (the "SLC"), consisting of McKesson Director Bradley Lerman, who joined the Board in April 2018.  On September 12, 2018, Plaintiffs filed a second consolidated amended complaint, adding Amalgamated, Detroit, and Steinberg as Intervening Plaintiffs.  ECF No. 124.  On September 17, 2018, the SLC filed a motion asking the Court to "enter a stay of all discovery and litigation activity in this case for ten months, to allow the SLC to investigate thoroughly the claims asserted in this litigation and to determine whether and how those claims should be pursued in the best interests of McKesson."  ECF No. 138 at 4.  Plaintiffs opposed the SLC's motion.  ECF No. 162.  After a November 6, 2018 hearing, the Court entered an order on November 13, 2018, denying in substantial part, the SLC's request for a stay, permitting discovery to go forward with the exception of a limited stay of deposition discovery (initially through July 2018).  ECF No. 189 at 8.

Over the months that followed, the parties engaged in extensive document discovery. Plaintiffs issued three sets of document requests and two sets of interrogatories.  McKesson and the other Defendants produced over 948,100 pages of documents to Plaintiffs, which Plaintiffs' counsel reviewed and analyzed.  Plaintiffs served several third party subpoenas, which resulted in the further production of 106,130 pages of documents which Plaintiffs' counsel reviewed and analyzed. Plaintiffs additionally obtained access to the transcripts of depositions of forty-four fact witnesses taken in the MDL, which Plaintiffs' counsel reviewed and analyzed.  Plaintiffs also spent significant time responding to two sets of document requests and two sets of interrogatories, propounded on Plaintiffs by certain Defendants.

The parties engaged in lengthy meet-and-confer discussions stretching over weeks and months about a series of discovery issues, including complex disputes over Plaintiffs' ability to

obtain documents as to which McKesson asserted an attorney-client privilege.  On several occasions, Plaintiffs served Defendants with their portion of a joint discovery letter consistent with the Court's Case Management Order.  *See* ECF No. 47 at 2.  Certain of the parties' discovery disputes were resolved without the need for intervention from the Court at the time the Settlement was reached.

### C.    Settlement Discussions

With the litigation proceeding at full steam, the parties—including Plaintiffs, Defendants, McKesson, the SLC, and Defendants' insurance carriers—pursued a parallel track of settlement negotiations, conducted under the auspices of three experienced mediators: the Hon. Daniel Weinstein (Ret.), Jed Melnick, and Robert Meyer, including three, in-person, full-day mediation sessions.

-    The first mediation (with just Mr. Meyer) took place on March 12, 2019.  It failed.

-    On April 16, 2019, Plaintiffs' counsel met in-person with counsel for McKesson, the SLC, and the Individual Defendants to discuss governance reforms Plaintiffs proposed as part of a potential settlement.

-    A second mediation (with just Mr. Meyer) took place on April 26, 2019.  It failed.

-    On July 10, 2019, Plaintiffs' counsel met in-person with the SLC to discuss the litigation and the settlement negotiations.

-    On July 17, 2019, Plaintiffs' counsel met in-person with counsel for McKesson, the SLC, and the Individual Defendants to discuss governance reforms Plaintiffs proposed as part of a potential settlement.

-    A third mediation (with all three mediators) took place on August 8, 2018.[9]  It failed.

In between these in-person sessions, the parties engaged in settlement communications facilitated by the mediators and exchanged multiple drafts of the proposed governance reforms. Following the failure of the third mediation, the parties continued to engage in settlement negotiations through the mediator.  The parties ultimately agreed to the final cash consideration of

---

[9] It is Plaintiffs' understanding that the mediators worked with the Defendants and their insurance carriers on numerous dates, including an in-person session on August 9, 2019.

$175 million through the mediators' recommendations.  Simultaneously, the parties negotiated and reached agreement on final corporate governance reforms.

On November 22, 2019, the parties agreed to a term sheet setting out the material terms of the Settlement.  On December 11, 2019, the parties agreed to a formal Stipulation of Settlement.

### III.     SETTLEMENT TERMS

#### A.     Monetary Consideration

The Settlement provides for a cash payment to the Company of $175 million.

#### B.     Governance Consideration

The Settlement also provides for significant governance reforms that will address and prevent the compliance failures that gave rise to the litigation.  Those reforms include: the separation of the CEO and Chairman roles,[10] term limits for directors, the addition of two new independent directors,[11] reforms to the composition, mandate, and training of McKesson's compliance committee[12] as well as improvements in reporting to the compliance committee and reporting by the compliance committee, revisions to the Company's compensation clawback policy, and enhancements to the Company's disclosures relating to lobbying concerning controlled substances and adjustments to executive compensation based on legal or compliance costs.

#### C.     Attorneys' Fees and Expenses

The parties have no agreement regarding attorneys' fees.  Plaintiffs' Counsel intend to seek fees not to exceed $52.5 million (30% of the cash recovery), plus expenses not to exceed $600,000.

---

[10] Shortly before the first mediation session, McKesson appointed a new Chairman of the Board who is not an executive of the Company.  McKesson has agreed to keep the separation of Chairman of the Board ("Chairman") and the Chief Executive Officer ("CEO") roles for the term of this Settlement.

[11] One qualifying director has been added.  McKesson will need to add another new director with the experience/background set forth in paragraph K of the Corporate Governance Reforms.

[12] The Compliance Committee itself was not formed until after the Court denied the motion to dismiss in this action and shortly before the first mediation.  Its existence is fairly attributable to the litigation.  *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 417 (Del. 2010) (discussing the presumption that curative actions taken after litigation is initiated are attributable to the litigation).

**D.     The Release**

The releases in the Settlement are appropriately tailored to claims brought on behalf of the Company arising from the allegations of the complaints in this Action and the Delaware Action.[13]

## IV.     LEGAL STANDARD

Approval of a derivative settlement is governed by Federal Rule of Civil Procedure 23.1, which requires Court approval following notice to stockholders.  The Court follows the same two-step process used for approval of a class action: "[U]nder Ninth Circuit precedent, this Court must grant preliminary approval of a settlement, including approval of the notice to shareholders and the proposed method of notice, before having the final settlement hearing."  *In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA(JCS), 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008).

"In order to grant preliminary approval, the Court need only conclude that the settlement of the claims on the agreed upon terms is within the range of possible approval." *Lloyd v. Gupta*, No. 3:15-cv-04183-MEJ, 2016 WL 3951652, at *4 (N.D. Cal. July 22, 2016) (cleaned up).  To obtain final approval, Plaintiffs will have to show that the settlement is "fundamentally fair, adequate, and reasonable."  *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995).

"Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).  Given the "strong judicial policy that favors settlements, particularly where complex class action [or derivative] litigation is concerned, the Court's "function is not to second-guess the settlement's terms," but simply to "to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a

---

[13] For avoidance of doubt, the Settlement makes clear that Plaintiffs are not releasing any direct claims held by any current, former, or future stockholder of McKesson who is not a Plaintiff, including any claims asserting violations of the federal or state securities laws.

whole, is fair, reasonable and adequate to all concerned." *Garner v. State Farm Mut. Auto. Ins. Co.*, No. 4:08-cv-01365-CW, 2010 WL 1687832, at *8 (N.D. Cal. Apr. 22, 2010) (cleaned up).

## V.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

In evaluating the fairness, adequacy, and reasonableness of a derivative settlement, the Court looks to the same factors considered in a class settlement: "the strength of the plaintiffs' case, the risk, expense, complexity, and likely duration of further litigation, the amount offered in settlement, the stage of the proceedings, the experience and views of counsel, and the reaction of class members[14] to the proposed settlement." *In re Hewlett-Packard Co. S'holder Derivative Litig.*, 716 F. App'x 603, 605 (9th Cir. 2017).  Here, those factors all support preliminary approval of the Settlement.

### A.   The Settlement Is A Great Result When Weighed Against The Risks of Continued Litigation

"[D]erivative lawsuits are rarely successful." *In re Pac. Enters.*, 47 F.3d at 377.  And this derivative lawsuit was harder than most.  As the Court recognized in the MTD Order, Plaintiffs had to "proceed on a director oversight theory"—*i.e.*, a *Caremark* claim.  ECF No. 85 at 15-16.  "This type of 'failure of oversight' theory is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1121 (N.D. Cal. 2015) (cleaned up).  In the three decades since *Caremark* was decided, there have been hundreds of decisions dismissing *Caremark* claims.  Until this year, the Delaware Supreme Court had **never** upheld a *Caremark* claim.[15]  And to undersigned counsel's knowledge, no *Caremark* claim has ever gone to trial.

---

[14] Although the Ninth Circuit referred to "class members," it presumably meant stockholders of the corporate nominal defendant. As the Notice has not yet been issued, it is, obviously, premature to consider stockholder reaction at this stage.

[15] In its first and only decision reversing dismissal of a *Caremark* claim, the Delaware Supreme Court acknowledged that *Caremark* "plaintiffs usually lose because they must concede the existence of board-level systems of monitoring and oversight such as a relevant committee, a regular protocol

Plaintiffs overcame those steep odds to obtain a remarkable settlement: $175 million in cash consideration and significant governance reforms that will help prevent a recurrence of similar compliance failures in future.  Measured by the cash recovery alone, this is the second-largest *Caremark* settlement of all time.[16]  It is almost twice the size of the next largest *Caremark* settlement.  *City of Monroe Emps.' Ret. Sys. v. Murdoch*, C.A. No. 2017-0833- AGB (Del. Ch. 2017) ($90 million).

The governance reforms are also highly meaningful.  In his accompanying declaration, Professor Robert Bartlett of the UC Berkeley School of Law opines that "the Governance Reforms will meaningfully improve Board oversight and, by doing so, reduce the chance of another compliance failure at McKesson involving controlled substances."  Bartlett Decl. ¶ 66.  And because of "the considerable liability that can arise from the Company's failure to comply with Controlled Substances Laws and Regulations, the Governance Reforms, by reducing the risk of another compliance failure, . . . provide significant value for McKesson and its shareholders."  *Id.*

In balancing the consideration gained through the Settlement against the strengths and weaknesses of the case and the risks of future litigation, Plaintiffs considered three key variables that apply to almost any type of case: liability, damages, and collectability (*i.e.*, the likelihood of being able to collect from the individual defendants in the event of a favorable judgment).

**Liability.**  Plaintiffs believed they had strong breach of fiduciary duty claims, but the path to

---

requiring board-level reports about the relevant risks, or the board's use of third-party monitors, auditors, or consultants."  *Marchand v. Barnhill*, 212 A.3d 805, 823 (Del. 2019).

[16] The largest *Caremark* settlement of all time is *In re Wells Fargo S'holder Derivative Litig.*, 3:16-cv-05541 (N.D. Cal.) with a $240 million cash payment.  But there is a significant asterisk.  In addition to the *Caremark* claims brought by the *Wells Fargo* plaintiff, Judge Tigar also sustained derivative claims brought under the federal securities laws alleging that the individual defendants had engaged in massive insider sales while in possession of material, non-public information and had caused the company to engage in stock repurchases at inflated prices. 282 F. Supp. 3d 1074, 1089-1107 (N.D. Cal. 2017).  Those non-*Caremark* claims—which were not present here—significantly increased the settlement value by increasing both the available damages and the likelihood of establishing liability.

MOTION FOR PRELIMINARY APPROVAL                                                    12
Case No.: 4:17-cv-01850-CW

a liability judgment was fraught with obstacles.  As the Court noted in the MTD Order, the Individual Defendants were all directors of the Company and protected by an exculpatory provision eliminating any liability for monetary damages arising from a breach of their duty of care.  ECF No. 85 at 15.[17]  To overcome the exculpatory provision, Plaintiffs would have to establish a breach of the duty of loyalty.

This is a high bar, particularly in the absence of evidence of self-dealing or related-party transactions.  "Good faith, not a good result, is what is required of the board."  *In re Goldman Sachs Grp., Inc. S'holder Litig.*, No. CIV.A. 5215-VCG, 2011 WL 4826104, at *23 (Del. Ch. Oct. 12, 2011).  Directors are not liable where a "well-constituted oversight mechanism, having received no specific indications of misconduct, fail[s] to discover [wrongdoing]."  *David B. Shaev Profit Sharing Account v. Armstrong*, No. CIV.A. 1449-N, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006), *aff'd*, 911 A.2d 802 (Del. 2006).

Here, the ultimate fact-finder may have agreed with Plaintiffs that the McKesson "directors did a poor job of overseeing risk in a poorly-managed corporation," but that, alone, "do[es] not imply director bad faith."  *In re Gen. Motors Company Derivative Litig.*, No. CV 9627-VCG, 2015 WL 3958724, at *17 (Del. Ch. June 26, 2015), *aff'd sub nom. In re Gen. Motors Co. Derivative Litig.*, 133 A.3d 971 (Del. 2016); *see also City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 50-51 (Del. 2017) ("In May 2015, Duke Energy pled guilty to nine misdemeanor criminal violations of the Federal Clean Water Act and paid a fine exceeding $100 million.  We agree with the Court of Chancery that the plaintiffs did not sufficiently allege that the directors faced a substantial likelihood of personal liability for a *Caremark* violation.  Instead, the directors at most faced the risk of an exculpated breach of the duty of care.").

Plaintiffs could not prove a breach of the duty of loyalty by showing "gross negligence;" they

---

[17] Hammergren was also an officer and not eligible for exculpation for acts taken in that capacity.

would have to show a "bad-faith **conscious** disregard of fiduciary duties." *General Motors*, 2015

WL 3958724, at *17 (emphasis added); *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d

362, 369 (Del. 2006) (bad faith is shown where a fiduciary "**intentionally** acts with a purpose other

than that of advancing the best interests of the corporation, where the fiduciary acts with the **intent** to

violate applicable positive law, or where the fiduciary **intentionally** fails to act in the face of a

known duty to act, demonstrating a conscious disregard for his duties.") (emphasis added).

This would have been hard to do because Defendants had no clear motive to cause or allow

McKesson to intentionally break the law.  The rare, viable *Caremark* case usually involves

allegations that directors "knowingly condoned illegal behavior," through "a business model

allegedly reliant on a clear violation of a federal regulation."  *Kandell on behalf of FXCM, Inc. v.

Niv*, No. CV 11812-VCG, 2017 WL 4334149, at *2, *18 (Del. Ch. Sept. 29, 2017), or, at minimum,

put "profits over safety."  *In re Massey Energy Co. Derivative & Class Action Litig.*, 160 A.3d 484,

490 (Del. Ch. 2017).[18]

Here, Plaintiffs alleged that the Defendants put "profits over safety" but that narrative was

challenged by Defendants who argued that that less than 2% of McKesson's revenues were

attributable to opioid sales.  ECF No. 69 at 3 n.3.  And unlike the "highly unusual set of facts" in

*FXCM*—where there was a "clear" legal violation—Defendants here would have had plausible

arguments that McKesson violated "complex and nuanced law" and the Company suffered damages

because its "regulator adopted a legal interpretation at odds with a rationally compliant, if ultimately

unavailing, position adopted by the corporation."  2017 WL 4334149, at *17-18 (suggesting that no

---

[18] While profit-seeking behavior might be argued to be in the best interests of the corporation, "Delaware law does not charter law breakers. . . . .  [A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." *Massey*, 2011 WL 2176479, at *20; *In re Facebook, Inc. Section 220 Litig.*, No. CV 2018-0661-JRS, 2019 WL 2320842, at *14 (Del. Ch. May 30, 2019) ("Our law does not countenance board level disobedience.").

breach of fiduciary duty would have occurred under such a scenario).

Indeed, even under circumstances where, as here, there was a prior consent decree, Delaware courts have rejected claims against directors who, in good faith, set up monitoring systems that simply proved inadequate to prevent new violations.  *Horman v. Abney*, No. CV 12290-VCS, 2017 WL 242571, at *10 (Del. Ch. Jan. 19, 2017) (discussing "the creation and implementation of a system of internal controls following UPS's acceptance of the AOD [prior agreement with the federal government].  The system functioned well, at least for a time, after the AOD was finalized and the Complaint makes no particularized allegation that the system was intentionally disabled or diminished within UPS.  That the Plaintiffs did not turn up any Board documents specifically referencing continued compliance with the AOD during a specific time period is not sufficient to allege that the system was not in place or that the Board was simply going through the motions when overseeing compliance.").

At the pleadings stage, Plaintiffs were able to survive primarily by pointing to gaps in the then-fragmentary documentary record.  Specifically, Plaintiffs alleged that between the time of the 2008 Settlement and the DEA raid in March 2013, there were only three Board meetings for which the meeting minutes reflect a discussion of issues related to the CSMP.  MTD Order at 17-18 (noting that "minutes from meetings of the Board of Directors and the Audit Committee show that these issues were seldom addressed" even though "Plaintiffs made a demand pursuant to Delaware General Corporation Law Section 220 for relevant documents, providing the opportunity to provide exculpatory documents"); *id.* at 19 (noting that gaps in board minutes "suggest[] some level of disregard"); *id.* at 23 ("The infrequency with which [Defendants] discussed this serious issue, despite the regular signals that the CSMP was failing and required more attention, evidences conscious disregard and abdication of responsibility.").

At summary judgment and trial, however, Defendants would have been able to put forward

affirmative evidence, including their own self-serving testimony, and would, no doubt, have argued that (1) the minutes were only a partial incomplete record of their oversight activities; and (2) they had, in any event, no "duty to take active steps affirmatively to monitor the monitors." *Horman*, 2017 WL 242571, at *9 (cleaned up).[19]

**Damages.**  There is no question that the potential damages in this case are massive.  In addition to paying a $150 million fine to the federal government, McKesson is paying over $100 million per year in legal fees to defend itself in the MDL[20] and will likely pay billions more for global peace.[21]

Whether Plaintiffs could prove that 100% of those payments were damages recoverable from Defendants, however, is a different question. Defendants would have, no doubt, argued that the MDL was "regulation by litigation," observing that every significant opioid distributor and manufacturer in the country was a defendant in the MDL.  Defendants would have had some justification in arguing that, no matter what they did as officers and directors, McKesson would still have been a defendant in the MDL and forced to pay a settlement amount driven as much by its relative market share as by its true culpability.

**Collectability.**  The Defendants are protected by a number of layers of directors and officers

---

[19] Plaintiffs also asserted a waste claim related to Defendant Hammergren's compensation.  The standard for waste is extreme: "a waste claim must be supported by facts demonstrating that no person of ordinary sound business judgment could consider" the transaction fair.  *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 881 (Del. Ch. 1999).

It is almost impossible to satisfy this test for executive compensation awards paid to current managers and approved by independent members of a board of directors.  Indeed, the Delaware Court of Chancery recently dismissed a waste claim challenging compensation to a CEO valued at "upwards of $55.8 billion."  *Tornetta v. Musk*, No. CV 2018-0408-JRS, 2019 WL 4566943, at *1 (Del. Ch. Sept. 20, 2019).

In light of the fact that less than 2% of McKesson's revenue was derived from opioid sales, it would have been difficult to establish that "no reasonable person of sound business judgment" would have considered Hammergren's compensation appropriate.  So, while Plaintiffs could point to the waste claim as increasing the potential damages, it was of lesser value than the breach-of-fiduciary-duty claims.

[20] Form 10-K filed by McKesson with the SEC on May 15, 2019 at 33.

[21] *See, e.g.*, Jessie Hellman, *Four states announce $48 billion settlement framework in opioid lawsuits*, THE HILL (Oct. 21, 2019).

("D&O") insurance.  In the event of a final, non-appealable judgment against Defendants, however, the D&O carriers could have had significant coverage defenses.[22]  The Individual Defendants are all wealthy people by the standards of ordinary Americans, but none would have had sufficient assets available to satisfy a ten-figure judgment.

**The SLC and The MDL.**  An SLC may, "[a]fter an objective and thorough investigation of [the] suit . . . cause [the] corporation to file a . . . motion to dismiss in . . . the best interests of the corporation, as determined by the committee."  *Zapata Corp. v. Maldonado*, 430 A.2d 779, 788-89 (Del. 1981).  "If . . . the Court is satisfied under Rule 56 standards that [1] the committee was independent and showed reasonable bases for good faith findings and recommendations" and [2] in "its own independent business judgment . . . the motion should be granted," then "the Court may proceed to grant the motion[.]"  *Id.*

The conventional wisdom is that an SLC will "[i]nvariably . . . move[] to dismiss . . . litigation" pending against fellow directors.  Charles W. Murdock, *Corporate Governance: The Role of Special Litigation Committees*, 68 WASH. L. REV. 79, 84 (1993); Minor Myers, *The Decisions of the Corporate Special Litigation Committees: An Empirical Investigation*, 84 IND. L.J. 1309, 1311 (2009) (referring to the "the widespread proposition that SLCs always recommend dismissal"); *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 940 (Del. Ch. 2003) (noting the heavy "social pressures" placed on SLC members to clear their fellow directors).[23]  In turn, courts regularly follow

---

[22] To prove liability, Plaintiffs might well have had to prove that Defendants knowingly violated positive law.  *Ritter*, 911 A.2d at 369.  The D&O policies excluded coverage for deliberately fraudulent or deliberately criminal acts or omissions but only where such act or omission was determined by a final non-appealable adjudication in the underlying action.

[23] There is some evidence that this pattern is less true where the case is pending in Delaware.  C.N.V. Krishnan, Steven Davidoff Solomon, Randall S. Thomas, *How do Legal Standards Matter? An Empirical Study of Special Litigation Committees* ("*SLC Study*") (Feb. 15, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3053449 at 25 ("SLC reports are less likely to recommend dismissal in Delaware cases.").  Overall, however, the data show that SLCs have a strong "tendency to side with management": they "recommend[] settlement, pursuit of litigation, or both in only 12% of . . . cases."  *Id.* at 3-4.

an SLC's recommendation to dismiss.  Where an SLC recommends dismissal, the case is either dismissed or settled (*i.e.*, before a decision on the recommendation)[24] about 90% of the time.  *See* Krishnan, et al., *SLC Study* at 16-17.

As such, Plaintiffs and their counsel knew that there was a real risk from the issuance of a report by the SLC.  The SLC was a one-member committee consisting of Bradley Lerman, a McKesson board member, who is not a defendant, and the General Counsel of Medtronic plc who was represented, in this action, by the Wilkinson Walsh Eskovitz firm.  Plaintiffs and their counsel considered the risks and engaged with the SLC and its counsel to explain Plaintiffs' claims, the evidence supporting the claims, as well as potential challenges to the SLC and any determination it made.  In the end, the SLC supports this Settlement as in the best interest of McKesson.

Finally, Plaintiffs were not free to seek the maximum monetary recovery at all costs.  "The derivative plaintiff, as a fiduciary to the company, owes a duty of loyalty to the company to act in its best interest."  *Breault v. Folino*, No. 8:01-cv-00826-GLT-AN, 2002 WL 31974381, at *1 (C.D. Cal. Mar. 15, 2002); *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 129 (Del. Ch. 1999) ("a derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity.").  Plaintiffs were required to consider the benefits of this settlement—a large financial recovery and substantial corporate governance reforms—compared to the risks of continued litigation, including the disruption to McKesson's business, the delay in obtaining the benefits of the settlement, and the risk of losing at trial and obtaining nothing for the Company.

### B. The Stage Of The Litigation Supports Preliminary Approval: Plaintiffs Obtained Extensive Discovery, Allowing Them To Evaluate The Strengths And Weaknesses Of Their Claims

The stage of the litigation supports preliminary approval.  Over the course of the litigation,

---

[24] Presumably, these settlements are at a steep discount.

"extensive [document] discovery had been conducted," giving "counsel . . . a good grasp on the merits of their case before settlement talks began." *Rodriguez v. W. Publ'g. Corp.*, 563 F.3d 948, 967 (9th Cir. 2009). In addition to the books and records that they obtained through pre-litigation document demands, Plaintiffs issued three sets of document requests and two sets of interrogatories in this action, in addition to several third party subpoenas. They received and analyzed over a million pages of documents produced by Defendants and third parties, as well as detailed interrogatory responses.

The Plaintiffs also had the benefit of reviewing transcripts of depositions and expert reports from numerous related actions involving McKesson (including the MDL), where a core issue was whether McKesson complied with the CSA. This further educated Plaintiffs and counsel on the strengths and weaknesses of their claims and further supports the appropriateness of the settlement.[25]

The "stage of the litigation" inquiry is not a formalistic box-checking exercise. "What is required is that 'sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently.'" *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (quoting Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2013)); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052, 1067 (N.D. Cal. 2017) ("while the parties reached the Settlement at an early phase of litigation, Class Counsel's careful pre-filing investigation and their extensive review of discovery materials indicate they had sufficient information to make an informed decision about the Settlement. Accordingly, this factor favors Settlement approval.").[26]

---

[25] As a result of the stay of depositions granted during the pendency of the SLC's investigation (ECF No. 187), Plaintiffs had not yet commenced depositions.

[26] Indeed, even the absence of any "formal discovery" would not prevent the parties from taking a seat at the "bargaining table," so long as the "the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (settlement warranted approval even where "extensive formal discovery had not been completed").

### C.     Plaintiffs' Counsel Are Highly Experienced And The Court Should Give Weight To Their Views, Which Supports Preliminary Approval

"Courts afford great weight . . . to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Volkswagen*, 229 F. Supp. 3d at 1067 (cleaned up).  Here, Plaintiffs were represented by sophisticated, highly experienced lawyers who have decades of experience with derivative, class, and other complex litigation.  Their strong support for the Settlement weighs heavily in favor of preliminary approval.

Similarly, "[t]he SLC has determined that this Settlement Agreement is in the company's best interest.  The SLC's [support for] the settlement is significant because it avoids the SLC's potential dismissal of the case.  This factor weighs in favor of approval of the Settlement Agreement." *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 336 (D.N.J. 2002).

### D.     The Settlement Is the Product of Hard-Fought, Arm's-Length Negotiations Conducted Under the Auspices of Experienced Mediators

Finally, while it is not one of the enumerated factors, "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Satchell v. Fed. Express Corp.*, No. C 3:03-cv-02878-SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007).  Here, the parties employed the services of *three* experienced mediators—Judge Weinstein, Mr. Melnick, and Mr. Meyer—and the final dollar figure was the product of a double-blind mediators' recommendation. *Roberti v. OSI Sys., Inc.*, No. 2:13-cv-09174-MWF-MRW, 2015 WL 8329916, at *3 (C.D. Cal. Dec. 8, 2015) (that "[t]he parties eventually agreed to settle the action following [a] double-blind Mediator's Recommendation" supported the adequacy and fairness of the settlement).

Similarly, the course of negotiations shows that this was a hard-fought, arm's-length process.  The parties participated in three, full-day, in-person mediation sessions over the course of a number of months and continued to negotiate between and after those mediations (using the mediators as intermediaries).  In addition to the formal mediation sessions, Plaintiffs' counsel met in-person with the SLC to discuss its investigation and had multiple in-person meetings with counsel for the

Company, the Individual Defendants, and the SLC to discuss the details of the governance reforms. *Hefler v. Wells Fargo & Co.*, No. 4:16-cv-05479-JST, 2018 WL 4207245, at *9 (N.D. Cal. Sept. 4, 2018) ("in light of the fact that the Settlement was reached after the parties engaged in motion practice and participated in multiple days of formal mediation, the Court concludes that the negotiations and agreement were non-collusive."); *HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*, No. 3:07cv-02245-MMA-NLS, 2010 WL 4027632, at *2 (S.D. Cal. Oct. 14, 2010) ("Counsel for the parties participated in arm's length negotiations for several months before reaching an agreement.  All parties are represented by competent, experienced litigators, and the active involvement of the Honorable [Daniel] Weinstein (Ret.) as a mediator during a substantial portion of the negotiations weighs considerably in favor of concluding this is not a collusive settlement.").

### E.    The Proposed Fee and Expense Award Is Reasonable

As set forth in the schedule below, Plaintiffs intend to move for an award of attorneys' fees and expenses when they seek final approval of the Settlement.  Plaintiffs will seek up to 30% of the common fund in fees, plus reimbursement of up to $600,000 in expenses.  Because this is only the preliminary approval phase, the Court need not yet make any decision regarding fees.  *Volkswagen*, 2016 WL 6091259, at *11 (granting preliminary approval, noting "Plaintiff has not yet requested attorneys' fees.  That the amount of attorneys' fees and costs is still to be determined is not fatal to preliminary approval," because "Class Counsel [are not required] to move for [their] fee award at the preliminary approval juncture, or even upon final approval.").

Nonetheless, counsel are aware that this Court has, on occasion, considered the potential fee award at the preliminary stage where "the apparent disproportion between the size of the Cash Fund and the amount of attorneys' fees counsel intend to request is so great as to call into question the fairness of the proposed settlement."  *Pokorny v. Quixtar Inc.*, No. 3:07-cv-0201-SC, 2011 WL 2912864, at *1 (N.D. Cal. July 20, 2011).  That scenario is not present here.

1

2

As set forth in the Notice, Plaintiffs' Counsel intend to seek a fee award no greater than 30%

of the common fund.  This is a fair and reasonable request.  A 25% award is, of course, the

3

"benchmark" under federal common law.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th

4

Cir. 2002), which can "be adjusted upward or downward to account for any unusual circumstances

5

involved in this case," with fee awards usually "rang[ing] from 20 percent to 30 percent of the fund

6

created."  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *see also In re*

7

*TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI, 2013 WL 1365900, at *7 (N.D. Cal.

8

9

Apr. 3, 2013) (awarding 28.5% of $1.08 billion fund for "exceptional" result, even though counsel's

10

"risk was lessened on account of parallel criminal price-fixing charges and guilty pleas").

11

Here, however, "[b]ecause Delaware law govern[ed] the [substantive] claims, it also governs

12

the fee award."  *Feuer v. Thompson*, 2013 WL 2950667, at *2 (N.D. Cal. June 14, 2013) (derivative

13

action) (citing *Vizcaino*, 290 F.3d at 1047 ("Because Washington law governed the claim, it also

14

governs the award of fees.")).  And 30% is also an appropriate request under Delaware law.

15

In common fund cases like this one, Delaware courts have "often approved fee requests of

16

30% or more of the benefits where," as here, "the settlement benefits are attributable solely to the

17

litigation."  *Marie Raymond Revocable Tr. v. MAT Five LLC*, 980 A.2d 388, 410 (Del. Ch. 2008)

18

19

*aff'd sub nom. Whitson v. Marie Raymond Revocable Tr.*, 976 A.2d 172 (Del. 2009); *see also*

20

*Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d 1039, 1043 (Del. 1996) (affirming "a fee of 33⅓% of

21

the total amount actually paid out to class members"); *Thorpe v. CERBCO, Inc.*, No. CIV. A. 11713,

22

1997 WL 67833, at *6 (Del. Ch. Feb. 6, 1997) ("plaintiffs are entitled to one-third of the common

23

24

fund"); *aff'd*, 703 A.2d 645 (Del. 1997).  Delaware has expressly "decline[d] to impose either a cap

25

or the mandatory use of any particular range of percentages for determining attorneys' fees in mega

26

fund cases."  *Americas Mining Corp. v. Theriault,* 51 A.3d 1213, 1261 (Del. 2012); *see also In re*

27

*Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1071 (Del. Ch. 2015) (counsel awarded

28

MOTION FOR PRELIMINARY APPROVAL                                                                22
Case No.: 4:17-cv-01850-CW

$72.5 million fee for $275 million derivative settlement where, as here, in addition to monetary recovery, "Lead Counsel obtained substantial non-monetary relief.").  Moreover, "Delaware judges have been . . . willing to award substantial attorneys' fees, even after a relatively quick settlement of the case," in the belief that "fee awards [should not be] structured to reward lawyers for needlessly prolonging litigation."  *Seinfeld v. Coker*, 847 A.2d 330, 333 (Del. Ch. 2000).[27]

Delaware has repeatedly "reject[ed] the lodestar methodology," *Theriault,* 51 A.3d at 1257 (Del. 2012) (approving fee award "that pa[id] the Plaintiff's counsel over $35,000 per hour worked and 66 times the value of their time and expenses"), preferring "instead to focus on the benefit conferred." *Sciabacucchi v. Salzberg*, No. CV 2017-0931-JTL, 2019 WL 2913272, at *6 (Del. Ch. July 8, 2019) (approving fee award reflecting implied rate of $11,262.26 per hour).  Delaware considers the time and effort expended by counsel only as a "cross-check to guard against windfalls, particularly in therapeutic benefit cases [*i.e.*, cases with no monetary recovery]." *In re Sauer-Danfoss Inc. Shareholders Litig.*, 65 A.3d 1116, 1136 (Del. Ch. 2011).[28]  Here, there will be no windfall.  Based on a preliminary analysis of billing records, Plaintiffs' Counsel have spent over 25,000 hours prosecuting the litigation with a combined lodestar of approximately $15 million.[29]  If Plaintiffs were awarded the full 30% in fees that would reflect a multiplier of approximately 3.5 and an implied rate of approximately $2,100 per hour—well within the range approved by Delaware, *Theriault,* 51 A.3d at 1257; *Salzberg,* 2019 WL 2913272, at *6, and the Ninth Circuit.  *Vizcaino*, 290 F.3d at 1051 n.6 ("Multiples ranging from one to four are frequently awarded in common fund cases when the

---

[27] So too in the Ninth Circuit.  *Vizcaino*, 290 F.3d at 1050 n.5 ("We do not mean to imply that class counsel should . . . receive a lesser fee for settling a case quickly[.]").

[28] When Delaware looks to time and effort as a cross-check it rarely analyzes the billing rates of individual lawyers.  *Coker*, 847 A.2d at 338 ("Although *Sugarland* explicitly allows courts to take hourly rates into consideration, judges in the Court of Chancery have seldom done so.").  Instead, the Court of Chancery "[t]raditionally . . . use[s] hours worked to calculate an effective [blended] hourly rate that can be examined to guard against windfall compensation when awarding large fees." *Sauer-Danfoss*, 65 A.3d at 1139 (collecting cases).

[29] These figures are still subject to a final audit.

MOTION FOR PRELIMINARY APPROVAL                                                                          23
Case No.: 4:17-cv-01850-CW

lodestar method is applied.") (cleaned up).

## VI.   THE NOTICE PLAN IS REASONABLY CALCULATED TO APPRISE STOCKHOLDERS OF THE ACTION AND AFFORD THEM AN OPPORTUNITY TO OBJECT

Notice should be approved where it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 736 F. App'x 639, 640 (9th Cir. 2018) (internal quotation omitted).  Here, McKesson's third-party investor communications providers will send the Notice to all current McKesson stockholders in the same manner that they give notice of McKesson's annual meeting. The notice will direct stockholders to a website, maintained by Lead Counsel, with links to the notice, motions for approval and for attorneys' fees and other important documents in the case. McKesson will also post a link to a copy of the Stipulation and the Notice on the "Investor Relations" section of the Company's website, investor.mckesson.com.  Finally, McKesson will cause a summary notice to be published in the national edition of the New York Times and transmitted over the PR Newswire.

This is significantly more detailed than notice plans that this Court has approved in prior derivative actions.  *In re Atmel Corp. Deriv. Litig.*, No. 5:06-cv-04592-JF, 2010 WL 9525643, at *5 (N.D. Cal. Mar. 31, 2010) (notice was issued via (i) a press release, (ii) a link on the company's website, and (iii) a notice published in Investor's Business Daily); *In re Rambus Inc. Derivative Litig.*, No. 5:06-cv-03513-JF, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (notice through (i) press release on Business Wire, (ii) a Form 8-K, and (iii) publication on the company's website).

Similarly, the contents of the Notice are "satisfactory" because it "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."  *Hewlett-Packard*, 716 F. App'x at 609 (quoting *Churchill Vill., L.L.C. v.*

*Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).  As in *Hewlett-Packard*, "the notice provide[s] a summary of the litigation; the reasons for settlement; the settlement terms, including an overview of the proposed governance reforms; the effect of court approval of the settlement agreement on shareholders' rights; the attorneys' fees to be awarded; an explanation of a shareholder's right to object, the deadline for objecting, and the right to appear at the final approval hearing." *Id.*  Nothing more is needed.

## VII.  PROPOSED SCHEDULE

Plaintiffs ask that the Court adopt the following schedule in connection with final approval:[30]

| Event | Deadline |
|-------|----------|
| Notice issued to current stockholders and posted on McKesson's website | 10 calendar days after the Court enters the Preliminary Approval Order |
| Summary notice published in the New York Times and transmitted to PR Newswire | 10 calendar days after notice is issued to current stockholders |
| Last day for Plaintiffs to move for final approval and move for a fee and expense award | 35 calendar days before the Final Approval Hearing |
| Last day for McKesson stockholders to object to or comment on the Settlement or Plaintiffs' counsel's request for fees | 21 calendar days before the Final Approval Hearing |
| Last day for Plaintiffs to file a reply in support of the Settlement and/or the motion for a fee and expense award | 7 calendar days before the Final Approval Hearing |
| Final Approval Hearing | At least 70 calendar days after entry of the Preliminary Approval Order |

## VIII.  CONCLUSION

The proposed Settlement is fair, reasonable, and adequate.  The proposed Notice is reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.  The Motion should be granted and the Court should preliminarily approve the Settlement and plan of Notice.

---

[30] CAFA notice is not required because a derivative action is not a class action under 28 U.S.C. § 1711(2).  This schedule will give stockholders at least 39 days between the time that notice is issued and the deadline to object to or comment on the Settlement or Plaintiffs' counsel's request for fees. This is consistent with the Court's Procedural Guidance for Class Action Settlements.

MOTION FOR PRELIMINARY APPROVAL                                    25
Case No.: 4:17-cv-01850-CW

Date: December 27, 2019

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Reed R. Kathrein*
Reed R. Kathrein (139304)
Danielle Smith (291237)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
danielles@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
Ronnie S. Spiegel (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP 1301
Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
ronnie@hbsslaw.com

James S. Notis (admitted *Pro Hac Vice*)
Jennifer Sarnelli (242510)
Meagan Farmer (admitted *Pro Hac Vice*)
GARDY & NOTIS, LLP
Tower 56
126 East 56th Street, 8th Floor
New York, NY  10022
Telephone: (212) 905-0509
Facsimile:  (212) 905-0508
jnotis@gardylaw.com
jsarnelli@gardylaw.com
mfarmer@gardylaw.com

*Co-Lead Counsel for Plaintiffs*

Jeffrey C. Block (*Pro Hac Vice* forthcoming)
Joel Fleming (281264)
BLOCK & LEVITON LLP
260 Franklin Street, Suite 1860
Boston, MA  02110
Telephone: (617) 398-5600
Facsimile:  (617) 507-6020
jeff@blockesq.com
joel@blockesq.com

*Counsel for Plaintiffs*

Jonathan D. Uslaner (256898)
BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
2121 Avenue of the Starts, Suite 2575
Los Angeles, CA  90067
Telephone: (310) 819-3472
jonathanu@blbglaw.com

David Wales (admitted *Pro Hac Vice*)
Mark Lebovitch (*Pro Hac Vice* forthcoming)
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
davidw@blbglaw.com
markl@blbglaw.com

Christine M. Mackintosh (admitted *Pro Hac Vice*)
Kim Evans (admitted *Pro Hac Vice*)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE  19801
Telephone: (302) 622-7081
Facsimile:  (302) 622-7100
cmackintosh@gelaw.com
kevans@gelaw.com

*Counsel for Intervening Plaintiffs Amalgamated Bank, as Trustee for Longview Largecap 500 Index Fund and Longview Largecap 500 Index VEBA Fund*

Christine M. Mackintosh (admitted *Pro Hac Vice*)
John T. Pearson (admitted *Pro Hac Vice*)
Kim Evans (admitted *Pro Hac Vice*)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE  19801
Telephone: (302) 622-7081
Facsimile:  (302) 622-7100
cmackintosh@gelaw.com
jpearson@gelaw.com
kevans@gelaw.com

David L. Wales (admitted *Pro Hac Vice*)

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
davidw@blbglaw.com

Jonathan D. Uslaner (256898)
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
12481 High Bluff Drive, Suite 300
San Diego, CA  92130
Telephone: (858) 793-0070
Facsimile:  (858) 793-0323
jonathanu@blbglaw.com

*Counsel for Intervening Plaintiff Michael Berent, Trustee, on behalf of Police & Fire Retirement System City of Detroit*

Hung G. Ta (admitted *Pro Hac Vice*)
JooYun Kim
Natalia D. Williams
HGT LAW
250 Park Avenue, 7th Floor
New York, NY  10177
Telephone: (646) 453-7288
Facsimile:  (646) 453-7289
hta@hgtlaw.com
jooyun@hgtlaw.com
natalia@hgtlaw.com

Peter Safirstein (admitted *Pro Hac Vice*)
Elizabeth S. Metcalf
SAFIRSTEIN METCALF LLP
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY  10118
Telephone: (212) 201-2855
Facsimile:  (212) 201-2858
psafirstein@safirsteinmetcalf.com
emetcalf@safirsteinmetcalf.com

*Counsel for Intervening Plaintiff Chaile Steinberg*