**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (139304)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (admitted *Pro Hac Vice*)
Ronnie S. Spiegel (admitted *Pro Hac Vice*)
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
ronnie@hbsslaw.com

**GARDY & NOTIS, LLP**
James S. Notis (admitted *Pro Hac Vice*)
Meagan Farmer (admitted *Pro Hac Vice*)
Tower 56
126 East 56th Street, 8th Floor
New York, NY  10022
Telephone: (212) 905-0509
Facsimile: (212) 905-0508
jnotis@gardylaw.com
mfarmer@gardylaw.com

[Additional counsel on signature block]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE MCKESSON CORPORATION DERIVATIVE LITIGATION | Case No. 4:17-cv-01850-CW<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: Tuesday, April 21, 2020<br>Hearing Time: 2:30 pm<br>Courtroom: TBD<br>Judge: Hon. Claudia Wilken |

1

## NOTICE OF MOTION AND MOTION

2

PLEASE TAKE NOTICE that on April 21, 2020, at 2:30 p.m., or as soon thereafter as this

3

motion may be heard, either in person or by telephone or video conference as directed by the Court,

4

Plaintiffs Eli Inzlicht ("Inzlicht"), Vladimir Gusinsky, as Trustee for the Vladimir Gusinsky Living

5

Trust ("Gusinsky"), Chaile Steinberg ("Steinberg"), Michael Berent, Trustee of the Police & Fire

6

Retirement System City of Detroit ("Detroit") and Amalgamated Bank, as Trustee for Longview

7

Largecap 500 Index Fund and Longview Largecap 500 Index VEBA Fund ("Amalgamated" and,

8

collectively, with the other plaintiffs, "Plaintiffs") will and hereby do move for an order before the

9

Honorable Claudia Wilken, United States District Judge of the United States District Court for the

10

Northern District of California, 1301 Clay Street, Oakland, California, granting final approval of the

11

proposed settlement of this derivative action (the "Settlement").[1]

12

The proposed Settlement is fair, reasonable, and adequate. This Motion should be granted.

13

The Motion is supported by the accompanying memorandum and points of authorities, the

14

Stipulation and Agreement of Compromise, Settlement and Release, dated December 11, 2019

15

submitted herewith (the "Stipulation"), and Exhibits thereto, the accompanying Joint Declaration of

16

Reed Kathrein and Meagan Farmer in Support of Plaintiffs' Motion for Final Approval of Settlement

17

and Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Kathrein-

18

Farmer Decl." or "Kathrein-Farmer Declaration"), the Declaration of Steve Berman, the Declaration

19

of Meagan Farmer, the Declaration of Joel Fleming, the Declaration of David Wales, the Declaration

20

of Christine M. Mackintosh, the Declaration of Hung G. Ta, the Declaration of Peter Safirstein, and

21

the Declaration of Gregory Nespole (collectively, "Plaintiffs' Counsel's Declarations"), the Affidavit

22

of Prof. Robert Bartlett of the UC Berkeley School of Law ("Bartlett Aff."), the Declaration of the

23

Hon. Daniel H. Weinstein, Robert A. Meyer, and Jed D. Melnick ("Mediators' Decl."), the

24

Declaration of Eli Inzlicht, the Declaration of Vladimir Gusinsky, the Declaration of Michael Berent,

25

as Trustee for the Police and Fire Retirement System for the City of Detroit, the Declaration of

26

27

[1] Simultaneously with this Motion, Plaintiffs' Counsel is filing a separate motion asking the Court to award $43,750,000.00 in attorneys' fees, plus $421,223.91 in expenses for a total of $44,171,223.91 (the "Fee and Expense Motion").

28

1

2

3

4

Deborah Silodor, Executive Vice President and General Counsel of Amalgamated Bank, as Trustee for Longview Largecap 500 Index Fund and Longview Largecap 500 Index VEBA Fund, the Declaration of Chaile Steinberg (collectively, "Plaintiffs' Declarations"), and the previous papers filed in this Action and such other matters as the Court may consider.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........................................................................................1

STATEMENT OF ISSUES TO BE DECIDED .........................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................................1

I.  PRELIMINARY STATEMENT .....................................................................................1

II.  BACKGROUND AND PROCEDURAL HISTORY .....................................................3

    A.  Factual Background .............................................................................................3

    B.  Procedural Background .......................................................................................4

    C.  Settlement Discussions ........................................................................................6

    D.  Preliminary Approval ..........................................................................................7

III.  SETTLEMENT TERMS .................................................................................................7

    A.  Monetary Consideration .....................................................................................7

    B.  Governance Consideration ..................................................................................7

    C.  The Release ..........................................................................................................8

    D.  Attorneys' Fees and Expenses ............................................................................8

V.  STOCKHOLDERS RECEIVED ADEQUATE NOTICE .............................................9

VI.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ........................10

    A.  The Settlement is a Great Result When Weighed Against the Risks of Continued Litigation ..........................................................................................10

    B.  The Stage of the Litigation Supports Approval: Plaintiffs Obtained Extensive Discovery, Allowing Them to Evaluate the Strengths and Weaknesses of Their Claims ................................................................................................................18

    C.  Plaintiffs' Counsel are Highly Experienced and the Court Should Give Weight to Their Views, Which Supports Preliminary Approval ........................................19

    D.  Stockholders' Reactions Support Final Approval .............................................20

    E.  The Settlement is the Product of Hard-Fought, Arm's-Length Negotiations Conducted Under the Auspices of Experienced Mediators .................................20

VII.  CONCLUSION ..............................................................................................................21

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Alaska Elec. Pension Fund v. Brown*,
   988 A.2d 412 (Del. 2010)..........................................................................7

*In re Atmel Corp. Derivative Litig.*,
   2010 WL 9525643 (N.D. Cal. Mar. 31, 2010) ........................................9

*Barbosa v. Cargill Meat Solutions Corp.*,
   297 F.R.D. 431 (E.D. Cal. 2013).............................................................19

*Breault v. Folino*,
   2002 WL 31974381 (C.D. Cal. Mar. 15, 2002) ....................................18

*In re Caremark Int'l Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996) .........................................................*passim*

*In re Cendant Corp., Derivative Action Litig.*,
   232 F. Supp. 2d 327 (D.N.J. 2002)........................................................19

*Chevron Corp. v. Pennzoil Co.*,
   974 F.2d 1156 (9th Cir. 1992) ................................................................6

*Churchill Village, L.L.C. v. General Electric*,
   361 F.3d 566 (9th Cir. 2004) .............................................................9, 20

*City of Birmingham Ret. & Relief System v. Good*,
   177 A.3d 47 (Del. 2017)........................................................................12

*City of Monroe Emps.' Ret. System v. Murdoch*,
   C.A. No. 2017-0833- AGB (Del. Ch. 2017) .........................................11

*David B. Shaev Profit Sharing Account v. Armstrong*,
   2006 WL 391931 (Del. Ch. Feb. 13, 2006), *aff'd*, 911 A.2d 802 (Del. 2006).....................12

*In re Extreme Networks, Inc. Sec. Litig.*,
   2019 WL 3290770 (N.D. Cal. July 22, 2019) .......................................20

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   343 F. Supp. 3d 394 (S.D.N.Y. 2018) ...................................................20

*In re Facebook, Inc. Section 220 Litig.*,
   2019 WL 2320842 (Del. Ch. May 30, 2019) .........................................13

*In re Fuqua Indus., Inc. S'holder Litig.*,
   752 A.2d 126 (Del. Ch. 1999) ...............................................................18

*Garner v. State Farm Mutual Automobile Insurance Co.*,
   2010 WL 1687832 (N.D. Cal. Apr. 22, 2010).....................................................6, 8

*In re General Motors Co. Derivative Litig.*,
   2015 WL 3958724 (Del. Ch. June 26, 2015),
   *aff'd sub nom. In re General Motors Co. Derivative Litig.*,
   133 A.3d 971 (Del. 2016).....................................................12

*In re Goldman Sachs Group, Inc. S'holder Litig.*,
   2011 WL 4826104 (Del. Ch. Oct. 12, 2011).....................................................12

*Grunstein v. Silva*,
   2012 WL 5868896 (Del. Ch. Nov. 20, 2012).....................................................6

*Handgards, Inc. v. Johnson & Johnson*,
   413 F. Supp. 926 (N.D. Cal. 1976).....................................................6

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998).....................................................8

*Harbor Finance Partners v. Huizenga*,
   751 A.2d 879 (Del. Ch. 1999).....................................................14

*HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*,
   2010 WL 4027632 (S.D. Cal. Oct. 14, 2010).....................................................21

*Hefler v. Wells Fargo & Co.*,
   2018 WL 6619983 (N.D. Cal. Dec. 18, 2018).....................................................16, 20, 21

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
   716 F. App'x 603 (9th Cir. 2017).....................................................9, 10

*Horman v. Abney*,
   2017 WL 242571 (Del. Ch. Jan. 19, 2017).....................................................13, 14

*Kandell of FXCM, Inc. v. Niv*,
   2017 WL 4334149 (Del. Ch. Sept. 29, 2017).....................................................12, 13

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998).....................................................19

*Marchand v. Barnhill*,
   212 A.3d 805 (Del. 2019).....................................................10

*In re Massey Energy Co. Derivative & Class Action Litig.*,
   160 A.3d 484 (Del. Ch. 2017).....................................................12, 13

*In re Mego Finance Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000).....................................................19

*Mushroom Assocs. v. Monterey Mushrooms, Inc.*,
    1992 WL 442892 (N.D. Cal. May 19, 1992)............................................................6

*In re Nat'l Prescription Opiate Litig.*,
    Case No. 1:17-md-2804 (N.D. Ohio) ............................................................*passim*

*National Rural Telecomm. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D.Cal.2004).........................................................................20

*In re Oracle Corp. Derivative Litig.*,
    824 A.2d 917 (Del. Ch. 2003) ...........................................................................17

*In re OSI Systems, Inc. Derivative Litig.*,
    2017 WL 5642304 (C.D. Cal. May 2, 2017) .......................................................10

*In re Pacific Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ...........................................................................8, 10

*In re Rambus Inc. Derivative Litig.*,
    2009 WL 166689 (N.D. Cal. Jan. 20, 2009)..........................................................9

*Roberti v. OSI Systems, Inc.*,
    2015 WL 8329916 (C.D. Cal. Dec. 8, 2015)........................................................21

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ............................................................................18

*Satchell v. Federal Express Corp.*,
    2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) .....................................................20

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) .......................................................................1, 12, 16

*Tornetta v. Musk*,
    2019 WL 4566943 (Del. Ch. Sept. 20, 2019).......................................................14

*In re Toyota Motor Corp. Unintended Acceleration Mktg.,*
    *Sales Practices, & Prod. Liab. Litig.*,
    736 F. App'x 639 (9th Cir. 2018) ........................................................................9

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices,*
    *& Prod. Liab. Litig.*,
    229 F. Supp. 3d 1052 (N.D. Cal. 2017)...............................................................19

*Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW*,
    95 A.3d 1264 (Del. 2014)....................................................................................6

*In re Wells Fargo S'holder Derivative Litig.*,
    4:03:16-cv-05541-JST (N.D. Cal.) .....................................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Yahoo! Inc. S'holder Derivative Litig.*,
    153 F. Supp. 3d 1107 (N.D. Cal. 2015) .............................................................................. 10

*Zapata Corp. v. Maldonado*,
    430 A.2d 779 (Del. 1981) ................................................................................................... 17

**Statutes**

21 U.S.C. § 801 *et seq.* ........................................................................................................ 2, 11

8 Del. Code § 220 ................................................................................................................... 14

33 U.S.C. § 1251 *et seq.* ........................................................................................................ 12

**Other Authorities**

Fed. R. Civ. P. 23.1 .................................................................................................................. 8

Charles W. Murdock, *Corporate Governance: The Role of Special Litigation*
    *Committees*, 68 WASH. L. REV. 79, 84 (1993) .................................................................. 17

Cornerstone Research, *Securities Class Action Settlements, 2017 Review and*
    *Analysis*, at 8 (2018)) ........................................................................................................ 16

Minor Myers, *The Decisions of the Corporate Special Litigation Committees: An*
    *Empirical Investigation*, 84 IND. L.J. 1309, 1311 (2009) .................................................. 17

Charles W. Murdock, *Corporate Governance: The Role of Special Litigation*
    *Committees*, 68 WASH. L. REV. 79 (1993) ........................................................................ 17

Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2013) .............................. 19

**STATEMENT OF ISSUES TO BE DECIDED**

1.     Whether the Settlement fair, adequate, and reasonable.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.        PRELIMINARY STATEMENT**

This is a derivative action brought by shareholders of McKesson Corporation,[2] which is the largest pharmaceutical distributor in the United States. After years of highly contested litigation, Plaintiffs agreed to settle claims that the Individual Defendants[3] (certain current and former members of McKesson's Board of Directors) breached their fiduciary duties through oversight failures related to McKesson's distribution of prescription opioids.

Plaintiffs' theory—a "claim that directors are subject to personal liability for employee failures"—is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[4] Only after extensive litigation—and multiple failed mediations—did the parties reach a proposed settlement, requiring Defendants to pay $175 million to the Company. If approved, it will be the second-largest cash settlement of a so-called *Caremark* claim[5] in history. The Settlement also provides for significant corporate governance reforms that will address and are designed to prevent the recurrence of the compliance failures that gave rise to the litigation, including: the separation of the CEO and Chairman roles, term limits for directors, the addition of two new independent directors, reforms to the composition, mandate, and training of McKesson's compliance committee as well as improvements in reporting to the compliance committee (which was formed after this Court denied the motion to dismiss) and reporting by the compliance committee, revisions to the Company's compensation clawback policy, and enhancements to the Company's disclosures relating to lobbying and adjustments to executive compensation based on legal or compliance costs.

---

[2] "McKesson" or the "Company."

[3] The Individual Defendants are Andy Bryant, Wayne Budd, John Hammergren, M. Christine Jacobs, Marie L. Knowles, Edward Mueller, Donald Knauss, Susan Salka, N. Anthony Coles, Alton Irby, III, David Lawrence, and Jane Shaw.

[4] *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006) (cleaned up).

[5] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

The Court preliminarily approved the Settlement on January 31, 2020.[6] Consistent with the Court's order, there has been an extensive notice program to advise McKesson stockholders of the proposed Settlement.[7] There has also been significant (and positive) public comment on the Settlement.[8] While the objection deadline has not yet run, there have been **zero** objections so far, which is strong evidence of the fairness of this Settlement.

The risk-reward tradeoff strongly supports the Settlement. Plaintiffs and the Company faced extreme risks if the action were prosecuted through trial. Delaware law is highly deferential to the business judgment of independent directors and no *Caremark* claim has **ever** been tried to judgment. McKesson is also defending serious related litigation regarding its alleged non-compliance with the Controlled Substance Act ("CSA"), including actions by state attorneys general and actions by municipalities and private plaintiffs in *In re National Prescription Opiate Litigation*, Case No. 1:17-md-2804 (N.D. Ohio) (the "MDL"). As such, it was important for McKesson to enact, quickly, the substantial corporate governance reforms imposed by the Settlement, which will substantially enhance Board oversight of distributions of controlled substances and compliance with the CSA, to avoid future violations.

The proposed Settlement appropriately balances these considerations and represents an historic and remarkable result for the Company and its shareholders. The Court should grant final approval.

---

[6] ECF No. 219.

[7] ECF No. 220 (Declaration of David J. Wiener Regarding Dissemination of Notice Pursuant to Order Granting Preliminary Approval of Settlement, filed with the Court on March 17, 2020).

[8] *See, e.g.*, Jef Feeley, *McKesson Board Agrees to $175 Million Accord in Opioid Case*, BLOOMBERG (Jan. 23, 2020), https://www.bloomberg.com/news/articles/2020-01-23/mckesson-agrees-to-175-million-settlement-in-opioid-case (noting that Plaintiffs had to overcome the fact that "[t]wo years ago, a committee of McKesson directors cleared board members and senior executives of wrongdoing, saying the company 'placed great emphasis on compliance' and 'encouraged ethical conduct.'"); Kevin LaCroix, *McKesson Opioid-Related Derivative Suit Settles for $175 Million*, THE D&O DIARY (Feb. 6, 2020), https://www.dandodiary.com/2020/02/articles/shareholders-derivative-litigation/mckesson-opioid-related-derivative-suit-settles-for-175-million/ ("the $175 million McKesson derivative suit settlement, if finally approved, would be the third largest-ever derivative suit settlement.").

## II.   BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs' preliminary approval motion sets out a detailed recitation of the facts and procedural background of this Action, which is incorporated by reference. ECF No. 203 at 2-8. For purposes of this Motion, we provide the following more concise summary.

### A.   Factual Background

Since 1999, over 200,000 Americans have died as a result of prescription drug overdoses. ECF No. 124 (Second Consol. Am. Compl. or "Complaint") ¶ 110.[9] Thousands more have died from overdoses on heroin, fentanyl, or other non-prescription opioids after first developing an opioid addiction through abuse of prescription pain medication. *Id.* Drug manufacturers and drug distributors played a particularly significant role in the opioid crisis and their failures to avoid overprescription and diversion of opioids were among the most important causes of the crisis.

McKesson is—and, at all relevant times, was—the largest wholesale pharmaceutical distributor in the United States. ¶¶ 98-99. Throughout the relevant period, McKesson sold billions of dollars' worth of opioids. ¶ 102.

In 2008, McKesson's Board agreed to settle a case brought by the Drug Enforcement Administration ("DEA") relating to the Company's alleged failure to report suspicious orders of controlled substances (the "2008 Settlement"). ¶ 5. In the 2008 Settlement, McKesson paid $13.25 million to settle allegations by the DEA and six states' attorneys general that McKesson failed to report suspicious orders from online pharmacies and, thereby, "fueled the explosive prescription drug problem." *Id.* In connection with the 2008 Settlement, McKesson was required to create a "Controlled Substances Monitoring Program" ("CSMP"). *Id.*

The Complaint alleges that Defendants failed to exercise their oversight responsibilities in the years following the 2008 Settlement. As set forth in the Complaint, McKesson's Board minutes show only five meetings between 2008 and 2013 at which issues related to opioids or the CSMP were discussed: "one in each of the years 2009, 2010, two in 2011 and one in 2013." ¶ 208. "[F]or almost two years—from July 2011 until April 23, 2013—there were . . . no minutes [reflecting] . . .

---

[9] Hereafter, ¶ _ citations are to the Second Consolidated Amended Complaint.

meetings of the Board at which the Board considered any issue relevant to the opioid crisis or the Board's oversight over the distribution of controlled substances." ¶ 216. Moreover, the Complaint alleges that the Board ignored a number of red flags during that same period, including presentations flagging the DEA's increased scrutiny on controlled substance distribution (¶¶ 210-212) and a warning that the CSMP program "Needs Improvement." ¶ 317.

In a settlement with the Department of Justice ("DOJ") first announced in 2015 and executed January 17, 2017 (the "2017 Settlement"), the Company agreed to pay a $150 million civil penalty, and suspend sales of controlled substances from several distribution centers, for multiple years, in order to resolve investigations and claims related to alleged violations of applicable statutes and regulations governing controlled substances. ¶ 4. The DOJ described the penalty as a "record," and said the suspensions were "among the most severe . . . ever agreed to by a [DEA] registered distributor." *Id.*

On the heels of that news, hundreds of local governments and other private plaintiffs brought suit against McKesson and the Company has also been targeted by state attorneys general. In October 2019, McKesson paid $82 million to resolve claims brought by Cuyahoga and Summit counties in Ohio, which were the first bellwether plaintiffs in the MDL.[10] McKesson and other distributors could end up paying billions of dollars in a global settlement.

**B.   Procedural Background**

A number of McKesson stockholders filed similar suits alleging breaches of fiduciary duty by the Defendants both here and in Delaware. After some initial procedural jockeying, Defendants and McKesson moved to stay this action in favor of the Delaware action. ECF No. 64. Shortly thereafter, McKesson and the Defendants moved to dismiss this action. ECF No. 69, 70. Defendants' motions to dismiss the Delaware actions were also fully briefed and argued on March 7, 2018. On May 14, 2018, after briefing and oral argument in this Action, this Court denied the motion to stay and denied, in substantial part, the motions to dismiss (the "MTD Order"). ECF No. 85.

---

[10] *See* Form 10-Q filed by McKesson on October 30, 2019 at 31.

MOTION FOR FINAL APPROVAL                                                                                                    - 4 -
Case No.: 4:17-cv-01850-CW
010688-11/1248342 V1

1    On May 25, 2018, the Delaware court stayed the Delaware action in deference to this Action.

2    ECF No. 90-2, Ex. H. On June 7, 2018, Defendants moved for partial reconsideration of the order

3    denying, in substantial part, the motions to dismiss. ECF No. 89. The Court denied that request. ECF

4    No. 97. Lead counsel in this Action and the Delaware action reached an agreement to jointly

5    prosecute their claims in this Action.

6    On July 25, 2018, McKesson's Board formed a one-member Special Litigation Committee

7    (the "SLC"), comprised of McKesson Director Bradley Lerman, who joined the Board in April 2018.

8    About six weeks later, the SLC moved for a ten-month stay "to allow the SLC to investigate

9    thoroughly the claims asserted in this litigation and to determine whether and how those claims

10   should be pursued in the best interests of McKesson." ECF No. 138 at 4. Plaintiffs opposed the

11   SLC's motion. ECF No. 162. After a hearing in early November, the Court entered an order on

12   November 13, 2018, denying in substantial part, the SLC's request for a stay and permitting

13   discovery to go forward with the exception of a limited stay of deposition discovery (initially

14   through July 2018). ECF No. 189 at 8. Over the months that followed, the parties engaged in

15   extensive document discovery, including extensive meet-and-confer discussions that stretched over

16   months and, on multiple occasions, came close to resulting in motions by Plaintiffs. More than one

17   million pages of documents were produced; the parties exchanged dozens of letters and had dozens

18   of (formal and informal) meet-and-confer calls concerning the document production, written

19   discovery responses, privilege defenses and privilege logs; and on, at least, five occasions, Plaintiffs

20   served Defendants with their portion of a joint discovery letter before the issues were ultimately

21   resolved.

22   At the time the Settlement was reached, Plaintiffs had forced Defendant Hammergren to

23   formally invoke an advice-of-counsel defense—thereby putting his privileged communications at

24

25

26

27

28

1

issue.[11] And Plaintiffs had served Defendants with their portion of a joint letter seeking to compel

2

privileged communications under both the "at issue" and *Garner* doctrines.[12] We believe that these

3

discovery efforts helped create the remarkable result achieved.

4

**C.     Settlement Discussions**

5

    With discovery proceeding at full steam, the parties—including Plaintiffs, Defendants,

6

McKesson, the SLC, and Defendants' insurance carriers—pursued a parallel track of settlement

7

negotiations, conducted under the auspices of three experienced mediators: Robert Meyer and, later,

8

the Hon. Daniel Weinstein (Ret.) and Jed Melnick. The parties' settlement discussions included

9

three, in-person, full-day mediation sessions, plus multiple, additional in-person sessions to discuss

10

governance reforms and the SLC's investigation. The mediation sessions were attended by over 100

11

participants and involved extensive presentations by Plaintiffs and Defendants analyzing the legal

12

and factual nuances of the case in depth.

13

    In between these in-person sessions, the parties engaged in settlement communications

14

facilitated by the mediators and exchanged multiple drafts of the proposed governance reforms.

15

Following the failure of the third mediation, the parties continued to engage in settlement

16

negotiations through the mediators.

17

    The parties ultimately agreed to the final cash consideration of $175 million through the

18

mediators' recommendations. Simultaneously, the parties negotiated and reached agreement on final

19

corporate governance reforms.

20

21

    [11] "The privilege which protects attorney-client communications may not be used both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). A party that relies on an "advice of counsel [defense] . . . waives the attorney-client privilege as to communications and documents relating to the advice." *Handgards, Inc. v. Johnson & Johnson*, 413

22

F. Supp. 926, 929 (N.D. Cal. 1976). So "the party claiming the advice of counsel has a tough choice: claim the defense or claim the attorney-client privilege." *Mushroom Assocs. v. Monterey*

23

*Mushrooms, Inc.*, No. 3:91-cv-01092-WHO2, 1992 WL 442892, at *3 (N.D. Cal. May 19, 1992); *Grunstein v. Silva*, No. CIV.A. 3932-VCN, 2012 WL 5868896, at *1 (Del. Ch. Nov. 20, 2012)

24

("Because Defendants' knowledge and understanding of these issues are based on the advice of counsel, the Court will not allow Defendants to use this evidence when Plaintiffs have been shielded

25

from it.").

26

    [12] *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264,

27

1276 (Del. 2014) (explaining that Delaware follows the *Garner* doctrine, which "allows stockholders of a corporation to invade the corporation's attorney-client privilege in order to prove fiduciary

28

breaches by those in control of the corporation upon showing good cause").

1    As set forth in the accompanying Mediators' Declaration ("Mediators' Decl."), "the

2    Settlement in its totality was the product of an extremely hard-fought negotiation. . . . [T]here were

3    many complex and novel issues that required significant thought and practical solutions [and] . . . the

4    negotiations were vigorous, fully at arm's-length, and conducted in good faith, with no collusion

5    whatsoever." Mediators' Decl. ¶ 16.

6    **D.    Preliminary Approval**

7    On November 22, 2019, the parties agreed to a term sheet setting out the material terms of the

8    Settlement. On December 11, 2019, the parties agreed to a formal Stipulation of Settlement.

9    Plaintiffs filed their motion for preliminary approval on December 27, 2019 (ECF No. 203) and,

10   following a hearing, the Court granted preliminary approval on January 31, 2020 (ECF No. 219).

11   **III.    SETTLEMENT TERMS**

12   **A.    Monetary Consideration**

13   The Settlement provides for a cash payment to the Company of $175 million.

14   **B.    Governance Consideration**

15   The Settlement provides for significant governance reforms that will address and prevent the

16   compliance failures that gave rise to the litigation. Those reforms include: the separation of the CEO

17   and Chairman roles,[13] term limits for directors, the addition of two new independent directors,[14]

18   reforms to the composition, mandate, and training of McKesson's compliance committee[15] as well as

19   improvements in reporting to the compliance committee and reporting by the compliance committee,

20   revisions to the Company's compensation clawback policy, and enhancements to the Company's

---

[13] Shortly before the first mediation session, McKesson's Board appointed a new Chairman who is not an executive of the Company. McKesson has agreed to maintain the separation of Chairman of the Board ("Chairman") and the Chief Executive Officer ("CEO") roles for the term of this Settlement.

[14] One qualifying director has been added. McKesson will need to add another new director with the experience/background set forth in paragraph K of the Corporate Governance Reforms.

[15] The Compliance Committee itself was not formed until after the Court denied the motion to dismiss in this Action and shortly before the first mediation. Its existence is fairly attributable to the litigation. *See Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 417 (Del. 2010) (discussing the presumption that curative actions taken after litigation is initiated are attributable to the litigation).

disclosures relating to lobbying concerning controlled substances and adjustments to executive compensation based on legal or compliance costs.

**C.     The Release**

The releases in the Settlement are appropriately tailored to claims brought on behalf of the Company arising from the allegations of the complaints in this Action and the Delaware action.[16]

**D.     Attorneys' Fees and Expenses**

The parties have no agreement regarding fees. In the Fee and Expense Motion, Plaintiffs' Counsel are seeking $43.75 million in fees (25% of the cash recovery), plus expenses of $421,223.91.

**IV.     LEGAL STANDARD**

Approval of a derivative settlement is governed by Federal Rule of Civil Procedure 23.1, which requires Court approval after notice to stockholders. The Court granted preliminary approval and notice has been issued consistent with the Court's order.

To obtain final approval, Plaintiffs must now show that the Settlement is "fundamentally fair, adequate, and reasonable." *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995).

In deciding this question, courts recognize that "[s]ettlement is the offspring of compromise; the question . . . is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). Given the "strong judicial policy that favors settlements, particularly where complex class action [or derivative] litigation is concerned," a reviewing court does not "second-guess" the parties' agreement and will grant approval so long as it can "reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Garner v. State Farm Mutual Automobile Insurance Co.*, No. 4:08-cv-01365-CW, 2010 WL 1687832, at *8 (N.D. Cal. Apr. 22, 2010) (cleaned up).

---

[16] For avoidance of doubt, the Settlement makes clear that Plaintiffs are not releasing any direct claims held by any current, former, or future stockholder of McKesson who is not a Plaintiff, including any claims asserting violations of the federal or state securities laws.

1

## V.   STOCKHOLDERS RECEIVED ADEQUATE NOTICE

2

Notice must be "reasonably calculated, under all the circumstances, to apprise interested

3

parties of the pendency of the action and afford them an opportunity to present their objections." *In*

4

*re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 736 F.

5

App'x 639, 640 (9th Cir. 2018) (internal quotation omitted).

6

Here, the Court's preliminary approval order required that stockholders receive multiple

7

forms of notice, including: direct communications sent by McKesson's third-party investor

8

communications provider to all then-current McKesson stockholders, a posting on the Investor

9

Relations section of McKesson's website, publication in the *New York Times* and via *PR Newswire*,

10

and postings on the websites of Lead Counsel. ECF No. 219 ¶ 4.

11

This notice program was even more comprehensive than notice plans that this Court has

12

required in prior derivative actions. *See In re Atmel Corp. Derivative Litig.*, No. 5:06-cv-04592-JF,

13

2010 WL 9525643, at *5 (N.D. Cal. Mar. 31, 2010) (notice was issued via (i) a press release, (ii) a

14

link on the company's website, and (iii) a notice published in Investor's Business Daily); *In re*

15

*Rambus Inc. Derivative Litig.*, No. 5:06-cv-03513-JF, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20,

16

2009) (notice through (i) press release on Business Wire, (ii) a Form 8-K, and (iii) publication on the

17

company's website). Similarly, the contents of the notice were "satisfactory" because they

18

"describe[d] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to

19

investigate and to come forward and be heard." *In re Hewlett-Packard Co. S'holder Derivative*

20

*Litig.*, 716 F. App'x 603, 609 (9th Cir. 2017) (quoting *Churchill Village, L.L.C. v. General Electric*,

21

361 F.3d 566, 575 (9th Cir. 2004)). As in *Hewlett-Packard*, "the notice provide[d] a summary of the

22

litigation; the reasons for settlement; the settlement terms, including an overview of the proposed

23

governance reforms; the effect of court approval of the settlement agreement on shareholders' rights;

24

the attorneys' fees to be awarded; an explanation of a shareholder's right to object, the deadline for

25

objecting, and the right to appear at the final approval hearing." *Id.*

26

Notice was issued consistent with the Court's order. ECF No. 220 ¶ 1-4.

27

28

1

## VI.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

2

        In evaluating a derivative settlement, the Court evaluates the same factors considered in a

3

class case: "the strength of the plaintiffs' case, the risk, expense, complexity, and likely duration of

4

further litigation, the amount offered in settlement, the stage of the proceedings, the experience and

5

views of counsel, and the reaction of class members to the proposed settlement." *In re Hewlett-*

6

*Packard*, 716 F. App'x at 605.[17]

7

        Here, those factors all support approval of the Settlement.

8

### A.   The Settlement is a Great Result When Weighed Against the Risks of Continued
Litigation

9

10

        "[D]erivative lawsuits are rarely successful." *Pacific Enters.*, 47 F.3d at 377. And this

11

derivative lawsuit was harder than most. As the Court recognized, Plaintiffs brought "a director

12

oversight theory"—*i.e.*, a *Caremark* claim. ECF No. 85 at 15-16. This is "possibly the most difficult

13

theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Yahoo! Inc.*

14

*S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1121 (N.D. Cal. 2015) (cleaned up). In the three

15

decades since *Caremark* was decided, there have been hundreds of decisions dismissing *Caremark*

16

claims. Until last year, the Delaware Supreme Court had **never** upheld a *Caremark* claim.[18] To

17

undersigned counsel's knowledge, no *Caremark* claim has ever gone to trial.

18

        Plaintiffs overcame those odds to obtain a settlement providing for $175 million in cash

19

consideration and significant governance reforms that will help prevent a recurrence of similar

20

compliance failures in the future. Measured by the cash recovery alone, this is the largest-ever cash

21

22

23

24

        [17] "The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *In re OSI Systems, Inc. Derivative Litig.*, No. 2:14-cv-02910-MWF-MRW, 2017 WL 5642304, at *2 (C.D. Cal. May 2, 2017).

25

26

        [18] In its first and only decision reversing dismissal of a *Caremark* claim, the Delaware Supreme Court acknowledged that *Caremark* "plaintiffs usually lose because they must concede the existence of board-level systems of monitoring and oversight such as a relevant committee, a regular protocol requiring board-level reports about the relevant risks, or the board's use of third-party monitors, auditors, or consultants." *Marchand v. Barnhill*, 212 A.3d 805, 823 (Del. 2019).

27

28

1   settlement of a pure *Caremark* claim.[19] It is almost twice the size of the next largest *Caremark*

2   settlement, *City of Monroe Employees' Ret. System v. Murdoch*, C.A. No. 2017-0833- AGB (Del.

3   Ch. 2017) ($90 million).

4          The governance reforms are also highly significant. In his affidavit, Professor Robert Bartlett

5   of the UC Berkeley School of Law opined that "the Governance Reforms will meaningfully improve

6   Board oversight and, by doing so, reduce the chance of another compliance failure at McKesson

7   involving controlled substances." ECF No. 203-3 ¶ 66. And because of "the considerable liability

8   that can arise from the Company's failure to comply with Controlled Substances Laws and

9   Regulations, the Governance Reforms, by reducing the risk of another compliance failure, . . .

10  provide significant value for McKesson and its shareholders." *Id.*

11         In balancing the consideration gained through the Settlement against the strengths and

12  weaknesses of the case and the risks of future litigation, Plaintiffs considered three key variables that

13  apply to almost any type of case: liability, damages, and collectability (*i.e.*, the likelihood of being

14  able to collect from the individual defendants in the event of a favorable judgment).

15         **Liability.** Plaintiffs believed they had viable breach of fiduciary duty claims, but the path to a

16  liability judgment was fraught with obstacles.

17         As the Court observed in addressing the motions to dismiss, the Individual Defendants were

18  all directors of the Company and protected by an exculpatory provision eliminating any liability for

19  monetary damages arising from a breach of their duty of care. ECF No. 85 at 15.[20] To overcome the

20  exculpatory provision, Plaintiffs would have to establish a breach of the duty of loyalty. This is a

21  high bar, particularly in the absence of evidence of self-dealing or related-party transactions. "Good

22

23         [19] The largest *Caremark*-related settlement is *In re Wells Fargo Shareholder Derivative
    Litigation*, 4:03:16-cv-05541-JST (N.D. Cal.) with a $240 million cash payment, which is pending

24  final Court approval. But in addition to the *Caremark* claims brought by the *Wells Fargo* plaintiff,
    Judge Tigar also sustained derivative claims brought under the federal securities laws alleging that

25  the individual defendants had engaged in massive insider sales while in possession of material, non-
    public information and had caused the company to engage in stock repurchases at inflated prices. 282

26  F. Supp. 3d 1074, 1089-1107 (N.D. Cal. 2017). Those non-*Caremark* claims—which were not
    present here—significantly increased the settlement value by increasing both the available damages

27  and the likelihood of establishing liability.

28         [20] Hammergren was also an officer and not eligible for exculpation for acts taken in that capacity.

1   faith, not a good result, is what is required of the board." *In re Goldman Sachs Group, Inc. S'holder*

2   *Litig.*, No. CIV.A. 5215-VCG, 2011 WL 4826104, at *23 (Del. Ch. Oct. 12, 2011).

3          Directors are not liable where a "well-constituted oversight mechanism, having received no

4   specific indications of misconduct, fail[s] to discover [wrongdoing]." *David B. Shaev Profit Sharing*

5   *Account v. Armstrong*, No. CIV.A. 1449-N, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006), *aff'd*,

6   911 A.2d 802 (Del. 2006). Here, the ultimate fact-finder may have found that the McKesson

7   "directors did a poor job of overseeing risk in a poorly-managed corporation," but that, alone,

8   "do[es] not imply director bad faith." *In re General Motors Co. Derivative Litig.*, No. CV 9627-

9   VCG, 2015 WL 3958724, at *17 (Del. Ch. June 26, 2015), *aff'd sub nom. In re General Motors Co.*

10  *Derivative Litig..*, 133 A.3d 971 (Del. 2016); *see also City of Birmingham Ret. & Relief System v.*

11  *Good*, 177 A.3d 47, 50-51 (Del. 2017) ("Duke Energy pled guilty to nine misdemeanor criminal

12  violations of the Federal Clean Water Act and paid a fine exceeding $100 million. We agree . . . that

13  the plaintiffs did not sufficiently allege that the directors faced a substantial likelihood of personal

14  liability for a *Caremark* violation. Instead, the directors at most faced the risk of an exculpated

15  breach of the duty of care.").

16         Plaintiffs could not prove a breach of the duty of loyalty by showing "gross negligence;" they

17  would have to show a "bad-faith **conscious** disregard of fiduciary duties." *General Motors*, 2015 WL

18  3958724, at *17 (emphasis added); *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362,

19  369 (Del. 2006) (bad faith is shown where a fiduciary "**intentionally** acts with a purpose other than

20  that of advancing the best interests of the corporation, where the fiduciary acts with the **intent** to

21  violate applicable positive law, or where the fiduciary **intentionally** fails to act in the face of a

22  known duty to act, demonstrating a conscious disregard for his duties.") (emphasis added). Plaintiffs

23  appreciated the challenge here, particularly because Defendants had no clear motive to cause or

24  allow McKesson to intentionally break the law.

25         The rare, viable *Caremark* case usually involves allegations that directors "knowingly

26  condoned illegal behavior," through "a business model allegedly reliant on a clear violation of a

27  federal regulation." *Kandell on behalf of FXCM, Inc. v. Niv*, No. CV 11812-VCG, 2017 WL

28  4334149, at *2, *18 (Del. Ch. Sept. 29, 2017), or that, at minimum, put "profits over safety." *In re*

*Massey Energy Co. Derivative & Class Action Litig.*, 160 A.3d 484, 490 (Del. Ch. 2017).[21] Here, Plaintiffs alleged that the Defendants put "profits over safety" but that narrative was challenged by Defendants who argued that that less than 2% of McKesson's revenues were attributable to opioid sales. ECF No. 69 at 3 n.3. And unlike the "highly unusual set of facts" in *FXCM*—where there was a "clear" legal violation—Defendants here would have had plausible arguments that McKesson violated "complex and nuanced law" and the Company suffered damages because its "regulator adopted a legal interpretation at odds with a rationally compliant, if ultimately unavailing, position adopted by the corporation." *Kandell,* 2017 WL 4334149, at *17-18 (suggesting no fiduciary breach would have occurred under such a scenario).

Indeed, even under circumstances where, as here, there was a prior consent decree, Delaware courts have rejected claims against directors who, in good faith, set up monitoring systems that proved inadequate to prevent new violations. *See Horman v. Abney*, No. CV 12290-VCS, 2017 WL 242571, at *10 (Del. Ch. Jan. 19, 2017) (discussing "the creation and implementation of a system of internal controls following UPS's acceptance of the AOD [prior agreement with the federal government]. The system functioned well, at least for a time, after the AOD was finalized and the Complaint makes no particularized allegation that the system was intentionally disabled or diminished within UPS. That the Plaintiffs did not turn up any Board documents specifically referencing continued compliance with the AOD during a specific time period is not sufficient to allege that the system was not in place or that the Board was simply going through the motions when overseeing compliance.").

At the pleadings stage, Plaintiffs were able to survive primarily by pointing to gaps in the then-fragmentary documentary record. Specifically, Plaintiffs alleged that between the time of the 2008 Settlement and the DEA raid in March 2013, there were only three Board meetings for which

---

[21] While profit-seeking behavior might be argued to be in the best interests of the corporation, "Delaware law does not charter law breakers. . . . [A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." *Massey*, 2011 WL 2176479, at *20; *See also In re Facebook, Inc. Section 220 Litig.*, No. CV 2018-0661-JRS, 2019 WL 2320842, at *14 (Del. Ch. May 30, 2019) ("Our law does not countenance board level disobedience.").

the meeting minutes reflect a discussion of issues related to the CSMP. ECF No. 85 at 17-18 (noting that "minutes from meetings of the Board of Directors and the Audit Committee show that these issues were seldom addressed" even though "Plaintiffs made a demand pursuant to Delaware General Corporation Law Section 220 for relevant documents, providing the opportunity to provide exculpatory documents"); *id.* at 19 (noting that gaps in board minutes "suggest[] some level of disregard"); *id.* at 23 ("The infrequency with which [Defendants] discussed this serious issue, despite the regular signals that the CSMP was failing and required more attention, evidences conscious disregard and abdication of responsibility.").

At summary judgment and trial, however, Defendants would have been able to put forward affirmative evidence, including their own self-serving testimony, and would, no doubt, have argued that (1) the minutes were only a partial incomplete record of their oversight activities; and (2) they had, in any event, no "duty to take active steps affirmatively to monitor the monitors." *Horman*, 2017 WL 242571, at *9 (cleaned up).[22] Liability would have been hotly contested, to put it mildly.

**Damages.** There is no question that the potential damages in this case were significant. In addition to paying a $150 million fine to the federal government, McKesson is paying approximately $150 million per year in legal fees to defend itself in the MDL.[23] The Company may have to pay billions more for global peace. In its most recent Form 10-Q, for example, McKesson stated that

---

[22] Plaintiffs also asserted a waste claim related to Defendant Hammergren's compensation. The standard for waste is extreme: "a waste claim must be supported by facts demonstrating that 'no person of ordinary sound business judgment' could consider" the transaction fair. *Harbor Finance Partners v. Huizenga*, 751 A.2d 879, 881 (Del. Ch. 1999).

It is almost impossible to satisfy this test for executive compensation awards paid to current managers and approved by independent members of a board of directors. Indeed, the Delaware Court of Chancery recently dismissed a waste claim challenging compensation to a CEO valued at "upwards of $55.8 billion." *Tornetta v. Musk*, C.A. No. 2018-0408-JRS, 2019 WL 4566943, at *1 (Del. Ch. Sept. 20, 2019).

In light of the fact that less than 2% of McKesson's revenue was derived from opioid sales, it would have been difficult to establish that "no reasonable person of sound business judgment" would have considered Hammergren's compensation appropriate. So, while Plaintiffs could point to the waste claim as increasing the potential damages, it was worth less than the breach of fiduciary duty claims.

[23] Form 10-K filed by McKesson with the SEC on May 15, 2019 at 33; Transcript of McKesson's February 4, 2020 earnings call ("For fiscal 2020, we continue to anticipate that opioid-related costs will approximately be $150 million.").

1   "liability is not probable, and is not able to reasonably estimate a loss or range of loss" in connection

2   with the opioid litigation pending against it but the Company noted that, in October 2019, "four state

3   attorneys general announced certain terms of a proposed framework for the potential settlement of

4   those opioid claims that they indicated they would find acceptable. The proposed framework would

5   have expected the three largest U.S. pharmaceutical distributors to pay an aggregate amount of up to

6   $18.0 billion over 18 years, with up to approximately $6.9 billion over 18 years expected from the

7   Company[.]"[24] The present value of $6.9 billion over 18 years is $3.95 billion, assuming a discount

8   rate of 7.7%[25] and that the payments are made in equal installments over 18 years.

9       The table below sets out the sums that McKesson has paid to date ($519 million):

| Payments | |
| --- | --- |
| DOJ/DEA Fine | $150 million[26] |
| Legal Fees (2018 – 2019) | $250 million[27] |
| Ohio bellwether settlements | $82 million[28] |
| West Virginia settlement | $37 million[29] |
| **Total** | **$519 million** |

15      As set forth above, potential future payments include $150 million per year in legal fees[30] and

16  $6.9 billion over 18 years as part of a potential global settlement. But the payments already made and

17  those that will potentially be made in future are not recoverable damages; they are only a starting

18  point. The recoverable damages would have been limited by the Individual Defendants' relative

19  share of responsibility and would, likely, have been only a fraction of these sums. Defendants would

20  have, no doubt, argued that the MDL was "regulation by litigation," observing that every significant

---

[24] Form 10-Q filed by McKesson on February 4, 2020.

[25] According to Bloomberg, McKesson's approximate weighted average cost of capital is 7.7%.

[26] Form 10-K filed by McKesson on May 15, 2019 at 111.

[27] Transcript of McKesson earnings call on January 31, 2019 (estimating opioid-related legal costs in excess of $100 million for fiscal year 2019); Transcript of McKesson earnings call on February 4, 2020 (estimating opioid-related legal costs in excess of $150 million for fiscal year 2020).

[28] Form 10-Q filed by McKesson on February 4, 2020 at 43.

[29] Form 10-K filed by McKesson on May 15, 2019 at 107.

[30] Transcript of McKesson earnings call on February 4, 2020.

1    opioid distributor and manufacturer in the country was a defendant in the MDL. Defendants would

2    have argued that, no matter what they did as officers and directors, McKesson would still have been

3    a defendant in the MDL and, likely, forced to pay a settlement amount driven as much by its relative

4    market share as by its true culpability. If the Individual Defendants' oversight failures impacted

5    McKesson's total exposure, they would argue, they did so only at the margins.

6          Plaintiffs would have opposed these arguments, but recognize their potential appeal to the

7    jury. So the likely damages, if Plaintiffs were successful at trial, would have been substantially less

8    than $3.95 billion. But even if the total damages were as large as $5 billion, the cash recovery would

9    still be approximately 3.5% of the estimated damages, which "is higher than recoveries achieved in .

10   . . securities fraud class actions of similar size (over $1 billion in estimated damages), which settled

11   for median recoveries of 2.5 percent between 2008 and 2016, and 3 percent in 2017." *Hefler v. Wells*

12   *Fargo & Co.*, No. 4:16-cv-05479-JST, 2018 WL 6619983, at *8 (N.D. Cal. Dec. 18, 2018) (citing

13   Cornerstone Research, *Securities Class Action Settlements, 2017 Review and Analysis*, at 8 (2018)).[31]

14         **Collectability.** One of the most important factors determining settlement value was

15   collectability. No matter how large the judgment, what mattered to the Company was what it could

16   collect—which was primarily a function of the available insurance, and given the amount available,

17   the recovery in the Settlement is very substantial. Here, the Individual Defendants were protected by

18   several layers of directors and officers ("D&O") insurance. In the event of a final, non-appealable

19   judgment against Defendants, however, the D&O carriers would likely also have significant

20   coverage defenses.[32] Plaintiffs did not see any realistic possibility of recovering from the Individual

21   Defendants' personal assets. The Individual Defendants are all wealthy people by the standards of

22   ordinary Americans, but none had sufficient assets available to satisfy a ten-figure judgment.

23

24         [31] In 2019, this figure was just 2.1%. *See* McIntosh & Starykh, *Recent Trends in Securities Class
      Action Litigation: 2019 Full-Year Review*, NERA ECONOMIC CONSULTING (Feb. 12, 2020) at 20,

25    https://www.nera.com/content/dam/nera/publications/2020/PUB_Year_End_Trends_012120_Final.p
      df.

26         [32] To prove liability, Plaintiffs might well have had to prove that Defendants knowingly violated

27    positive law. *See Ritter*, 911 A.2d at 369. The D&O policies excluded coverage for deliberately
      fraudulent or deliberately criminal acts or omissions but only where such act or omission was

28    determined by a final non-appealable adjudication in the underlying action.

**The SLC and The MDL.** The final factors that Plaintiffs had to consider were the SLC and the ongoing related litigation against McKesson, including the MDL.

An SLC may, "[a]fter an objective and thorough investigation of [the] suit . . . cause [the] corporation to file a . . . motion to dismiss in . . . the best interests of the corporation, as determined by the committee." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 788-89 (Del. 1981). "If . . . the Court is satisfied under Rule 56 standards that [1] the committee was independent and showed reasonable bases for good faith findings and recommendations" and [2] in "its own independent business judgment . . . the motion should be granted," then "the Court may proceed to grant the motion[.]" *Id.*

The conventional wisdom is that an SLC will "[i]nvariably . . . move[] to dismiss . . . litigation" pending against fellow directors. Charles W. Murdock, *Corporate Governance: The Role of Special Litigation Committees*, 68 WASH. L. REV. 79, 84 (1993); Minor Myers, *The Decisions of the Corporate Special Litigation Committees: An Empirical Investigation*, 84 IND. L.J. 1309, 1311 (2009) (referring to the "the widespread proposition that SLCs always recommend dismissal"); *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 940 (Del. Ch. 2003) (noting the heavy "social pressures" placed on SLC members to clear their fellow directors).[33] Nevertheless, courts often follow an SLC's recommendation to dismiss. Where an SLC recommends dismissal, the case is either dismissed or settled (*i.e.*, before a decision on the recommendation)[34] about 90% of the time. *See* Krishnan, et al., *SLC Study* at 16-17.

As such, Plaintiffs and their counsel knew that there was a real risk in simply waiting for the SLC to issue a report. Plaintiffs and their counsel considered the risks and engaged extensively with the SLC and its counsel to explain Plaintiffs' claims, and the evidence supporting the claims. In the end, the SLC fully supports this Settlement as in the best interest of McKesson.

---

[33] There is some evidence that this pattern is less true where the case is pending in Delaware. C.N.V. Krishnan, Steven Davidoff Solomon, Randall S. Thomas, *How do Legal Standards Matter? An Empirical Study of Special Litigation Committees* ("*SLC Study*") (Feb. 15, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3053449 at 25 ("SLC reports are less likely to recommend dismissal in Delaware cases."). Overall, however, the data show that SLCs have a strong "tendency to side with management": they "recommend[] settlement, pursuit of litigation, or both in only 12% of . . . cases." *Id.* at 3-4.

[34] Presumably, these settlements are at a steep discount.

Finally, Plaintiffs were not entirely free to seek the maximum cash recovery at all costs. "The derivative plaintiff, as a fiduciary to the company, owes a duty of loyalty to the company to act in its best interest." *Breault v. Folino*, No. 8:01-cv-00826-GLT-AN, 2002 WL 31974381, at *1 (C.D. Cal. Mar. 15, 2002); *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 129 (Del. Ch. 1999) ("[A] derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity."). Plaintiffs properly considered the overall benefits of this Settlement—an historic financial recovery and substantial corporate governance reforms—compared to all of the risks of continued litigation, including the disruption to McKesson's business, the delay in obtaining the benefits of the Settlement, and the risk of losing at trial and obtaining nothing for the Company.

**B.     The Stage of the Litigation Supports Approval: Plaintiffs Obtained Extensive Discovery, Allowing Them to Evaluate the Strengths and Weaknesses of Their Claims**

The stage of the litigation supports approval. Over the course of the litigation, "extensive [document] discovery had been conducted," giving "counsel . . . a good grasp on the merits of their case before settlement talks began." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 967 (9th Cir. 2009).

In addition to the books and records that they obtained through pre-litigation demands, Plaintiffs received and analyzed over a million pages of documents produced by Defendants and third parties, as well as detailed interrogatory responses. Plaintiffs also had the benefit of reviewing transcripts of depositions and expert reports from numerous related actions involving McKesson (including the MDL). This further educated Plaintiffs and counsel on the strengths and weaknesses of their claims and further supports the appropriateness of the settlement.[35]

At the time the Settlement was reached, Plaintiffs were putting severe pressure on Defendants by forcing Defendant Hammergren to invoke an advice-of-counsel defense and seeking privileged communications placed at issue by that defense. Plaintiffs' efforts to seek and obtain privileged communications forced Defendants' hand; if they had not agreed to this near-record Settlement,

---

[35] As a result of the stay of depositions granted during the pendency of the SLC's investigation (ECF No. 187), Plaintiffs had not yet commenced depositions.

1   Plaintiffs would very likely have obtained their attorney-client communications, which would likely

2   have been powerful evidence at trial.

3       The "stage of the litigation" inquiry is not a box-checking exercise. What matters is that

4   "'sufficient discovery has been taken or investigation completed to enable counsel and the court to

5   act intelligently.'" *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013)

6   (quoting Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2013)); *In re*

7   *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052,

8   1067 (N.D. Cal. 2017) ("[W]hile the parties reached the Settlement at an early phase . . . Class

9   Counsel's careful pre-filing investigation and their extensive review of discovery materials indicate

10  they had sufficient information to make an informed decision about the Settlement. . . . [T]his factor

11  favors Settlement approval.").[36]

12  **C.    Plaintiffs' Counsel are Highly Experienced and the Court Should Give Weight to Their
        Views, Which Supports Preliminary Approval**

13

14      "Courts afford great weight . . . to the recommendation of counsel, who are most closely

15  acquainted with the facts of the underlying litigation." *Volkswagen*, 229 F. Supp. 3d at 1067 (cleaned

16  up). Here, Plaintiffs were represented by sophisticated, highly experienced lawyers who have

17  decades of experience with derivative, class, and other complex litigation. *See* Exhibit A to each of

18  Plaintiffs' Counsel's Declarations. Their support for the Settlement weighs heavily in favor of final

19  approval.

20      Similarly, "[t]he SLC has determined that this Settlement Agreement is in the company's best

21  interest. The SLC's [support for] the [S]ettlement is significant because it avoids the SLC's potential

22  dismissal of the case. This factor weighs in favor of approval of the Settlement Agreement." *In re*

23  *Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 336 (D.N.J. 2002).

24

25

26      [36] Indeed, even the absence of any "formal discovery" would not prevent the parties from taking
    a seat at the "bargaining table," so long as the "the parties have sufficient information to make an

27  informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir.
    1998); *In re Mego Finance Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (settlement

28  warranted approval even where "extensive formal discovery had not been completed").

**D.      Stockholders' Reactions Support Final Approval**

"It is established that the absence of a large number of objections to a proposed . . . settlement raises a strong presumption that the terms . . . are favorable to the class members." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528–29 (C.D.Cal.2004); *Churchill Village*, 361 F.3d at 577 (approving settlement where "only 45 of the approximately 90,000 notified class members objected to the settlement.").

Here, McKesson has approximately 180 million outstanding shares and its stockholder base consists primarily of hundreds of large, sophisticated institutional investors.[37] Notices were sent to all current McKesson stockholders as of February 10, 2020. ECF No. 220 at ¶ 2. No one has objected yet. That not one stockholder, let alone any "sophisticated institutional investor[,] objected to the Proposed Settlement is indicia of its fairness." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 410 (S.D.N.Y. 2018) ("The overwhelmingly positive reaction–or absence of a negative reaction–weighs strongly in favor of confirming the Proposed Settlement" where "out of more than 1.3 million potential class members who received Notice Packets, two objected. Both objections were filed by retail investors whose total share ownership equaled 1,100, or 0.0003 of the shares at issue in the litigation. ") (internal citations omitted); *In re Extreme Networks, Inc. Sec. Litig.*, No. 5:15-cv-04883-BLF, 2019 WL 3290770, at *9 (N.D. Cal. July 22, 2019) ("Many potential class members are sophisticated institutional investors; the lack of objections from such institutions indicates that the settlement is fair and reasonable."); *Hefler*, 2018 WL 6619983, at *9 (fact that "no institutional investor submitted an objection" weighed in favor of fairness).

**E.      The Settlement is the Product of Hard-Fought, Arm's-Length Negotiations Conducted Under the Auspices of Experienced Mediators**

Finally, while it is not one of the enumerated factors, "[t]he assistance of . . . experienced mediator[s] in the settlement process confirms that the settlement is non-collusive." *Satchell v. Federal Express Corp.*, No. 3:03-cv-02659-SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007). Here, the parties employed the services of three experienced mediators—Judge Weinstein, Mr.

---

[37] *See* List of McKesson Corp holders, Bᴌᴏᴏᴍʙᴇʀɢ Lᴀᴡ, https://www.bloomberglaw.com/company/holdings/MCK%20US%20Equity.

Melnick, and Mr. Meyer—and the final dollar figure was the product of the mediators' recommendation. *See Roberti v. OSI Systems, Inc.*, No. 2:13-cv-09174-MWF-MRW, 2015 WL 8329916, at *3 (C.D. Cal. Dec. 8, 2015) (fact that settlement followed mediator's recommendation supported the adequacy and fairness of the settlement).

Similarly, the course of negotiations shows that this was a hard-fought, arm's-length process. The parties participated in three, full-day, in-person mediation sessions over the course of a number of months and continued to negotiate between and after those mediations (using the mediators as intermediaries). In addition to the formal mediation sessions, Plaintiffs' Counsel met in-person with the SLC to discuss its investigation and had multiple in-person meetings with counsel for the Company, the Individual Defendants, and the SLC to discuss the details of the governance reforms. *See Hefler*, 2018 WL 4207245, at *9 ("[I]n light of the fact that the Settlement was reached after the parties engaged in motion practice and participated in multiple days of formal mediation, the Court concludes that the negotiations and agreement were non-collusive."); *HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*, No. 3:07cv-02245-MMA-NLS, 2010 WL 4027632, at *2 (S.D. Cal. Oct. 14, 2010) ("Counsel for the parties participated in arm's length negotiations for several months before reaching an agreement. All parties are represented by competent, experienced litigators, and the active involvement of the Honorable [Daniel] Weinstein (Ret.) as a mediator during a substantial portion of the negotiations weighs considerably in favor of concluding this is not a collusive settlement.").

## VII.   CONCLUSION

The proposed Settlement is fair, reasonable, and adequate. The Court should grant final approval.

Date: March 17, 2020                           Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Reed R. Kathrein*
Reed R. Kathrein (139304)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Facsimile:  (510) 725-3001
reed@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
Ronnie S. Spiegel (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
ronnie@hbsslaw.com

James S. Notis (admitted *Pro Hac Vice*)
Meagan Farmer (admitted *Pro Hac Vice*)
GARDY & NOTIS, LLP
Tower 56
126 East 56th Street, 8th Floor
New York, NY  10022
Telephone: (212) 905-0509
Facsimile:  (212) 905-0508
jnotis@gardylaw.com
mfarmer@gardylaw.com

*Co-Lead Counsel for Plaintiffs*

Jeffrey C. Block (*Pro Hac Vice* forthcoming)
Joel Fleming (281264)
BLOCK & LEVITON LLP
260 Franklin Street, Suite 1860
Boston, MA  02110
Telephone: (617) 398-5600
Facsimile:  (617) 507-6020
jeff@blockesq.com
joel@blockesq.com

*Counsel for Plaintiffs*

Jonathan D. Uslaner (256898)
BERNSTEIN LITOWITZ BERGER & GROSSMAN
LLP
2121 Avenue of the Starts, Suite 2575
Los Angeles, CA  90067
Telephone: (310) 819-3472
jonathanu@blbglaw.com

David Wales (admitted *Pro Hac Vice*)
Mark Lebovitch (*Pro Hac Vice* forthcoming)

1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
davidw@blbglaw.com
markl@blbglaw.com

Christine M. Mackintosh (admitted *Pro Hac Vice*)
Kim Evans (admitted *Pro Hac Vice*)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7081
Facsimile: (302) 622-7100
cmackintosh@gelaw.com
kevans@gelaw.com

*Counsel for Intervening Plaintiffs Amalgamated Bank,*
*as Trustee for Longview Largecap 500 Index Fund and*
*Longview Largecap 500 Index VEBA Fund*

Christine M. Mackintosh (admitted *Pro Hac Vice*)
Kim Evans (admitted *Pro Hac Vice*)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7081
Facsimile: (302) 622-7100
cmackintosh@gelaw.com
kevans@gelaw.com

David L. Wales (admitted *Pro Hac Vice*)
BERNSTEIN LITOWITZ BERGER
      & GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
davidw@blbglaw.com

Jonathan D. Uslaner (256898)
BERNSTEIN LITOWITZ BERGER
      & GROSSMANN LLP
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323
jonathanu@blbglaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Counsel for Intervening Plaintiff Michael Berent, Trustee, on behalf of Police & Fire Retirement System City of Detroit*

Hung G. Ta (admitted *Pro Hac Vice*)
JooYun Kim
Natalia D. Williams
HGT LAW
250 Park Avenue, 7th Floor
New York, NY  10177
Telephone: (646) 453-7288
Facsimile:  (646) 453-7289
hta@hgtlaw.com
jooyun@hgtlaw.com
natalia@hgtlaw.com

Peter Safirstein (admitted *Pro Hac Vice*)
Elizabeth S. Metcalf
SAFIRSTEIN METCALF LLP
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY  10118
Telephone: (212) 201-2855
Facsimile:  (212) 201-2858
psafirstein@safirsteinmetcalf.com
emetcalf@safirsteinmetcalf.com

*Counsel for Intervening Plaintiff Chaile Steinberg*