**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (139304)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (admitted *Pro Hac Vice*)
Ronnie S. Spiegel (admitted *Pro Hac Vice*)
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
ronnie@hbsslaw.com

**GARDY & NOTIS, LLP**
James S. Notis (admitted *Pro Hac Vice*)
Meagan Farmer (admitted *Pro Hac Vice*)
Tower 56
126 East 56th Street, 8th Floor
New York, NY  10022
Telephone: (212) 905-0509
Facsimile: (212) 905-0508
jnotis@gardylaw.com
mfarmer@gardylaw.com

[Additional counsel on signature block]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE MCKESSON CORPORATION DERIVATIVE LITIGATION | Case No. 4:17-cv-01850-CW<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: Tuesday, April 21, 2020<br>Hearing Time: 2:30 pm<br>Courtroom: TBD<br>Judge: Hon. Claudia Wilken |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on April 21, 2020, at 2:30 p.m., or as soon thereafter as this motion may be heard, either in person or by telephone or video conference as directed by the Court, Plaintiffs Eli Inzlicht ("Inzlicht"), Vladimir Gusinsky, as Trustee for the Vladimir Gusinsky Living Trust ("Gusinsky"), Chaile Steinberg ("Steinberg"), Michael Berent, Trustee of the Police & Fire Retirement System City of Detroit ("Detroit") and Amalgamated Bank, as Trustee for Longview Largecap 500 Index Fund and Longview Largecap 500 Index VEBA Fund ("Amalgamated" and, collectively, with the other plaintiffs, "Plaintiffs") will and hereby do move for an order before the Honorable Claudia Wilken, United States District Judge of the United States District Court for the Northern District of California, 1301 Clay Street, Oakland, California, awarding Plaintiffs' Counsel attorneys' fees and reimbursement of litigation expenses.

The proposed fee and reimbursement of litigation expenses award is fair and reasonable, and should be granted. The Motion is supported by the accompanying memorandum and points of authorities, the Stipulation and Agreement of Compromise, Settlement and Release, dated December 11, 2019 submitted herewith (the "Stipulation"), and Exhibits thereto, the accompanying Joint Declaration of Reed Kathrein and Meagan Farmer in Support of Plaintiffs' Motion for Final Approval of Settlement and Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Kathrein-Farmer Decl." or "Kathrein-Farmer Declaration"), the Declaration of Steve Berman, the Declaration of Meagan Farmer, the Declaration of Joel Fleming, the Declaration of David Wales, the Declaration of Christine M. Mackintosh, the Declaration of Hung G. Ta, the Declaration of Peter Safirstein, and the Declaration of Gregory Nespole (collectively, "Plaintiffs' Counsel's Declarations"), the Affidavit of Prof. Robert Bartlett of the UC Berkeley School of Law ("Bartlett Aff."), the Declaration of the Hon. Daniel H. Weinstein, Robert A. Meyer, and Jed D. Melnick ("Mediators' Decl."), the Declaration of Eli Inzlicht, the Declaration of Vladimir Gusinksy, the Declaration of Michael Berent, as Trustee for the Police and Fire Retirement System for the City of Detroit, the Declaration of Deborah Silodor, Executive Vice President and General Counsel of Amalgamated Bank, as Trustee for Longview Largecap 500 Index Fund and Longview Largecap 500

1    Index VEBA Fund, the Declaration of Chaile Steinberg (collectively, "Plaintiffs' Declarations"), and

2    the previous papers filed in this Action and such other matters as the Court may consider.

1

**TABLE OF CONTENTS**

2
<u>Page</u>

NOTICE OF MOTION AND MOTION ..............................................................................1

STATEMENT OF ISSUES TO BE DECIDED ...............................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

I.      PRELIMINARY STATEMENT .............................................................................1

II.     ARGUMENT .............................................................................................................4

        A.      Standard of Review ..................................................................................4

        B.      The Requested Fee is Reasonable ...........................................................5

                1.      The Results Achieved .....................................................................5

                        a.      Plaintiffs Obtained $175 Million in Cash........................5

                        b.      Plaintiffs Obtained Substantial Corporate Governance Reforms ........9

                                (1)     The New Compliance Committee and Reporting Requirements ...............................................................10

                                (2)     Structural Reforms Designed to Improve the Company's Culture of Compliance .........................................11

                                (3)     Enhanced Oversight of Executive Compensation .................11

                                (4)     Disclosure Requirements Related to Regulatory Compliance with Controlled Substance Laws and Regulations ...............12

                2.      The Substantial Risks of the Litigation Support the Fee Request .................14

                3.      Plaintiffs' Counsel Invested Significant Time and Effort ............................16

                4.      The Skill Required and Quality of Work Performed Support the Fee Request ...............................................................................19

                5.      The Reaction of the Stockholders to Date Supports the Fee Request ..........21

                6.      The Fee Request is Supported by Plaintiffs ..................................................21

        C.      Plaintiffs' Counsel's Expenses are Reasonable and Should be Approved ...............22

III.    CONCLUSION ........................................................................................................23

1

2

**TABLE OF AUTHORITIES**

**Page(s)**

3

**Cases**

4

5

*In re Activision Blizzard, Inc. S'holder Litig.*,
   124 A.3d 1025 (Del. Ch. 2015) ..............................................................4, 12, 13, 19

6

*In re Activision Sec. Litig.*,
   723 F. Supp. 1373 (N.D. Cal. 1989) ............................................................................4

7

8

*Americas Mining Corp. v. Theriault*,
   51 A.3d 1213 (Del. 2012) .................................................................................*passim*

9

10

*In re Anthem, Inc. Data Breach Litig.*,
   2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ............................................................4

11

*In re Atmel Corp. Derivative Litig.*,
   2010 WL 9525643 (N.D. Cal. Mar. 31, 2010) ..........................................................12

12

13

*Berger v. Pubco Corp.*,
   2010 WL 2573881 (Del. Ch. June 23, 2010) ......................................................6, 20

14

15

*In re Bluetooth Headset Prod. Liab. Litig.*,
   654 F.3d 932(9th Cir. 2011) ......................................................................................18

16

*Booth v. Strategic Realty Trust, Inc.*,
   2015 WL 6002919 (N.D. Cal. Oct. 15, 2015) .............................................................6

17

18

*In re Brocade Sec. Litig.*,
   No. 3:05-cv-02042-CRB, slip op. (N.D. Cal. Jan. 26, 2009) .....................................17

19

20

*Buccellato v. AT&T Operations, Inc.*,
   2011 WL 3348055 (N.D. Cal. June 30, 2011) ..........................................................16

21

*In re Caremark Int'l Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996). ..........................................................................*passim*

22

23

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2016 WL 412 6533 (N.D. Cal. Aug. 3, 2016) .........................................................4, 5

24

*City of Monroe Emps.' Ret. System v. Murdoch et al.*,
   No. 2017-0833-AGB (Del. Ch. Nov. 20, 2017) ..............................................6, 7, 13

25

26

*In re Clear Channel Outdoor Holdings Inc. Derivative Litig.*,
   C.A. No. 7315-CS (Del. Ch. Sept. 9, 2013) ..............................................................17

27

28

*Cryer v. Franklin Resources, Inc.*,
   No. 4:16-cv-04265-CW (N.D. Cal. Oct. 4, 2019) .......................................................5

*Cumming v. Edens et al.*,
  No. 13007-VCS (Del. Ch. July 31, 2019) ...................................................6

*Dargon v. Perelman*,
  C.A. No. 15101-VCL (Del. Ch. Aug. 29, 1997) .....................................19

*In re Digex Inc. S'holders Litig.*,
  C.A. No. 18336-CC (Del. Ch. Apr. 6, 2001).............................................17

*Dow Jones & Co. v. Shields*,
  1992 WL 44907 (Del. Ch. Jan. 10, 1992) ...............................................14

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) ........................................14

*In re Emerson Radio S'holder Derivative Litig.*,
  2011 WL 1135006 (Del. Ch. Mar. 28, 2011) ...........................................20

*In re Equity Funding Corp. Sec. Litig.*,
  438 F. Supp. 1303 (C.D. Cal. 1977).........................................................21

*In re Facebook Inc. Class C Reclassification Litig.*,
  No. 12286-VCL (Del. Ch. Oct. 24, 2018) ...............................................12

*Feldman v. Donegal Grp., Inc.*,
  C.A. No. 18786-VCJ (Del. Ch. Aug. 8, 2001) ..........................................4

*Feuer v. Thompson*,
  2013 WL 2950667 (N.D. Cal. June 14, 2013).............................................4

*Fischel v. Equitable Life Assurance Society of the U.S.*,
  307 F.3d 997 (9th Cir. 2002).......................................................................4

*In re Fox Entm't Grp., Inc. S'holder Litig.*,
  C.A. No. 1033-N (Del. Ch. Sept. 19, 2005) .............................................19

*Franklin Balance Sheet Inv. Fund v. Crowley*,
  2007 WL 2495018 (Del. Ch. Aug. 30, 2007) ..........................................18

*In re Genentech, Inc. S'holders Litig.*,
  C.A. No. 3911-VCS (Del. Ch. July 9, 2009)............................................17

*In re Google Inc. Class C S'holder Litig.*,
  Cons. C.A. No. 7469–CS (Del. Ch. Oct. 28, 2013)..................................13

*In re Handy & Harman Ltd. S'holders Litig.*,
  No. 2017-0882-TMR (Del. Ch. Dec. 2, 2019) ...........................................6

*Harris v. Marhoefer*,
  24 F.3d 16 (9th Cir. 1994).........................................................................22

*In re Heritage Bond Litig.,*
  2005 WL 1594403 (C.D. Cal. June 10, 2005)..................................6

*IP Telesis Inc. v. Velocity Networks Inc.,*
  2013 WL 12126105 (C.D. Cal. Feb. 8, 2013) .............................16

*In re Jefferies Group, Inc. S'holders Litig.,*
  2015 WL 3540662 (Del. Ch. June 5, 2015) ...............................18

*Johnson v. Hui,*
  811 F. Supp. 479 (N.D. Cal. 1991).........................................16

*Kindt v. Lund,*
  2003 WL 21453879 (Del. Ch. May 30, 2003) .........................16

*Knight v. Red Door Salons, Inc.,*
  2009 WL 248367 (N.D. Cal. Feb. 2, 2009)..............................21

*Lopez v. Youngblood,*
  2011 WL 10483569 (E.D. Cal. Sept. 2, 2011) ..........................4

*In re Lucent Techs., Inc. Sec. Litig.,*
  327 F. Supp. 2d 426 (D.N.J. 2004).........................................22

*Marie Raymond Revocable Tr. v. MAT Five LLC,*
  980 A.2d 388 (Del. Ch. 2008) .................................................6

*In re Moneygram Int'l, Inc. S'holder Litig.,*
  2013 WL 68603 (Del. Ch. Jan. 7, 2013) ...................................6

*In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Antitrust Litig.*
  No. 4:14-MD-02541 (N.D. Cal. Dec. 6, 2017)........................19

*In re NCS Healthcare, Inc. S'holder Litig.,*
  2003 WL 21384633 (Del. Ch. May 28, 2003) .........................19

*In re News Corp. S'holder Derivative Litig.,*
  C.A. No. 6285-VCN (Del. Ch. June 26, 2013) ..........................9

*In re Oclaro, Inc. Derivative Litig.,*
  2014 WL 4684993 (N.D. Cal. Sept. 19, 2014)........................15

*In re Omnivision Technologies Inc.,*
  559 F. Supp. 2d 1036 (N.D. Cal. 2008)............................*passim*

*In re Online DVD-Rental Antitrust Litig.,*
  779 F.3d 934 (9th Cir. 2015) ...................................................5

*In re Pacific Enters. Sec. Litig.,*
  47 F.3d 373 (9th Cir. 1995) ...................................................14

*Paul, Johnson, Alston & Hunt v. Graulty,*
    886 F.2d 268 (9th Cir. 1989) ................................................................. 5, 6

*In re Pfizer Inc. S'holder Derivative Litig.,*
    2010 WL 2747447 (S.D.N.Y. July 13, 2010) ........................................ 13

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Stumpf,*
    2012 WL 12920191 (N.D. Cal. May 17, 2012) ..................................... 15

*In re Rambus Inc. Derivative Litig.,*
    2009 WL 166689 (N.D. Cal. Jan. 20, 2009) .......................................... 12

*Roberti v. OSI Systems, Inc.,*
    2015 WL 8329916 (C.D. Cal. Dec. 8, 2015) ......................................... 18

*Rodman v. Safeway,*
    2018 WL 4030558 (N.D. Cal. Aug. 22, 2018) ......................................... 5

*Ryan v. Gifford,*
    2009 WL 18143 (Del. Ch. Jan. 2, 2009) .......................................... 14, 20

*Sarnacki v. Golden,*
    4 F. Supp. 3d 317 (D. Mass. 2014),
    *aff'd*, 778 F.3d 217 (1st Cir. 2015) .................................................... 16

*In re Sauer-Danfoss Inc. S'holders Litig.,*
    65 A.3d 1116 (Del. Ch. 2011) ......................................................... 17, 18

*Sciabacucchi v. Salzberg,*
    2019 WL 2913272 (Del. Ch. July 8, 2019) ........................................... 17

*In re Starz S'holder Litig.,*
    C.A. No. 12584-VCG (Del. Ch. Dec. 10, 2018) ................................... 20

*Sugarland Indus., Inc. v. Thomas,*
    420 A.2d 142 (Del. 1980) ........................................................... 5, 19, 21

*In re Veeco Instruments Inc. Sec. Litig.,*
    2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ......................................... 22

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043 (9th Cir. 2002) ............................................................. 16

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices,*
    *and Prod. Liab. Litig.,*
    2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) ...................................... 18

*In re Washington Public Power Supply System Sec. Litig. ("WPPSS"),*
    19 F.3d 1291 (9th Cir. 1994) .......................................................... 4, 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
    16-cv-05541-JST (N.D. Cal. Oct. 24, 2019) ....................................................7, 18

*In re Yahoo! Inc. S'holder Derivative Litig.*,
    153 F. Supp. 3d 1107 (N.D. Cal. 2015) .................................................................15

*In re Yahoo! S'holders Litig.*,
    C.A. 3561–CC (Del. Ch. Mar. 6, 2009) ...............................................................13

**Statutes**

15 U.S.C. § 78u-4 .........................................................................................................19, 22

21 U.S.C. § 801 *et seq.* ..............................................................................................*passim*

8 Del. Code § 220 ......................................................................................................2, 6, 19

**Other Authorities**

H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730 (1995)....................22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether the Court should approve as fair and reasonable Plaintiffs' application for an award of attorneys' fees for Plaintiffs' Counsel.

2.      Whether the Court should approve as fair and reasonable Plaintiffs' application for reimbursement of litigation expenses incurred by Plaintiffs' Counsel.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs and Co-Lead Counsel, on behalf of Plaintiffs' Counsel in this Action, respectfully submit this memorandum of law in support of their motion for (a) an award of attorneys' fees for Plaintiffs' Counsel in the amount of $43,750,000, for Plaintiffs' Counsel's role in securing a $175 million Settlement Fund and meaningful corporate governance reforms as a result of the Settlement; and (b) reimbursement of $421,223.91 in litigation expenses that were reasonably and necessarily incurred by Plaintiffs' Counsel in prosecuting and resolving this Action.[1]

**I.      PRELIMINARY STATEMENT**

The proposed Settlement,[2] which provides for the payment of $175 million in cash and the adoption of substantial corporate governance reforms to resolve this Action, is an historic result for McKesson Corporation ("McKesson" or the "Company") and its stockholders. The Settlement is one of the largest settlements ever in a derivative action. The corporate governance reforms, in which Plaintiffs' Counsel used their own expertise and that of Professor Robert Bartlett, the I. Michael Heyman Professor of Law at the University of California, Berkeley School of Law, represent the cutting edge of governance structures designed to materially enhance Board of Director (the "Board") oversight of the Company's obligations under the Controlled Substance Act of 1970 (the

---

[1] Plaintiffs' Counsel are Hagens Berman Sobol Shapiro LLP; Gardy & Notis, LLP; Block & Leviton LLP; Grant & Eisenhofer P.A.; Bernstein Litowitz Berger & Grossmann LLP; HGT Law; Safirstein Metcalf LLP; and Levi & Korsinsky, LLP.

[2] Unless otherwise defined in this memorandum, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated December 11, 2019 (the "Stipulation" or "Settlement Stipulation") or the Kathrein-Farmer Decl. Citations to "¶" in this memorandum refer to paragraphs in the Kathrein-Farmer Decl.

1   "CSA") and other state and federal laws and regulations pertaining to the distribution of opioids and

2   other controlled substances. Their significance is detailed in Professor Bartlett's affidavit.[3]

3          The significant monetary recovery and corporate governance reforms would not exist absent

4   the skill, tenacity, and effective advocacy of Plaintiffs' Counsel, who litigated this Action on a fully

5   contingent basis against an army of highly skilled and experienced defense counsel. The Settlement

6   was reached only after nearly three years of hotly-contested litigation, including substantial fact

7   discovery, which required Plaintiffs' Counsel to dedicate a significant amount of time and resources.

8          As detailed in the accompanying Kathrein-Farmer Declaration,[4] Plaintiffs' Counsel

9   vigorously pursued this litigation from the outset by, among other things, (i) conducting extensive

10  investigation into the claims, including demands for relevant documents pursuant to Section 220 of

11  the Delaware General Corporation Law; (ii) drafting highly detailed complaints based on the

12  extensive investigation conducted; (iii) researching, briefing and arguing opposition to Defendants'

13  motions to dismiss the complaints; (iv) researching, briefing and arguing the opposition to the

14  Special Litigation Committee's ("SLC") motion for a stay of proceedings; (v) serving and

15  responding to extensive discovery demands, including document requests, interrogatories and

16  subpoenas on third-parties; (vi) strategically navigating the extensive discovery disputes that

17  emerged throughout the process; (vii) engaging in vigorous, arm's-length settlement negotiations,

18  including three separate mediations sessions with three experienced mediators; and (viii) researching,

19  negotiating and preparing the corporate governance reforms.

20         The Settlement achieved through Plaintiffs' Counsel's efforts is a particularly favorable result

21  considering the significant risks in the case. The risks are discussed in detail in the Kathrein-Farmer

22  Declaration and the memorandum of law in support of Plaintiffs' motion for final approval of the

23  Settlement. There was a serious risk that Plaintiffs would not be able to achieve any recovery at all.

24         As compensation for their significant efforts on behalf of McKesson and its stockholders, and

25  the risks of nonpayment they faced in bringing the Action on a contingent basis, Plaintiffs' Counsel

26  _____

27    [3] Bartlett Aff., dated December 12, 2019, and submitted to the Court on December 27, 2019, ECF
    No. 203-3.

28    [4] The Kathrein-Farmer Declaration is an integral part of this submission.

MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIG. EXPENSES          - 2 -
Case No.: 4:17-cv-01850-CW
010688-11/1248354 V1

seek attorneys' fees in the amount of $43,750,000. Even if the Court were to completely ignore the material value of the corporate governance reforms, this amount represents 25% of the Cash Consideration (net of expenses), which would conform to Delaware precedents and the "benchmark" percentage awarded in the Ninth Circuit for contingency-fee litigation.

The requested fee has the full support of all Plaintiffs in this Action. *See* Plaintiffs' Declarations. Plaintiffs have endorsed the requested fee as reasonable in light of the result achieved in the Action, the quality of counsel's work, and the risks of the litigation. *Id.*

In accordance with the Preliminary Approval Order, an extensive Notice program was provided to current McKesson stockholders. *See* Stipulation, attached hereto as Exhibit A. The Notice advised McKesson stockholders that Plaintiffs' Counsel would apply for an award of attorneys' fees not to exceed 25 percent of the Cash Consideration, net of expenses, and reimbursement of litigation expenses not to exceed $600,000. *See* Notice, attached as Exhibit A, at Exhibit B-1 at 15. The expenses sought are less than the maximum amounts stated in the Notice, and the fee request conforms with the Notice. The deadline for stockholders to object to the requested attorneys' fees and expenses has not yet passed, but, to date, no objections to the request for fees and expenses have been filed on the Court's docket. ¶ 103.[5]

In light of the excellent recovery obtained, the time and effort devoted by Plaintiffs' Counsel to the Action, the skill, quality, and expertise required, the wholly contingent nature of the representation, and the considerable risks they undertook, Co-Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved by the Court. The costs and expenses incurred by Plaintiffs' Counsel are reasonable in amount and were necessarily incurred in the successful prosecution of the Action, and they too should be approved.

---

[5] The deadline for the submission of objections is March 31, 2020. Should any objections be received, Lead Counsel will address them in its reply papers, due on or before April 14, 2020.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.      ARGUMENT

### A.      Standard of Review

Because "Delaware law govern[ed] the [substantive] claims, it also governs the fee award." *Feuer v. Thompson*, No. 4:10-cv-00279-YGR, 2013 WL 2950667, at *2 (N.D. Cal. June 14, 2013) (derivative action) (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) ("Because Washington law governed the claim, it also governs the award of fees.")). There is little substantive difference between Delaware law and Ninth Circuit law on this issue.

It is well established in the Ninth Circuit that, in a common fund case, the court has discretion to apply either the percentage of the fund method or the lodestar method in calculating a fee award. *See Fischel v. Equitable Life Assurance Society of the U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002); *In re Washington Public Power Supply System Sec. Litig. ("WPPSS")*, 19 F.3d 1291, 1295-96 (9th Cir. 1994). "Despite this discretion, use of the percentage method in common fund cases appears to be dominant." *In re Omnivision Technologies Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (collecting cases). This is true even where the settlement results in a nine-figure "megafund." *In re Anthem, Inc. Data Breach Litigation*, No. 5:15-md-02617-LHK, 2018 WL 3960068, at *26-27 (N.D. Cal. Aug. 17, 2018) (awarding 27% out of a $115 million settlement fund); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 4:07-cv-05944-JST, 2016 WL 412 6533, at * 1 (N.D. Cal. Aug. 3, 2016) (awarding 27.5% of $576.75 million common fund).[6]

Similarly, Delaware courts determine the amount of a fee award as "a percentage of the benefit. . . . [w]hen the benefit is quantifiable." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1070 (Del. Ch. 2015); *see also Feldman v. Donegal Group, Inc.*, C.A. No. 18786-VCJ at

---

[6] The "advantages of using the percentage method have been described thoroughly by other courts." *Omnivision*, 559 F. Supp. 2d at 1046. The percentage of the fund method aligns the interests of counsel and plaintiff by incentivizing attorneys to obtain the maximum possible recovery in the most efficient manner. *See Lopez v. Youngblood*, No. 1:07-cv-00474-DLB, 2011 WL 10483569, at *3 (E.D. Cal. Sept. 2, 2011) ("[T]he percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class, *i.e.*, class counsel directly benefit from increasing the size of the class fund and working in the most efficient manner."). The lodestar method, in contrast, "does not achieve the stated purposes of proportionality, predictability and protection of the class. It encourages abuses such as unjustified work and protracting the litigation. . . . [I]t does not encourage efficiency, but rather, it adds inefficiency to the process." *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D. Cal. 1989).

29 (Del. Ch. Aug. 8, 2001) (Transcript) (fee award determined "on a percentage basis" when the benefit "is capable of some realistic financial valuation"). Like the Ninth Circuit, Delaware rejects the use of a declining percentage in megafund cases. *See Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1261 (Del. 2012) ("we decline to impose either a cap or the mandatory use of any particular range of percentages for determining attorneys' fees in megafund cases.").

Delaware considers the five so-called *Sugarland* factors in determining a fee award: "1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the standing and ability of counsel involved." *Id.* at 1254 (citing *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149 (Del. 1980)). These overlap with and parallel the factors considered by courts applying federal law in this Circuit: (1) the results achieved, (2) the risks of litigation, (3) the skill required and the quality of work, (4) the contingent nature of the fee and the financial burden carried by the plaintiffs, (5) awards made in similar cases, (6) the [stockholder's] reaction, and (7) a lodestar cross-check. *See Omnivision*, 559 F. Supp. 2d at 1046-48 (citing *Vizcaino*, 290 F.3d at 1048-51).

## B.    The Requested Fee is Reasonable

### 1.    The Results Achieved

"Delaware courts have assigned the greatest weight to the benefit achieved in litigation." *Theriault*, 51 A.3d at 1254. Courts in this Circuit say the same thing. *See Rodman v. Safeway*, 2018 WL 4030558, at *3 (N.D. Cal. Aug. 22, 2018) (awarding 28% for attorneys' fees for "exceptional results"); *Cathode Ray Tube*, 2016 WL 4126533 at *4 ("[o]utstanding results merit a higher fee"); *Omnivision*, 559 F. Supp. 2d at 1046 (settlement's "substantial achievement" favored granting the requested 28% fee award).

#### a.    Plaintiffs Obtained $175 Million in Cash

Here, the starting point for measuring the benefit achieved is the cash recovery of $175 million.

In the Ninth Circuit, of course, 25 percent is the "benchmark" award for attorneys' fees. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 273 (9th Cir. 1989); *Cryer v. Franklin Resources, Inc.*, No. 4:16-cv-

04265-CW (N.D. Cal. Oct. 4, 2019) (slip op. at 3) (J. Wilken). While the 25 percent benchmark can "be adjusted upward or downward to account for any unusual circumstances," *Graulty*, 886 F.2d at 272, courts have found fee awards in the amount of the 25 percent benchmark to be "presumptively reasonable." *Booth v. Strategic Realty Trust, Inc.*, No. 3:13-cv-04921-JST, 2015 WL 6002919, at *7 (N.D. Cal. Oct. 15, 2015). Courts have also found that, "in most common fund cases, the award exceeds that benchmark." *Omnivision*, 559 F. Supp. 2d at 1047; *accord In re Heritage Bond Litig.*, No. 2:02-ml-01475-RGK, 2005 WL 1594403, at *19 & n.14 (C.D. Cal. June 10, 2005). Similarly, Delaware courts routinely issue attorneys' fee awards of 25 percent or more in complex class or derivative actions. *See Cumming v. Edens et al.*, No. 13007-VCS (Del. Ch. July 31, 2019) (Order) (awarding 27% for fees and expenses); *In re Handy & Harman Ltd. S'holders Litig.*, No. 2017-0882-TMR (Del. Ch. Dec. 2, 2019) (Order) (fee award of 25%); *City of Monroe Emps.' Ret. System v. Murdoch et al.*, No. 2017-0833-AGB (Del. Ch. Nov. 20, 2017) ("*Twenty-First Century Fox*") (Order) (fee award of 25% on settlement of $90 million plus corporate governance, where action settled before motion to dismiss); *In re Moneygram Int'l, Inc. S'holder Litig.*, No. Civ. A. 6387–VCL, 2013 WL 68603 (Del. Ch. Jan. 7, 2013) (awarded 25% of net value of common fund plus fee for non-monetary benefits); *Berger v. Pubco Corp.*, No. Civ. A 3414-CC, 2010 WL 2573881, at *1 (Del. Ch. June 23, 2010) ("a 26% fee is at the bottom of the 25-33% range that is found in many Court of Chancery cases"); *Marie Raymond Revocable Trust v. MAT Five LLC*, 980 A.2d 388, 410 (Del. Ch. 2008) ("This court has often approved fee requests of 30% or more of the benefits where the settlement benefits are attributable solely to the litigation."). The orders and transcripts of the above-referenced cases are attached hereto as Exhibit B.

Here, Plaintiffs' Counsel's request for a 25 percent award is further justified by the substantial risks Plaintiffs faced in the Action, including those related to demand futility, establishing breach of fiduciary duty, scienter, and damages, as well as the risk that the SLC of McKesson would seek to takeover and terminate this litigation. ¶¶ 18, 75. The Settlement resulted from Plaintiffs' Counsel's thorough investigation of the claims, including demands pursuant to Delaware General Corporation Law Section 220 for relevant documents; drafting highly detailed consolidated complaints that substantially survived Defendants' motions to dismiss; defeating Defendants' motion

for reconsideration; substantially defeating the SLC's motion for a stay of proceedings; conducting extensive fact discovery and discovery disputes; and engaging in vigorous, arm's-length settlement negotiations. ¶¶ 96-97; Mediators' Decl. ¶¶ 6-16. McKesson will receive $175 million and McKesson and its stockholders will benefit from the corporate governance reforms for years to come.

The proposed Settlement is historically significant by any measure. In terms of derivative suits, $175 million is the one of the largest recoveries ever, the largest recovery in a derivative action based solely on *Caremark*[7] or oversight failures, and almost double the size of the next largest *Caremark* settlement of $90 million in the *Twenty-First Century Fox* case.[8]

The Settlement achieved by Plaintiffs' Counsel, as a percentage of recoverable damages, is also high. Potential recoverable damages include both payments already incurred and future payments that may be incurred. McKesson's payments to date incurred include: (i) the fine of $150 million paid to the DOJ with the 2017 Settlement; (ii) the $82 million settlement with two Ohio counties; (iii) the $37 million settlement with the State of West Virginia; and (iv) legal fees incurred in defending the various opioid related lawsuits totaling approximately $250 million in 2018 and 2019. As for future payments, McKesson is a defendant in the Opioid MDL and is being sued by numerous state Attorneys Generals. There is no settlement in those actions, but statements by McKesson indicated that a possible settlement was being discussed of $6.9 billion to be paid over 18 years. Even assuming McKesson agreed to that level of payment (which it obviously has not done to date) over the 18 years, with a discount rate of 7.7 percent,[9] the present value of those payments is $3.95 billion.

Whether or not the Court considers the potential future payments, these all-in figures do not match the reasonably likely recovery of damages in this case.

*First*, these are estimates, as there is no settlement in the Opioid MDL.

---

[7] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[8] While the *Wells Fargo* case involved *Caremark* claims, it also benefitted from massive insider trading claims, which surely drove a significant part of the $240 million recovery in that matter.

[9] This is based on McKesson's weighed average cost of capital, as reported by Bloomberg. ¶ 7.

*Second*, throughout this litigation, Defendants have argued that while they had oversight responsibilities, they were not the ones actually performing the compliance with the CSA and CSMP, and they relied on the information being provided to them. Defendants have noted that McKesson is an enormous company with 80,000 employees, annual revenues last year of $214 billion, and ranked seventh on the Fortune 500. Defendants also point to the systems in place at McKesson for regulatory compliance, including, but not limited to, a compliance department, an internal audit department, and the legal department. As Defendants have noted, these departments (not Defendants) bore primary responsibility for compliance and reported up to the executives and the Board.

While Plaintiffs were prepared to show why those systems were sufficiently flawed to permit a finding of liability for breach of duty, Defendants would surely limit any damage award by arguing that damages had to be capped by the Board's proportionate responsibility for the Company's overall fines. After all, Defendants would argue, even a perfect compliance system leaves room for rogue actors to violate the law. The risk of a liability verdict with damages limited to a modest percentage of overall settlement payments could not be ignored.

*Third*, Defendants point to the fact that the Opioid MDL is targeting the entire industry, and as such, they argue that much of any settlement McKesson may ultimately pay is based not just on misconduct, but on a societal problem being addressed through the courts.

*Fourth*, there would be a substantial collectability issue for any judgment or settlement substantially above the amount of the Cash Settlement, given the amount of Director & Officer insurance, and the fact that none of the Defendants are believed to be billionaires.

In light of the significant risks of establishing liability, tough questions about future potential payments, and the real collectability risks Plaintiffs faced in this case, the $175 million cash recovery represents an excellent result for McKesson and its stockholders.

Plaintiffs' Counsel are not aware of academic studies analyzing the percentage of recovery of damages in derivative actions. Studies of such recoveries in securities fraud class actions, however, provide valuable insights. A NERA study found that the median settlement of securities fraud class actions in 2019 represented 2.1 percent of estimated damages. *See* NERA, Janeen McIntosh and

1    Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review

2    (2020), at 20.

3           In light of these circumstances, both the financial recovery and the corporate governance

4    reforms obtained is a substantial achievement on behalf of McKesson and weighs in favor of

5    granting the requested fee of 25 percent of the monetary recovery.

6                    **b.**       **Plaintiffs Obtained Substantial Corporate Governance Reforms**

7           Although the requested fee award could be approved based solely on the $175 million

8    monetary recovery, the Court should also credit the significant value of the governance reforms and

9    the significant fee those reforms would support, even absent any cash. The governance reforms are

10   specially designed to address the conduct and problems at issue in this case. The governance reforms

11   will improve Board oversight and reduce the risk of future compliance failures at McKesson.

12          If the Court were to consider the governance reforms worth in the $5 to $10 million range, as

13   Delaware precedent readily supports, the remaining balance of the fee requested is even more easily

14   supported as eminently reasonable. *See, e.g.*, *In re News Corp. S'holder Derivative Litig.*, C.A. No.

15   6285-VCN, at 76 (Del. Ch. June 26, 2013) (Transcript) (finding substantial corporate governance

16   improvements alone as "justifying a fee of perhaps six to $10 million or even more after considering

17   the future savings that good conduct might bring."). *See also* subsection b.(4), below, providing

18   additional case law support for this point.

19          Those reforms include: the separation of the CEO and Chairman roles; term limits for

20   directors; the addition of two new independent directors; reforms to the composition, mandate, and

21   training of McKesson's Compliance Committee; improvements in reporting to the Compliance

22   Committee by management, advisors, and committees and reporting by the Compliance Committee

23   to the Board; revisions to the Company's executive compensation clawback policy; enhancements to

24   the Company's disclosures relating to McKesson's lobbying efforts concerning controlled

25   substances; and adjustments to executive compensation based on legal or compliance costs.

26          Plaintiffs' corporate governance expert, Professor Robert Bartlett, explained "the Governance

27   Reforms fall into four distinct categories," each of which is discussed below. Bartlett Aff. at 32.

28

1

### (1) The New Compliance Committee and Reporting Requirements

2  The governance reforms substantially strengthen the new Compliance Committee, which was

3  established after the denial of the motion to dismiss and shortly before the first mediation session.

4  The governance reforms detail the Compliance Committee's purpose and role in overseeing

5  compliance with the CSA, including CSMP. The governance reforms address the requirements for

6  the Compliance Committee's members, including that 75 percent be independent members who

7  joined the Board after January 1, 2018, and at least half have experience tailored to compliance for a

8  company that must comply with healthcare regulatory requirements, such as FDA and/or DEA

9  requirements.

10  The governance reforms require specific training that the members of the Compliance

11  Committee will receive on, among other things, CSA and CSMP, so they have the background and

12  education necessary to competently oversee these issues. They also address Defendants' argument in

13  this litigation that they were not told of serious compliance issues. The governance reforms lay out in

14  detail the required information and reporting that must be made to the Compliance Committee,

15  which includes (i) government inquiries, investigations, and actions, (ii) external complaints

16  including *qui tam* actions and FDA 483 reports and warning letters, (iii) internal complaints,

17  including from the McKesson Integrity Line; (iv) analysis of compliance with the CSA, the CSMP,

18  and reporting of suspicious orders; and (v) regular reporting by senior executives of the Company,

19  Company committees, and outside counsel on regulatory compliance.

20  These reforms will ensure that the members of the Compliance Committee have the

21  experience, training, and information necessary to properly oversee McKesson's compliance with

22  CSA and CSMP. As Professor Bartlett explained in his affidavit:

23  > Together with the robust information reporting requirements discussed
   > previously, these requirements should help induce members of the
24  > Compliance Committee to take an active role in discharging their
   > oversight responsibilities. Moreover, the robust, periodic training
25  > required of Committee members should help underscore for Committee
   > members the importance of viewing compliance as not only complying
   > with the minimal requirements imposed by Controlled Substances Laws
26  > and Regulations but also about how to achieve the public health
   > objectives that these . . . reflect.
27

28  Bartlett Aff. at 50.

### (2)   Structural Reforms Designed to Improve the Company's Culture of Compliance

The governance reforms separate the Board's Chair from the CEO. This is significant because the Chair substantially influences the topics selected for the Board agenda and what is discussed at meetings, including compliance issues. The governance reforms provide for two new independent directors, and 12-year terms limits (with some subject to waiver by the Board with public disclosure). At least one of the new directors must have experience tailored to compliance for a company that must comply with healthcare regulatory requirements, such as FDA and/or DEA requirements. All these factors highlight the importance of regulatory compliance. As Professor Bartlett explained:

> In short, the combination of a substantially increased flow of compliance-related information with increased experience and training on these topics should lead a properly functioning independent Board to exercise its oversight to emphasize compliance with law and regulatory compliance.

Bartlett Aff. at 57.

### (3)   Enhanced Oversight of Executive Compensation

The governance reforms also improve the Company's compensation policies and disclosures and compel management to emphasize regulatory compliance. These reforms include a requirement that the Compliance Committee provide an annual presentation to the Compensation Committee of senior management's compliance performance, before compensation is set, so it can be taken into consideration in setting compensation. The reforms include revisions to the clawback policies, empowering the Board to take clawback actions for regulatory violations. The reforms also require that McKesson publicly disclose if any financial performance metric used for senior executive compensation is adjusted to exclude legal or compliance costs. As Professor Bartlett explained:

> This disclosure obligation, in turn, should accordingly deter the Board from entering into these arrangements, thus helping to ensure that management is incentivized to account for regulatory and compliance risk when pursuing corporate objectives.

Bartlett Aff. at 60.

**(4)** **Disclosure Requirements Related to Regulatory Compliance with Controlled Substance Laws and Regulations**

The governance reforms will also enhance McKesson's regulatory compliance disclosures through amendments to both the Commitment Statement and the Compliance Committee Charter and Checklist, to emphasize compliance with laws related to lawful distribution of controlled substances, and those portions of the Checklist will now be public. The Compliance Committee will also issue a public written summary of its activities. As discussed, there are also disclosure obligations if regulatory and/or compliance costs are excluded from financial metrics used for executive compensation. In addition, the governance reforms require McKesson to disclose annually how much it spends on lobbying, its lobbying policy priorities related to laws and regulations governing distribution of controlled substances, and a summary of those lobbying efforts.

Professor Bartlett concluded, and Plaintiffs agree, that:

> [T]he Governance Reforms will meaningfully improve Board oversight of the Company's compliance with Controlled Substances Laws and Regulations and, by doing so, reduce the chance of another compliance failure at McKesson involving controlled substances. . . . [T]he Governance Reforms, by reducing the risk of another compliance failure, will therefore provide significant value for McKesson and its shareholders.

Bartlett Aff. at 66.

Courts have regularly awarded substantial legal attorneys' fees to plaintiffs' counsel who achieved significant non-monetary governance reforms in settlements. *See, e.g.*, *In re Atmel Corp. Derivative Litigation*, No. 2:06-cv-04592-RSWL, 2010 WL 9525643 (N.D. Cal. Mar. 31, 2010) (fees awarded of $4.94 million based on $9.65 million cash settlement and governance reforms); *In re Rambus Inc. Derivative Litig.*, No. 2:06-cv-03513-GPS-RC, 2009 WL 166689 (N.D. Cal. Jan. 20, 2009) (fee award of $2 million based on governance only settlement). The Delaware Chancery Court has awarded substantial fees in numerous derivative cases based on the benefits from non-cash settlements. In *In re Facebook Inc. Class C Reclassification Litigation*, No. 12286-VCL (Del. Ch. Oct. 24, 2018), the Delaware Chancery Court approved an attorneys' fees award of $68.7 million after Facebook dropped its plan to reclassify its shares that would have created a new class of stock. In *In re Activision Blizzard*, 124 A.3d 1025, the Delaware Chancery Court approved a settlement that

included the addition of two independent directors to Activision's Board and the reduction in the CEO's voting power from 24.9 percent to 19.9 percent. "Establishing an independent Board majority and reducing the stockholder-level control of insiders at a corporation with a market capitalization in excess of $15 billion is a valuable non-monetary benefit. Precedent suggests that an award of $5-10 million could be justified." *Id.* at 1071. *See also In re Google Inc. Class C S'holder Litig.*, Cons. C.A. No. 7469–CS, tr. at 109 (Del. Ch. Oct. 28, 2013) (awarding $8.5 million plus expenses for "largely a corporate governance settlement" in which "the benefits are substantial" and "somewhere between a solid single and a double"); *In re Yahoo! S'holders Litig.*, C.A. 3561–CC, let. op. at 1 (Del. Ch. Mar. 6, 2009) (awarding $8.4 million for "substantial benefit" of amending employee severance plan in a manner that "made it less expensive to sell Yahoo, making the company a more attractive target to potential suitors").

As set forth above and in the accompanying Bartlett affidavit, reducing the risk of future violations of the CSA is important and valuable to McKesson and its stockholders. In this regard, several derivative cases and their settlements have addressed analogous issues, with both important governance reforms and substantial monetary recoveries.

The *Pfizer* derivative action was brought after Pfizer or its subsidiaries pled guilty three times to misdemeanors for off-label marketing of pharmaceutical drugs and paid $2.3 billion in criminal fines and related settlements. The *Pfizer* complaint alleged, *inter alia*, a failure of oversight by the board and senior executives. The court denied the motion to dismiss in substantial part, and the parties then engaged in discovery. *In re Pfizer Inc. S'holder Derivative Litig.*, No. 1:09-cv-07822-JSR, 2010 WL 2747447 (S.D.N.Y. July 13, 2010). The settlement in *Pfizer* created a new Board committee to oversee regulatory compliance and funded it with $75 million. The court awarded $23.6 million in fees and expenses, or 28 percent of the cash recovery, plus expenses. *Pfizer*, No. 09-7822-JSR (S.D.N.Y. Apr. 29, 2010) (Order).

The *Twenty-First Century Fox* derivative action arose out of the widespread allegations of sexual harassment and racial discrimination involving senior executives at Fox. *Twenty-First Century Fox*, No. 2017-0833-AGB. The complaint alleged, *inter alia*, breaches of fiduciary duty by the Fox board and senior executives for allowing and turning a blind eye to a toxic environment for

women and minorities. The settlement included both (i) the creation of the Fox News Workplace

Professionalism and Inclusion Council of experts, a majority of whom are outside the company, to

oversee and advise the board and senior management on harassment and discrimination issues; and

(ii) the payment of $90 million. The Chancellor of the Delaware Chancery Court awarded a fee of 25

percent of the $90 million, based on the value of the governance and the monetary recovery.

Here, the benefits conferred on McKesson from the corporate governance reforms are

substantial and would justify a substantial fee independent of the monetary recovery. As such, the

reforms further support the requested fee of 25 percent.

## 2. The Substantial Risks of the Litigation Support the Fee Request

The contingent nature of the representation is the "second most important factor." *Dow Jones

& Co. v. Shields*, No. 184, 1991, 1992 WL 44907, at *2 (Del. Ch. Jan. 10, 1992). "[A]n attorney may

be entitled to a much larger fee when the compensation is contingent than when it is fixed on an

hourly or contractual basis." *Ryan v. Gifford*, No. 2213–CC, 2009 WL 18143, at *13 (Del. Ch. Jan.

2, 2009). The Ninth Circuit has also confirmed that a determination of a fair and reasonable fee must

include consideration of the contingent nature of the fee and the obstacles surmounted:

> Contingent fees that may far exceed the market value of the services if
> rendered on a non-contingent basis are accepted in the legal profession
> as a legitimate way of assuring competent representation for plaintiffs
> who could not afford to pay on an hourly basis regardless whether they
> win or lose.

*WPPSS*, 19 F.3d at 1299; *see also Omnivision*, 559 F. Supp. 2d at 1047; *In re Dynamic Random

Access Memory (DRAM) Antitrust Litig.*, No. M:02-cv-01486-PJH, 2007 WL 2416513, at *1 (N.D.

Cal. Aug. 16, 2007).

Here, Plaintiffs' Counsel received no compensation during this litigation, invested 26,207.71

hours for a total lodestar of approximately $15,020,210.40 million, and incurred expenses totaling

$421,223.91 in prosecuting the case. ¶¶ 92, 100. Any fee award and expense reimbursement have

always been at risk and contingent on the result achieved and on this Court's discretion in awarding

fees and expenses.

"[D]erivative lawsuits are rarely successful." *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373,

378 (9th Cir. 1995). And this derivative lawsuit was harder than most. As the Court recognized,

1    Plaintiffs brought "a director oversight theory"—i.e., a *Caremark* claim. ECF No. 85 at 15-16. This

2    is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a

3    judgment." *In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1121 (N.D. Cal.

4    2015) (cleaned up). In the three decades since *Caremark* was decided, there have been legions of

5    decisions dismissing *Caremark* claims. Until last year, the Delaware Supreme Court had never

6    upheld a *Caremark* claim.

7            Despite the most vigorous and competent efforts, Plaintiffs' Counsel knows success in

8    contingent litigation such as this is never guaranteed. The commencement of a derivative action and

9    denial of motions to dismiss are no guarantee of success. These cases are not always settled, nor are

10   cases always successful. Hard, diligent work by skilled counsel is required to develop facts and

11   theories to prosecute a case or persuade defendants to settle on favorable terms.

12           As discussed in greater detail in the Kathrein-Farmer Declaration, there were many

13   substantial challenges to succeeding in this litigation. At the outset of the case, there was a

14   significant risk that the case would be dismissed on demand futility grounds. As this Court is aware,

15   it is very difficult to plead demand futility in a *Caremark* action, as it requires pleading scienter to

16   overcome McKesson's exculpation clause, which protects directors from monetary damages for a

17   breach of the duty of care. Defendants might have raised demand futility again at summary judgment

18   and at trial. *See, e.g., Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Stumpf*, 2012

19   WL 12920191, at *1 &n. 1 (N.D. Cal. May 17, 2012) (disagreeing with plaintiffs' argument that "the

20   individual defendants cannot relitigate the issue of demand futility on summary judgment"); *In re*

21   *Oclaro, Inc. Derivative Litig.*, 2014 WL 4684993, at *2 (N.D. Cal. Sept. 19, 2014) (difficulty in

22   establishing demand futility "would arise in both motion practice and at trial" and the "powerful

23   presumption created by the business judgment rule would pose an additional hurdle to the derivative

24   plaintiffs' fiduciary duty claims").

25           Plaintiffs also faced the real and significant risk that the SLC would take over the action and

26   move to terminate it. Under Delaware law, a properly appointed and constituted SLC, after a proper

27   investigation and consistent with the Court's view of fairness, can take over and terminate a

28   derivative action as not in the best interest of the company. Many derivative actions have been

dismissed in this manner by an SLC. *See, e.g.*, *Sarnacki v. Golden*, 4 F. Supp. 3d 317, 322 (D. Mass. 2014) (applying Delaware law and dismissing derivative action by SLC as not in the best interests of the corporation to pursue the claims), *aff'd*, 778 F.3d 217 (1st Cir. 2015); *IP Telesis Inc. v. Velocity Networks Inc.*, No. 2:11-cv-09950-RGK-AJW, 2013 WL 12126105 (C.D. Cal. Feb. 8, 2013) (same); *Kindt v. Lund*, No. C.A. 17751-NC, 2003 WL 21453879 (Del. Ch. May 30, 2003) (same); *Johnson v. Hui*, 811 F. Supp. 479, 483 (N.D. Cal. 1991) (same).

Moreover, Defendants may well have prevailed on their defenses that they properly relied on compliance experts, internal audit, and counsel in discharging their duties overseeing McKesson, including for compliance with the CSA. In this regard, Defendants identified in their interrogatory responses numerous persons and committees they relied upon. A finder of fact could potentially find that the Board did not do a good job of oversight, but that these failings were not sufficient to prove a breach of duty of loyalty. Similarly, Defendants sharply disputed that their conduct caused any damages, again pointing to the mechanisms and committees at McKesson for compliance, and their reliance on them. So while Plaintiffs' Counsel believed in the merits of their claims, there would be many challenges in establishing all of these elements and a substantial risk that Plaintiffs might not be able to do so. These arguments could have materially reduced the amount of recoverable damages available and adversely affected any potential recovery. These substantial risks facing Plaintiffs' Counsel further support the requested fee.

### 3.   Plaintiffs' Counsel Invested Significant Time and Effort

In cases where attorneys' fees are sought based on a percent of the common fund, courts in this Circuit frequently employ a lodestar crosscheck to assess the reasonableness of the fees sought. *See, e.g., Vizcaino*, 290 F.3d at 1050 ("[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award."). In the Ninth Circuit, "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Id.* at 1050, n.6 (28% fee award represented a multiplier of 3.65); *see also Buccellato v. AT&T Operations, Inc.*, No. 5:10-cv-00463-JW, 2011 WL 3348055, at *2 (N.D. Cal. June 30, 2011) (awarded 4.3 lodestar multiplier as

1   part of a 25% fee award); *In re Brocade Sec. Litig.*, No. 3:05-cv-02042-CRB, slip op. at 13 (N.D.

2   Cal. Jan. 26, 2009) (awarding 25% of $160 million common fund, representing a 3.5 multiplier).

3        Delaware has repeatedly "reject[ed] the lodestar methodology," *Theriault,* 51 A.3d at 1257,

4   preferring "instead to focus on the benefit conferred." *Sciabacucchi v. Salzberg*, No. C.A. 2017-

5   0931-JTL, 2019 WL 2913272, at *6 (Del. Ch. July 8, 2019) (approving fee award reflecting implied

6   rate of $11,262.26 per hour for non-monetary relief). Nonetheless, as in federal court, Delaware

7   considers the time and effort expended by counsel as a "cross-check to guard against windfalls,

8   particularly in therapeutic benefit cases." *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116,

9   1136 (Del. Ch. 2011). When cross-checking against lodestar, Delaware courts often approve awards

10  with high lodestar multipliers. In *Theriault*, the Delaware Supreme Court affirmed a fee award of

11  $304 million, which represented a multiplier of 87 times lodestar, in concluding that the

12  "extraordinary benefit that was achieved in this case merits a very substantial award of attorneys'

13  fees." 51 A.2d at 1255. Delaware has often awarded high multipliers where the benefits conferred

14  warranted such an award. *See, e.g., In re Genentech, Inc. S'holders Litig.*, C.A. No. 3911-VCS (Del.

15  Ch. July 9, 2009) (Transcript) (fee award of $24.5 million, which translated into an 11.3 multiplier);

16  *In re Digex Inc. S'holders Litig.*, C.A. No. 18336-CC at 141-47 (Del. Ch. Apr. 6, 2001) (Transcript)

17  (9x multiplier); *In re Clear Channel Outdoor Holdings Inc. Derivative Litig.*, C.A. No. 7315-CS

18  (Del. Ch. Sept. 9, 2013) (Transcript) (approving a $6 million fee award, representing a 10.5x

19  multiplier).

20       As set forth in the Kathrein-Farmer Declaration and lodestar report submitted herewith,

21  Plaintiffs' counsel has expended a total of 26,207.71 hours over the course of three years of

22  investigation, litigation, and negotiation of the monetary payment and governance reforms reflected

23  in the Settlement. ¶ 91.[10] Plaintiffs' Counsel's lodestar, derived by multiplying the hours spent on the

24  litigation by each attorney and professional by their current hourly rates, is $15,020,210.40. ¶ 92.

25

26       [10] The time incurred by each set of Plaintiffs' Counsel has been individually reported by such
27  firms, as forth in the attached declarations of Steve W. Berman, Meagan Farmer, Joel Fleming,
    David L. Wales, Christine M. Mackintosh, Hung G. Ta, Peter Safirstein, and Gregory M. Nespole.
28  The time for preparation of the fee and expense application were excluded from the lodestar.

Accordingly, the requested fee of 25 percent of the cash recovery, net of expenses, which equates to approximately $43.75 million, represents a multiplier of approximately 2.9 of Plaintiffs' Counsel's lodestar.[11] This is squarely within the multiplier range of one to four frequently used as a crosscheck. Given the extraordinary results achieved in untested and risky shareholder derivative waters, Plaintiffs' Counsel's 26,207.71 hours support the reasonableness of the fee request.

Director and partners' rates are $650-1,075 per hour, associates' rates range from $350-615 per hour, and paralegals' rates range from $175-350 per hour. ¶ 91. These are "reasonable hourly rate[s] for the region and for the experience of the lawyer[,]" *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 932, 941(9th Cir. 2011); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (lodestar cross-check supported the reasonableness of the requested fee award where "[t]he blended average hourly billing rate is $529 per hour for all work performed and projected, with billing rates ranging from $275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals[]"); *Roberti v. OSI Systems, Inc.*, No. 2:13-cv-09174-MWF-MRW, 2015 WL 8329916, at *7 (C.D. Cal. Dec. 8, 2015) ("Lead Counsel's attorney rates—between $525 to $975— are reasonable given that each has at least 15 years of litigation experience" except associates).

Delaware courts routinely award higher effective rates on successful contingency cases. *See, e.g.*, *In re Jefferies Group, Inc. S'holders Litig.*, No, Consolidated C.A. No. 8059–CB, 2015 WL 3540662, at *4 (Del. Ch. June 5, 2015) (fee represented hourly rate over $2,200); *Franklin Balance Sheet Investment Fund v. Crowley*, No. C.A. 888-VCP, 2007 WL 2495018, at *14 (Del. Ch. Aug. 30,

---

[11] Plaintiffs' Counsel is aware that in the *In re Wells Fargo & Co. Shareholder Derivative Litigation*, 16-cv-05541-JST (N.D. Cal. Oct. 24, 2019), the Court is reviewing the appropriate rate for contract attorneys ("i.e., attorneys who are not full time firm employees but rather were hired through an outside agency"), which was almost $10 million of the lodestar and represented more than 44% of the lodestar in that case. Here, unlike in *Wells Fargo*, only a small portion of the lodestar was derived from work performed by contract attorneys. All of the attorneys who worked on this case, except for two, were employees of the law firms and not contract attorneys. The lodestars for those two contract attorneys (David Correa and Matt Rovner) totaled $402,290, based on billing rate of $350. *See* Kathrein-Farmer Decl., at Ex. B (Berman Decl.). As such, staff attorneys represented less than 3% of the lodestar in this case. Even an adjustment in the rate for the two contract attorneys who worked on this case would have only a *de minimis* impact on the lodestar or the lodestar cross check.

2007) (fee represented an hourly rate of $4,023); *In re Fox Entm't Grp., Inc. S'holder Litig.,* C.A. No. 1033-N, tr. at 70 (Del. Ch. Sept. 19, 2005) (fee represented hourly rate of $3,000); *In re NCS Healthcare, Inc. S'holder Litig.,* No. C.A. 19786, 2003 WL 21384633, at *3 (Del. Ch. May 28, 2003) (fee represented hourly rate of $3,030); *Dargon v. Perelman,* C.A. No. 15101-VCL, tr. at 48-51 (Del. Ch. Aug. 29, 1997) (fee represented hourly rate of $3,500).

### 4.   The Skill Required and Quality of Work Performed Support the Fee Request

The fourth and fifth *Sugarland* factors (caliber of counsel and complexity of the litigation) are often considered together. "All else equal, litigation that is challenging and complex supports a higher fee award." *Activision*, 124 A.3d at 1072; *see also Omnivision*, 559 F. Supp. 2d at 1047 ("The 'prosecution and management of a complex national class action requires unique legal skills and abilities.' This is particularly true in securities cases because the [PSLRA] makes it much more difficult for securities plaintiffs to get past a motion to dismiss."); *Theriault*, 51 A.3d at 1256 (complexity of the case "supports a substantial award of attorneys' fees").

Here, Plaintiffs' Counsel are among the most experienced and skilled practitioners in the corporate and securities litigation fields, and the firms have long and successful track records in derivative and securities cases throughout the country, including within this Circuit. Indeed, Co-Lead Counsel has tried a major antitrust case before this Court and obtained a substantial recovery. *See In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Antitrust Litig.*, No. 4:14-MD-02541 (N.D. Cal. Dec. 6, 2017) (Order). Plaintiffs' Counsel's reputation as experienced counsel in complex cases, facilitated Plaintiffs' Counsel's ability to negotiate the Settlement.

Plaintiffs' Counsel's persistent work is directly responsible for the historic Settlement. Plaintiffs' Counsel thoroughly investigated the claims, which included demands for relevant documents pursuant to Section 220 of the Delaware General Corporation Law. Plaintiffs' Counsel pleaded those claims in highly detailed complaints, then opposed in briefs and in oral arguments Defendants' motions to dismiss the complaints. Plaintiffs' Counsel engaged extensively in discovery, including serving and responding to document requests and interrogatories, and serving subpoenas on third-parties, and combatted Defendants on numerous discovery disputes. In fact, more than one million pages of documents were produced; the parties exchanged dozens of letters and had dozens

1   of (formal and informal) meet-and-confer calls; and on, at least, five occasions, Plaintiffs served

2   Defendants with their portion of a joint discovery letter, only for the issues to be mooted before the

3   letter was filed.

4        Plaintiffs' Counsel also performed extensive work in successfully opposing the SLC's motion

5   for a stay of proceedings. Plaintiffs' Counsel worked with an expert to develop the corporate

6   governance reforms which became an integral part of the Settlement. Finally, Plaintiffs' Counsel

7   engaged in vigorous, arm's-length settlement negotiations, including three separate mediations

8   sessions with three experienced mediators. ¶ 96. The mediation sessions were attended by over 100

9   participants and involved extensive presentations by Plaintiffs and Defendants analyzing the legal

10  and factual nuances of the case in depth. Plaintiffs' Counsel also attended three lengthy in-person

11  meetings with Defendants to negotiate the corporate governance portion of the Settlement.

12       As set forth above, Delaware Courts frequently award 25 percent in legal fees in a successful

13  contingent fee case. In *In re Emerson Radio Shareholder Derivative Litigation*, No. C.A. 3392–VCL,

14  2011 WL 1135006, at *3 (Del. Ch. Mar. 28, 2011), the Court noted that the median attorneys' fee

15  award in Delaware is 25 percent, citing Richard A. Rosen, David C. McBride & Danielle Gibbs,

16  *Settlement Agreements in Commercial Disputes: Negotiating, Drafting and Enforcement* § 27. 10, at

17  27–100 (2010)).  Delaware courts frequently award greater than 25 percent when the case is litigated

18  deeply. *See Emerson*, 2011 WL 1135006 at *6-7 (awarded 29 percent of the cash recovery and

19  valuing therapeutic benefits of the settlement); *Berger*, 2010 WL 2573881 at *1 (awarded 26% in

20  fees and expenses where "lengthy and thorough litigation by counsel . . . resulted in a final judgment

21  and not a quick settlement"); *Ryan,* 2009 WL 18143 at *5 (awarding 33% of cash amount where

22  plaintiffs' counsel engaged in "meaningful discovery" and survived "significant, hard fought motion

23  practice"); *In re Starz S'holder Litig.,* C.A. No. 12584-VCG, at ¶ 12 (Del. Ch. Dec. 10, 2018)

24  (Order) (awarding 30% of a $92.5 million settlement).

25       Plaintiffs' Counsel's extensive efforts and skill leading to the Settlement strongly support the

26  requested percentage fee.

27       The quality and vigor of opposing counsel are also important in evaluating the caliber of

28  Plaintiffs' Counsel's work. *See, e.g., In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1337

1   (C.D. Cal. 1977) ("plaintiffs' attorneys in this class action have been up against established and

2   skillful defense lawyers, and should be compensated accordingly"); *Theriault*, 51 A.3d at 1256

3   (noting Plaintiffs faced off "against major league, first-rate legal talent"). McKesson and Defendants

4   are each represented by highly experienced and prestigious counsel, who vigorously represented

5   their clients. ¶ 97; Mediators' Decl. ¶ 18. McKesson was represented by Morrison & Foerster LLP;

6   the outside directors by Orrick, Herrington & Sutcliffe LLP; former officers by Munger Tolles &

7   Olson LLP and Kane+Kimball LLP; and the SLC by Wilkinson, Walsh + Eskovitz. The fact that

8   Plaintiffs' Counsel achieved this excellent Settlement in the face of this formidable legal opposition

9   further evidences the quality of its work.

10       **5.      The Reaction of the Stockholders to Date Supports the Fee Request**

11       Although it is not a *Sugarland* factor, the stockholders' reaction to a proposed settlement and

12   fee request is a relevant factor in approving fees. *See Knight v. Red Door Salons, Inc.*, No. 3:08-CV-

13   01520, 2009 WL 248367, at *7 (N.D. Cal. Feb. 2, 2009); *Omnivision*, 559 F. Supp. 2d at 1048. Here,

14   the Notice of Pendency and Proposed Settlement of Stockholder Derivative Actions ("the Notice")

15   was provided to stockholders. *See* Declaration of David J. Wiener Regarding Dissemination of

16   Notice Pursuant to Order Granting Preliminary Approval of Settlement, ECF No. 220 ¶¶ 1-4. In

17   addition, the Summary Notice was published in *The New York Times* and transmitted over the *PR*

18   *Newswire* on February 7, 2020, and posted on McKesson's website. *Id.* ¶ 4. The Notice informed

19   McKesson stockholders that Plaintiffs' Counsel would seek fees of 25 percent of the Cash

20   Settlement, which is $43,750,000, plus expenses of up to $600,000. *Id.* at Exhibit 1, ECF No. 220-1

21   at page 16. The Notice further informed McKesson stockholders of their right to object to the request

22   for attorneys' fees and expenses. While the deadline for filing any objections is not until March 31,

23   2020, to date, no stockholder has filed an objection to the fees and expenses requested. ¶ 103.

24       **6.      The Fee Request is Supported by Plaintiffs**

25       Each of the Plaintiffs supports the Settlement, and the fee and expense request. While not

26   required, the Plaintiffs in this Action each filed declarations with this Court in support of the

27   Settlement, and the fee and expense request.

28

1    While this is a derivative action and not a securities class action, it must be noted that two of

2    the Plaintiffs—Amalgamated Bank and Detroit—are institutional investors, precisely the type of

3    financially interested plaintiffs that Congress sought to encourage to play an active role in securities

4    litigation by enacting the PSLRA. The PSLRA was intended to encourage institutional investors to

5    assume control of securities class actions in order to "increase the likelihood that parties with

6    significant holdings in issuers, whose interests are more strongly aligned with the class of

7    shareholders, will participate in the litigation and exercise control over the selection and actions of

8    plaintiff's counsel." H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731

9    (1995).

10    In their role as fiduciaries, Plaintiffs have closely supervised, monitored, and actively

11    participated in the prosecution and settlement of the Action. *See* Kathrein-Farmer Decl., Exs. J

12    through N. Based on their direct observation of the high quality of work performed by Plaintiffs'

13    Counsel throughout this litigation, Plaintiffs believe that the requested fee is reasonable in light of

14    the substantial recovery in the Action, the work counsel performed, and the risks of the litigation. *Id.*

15    Accordingly, Plaintiffs' endorsement of the fee request in this derivative action supports its approval.

16    *See, e.g., In re Veeco Instruments Inc. Sec. Litig.*, No. 1:05-md-01695-CM-GAY, 2007 WL 4115808,

17    at *8 (S.D.N.Y. Nov. 7, 2007) ("public policy considerations support the award in this case because

18    the Lead Plaintiff . . .—a large public pension fund—conscientiously supervised the work of lead

19    counsel and has approved the fee request"); *In re Lucent Tech., Inc. Sec. Litig.*, 327 F. Supp. 2d 426,

20    442 (D.N.J. 2004) ("Significantly, the Lead Plaintiffs, both of whom are institutional investors with

21    great financial stakes in the outcome of the litigation, have reviewed and approved Lead Counsel's

22    fees and expenses request.").

23    **C.    Plaintiffs' Counsel's Expenses are Reasonable and Should be Approved**

24    Plaintiffs' Counsel also requests that the Court grant its application for reimbursement of its

25    litigation expenses incurred in prosecuting and resolving this litigation. ¶¶ 87, 100, 103. Expenses are

26    reimbursable in a common-fund case where they are of the type typically billed by attorneys to

27    paying clients in the marketplace. *See, e.g., Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)

28    (plaintiff may recover "those out-of-pocket expenses that 'would normally be charged to a fee paying

1   client'"); *Omnivision*, 559 F. Supp. 2d at 1048 ("Attorneys may recover their reasonable expenses

2   that would typically be billed to paying clients in non-contingency matters.").

3          From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover

4   any of their expenses and would not recover anything unless and until the Action was successfully

5   resolved. Plaintiffs' Counsel also understood that, even assuming the case was ultimately successful,

6   an award of expenses would not compensate for the lost use of the funds advanced to prosecute this

7   Action. Thus, Plaintiffs' Counsel were motivated to take significant steps to minimize expenses

8   whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action. ¶

9   101.

10         As discussed in detail in the Kathrein-Farmer Declaration, Plaintiffs' Counsel incurred

11  $421,223.91 in litigation expenses in litigating the Action. ¶ 100. The litigation expenses were

12  reasonable and necessary for the prosecution and resolution of the litigation and are of the type

13  routinely charged to hourly paying clients. These include mediator fees, expert fees, document-

14  management costs, online research, service of process expenses, out-of-town travel expenses, court

15  fees, copying costs, and postage expenses. A complete breakdown by category of the expenses

16  incurred by Plaintiffs' Counsel is presented in Paragraph 100 of the Kathrein-Farmer Declaration.

17  These expense items are incurred separately by Plaintiffs' Counsel and are not duplicated in the

18  firms' rates.

19         The Notice provided to stockholders informed them that Plaintiffs' Counsel intends to apply

20  for the reimbursement of litigation expenses up to $600,000. The amount of expenses now sought by

21  Lead Counsel is $421,223.91. The deadline for objecting to the fee and expense application is March

22  31, 2020. To date, there have been no objections to the request for attorneys' fees and litigation

23  expenses.

### III.     CONCLUSION

25         The Court should approve the fee and expense application (i) awarding Plaintiffs' Counsel 25

26  percent of the Settlement Fund ($43,750,000.00) in fees, and (ii) awarding $421,223.91 for

27  Plaintiffs' Counsel's litigation expenses.

28

1   Date: March 17, 2020                    Respectfully submitted,

2                                           HAGENS BERMAN SOBOL SHAPIRO LLP

3                                           By: */s/ Reed R. Kathrein*
4                                           Reed R. Kathrein (139304)
                                            715 Hearst Avenue, Suite 202
5                                           Berkeley, CA  94710
                                            Telephone: (510) 725-3000
6                                           Facsimile: (510) 725-3001
                                            reed@hbsslaw.com
7
8                                           Steve W. Berman (admitted *Pro Hac Vice*)
                                            Ronnie S. Spiegel (admitted *Pro Hac Vice*)
9                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                            1301 Second Avenue, Suite 2000
10                                          Seattle, WA  98101
                                            Telephone: (206) 623-7292
11                                          Facsimile: (206) 623-0594
                                            steve@hbsslaw.com
12                                          ronnie@hbsslaw.com
13
                                            James S. Notis (admitted *Pro Hac Vice*)
14                                          Meagan Farmer (admitted *Pro Hac Vice*)
                                            GARDY & NOTIS, LLP
15                                          Tower 56
                                            126 East 56th Street, 8th Floor
16                                          New York, NY  10022
                                            Telephone: (212) 905-0509
17                                          Facsimile: (212) 905-0508
                                            jnotis@gardylaw.com
18                                          mfarmer@gardylaw.com
19
20                                          *Co-Lead Counsel for Plaintiffs*

21                                          Jeffrey C. Block (*Pro Hac Vice* forthcoming)
                                            Joel Fleming (281264)
22                                          BLOCK & LEVITON LLP
                                            260 Franklin Street, Suite 1860
23                                          Boston, MA  02110
                                            Telephone: (617) 398-5600
24                                          Facsimile: (617) 507-6020
                                            jeff@blockesq.com
25                                          joel@blockesq.com
26
27                                          *Counsel for Plaintiffs*

28                                          Jonathan D. Uslaner (256898)

MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIG. EXPENSES                    - 24
Case No.: 4:17-cv-01850-CW
010688-11/1248354 V1

1
    BERNSTEIN LITOWITZ BERGER & GROSSMAN
    LLP
2
    2121 Avenue of the Starts, Suite 2575
    Los Angeles, CA  90067
3
    Telephone: (310) 819-3472
    jonathanu@blbglaw.com
4

5
    David Wales (admitted *Pro Hac Vice*)
    Mark Lebovitch (*Pro Hac Vice* forthcoming)
6
    1251 Avenue of the Americas
    New York, NY  10020
7
    Telephone: (212) 554-1400
    Facsimile: (212) 554-1444
8
    davidw@blbglaw.com
    markl@blbglaw.com
9

10
    Christine M. Mackintosh (admitted *Pro Hac Vice*)
    Kim Evans (admitted *Pro Hac Vice*)
11
    GRANT & EISENHOFER P.A.
12
    123 Justison Street
    Wilmington, DE  19801
13
    Telephone: (302) 622-7081
    Facsimile: (302) 622-7100
14
    cmackintosh@gelaw.com
    kevans@gelaw.com
15

16
    *Counsel for Intervening Plaintiffs Amalgamated Bank,*
    *as Trustee for Longview Largecap 500 Index Fund and*
17
    *Longview Largecap 500 Index VEBA Fund*

18
    Christine M. Mackintosh (admitted *Pro Hac Vice*)
    Kim Evans (admitted *Pro Hac Vice*)
19
    GRANT & EISENHOFER P.A.
20
    123 Justison Street
    Wilmington, DE  19801
21
    Telephone: (302) 622-7081
    Facsimile: (302) 622-7100
22
    cmackintosh@gelaw.com
    kevans@gelaw.com
23

24
    David L. Wales (admitted *Pro Hac Vice*)
    BERNSTEIN LITOWITZ BERGER
25
       & GROSSMANN LLP
26
    1251 Avenue of the Americas
    New York, NY  10020
27
    Telephone: (212) 554-1400
    Facsimile: (212) 554-1444
28
    davidw@blbglaw.com

1

2                                 Jonathan D. Uslaner (256898)
BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP

3                                 12481 High Bluff Drive, Suite 300

4                                 San Diego, CA  92130
Telephone: (858) 793-0070

5                                 Facsimile: (858) 793-0323
jonathanu@blbglaw.com

6

7                                 *Counsel for Intervening Plaintiff Michael Berent,
Trustee, on behalf of Police & Fire Retirement System

8                                 City of Detroit*

9                                 Hung G. Ta (admitted *Pro Hac Vice*)
JooYun Kim

10                               Natalia D. Williams
HGT LAW

11                               250 Park Avenue, 7th Floor

12                               New York, NY  10177
Telephone: (646) 453-7288

13                               Facsimile: (646) 453-7289

14                               hta@hgtlaw.com
jooyun@hgtlaw.com

15                               natalia@hgtlaw.com

16                               Peter Safirstein (admitted *Pro Hac Vice*)
Elizabeth S. Metcalf

17                               SAFIRSTEIN METCALF LLP

18                               The Empire State Building
350 Fifth Avenue, 59th Floor

19                               New York, NY  10118
Telephone: (212) 201-2855

20                               Facsimile: (212) 201-2858

21                               psafirstein@safirsteinmetcalf.com
emetcalf@safirsteinmetcalf.com

22

23                               *Counsel for Intervening Plaintiff Chaile Steinberg*

24

25

26

27

28